1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5   THUNDER STUDIOS, INC.; RODRIC    )
    DAVID,                           )
6                                    )
               PLAINTIFFS,           )
7                                    )
           vs.                       ) No. CV 17-0871-AB
8                                    )
    CHARIF KAZAL; TONY KAZAL;        )
9   ADAM KAZAL; AND DOES 1 TO 100,   )
    INCLUSIVE,                       )
10                                   )
               DEFENDANTS.           )
11  _____ )

12

13

14          REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            THURSDAY, DECEMBER 6, 2018

16                   9:19 A.M.

17             LOS ANGELES, CALIFORNIA

18        Day 2 of Jury Trial, A.M. Session

19

20

21

22  _____

23          **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
             FEDERAL OFFICIAL COURT REPORTER
24           350 WEST FIRST STREET, ROOM 4311
             LOS ANGELES, CALIFORNIA 90012
25               cmjui.csr@gmail.com

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFFS:

 3           LAW OFFICES OF SETH W. WIENER
             BY:  SETH W. WIENER, ATTORNEY AT LAW
 4           609 KARINA COURT
             SAN RAMON, CALIFORNIA 94582
 5           (925) 487-5607

 6               -and-

 7           SYVERSON, LESOWITZ & GEBELIN
             BY:  STEVEN GEBELIN, ATTORNEY AT LAW
 8           8383 WILSHIRE BOULEVARD, SUITE 520
             BEVERLY HILLS, CALIFORNIA 90211
 9           (310) 341-3072

10
     FOR THE DEFENDANTS:
11
             THE TAYLOR LAW FIRM
12           BY:  BENJAMIN TAYLOR, ATTORNEY AT LAW
             AND DIANE BANI-ESRAILI, ATTORNEY AT LAW
13           1880 CENTURY PARK EAST, SUITE 714
             LOS ANGELES, CALIFORNIA 90067
14           (310) 201-7600

15

16

17

18

19

20

21

22

23

24

25
```

<u>I N D E X</u>

<u>DECEMBER 6, 2018</u>

PLAINTIFFS'
WITNESSES                                              PAGE

RODRIC DAVID (THE PLAINTIFF RESUMED)
    CROSS-EXAMINATION BY MR. TAYLOR (RESUMED)      11
    REDIRECT EXAMINATION BY MR. WIENER            114
    RECROSS-EXAMINATION BY MR. TAYLOR             126

<u>EXHIBITS</u>

| TRIAL EXHIBITS | MARKED | ADMITTED | NOT ADMIT |
|---|---|---|---|
| 5 | | 119 | |
| 20 | | 122 | |
| 42 | | | 16 |

```
 1            LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 6, 2018

 2                            9:19 A.M.

 3                              - - -

 4         (The following was heard in open court outside the

 5          presence of the jury:)

 6              THE CLERK:  Calling CV 17-0871-AB, Thunder

 7    Studios, Inc., versus Charif Kazal, et al., jury trial,

 8    Day 2.

 9              Counsel, please state your appearances.

10              MR. WIENER:  Good morning, Your Honor.

11    Seth Wiener for plaintiffs.

12              THE COURT:  Good morning.

13              MR. TAYLOR:  Good morning, Your Honor.  Steven

14    Gebelin, also on behalf of plaintiffs.

15              THE COURT:  Good morning.

16              MR. TAYLOR:  And good morning, Your Honor.

17    Benjamin Taylor on behalf of the defendants.

18              MS. BANI-ESRAILI:  Good morning, Your Honor.

19    Diane Bani-Esraili for the defendant.

20              THE COURT:  Good morning to you all.

21              All right.  So I understand there's an issue with

22    respect to a witness.  I don't know which side wants to

23    discuss further.

24              MR. WIENER:  Yes, Your Honor.  Seth Wiener for

25    plaintiffs.
```

```
 1            The issue is a witness named Michael Hammond, who
 2   is situated in Sydney, Australia.  We'd originally planned
 3   to have him testify on Wednesday; he made travel
 4   arrangements contingent on that, and as the Court's aware,
 5   Wednesday was the day of mourning.
 6            Mr. Hammond was unable to get a ticket for today
 7   and also was unable to get released from work.  He is a DJ
 8   on the air today.  So we're asking that he be taken out of
 9   turn on Friday.  His testimony is anticipated to be about 30
10   minutes at most.
11            THE COURT:  You said tomorrow?
12            MR. WIENER:  No, on Monday.
13            THE COURT:  Okay.  Let me make sure I understand.
14   So he can be here Monday?
15            MR. WIENER:  Correct.
16            THE COURT:  And you're asking to have him be taken
17   out of turn.  I'm not sure.  What do you mean by that?  Do
18   you anticipate your case will be done today?
19            MR. WIENER:  Plaintiffs expect that our case will
20   be closed today with the exception of Mr. Hammond.
21            THE COURT:  Okay.  Is there any objection to that
22   proposal?
23            MR. TAYLOR:  We would object, Your Honor, for a
24   few reasons.  Your Honor, obviously, the national day of
25   mourning was beyond all of our control, but, based on the
```

```
 1   representations by counsel on Tuesday about what he intended

 2   to do today, we made arrangements not only for my client to

 3   change his flight from the weekend to Tuesday, which cost

 4   him a lot of money -- obviously, an extra hotel and change

 5   fees -- but for the third-party witnesses we intended to

 6   call today to come on Monday.  So it creates problems in

 7   terms of cost and timing and scheduling from our

 8   perspective.

 9            THE COURT:  Okay.  Help me understand that a

10   little clearer.

11            You are saying that Mr. Kazal has now agreed to

12   stay till next week?

13            MR. TAYLOR:  Right.  If Your Honor recalls, there

14   was an issue about calling him out of turn --

15            THE COURT:  Right.

16            MR. TAYLOR:  -- I said I had to speak with him.

17   We talked after court adjourned on Tuesday, and he was able

18   to arrange to change his ticket.  You know, it's not

19   necessarily a given.  So he was able to make that

20   arrangement.

21            It cost him a significant amount of money, and he

22   has to now stay in a hotel three extra nights.  And so that

23   was all done based on the assumption he wouldn't

24   be called -- you know, he wouldn't be called out of order

25   because he could now stay until Monday.  Now counsel is
```

```
 1    saying, well, we have to call our witness out of order.
 2              It just creates problems for our scheduling
 3    because I've also told the other witnesses I intend to call
 4    that they're not going to be needed today because I had
 5    assumed Mr. Hammond would also be testifying and that we
 6    would be able to read in the deposition transcripts into the
 7    record today.
 8              THE COURT:  Okay.  So let me -- who do you intend
 9    on calling today, Mr. Wiener?  You are going to continue
10    with Mr. David?
11              MR. WIENER:  Right.
12              THE COURT:  And then who else?
13              MR. WIENER:  It will be Paul Kolesa.  His
14    testimony is anticipated, I believe, to be 30 minutes to one
15    hour, then the wife of Rodric David, Elizabeth David.  Her
16    testimony is expected to be about 45 minutes.
17              THE COURT:  Okay.  And then after that you're
18    going to rest with the -- well, then it would be Mr. Hammond
19    if he was here.
20              MR. WIENER:  Correct --
21              THE COURT:  Hold on one second.
22              MR. WIENER:  Yeah.  Mr. Taylor and I would likely
23    use the two depo transcripts as a gap filler, and they're
24    estimated to be about 30 minutes.
25              THE COURT:  Okay.  So then we'll go with
```

```
 1    Mr. David, Mrs. David, depo testimony, and then that would
 2    be it for today.
 3              MR. WIENER:  Yeah.  And also Mr. Kolesa.
 4              THE COURT:  I'm sorry.  Mr. Kolesa as well.  Okay.
 5    That would be it for today.  And then on Monday you would
 6    call, based on your proposal, Mr. Hammond -- correct? --
 7    Mr. Wiener?
 8              MR. WIENER:  Yes, that's correct.
 9              THE COURT:  And then you would begin your case.
10    And who do you anticipate calling, if you care to share at
11    this time?
12              MR. TAYLOR:  Of course, Your Honor.  Mr. Kazal.
13              THE COURT:  Right.
14              MR. TAYLOR:  And between his direct and cross, it
15    could be a few hours.  And then I guess we'll be able to
16    read in the deposition transcripts of the other
17    defendants -- Tony and Adam, today.  That would take care of
18    their testimony, I suppose.
19              Then we have two other third-party witnesses,
20    Mr. Woodward and Mr. Parlata, who I told would likely not
21    have to come in today because they would be here all day and
22    not testify based on what happened Tuesday.  So that's the
23    plan for us.
24              THE COURT:  Okay.  The reason why I ask all these
25    questions is I'm not sure I see what the issue is.  If we go
```

1    with Kolesa, Mr. and Mrs. David, and deposition transcript,

2    maybe we'll end early.  I'm not happy about that, but it is

3    what it is given the change in schedule because of the day

4    of mourning.

5           If we end today with that and then on Monday we

6    resume with Mr. Kazal and the other witnesses and

7    Mr. Hammond, where is the prejudice to you as it relates to

8    calling Mr. Hammond out of order?

9           MR. TAYLOR:  Well, I don't suppose there's actual

10   prejudice, Your Honor.  It's just counsel made certain

11   representations.  His witness would have been here already;

12   so he could have stayed a second day, and now he can't be

13   here until Monday.

14          So it creates a certain consternation, at the very

15   least, that my client rearranged his whole schedule and

16   incurred a lot of fees and costs based on what counsel

17   represented Tuesday and now further changes --

18          THE COURT:  Okay.

19          MR. TAYLOR:  That's the extent of it, Your Honor.

20          THE COURT:  All right.  Look.  In the interest of

21   time so we can get this trial moving, your objection is

22   noted but overruled.  We've got witnesses coming from all

23   over the country.  I apologize.  It's an inconvenience to

24   you, but the reality of it is we've got to get this case to

25   the jury, and I want to do whatever we can to get that to a

1    jury.

2              So is there anything further that we need to

3    discuss this morning?

4              MR. TAYLOR:  I don't believe so, Your Honor.

5              MR. WIENER:  No, Your Honor.

6              THE COURT:  So, then, let me just confer with my

7    courtroom deputy.

8              So let's bring in the jury.

9              And Mr. David, you can resume the witness stand.

10   So we can resume your testimony.

11             And, Counsel, just -- I don't know.  I guess there

12   are some depo transcripts on the screen.  So if it's on my

13   screen, it's presumably on the screen of the jurors as well.

14   So please keep that in mind.  You may need to unplug it from

15   the connection because it's on their screen right now.

16             MR. GEBELIN:  I can see it.  I am trying to make

17   sure that that screen is separate and will be blank when we

18   don't have an exhibit up.

19             THE COURT:  Okay.

20             MR. GEBELIN:  Take me about two seconds to do it.

21   And if they start coming out before I'm done, I'm going to

22   unplug it.

23             THE COURT:  All right.  Perfect.

24        (The following was heard in open court in the presence

25         of the jury:)

```
 1              THE COURT:  Good morning, ladies and gentlemen.
 2   Thank you for braving the weather this morning.  I
 3   appreciate it.  We are ready to resume.
 4              We were -- I believe, Mr. Taylor, you were doing
 5   cross-examination.  You may continue.
 6              MR. TAYLOR:  Thank you, Your Honor.
 7                        RODRIC DAVID,
 8     the Plaintiff herein, recalled as a witness on his own
 9                           behalf,
10              having been previously duly sworn,
11                 testified further as follows:
12                 CROSS-EXAMINATION (RESUMED)
13   BY MR. TAYLOR:
14   Q    Good morning, Mr. David.
15   A    Good morning.
16   Q    You understand that you're still under oath?
17   A    I do.
18   Q    Now, you testified on Tuesday that the Cayman Islands
19   Court reversed the conversion of debt to equity in Emergent
20   Capital; correct?
21   A    It did.
22   Q    And that was in 2011?
23   A    It may have been early 2012 but late '11, early '12,
24   around there.
25              MR. TAYLOR:  I'm sorry, Your Honor.  I don't know
```

```
 1   if it's the microphone.  I can't hear the --
 2            THE WITNESS:  Sorry.
 3            I am not specifically sure.  Late '11, early '12.
 4   BY MR. TAYLOR:
 5   Q    And the debt conversion was about $49,900; is that
 6   right?
 7   A    I don't recall the specifics.  I don't know.  I don't
 8   recall.
 9   Q    But the board of directors vote that was at issue
10   converted the debt -- whatever it was -- to equity,
11   50 percent equity, in a company that was worth about
12   $25 million; right?
13   A    That's incorrect, no.
14   Q    Which part of that is wrong?
15   A    The valuation of the company at the time.
16   Q    Well, didn't the company sell for about $25 million in
17   2011?
18   A    I don't recall the date of the sale.  The conversion of
19   debt to equity was done actually in 2010 prior to the
20   finality of the lawsuit regarding than subsidiary business.
21   The auditor's report we had received in 2010 --
22            THE REPORTER:  Please repeat that.
23            THE WITNESS:  Oh, auditor's report.
24            The auditor's report we had received
25   contemporaneously at that time suggested that the value of
```

```
 1   the company was nil at that time.
 2   BY MR. TAYLOR:
 3   Q    When you say "the company," you mean Emergent Capital?
 4   A    No, the subsidiary company.  It was specific to Global
 5   Renewables in Australia.
 6   Q    The report said the value of Global Renewables was nil
 7   at the time?
 8   A    Yes.
 9   Q    But didn't you testify Tuesday that it sold for
10   $25 million in 2011 to Iron Bridge?
11   A    Yeah.  So we were talking about the audit trial that
12   was done by the -- I can't remember the auditors at the
13   time -- that the audit that was done -- I believe it was
14   2010.  So it was 18 months to two years prior, and in
15   between that there was a judgment in a lawsuit between
16   Global Renewables Australia and the New South Wales
17   government that was --
18              THE REPORTER:  Please repeat that.
19              THE WITNESS:  New South Wales government that made
20   the business viable.  Up to that point, it was losing
21   significant amounts of money.  Sorry.
22   BY MR. TAYLOR:
23   Q    Well, the Court order in the Cayman Islands -- whether
24   it was issued in 2011 or 2012 -- you read that Court order;
25   right?  At the time?
```

```
 1    A    Contemporaneously at the time, yes.
 2    Q    Now, in its order the Court -- the Cayman Court in its
 3    order concluded that, as a director, you had breached your
 4    fiduciary duties to the company, to ECL; isn't that true?
 5    A    In the liquidation hearing, there was an adverse
 6    finding that the directors, plural, made a breach of
 7    fiduciary duty because the judge thought we should have
 8    considered a rights issue instead, but there was no
 9    testimony specific to that issue because it was a
10    liquidation hearing.
11    Q    And you were one of the directors; correct?
12    A    Yes, I was.
13    Q    Now, you also testified on Tuesday about the ICAC
14    inquiry and that you learned about it after being subpoenaed
15    in 2011.
16         Do you recall that testimony?
17    A    Yes.
18    Q    So you had not been in contact with anyone relating to
19    the ICAC inquiry before receiving the subpoena in 2011?
20    A    Certainly not in regards to the ICAC, no.
21    Q    I'm not sure I understand what you're saying.  It's a
22    yes or no question.
23    A    Well, I was -- I was aware of an ICAC inquiry through
24    research online.  It was a newspaper article -- I want to
25    say 2010 -- that there was an ICAC inquiry on the Kazals'
```

1  leases and the Rocks.   So I am aware of that one as a

2  separate issue.

3  Q    Well, isn't that the same inquiry that we're talking

4  about?

5  A    No, no, they're two different -- two specifically

6  different inquiries.

7  Q    Well, however many inquiries there were, you are aware

8  that Mr. Kazal was never charged with any crime by the

9  prosecutor in connection with any ICAC inquiry, are you not?

10 A    I am aware that the ICAC submitted to the Department of

11 Prosecutions in Australia -- I think it's called the

12 Department of Public Prosecutions.   That's the legal body

13 that prosecutes criminal activity.

14         The ICAC is a commission that is independent that

15 makes -- it's not a -- it's not a -- it doesn't have

16 legislative power to make a criminal conviction.   They

17 didn't make recommendations to the Department of Public

18 Prosecutions of what they should do.

19 Q    Right.   And the DPP, the Department of Public

20 Prosecutions, declined to prosecute Mr. Kazal; right?

21 A    Yes, it did.

22         THE COURT:  Mr. David, do me a favor.  Just bring

23 the mic a little closer to you, if you wouldn't mind.

24         THE WITNESS:  I apologize.  Is that better?

25         THE COURT:  Yes.  Thank you.

1   BY MR. TAYLOR:

2   Q    Now, there was a little bit of testimony on Tuesday

3   about a June 2017 report by the inspector of ICAC.  Do you

4   recall that?

5   A    Yes.

6   Q    You at some point, obviously, after it came out

7   publicly, you've seen that report; right?

8   A    I am aware of it.  I have seen it, but I haven't read

9   it in depth.

10  Q    I will ask you to turn to Exhibit 42 in the binder in

11  front of you.

12          Is this the report that we are referring to?

13  A    I believe it is.

14          MR. TAYLOR:  Your Honor, I would like to move

15  Exhibit 42 into evidence.

16          THE COURT:  Any objection?

17          MR. WIENER:  No objection, Your Honor.

18          THE COURT:  All right.  Forty-two will be

19  admitted.

20      (Trial Exhibit 42 was admitted into evidence.)

21  BY MR. TAYLOR:

22  Q    If you could turn to page 40 of the report.  It's Bates

23  labeled Kazal 00159.

24  A    Yes.

25  Q    If you could read paragraph 155 out loud, please.

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A     I'm sorry?

 2   Q     Read paragraph 155.

 3   A     "Having made the finding of corrupt conduct, the

 4   Commission came to a view there was insufficient admissible

 5   evidence available to prosecute Charif Kazal and, therefore,

 6   declined to refer the question of whether Charif Kazal

 7   should be charged the DPP for its advice."

 8   Q     That's consistent with what you just testified a moment

 9   ago -- right? -- that Mr. Kazal was never prosecuted for any

10   crime?

11   A     Yes.

12   Q     And if you could look at the first sentence of

13   paragraph 156.

14   A     Yes.

15   Q     If you could read that sentence as well.

16   A     Just the first?

17   Q     Yes.

18   A     "The consequence of that course is that Charif Kazal

19   will never have the opportunity to clear his name.

20   Q     Now, when this report was issued, did you read that

21   statement in this report?

22   A     No, I've only read the executive summary.

23   Q     If you could turn to the following page, page 49.

24         THE COURT:  Are you talking about Kazal 160?

25         MR. TAYLOR:  Yes.  I'm sorry, Your Honor.  Yes,
```

```
 1    it's labeled Kazal 160 at the bottom.
 2    Q    If you could just read the highlighted portion on the
 3    screen of paragraph 157.
 4    A    It's not highlighted in my book.
 5    Q    That's why I am directing you to the screen.
 6         Do you see it on the screen in front of you?
 7    A    I do.  Yes.  I'll read it.  I know what section you
 8    mean.
 9    Q    Okay.
10    A    "That finding having been made, however, leaves
11    Charif Kazal with a stain upon his honor, reputation, and
12    his right to be considered as a person of good character
13    with no means of law being able to retrieve or recapture
14    those qualities through recourse to the law or to have the
15    findings of the Commission expunged from the records of ICAC
16    and its publishings on the Internet.  It had impacted upon
17    his presumption of innocence.  To the extent that it
18    interferes with his interest in retaining his presumption of
19    innocence, it may be a breach of Articles 11 and/or 12 of
20    the Universal Declaration of Human Rights."
21    Q    Prior to today have you seen this paragraph in the
22    report?
23    A    No.
24    Q    Do you have any reason to disagree with what its says
25    here?
```

```
 1   A    I am just reading straight out of the report.  I've got
 2   no reason to disagree with what I just read.
 3   Q    If you could turn back one page to page 39, Kazal 158.
 4   If you could just read paragraph 150.
 5   A    "It is also worth noting that many of the propositions
 6   contained in the list above, although legitimate findings
 7   made by the Commission, were in respect of matters very much
 8   in issue between Kelly on the one hand and the Commission on
 9   the other and Kazal on the one hand and the Commission on
10   the other.  They appear to rely heavily upon the
11   Commission's acceptance of David's evidence."
12   Q    Have you ever seen this paragraph prior to today?
13   A    No, I have not.
14   Q    Was it your understanding that the Commission relied
15   heavily upon your evidence in reaching its conclusions?
16   A    No.
17   Q    Do you think that's an incorrect statement?
18   A    No, I'm just not the ICAC.
19   Q    I'm sorry?
20   A    I'm just not the ICAC.
21   Q    Now, you recall, Mr. David, that you gave a deposition
22   in this case about six weeks ago?
23   A    With you, yes.
24   Q    Yes.
25        And your attorney was present with you at the
```

```
 1   deposition?
 2   A     Mr. Wiener, yes.
 3   Q     Yes.
 4             And the deposition was given under oath in front
 5   of a court reporter; right?
 6   A     Yes.
 7   Q     And you testified truthfully at your deposition, did
 8   you not?
 9   A     I did.
10   Q     You are familiar with a Website called
11   kazalfamilystory.com?
12   A     Yes.
13   Q     And when did you first learn of its existence?
14   A     In the year of 2013.
15   Q     How is it that you learned of this Website?
16   A     I honestly don't recall specifically how I learned
17   about it.
18   Q     Now, when you first went to the Website, do you recall
19   what you observed there?
20   A     It had a series of pages.  It was a banner on the top,
21   and it had a series of articles written by -- authored by
22   Mr. Kazal stepping through a whole series of allegations
23   against me.
24   Q     When you say "by Mr. Kazal," you mean Charif Kazal?
25   A     I believe so.  Well, yes, Mr. Charif Kazal, yes.
```

```
 1    Q    And when you first went to the Website, did you observe
 2    that there were any photographs on the site, or was it just
 3    words?
 4    A    No.  Graphics.
 5    Q    What do you mean by that?
 6    A    I don't know whether there were screenshots admitted
 7    into evidence, but I recall there was a sign -- like a
 8    freeway sign from Los Angeles, and there was a headline like
 9    "I fled to America."
10         There was someone chasing after a chicken.  There
11    was a bloody handprint graphic.  There was some other stock
12    graphics.  There was a big banner in red, said "Warning"
13    with -- included a photo of myself and said "Warning, the
14    corporate thief."  It was primarily lots of graphics like
15    that.
16    Q    So the first time you went to the site you saw a
17    photograph of yourself there; right?
18    A    I did.  I believe the photo came from one of the
19    articles in the Sydney Morning Herald from 2010.
20    Q    At some point did you visit the site and see additional
21    photos of yourself there?
22    A    I did, yes.
23    Q    When was that?
24    A    The site went through a few evolutions.  I believe the
25    wire frame was changed of the Website into a WordPress site,
```

1  and I want to say that occurred in early 2016, and then it

2  evolved.

3            And in late '16, it wire framed again and then had

4  a series of chapters with people's names:  Myself;

5  David Singh; Linton Besser, one of the journalists.  There

6  was another journalist -- what was his name?  Baker, I

7  think.

8            And so those were all, like, clicks you would --

9  like thumbnails, and if you click on those, then the e-mails

10  that I had been sent by Charif Kazal and Tony Kazal would

11  come up like in a mini window, and it would have a

12  photographic -- a headline, and it would want you to click

13  on that to open up the full page to read it in totality.

14  That's when I noticed the -- the first time the use of our

15  copyrighted images.

16  Q    And you don't know who posted them to the Website;

17  isn't that true?

18  A    No, I don't know.

19  Q    In fact, you don't know who posted any of the photos to

20  that Website; isn't that right?

21  A    No, I don't know.

22  Q    And you don't know how whoever posted them to the

23  Website obtained those photos, do you?

24  A    No, I don't know.

25  Q    Now, I asked you at your deposition about the lawsuit

1    that your attorneys filed, the Second Amended Complaint.

2           Do you recall that questioning?

3    A    My lawyers filed?

4    Q    Your --

5    A    Oh, in here?

6    Q    Your lawyers filed a lawsuit in this case.  That's why

7    we're here, and they filed what's called an

8    Amended Complaint and then a Second Amended Complaint.

9           Do you recall that testimony?  I asked you about

10   the Second Amended Complaint --

11   A    Yes.

12   Q    And you said that you had reviewed the Second Amended

13   Complaint before it was filed and that it was accurate --

14   right? -- to your lawsuit?

15   A    Yes.

16   Q    Now, in the deposition I asked you about whether the

17   allegations in the lawsuit that -- between 2013 and 2018

18   Charif Kazal had intentionally and maliciously copied

19   certain of Thunder Studios's copyrighted photographs on

20   kazalfamilystory.com, and you said that that was an accurate

21   statement; correct?

22   A    An accurate statement, yes.

23   Q    And that's still your testimony, that that's an

24   accurate statement; right?

25   A    Yes.

1  Q    Now, you said a moment ago that you first visited the

2  site in 2013; right?

3  A    I did.

4  Q    And then at some point later on you saw additional

5  photos of yourself appearing on the site you thought maybe

6  in 2016?

7  A    Yes.

8  Q    You don't know when those photos first appeared,

9  though, do you?

10 A    No.

11 Q    And during the period between 2013 and 2016, did you

12 have occasion to frequent the site, the kazalfamilystory.com

13 Website?

14 A    Yes.

15 Q    What was your purpose in doing that?

16 A    In early 2014, I -- well, my solicitors in Australia

17 sued Mr. Kazal for defamation and malicious persecution.

18 That case is, actually, still ongoing.  As part of the

19 requirements for that, we had to, my lawyers, maintain

20 observation of that Website.

21 Q    Now, the Court in Australia in the lawsuit you just

22 mentioned --

23 A    Yes.

24 Q    -- never ordered that the kazalfamilystory.com Website

25 be taken down; right?

 1   A    No.   Australia doesn't provide injunctive relief.   The

 2   legal system in Australia wants to ensure damages are the

 3   appropriate remedy.

 4            MR. TAYLOR:   Your Honor, if I could just ask the

 5   Court to have the witness answer more directly yes or no

 6   questions instead of giving a narrative.

 7            THE COURT:   All right.   Ask the next question,

 8   Counsel.

 9            MR. TAYLOR:   Thank you, Your Honor.

10   Q    And you never sought such relief in the United States

11   Court; correct?

12   A    I believe we did.

13   Q    You sought an order to have the kazalfamilystory.com

14   Website taken down?

15   A    So I will have to talk to my attorneys, but I remember

16   correspondence in 2014 which was concurrent with the

17   communications the Australian lawyers were having where we

18   were seeking cease and desist.

19            In America, you have different laws associated

20   with libel and defamation, and so any action that I take in

21   American needs to comply with American law.   In America,

22   particularly in the state of California, there is

23   anti-SLAPP, which means anyone who is perceived under the

24   law to be a public figure has a differing right.

25            MR. TAYLOR:   Your Honor, I would move to strike

```
 1    the last two sentences, at least, as nonresponsive.

 2              THE COURT:  Sustained.  Stricken.

 3              Ask the question again, please.

 4    BY MR. TAYLOR:

 5    Q    I believe the question was you never sought injunctive

 6    relief in the United States Courts to have the

 7    kazalfamilystory.com Website taken down; isn't that right?

 8    A    No, that's not right.

 9    Q    You did seek such relief from the Courts?

10    A    Well, I need to refer to my attorneys.  It was a matter

11    that my attorneys dealt with.  At the time we had in-house

12    counsel that was responsible for that.

13    Q    But the Courts in America never ordered the site taken

14    down; right?

15    A    No, they did not.

16    Q    Now, in the course of your work and your personal life,

17    you visit various Websites on a day-to-day basis; correct?

18    A    Yes.

19    Q    And when you go to those sites, sometimes you click on

20    links or you read different pages or you use the site like

21    mobile banking; is that right?

22    A    I don't do mobile banking.

23    Q    But I'm just giving an example.

24              You use different Websites for different things;

25    right?
```

1   A    Well, I -- you know, I go to Websites, yes.

2   Q    And when you go to those Websites, do you typically

3   click on and read the Website's terms and conditions?

4   A    Rarely.

5   Q    Sometimes you do?

6   A    Yes.

7   Q    Why do you do that?

8   A    Some Websites require you to -- pop-up window -- when

9   you click on it, pop-up window -- they want you to read

10  their terms of service and agree to them.

11  Q    Right.  And most people just check on the box at the

12  bottom.  They don't actually read the terms of service.

13       You're saying you actually read the terms of

14  service?

15  A    Sometimes.

16  Q    Now, the photos that appeared on thunderstudios.com in

17  the period between 2013 and 2016, did they bear any kind of

18  watermark or copyright symbol on them?

19  A    I have seen photos that do have symbols on them.  I

20  can't confirm whether all do.

21  Q    The photographs that you allege in this lawsuit were

22  misappropriated, did Thunder Studios ever market or license

23  those photographs to any third parties?

24  A    No.

25  Q    Did they ever sell the rights to those photographs?

```
1    A    No.
2    Q    Did Thunder Studios ever directly profit financially
3    from the photographs in any way?
4    A    Not from the style of them.  We use them
5    reputationally.
6    Q    At some point the decision was made to register the
7    copyrights to certain photographs; right?
8    A    Yes.
9    Q    And we looked at the registration certificates
10   yesterday.  I believe Exhibits 23 and 24 in the binder.
11             Do you recall that?
12   A    I remember looking at -- not yesterday, the day before,
13   yeah, yeah.
14   Q    The schedule this week has, I think, thrown us off a
15   little bit, all of us.
16             The registration certificates were dated December
17   2016; right?
18   A    They were.
19   Q    And at some point, obviously, the decision was made to
20   copyright -- to register the copyright in those photographs;
21   correct?
22   A    Yes.
23   Q    And whose decision was that?
24             MR. WIENER:  Objection.  Calls for attorney-client
25   communication.
```

```
 1              THE COURT:  All right.  To the extent it is,
 2   objection sustained.
 3   BY MR. TAYLOR:
 4   Q    If you can answer that question without revealing
 5   attorney-client communications, I would ask you to do that.
 6              THE COURT:  If you can.
 7   BY MR. TAYLOR:
 8   Q    If possible.
 9   A    I am the CEO; so ultimately the decision would be mine.
10   Q    And the decision to register the copyrights was made
11   shortly before the December 2016 registrations were issued;
12   right?
13   A    "Shortly" is a broad word.  I would have thought maybe
14   two or three months before.
15   Q    Who handled the registration of the copyrights for
16   Thunder Studios?
17   A    A gentleman by the name of Paul Kolesa.
18   Q    And he's the director of content security for
19   Thunder Studios?
20   A    Security officer, yes.
21   Q    Okay.  But that doesn't mean physical security.  It
22   means intellectual property?
23   A    Yes, intellectual property, digital assets.  You know,
24   manages all of our digital assets.
25   Q    And the decision to register the copyright in the
```

1   photographs was intended to include all of the photographs

2   that Thunder Studios had on its Website at the time?

3   A     No.

4   Q     What was the purpose of the registration?

5   A     To secure all of our assets.  It's our understanding

6   that as soon as an image is captured, there is a copyright

7   that's awarded to the person who captured it.  And then, if

8   you want to protect it through the legal means, you have to

9   actually register it.

10  Q     Right.

11        So my question was was the decision to register

12  the copyright intended to include every photograph that had

13  ever appeared on thunderstudios.com?

14  A     No, it was to capture every photo in our asset

15  register.

16  Q     So whether that photo appeared on your Website or not?

17  A     Correct.

18  Q     Now, it's true, isn't it, that you have no direct

19  evidence that Tony Kazal, one of the defendants in this

20  case, was involved in any way, shape, or form in the

21  selection of photos that appeared on kazalfamilystory.com?

22        MR. WIENER:  Objection.  Argumentative.

23        THE COURT:  Overruled.

24        THE WITNESS:  I don't personally have any evidence

25  specific to Mr. Kazal on how he attached our photographs to

```
 1  his e-mails.
 2  BY MR. TAYLOR:
 3  Q    Well, you have no evidence that he actually attached
 4  any photographs to the e-mails that appear on the Website;
 5  isn't that true?
 6  A    Except the e-mail on the Website itself and his -- and
 7  the attachment of the photos embedded within it.
 8  Q    Right.
 9       But the e-mails that appeared on the site were
10  actually e-mails that had been sent directly to you
11  previously; correct?
12  A    I had received those e-mails, yes, directly.
13  Q    And when you received those e-mails at your
14  thunderstudios.com e-mail address, they didn't have any
15  photos in them; right?
16  A    No, not in the e-mail itself, only when it was
17  published on the Website.
18  Q    And you don't know who actually published the e-mails
19  on the Website; right?
20  A    Only except what defendants have pled.
21  Q    I'm not sure that answers my question.
22       You don't know who actually posted --
23  A    I don't know.
24  Q    -- the e-mails on the Website; right?
25  A    I don't know directly, no.
```

```
 1   Q    Now, the e-mails from Tony that you just referenced
 2   were CC'd to a number of people; correct?
 3   A    Yes, they were.
 4   Q    And those people included employees of Thunder Studios
 5   and Charif Kazal as well; right?
 6   A    Yes, they did.  I can't confirm all of them but, yes,
 7   that's --
 8   Q    But it's true, is it not, that there was a certain
 9   pattern, there was a certain continuity and consistency in
10   the e-mails in terms of their content and the messaging and
11   who was copied on the e-mails?
12   A    Definitely there was a pattern to them, right.
13   Q    It's true, isn't it, also that you have no direct
14   evidence that Mr. Tony Kazal was in any way involved with
15   the development or production of the kazalfamilystory.com
16   Website; correct?
17   A    I don't, no.
18   Q    You don't know or I don't, comma, n-o?
19   A    I don't, comma, n-o.
20   Q    I thought you said "I don't know."
21   A    I'm sorry.
22   Q    Thank you for clarifying.
23        Now, it's also true, Mr. David, that you have no
24   specific evidence at all that defendant Adam Kazal was
25   involved in any way in the selection of photos that appeared
```

```
 1   on the kazalfamilystory.com Website?
 2   A    I don't have any evidence, no.
 3   Q    And it's also true, is it not, that you have no
 4   information at all to suggest that defendant Adam Kazal was
 5   in any way involved with the development or production of
 6   the kazalfamilystory.com Website?
 7   A    Except for the video assets that were put on there, no.
 8   Q    But you don't know who put any videos on the Website,
 9   do you?
10   A    Only through the process of the Australian legal
11   process.  So I don't know whether that would be considered
12   hearsay or direct.  I am a little confused.  That's all.
13   Q    The photos that appeared on the kazalfamilystory.com
14   Website, the photographs of yourself, I mean, were they --
15   some of them were altered or modified in certain ways;
16   right?
17   A    Not by us.  Yes, they were.
18   Q    I mean by someone else.
19   A    Yes.
20   Q    Now, some point in late October 2016 -- I believe the
21   evidence is that it's October 26th I will represent -- you
22   became aware of the presence of some protestors in your
23   neighborhood; right?
24   A    October 26th, yeah.
25   Q    You testified about that on Tuesday.
```

```
 1   A     Yes.
 2   Q     Can you briefly describe their exact location relative
 3   to your house.
 4   A     They were -- how do I explain it? -- they were right at
 5   an intersection between Homewood Way and Homewood Road.
 6   Q     So let's put it this way:  How far away from your house
 7   were they standing?
 8   A     About 500 meters.
 9   Q     They weren't assembling or congregating right in front
10   of your house; right?
11   A     No, they were actually walking up and down
12   Homewood Road.
13   Q     And they appeared in the morning during the daylight
14   hours; right?
15   A     Certainly I saw them about 7:00 in the morning.
16   Q     And the first time you saw them I guess it was
17   7:00 A.M. on October 26th; right?
18   A     Yes.
19   Q     How many protestors were there?
20   A     I want to say about six.
21   Q     And none of the defendants in this case were actually
22   physically present among the protestors; right?
23   A     Not to my knowledge.
24   Q     You didn't see them?
25   A     I didn't see them.
```

1   Q    Now, it's true, Mr. David, isn't it, that you have no

2   specific information that defendant Charif Kazal was in any

3   way involved in the organizing of the protest that occurred

4   in your neighborhood.  Correct?

5   A    Except what's tendered as evidence.  I don't personally

6   have any direct knowledge.

7   Q    Same question with respect to defendant Tony Kazal.

8   A    That's a little different because there's a signed

9   contract between the perpetrators that organized it and

10  Mr. Kazal, Mr. Tony Kazal.

11  Q    What was your understanding at the time as to who was

12  behind the protest, the October 26th protest?

13  A    The Kazal family.

14  Q    The protestors were holding signs and banners; correct?

15  A    They were.

16  Q    And did they indicate any names on them of who was --

17  A    Yes.  On every poster, banner, and it was the care of

18  symbol Adam Kazal.

19  Q    Adam Kazal; right?

20  A    Yes.

21  Q    Only Adam Kazal?

22  A    Yes.

23  Q    Now, when you saw these protestors, you were on foot,

24  or you were in your vehicle?

25  A    I had arrived via vehicle and got on foot.

```
1    Q     You parked and got out of your car?

2    A     Yes.

3    Q     And you approached the protestors; right?  You went up

4    directly towards them?

5    A     Yes.

6    Q     And you asked them questions like "What are you doing?"

7    A     Yes.

8    Q     "Get out of here.  I am going to call the police";

9    right?

10   A     Yes.

11   Q     Now, did any of those protestors, those six or so

12   protestors on that morning of October 26th, make any kind of

13   verbal threat to you of any kind?

14   A     No.

15   Q     Did they make any physical threat of any kind?

16   A     No.

17   Q     Did they gesture towards you in any way?

18   A     No.

19   Q     They didn't actually even say a word to you, did they?

20   A     They did not.

21   Q     Now, the signs that they were holding, they said things

22   like, "Rodric David, the corporate thief," things like that;

23   right?

24   A     Yes.

25   Q     Did the signs contain any profanity or vulgarity of any
```

1   kind?

2   A     No.

3   Q     Did they -- they didn't contain any threats or calls to

4   violence, did they?

5   A     No.

6   Q     Now, that morning of the 26th, you told the protestors

7   you would call the police, and, in fact, you or your wife

8   did call the police; right?

9   A     Yes.

10  Q     The LAPD responded to the neighborhood; right?

11  A     Yes.

12  Q     How many police officers came out?

13  A     I think it was two patrol cars came.

14  Q     Now, you mentioned a moment ago that you spoke to the

15  protestors.  Your wife spoke to the protestors as well;

16  didn't she?

17  A     I wasn't there when she was there.  She can give --

18  sorry.

19          I just inadvertently didn't turn off my phone.  I

20  apologize.

21          I wasn't there at the same time as my wife.

22  Q     But you spoke to her about this later, and she told you

23  that she had interacted with the protestors?

24  A     When I got home, yes.

25  Q     At the time you saw them, you felt comfortable and safe

```
 1  enough to go up to them and engage with them; right?

 2  A    I wouldn't say comfortable, no.  But it was obvious to

 3  me that this was organized, these people were paid to be

 4  there.

 5  Q    Right.

 6         So you didn't feel any threat to your safety?

 7  A    Not from them, no.

 8  Q    Now, I asked you that question at deposition, and you

 9  said that you were not in fear for your safety that morning

10  because the protestors looked like they were Hispanic

11  laborers who had no idea what they were doing let alone

12  being able to read the signs that they were holding.  Is

13  that right?

14  A    Yes.

15  Q    And that's still your testimony today; right?

16  A    Yes.

17  Q    So at some point the police arrived.  I think you

18  said -- you said two officers or two cars?

19  A    Two patrol cars came by.

20  Q    So at least two officers, maybe three?

21  A    Yes, yes.

22  Q    And, obviously, you spoke with them when they got

23  there; right?

24  A    I spoke to at least one of them, yes.

25  Q    And did you speak to them where the protestors were
```

```
 1   assembled or at your house?

 2   A    Near where the protestors were assembled.

 3   Q    Okay.  So within the view of the protestors; right?

 4   A    Yes.

 5   Q    And the police told you that the protestors had every

 6   right to be there, didn't they?

 7   A    Yes, they did.

 8   Q    The police told you there was a lawful right to

 9   protest?

10   A    There is.

11   Q    Nothing they could do about it; right?

12   A    Except to say they're not allowed to congregate.

13   Q    Meaning the police told you the protestors had to --

14   A    They had to be moving.

15   Q    -- keep moving, they couldn't just stand in one place?

16   A    Correct.

17   Q    The --

18   A    And they couldn't -- they couldn't touch private

19   property and the public -- the public furniture like street

20   poles and road signs and stuff like that.

21   Q    Okay.  But the police said --

22   A    It --

23   Q    -- that they were allowed to --

24        THE COURT:  You guys are stepping on each other.

25   If you want a decent transcript, you are not accomplishing
```

1  that.  So wait for the witness to answer and then ask the

2  next question.

3          MR. TAYLOR:  Sure.  My apologies.

4  Q    You were done with your answer?

5  A    I said move on.  They told the protestors to move on.

6  Q    Meaning they had to leave the neighborhood?

7  A    No.  They had to be walking.

8  Q    Right.

9          But they could stay in the area that they were

10  congregating --

11  A    Yes -- not congregating but they could stay, moved on.

12  Q    Were they standing on the sidewalk or in the street?

13  A    In the street.

14  Q    But on the edge of the road or in the middle of the

15  street?

16  A    Towards the middle of the road between the road and the

17  cars that are parked.  So they were halfway on the road.

18  Q    Okay.

19  A    The cars are parked, and then they are standing in the

20  traffic flow.

21  Q    But cars were able to pass by; right?

22  A    They moved around them, yes.

23  Q    They didn't block the traffic or anything?

24  A    No.

25  Q    Now, your house is on a cul-de-sac; correct?

```
 1   A    Yes.

 2   Q    Meaning, it's not a through street?

 3   A    No.

 4   Q    So it's fair to say that it doesn't get much traffic.

 5   A    It doesn't.

 6   Q    Now, when the police arrived and you spoke with them,

 7   how long was that conversation?

 8   A    I would be guessing.  Maybe ten minutes.

 9   Q    Okay.  And did you ask the police about your rights,

10   what you were able to do legally?

11   A    They told me to contact my lawyers.

12   Q    Anything else?

13   A    No.  They said -- no, if it's a dispute with, you know,

14   other parties, it's ongoing, you should follow the legal

15   process.

16   Q    And they said that because you told them that it was

17   based on a business dispute?

18   A    I don't recall specifically saying that, but I told

19   them it was a long-standing dispute, yes.

20   Q    Now, after your conversation with the police ended, did

21   you go back -- did you go to your house, or did you leave

22   the neighborhood?

23   A    I went home.

24   Q    Did the police leave the scene at the same time?

25   A    I don't know.  I don't know how long the police
```

```
 1   actually stayed in the area.

 2   Q    So you went back to your house, and the police were

 3   still there?

 4   A    Yes.

 5   Q    Now, that you observed during your conversation with

 6   the police and thereafter, did the police order the

 7   protestors to disburse and leave the area?

 8   A    They told them to move on.

 9   Q    But they didn't tell them they had to pack up and leave

10   the neighborhood; right?

11   A    Not to my knowledge.

12   Q    And you didn't observe the police actually confiscating

13   any of the protestors' signs or banners; right?

14   A    I observed the police forcing them to take them down

15   from neighbors' properties and street furniture.

16   Q    But they didn't actually take them away from the

17   protestors; right?

18   A    I didn't observe that, no.

19   Q    You didn't observe the police make any arrests; right?

20   A    No, I did not.

21   Q    The police allowed the protest to continue; correct?

22   A    Yes, they did.

23   Q    And the police told you -- didn't they -- that there

24   was actually no crime that had been committed in --

25   A    No, they --
```

```
 1   Q      -- gathering of the protesters.
 2              THE COURT:  Hold on.  Again --
 3              THE WITNESS:  Sorry.  My apologies.
 4              THE COURT:  Thank you.
 5   BY MR. TAYLOR:
 6   Q      I know my questions may be predictable at moments, but,
 7   again, the police told you, didn't they, that there was no
 8   crime that had been committed in the gathering of these
 9   protestors in your neighborhood; right?
10   A      They didn't say that to me.  They said there is a right
11   of peaceful protest in California.
12   Q      Well, you never became aware, did you, that anyone was
13   charged with any crime in connection with that protest;
14   right?
15   A      No, I did not.
16   Q      You recorded some video of the protestors with your
17   cell phone; right?
18   A      Yes.
19   Q      And you filmed them for a few minutes; correct?
20   A      Approximately.
21   Q      And how close were you to the protestors when you were
22   doing that?
23   A      Some, quite a distance.  Some, very close.  I wanted to
24   capture faces on the camera.
25   Q      And when you say "very close," you mean five feet --
```

```
 1   A    Within a foot.

 2   Q    Sorry?

 3   A    Within a foot.

 4   Q    Within a foot.

 5        Your wife came out and took some photos and video

 6   of the protestors as well with her phone, didn't she?

 7   A    I wasn't there.  You can ask her.

 8   Q    Well, I may; but she told you that, didn't she?

 9   A    She told me that, yes.

10   Q    Now, I believe you testified on direct that after this

11   initial protest at your home in the area of your home in

12   October, a couple weeks passed, and then there were some

13   additional protests in November 2016; right?

14   A    For at least a week, yes.

15   Q    And were they in the -- roughly the same area?

16   A    Roughly.

17   Q    I asked you about that at your deposition.  You

18   testified that the people who appeared in November in your

19   neighborhood appeared different -- looked different in

20   appearance from the people who had been gathered in October.

21   A    They were different persons, yes.

22   Q    They were different persons.

23        And they looked different; right?

24   A    Yes.

25   Q    They were of a different racial makeup, for example?
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    A    I can't say that for the protestors themselves outside

 2    my house.  Certainly they were different at Thunder Studios,

 3    and there was an addition outside my house of the film crew.

 4    Q    Okay.  You testified that the group that appeared in

 5    November looked more "thuggish," to use your word; right?

 6              Do you recall --

 7    A    Yes.

 8    Q    -- that?  That's true?

 9    A    Yes.

10    Q    That was your impression?

11    A    Yes.

12    Q    And were there roughly the same number of protestors or

13    more or less than in October?

14    A    I would have thought, to the best of my recollection,

15    approximately eight in total and the van.

16    Q    This is in November 2016?

17    A    Correct.

18    Q    The protestors who appeared in November, you --

19    obviously, you saw them when they appeared; right?

20    A    In November?

21    Q    Right.

22    A    Yes.

23    Q    And you drove past them in your car; right?  Because

24    they weren't outside your house, they were a block or two

25    away?
```

```
 1    A    No, they were on Homewood Road; so about 500 meters
 2   away from my house.
 3    Q    But roughly in the same location as the protestors who
 4   appeared in October; right?
 5    A    Roughly, within a couple of hundred meters.
 6    Q    Was it the same people every day?
 7    A    I don't know.
 8    Q    I want to show you a still image from the video that
 9   your attorney played yesterday --
10    A    Tuesday.
11    Q    I'm sorry.  Tuesday.
12            I believe it's Exhibit -- part of Exhibit 7 that
13   was moved into evidence, Your Honor.
14            THE COURT:  All right.  Go ahead.
15      (Exhibit played.)
16   BY MR. TAYLOR:
17    Q    This is a screenshot from the video that was played the
18   other day.
19            That's the van that you are referring to at the
20   left?
21    A    It is.
22    Q    That's a group of four of the protestors who appeared
23   in November?
24    A    Yes.
25    Q    And those are the protestors you described as looking
```

```
 1    thuggish?

 2    A    No, I'm -- there are some of them, yes.

 3    Q    Why did you say they look thuggish?

 4    A    Well, some of the other guys that are not in the photo

 5    were bald and were dressed in a way that looked more

 6    thuggish to me.

 7    Q    So these protestors here, these four, didn't look

 8    thuggish to you?

 9    A    They were congregating as a group.  They looked

10    thuggish to me.

11    Q    Okay.  Now, that October morning, October 26th, you

12    became aware of a gathering of protestors outside of the

13    gates of Thunder Studios as well; right?

14    A    I got a phone call saying there were protestors outside

15    of Thunder Studios.

16    Q    You got a phone call after you saw the protestors in

17    your neighborhood?

18    A    Yes.

19    Q    Though sometime after 7:00 A.M.?

20    A    Yes.

21    Q    And did you go to Thunder Studios that morning?

22    A    Yes.

23    Q    So you got a call when you were on your way down there?

24    A    Yes.

25    Q    Who called you, by the way?
```

```
 1   A     I got a couple of phone calls from various Thunder
 2   employees.
 3   Q     And then when you arrived at Thunder Studios, you
 4   observed the protestors; right?
 5   A     Yeah, I saw them.
 6   Q     How many were there?
 7   A     All right.  It was different throughout the day.  I
 8   want to say in total about 12.
 9   Q     These were different people from the ones that had
10   appeared in your neighborhood that morning; right?
11   A     Yes.
12   Q     When you first observed them as you approached
13   Thunder Studios, it was as you were in the car with
14   Matthew Price driving into Thunder Studios; right?
15   A     I was the passenger in the car; yes.
16   Q     Right.
17         Mr. Price was driving?
18   A     Yes.
19   Q     And Mr. Price was the CTO, the chief technology
20   officer, of Thunder Studios at the time?
21   A     At the time.
22   Q     And you drove with him because he lived near you at the
23   time?
24   A     His daughter goes to the elementary school with my
25   daughter, which -- and so he would drop off his daughter and
```

```
 1    pick me up, and we would carpool.
 2    Q    That's because the school is very close to your house?
 3    A    Very close.
 4    Q    Now, when you observed the protestors, they were
 5    standing at, sort of, gates of the car park of
 6    Thunder Studios; right?
 7    A    Yes.
 8    Q    And the gate is normally closed; right?
 9    A    It opens up for access for pedestrians and cars.
10    Q    Right.
11           So it opened up, and Mr. Price drove in?
12    A    Yes.
13    Q    Of the parking lot.
14           And he parked the car?
15    A    Yes, in the secure lot.
16    Q    Right.
17           And then the gate closed, and the protestors
18    remained outside on the sidewalk; right?
19    A    Yep.
20    Q    You got out of the car, and you turned towards the
21    protestors; right?
22    A    No, I turned towards my security guards and thanked
23    them, did a great job.
24    Q    So when you got out of the car, you didn't gesture
25    towards the protestors or wave or give them a thumbs up or
```

```
 1   anything like that?

 2   A    I definitely gestured to my security guard.

 3   Q    So you gave some kind of wave, or you applauded and

 4   gave a thumbs up to your security guard?

 5   A    James, yes.

 6   Q    Who you see every day?

 7   A    Yes.

 8   Q    And you greet him typically that way every morning?

 9   A    No, no, but James had dealt with these protestors

10   trying to get through the fences and into the lobby at the

11   studio.  He is a 76-year-old man.  So I was very proud of

12   him being able to prevent them from doing that.

13   Q    I see.

14        So you're saying the protestors tried to -- 12

15   protestors tried to break into the Thunder Studios lot?

16   A    That's not what I said.

17   Q    I misunderstood you then.

18   A    Well, you asked me how many protestors.  I said there

19   were about 12 throughout the day.  I don't know.  I wasn't

20   there at the time when James addressed -- you know,

21   prevented them from accessing the property.

22   Q    So how did you know when you had gotten there with

23   Mr. Price that James had prevented any of the protestors

24   from accessing the property?

25   A    Because that's what my employees told me when they
```

1   called me.

2   Q    I see.

3         So James -- you are saying James must have told

4   your employees that he had prevented people from accessing

5   the property?

6   A    I don't know.  They didn't enunciate to me.  They had

7   conversations with James.

8   Q    And then after gesturing towards James, you went and

9   spoke with him; right?

10  A    No.  I think I walked into the lobby.

11  Q    I see.

12        So you turned away from the parking lot and went

13  into the building?

14  A    That's what I recall.

15  Q    Now, James, or whoever the security guard is at any

16  given moment, is in a little booth by the gate to the car

17  park; right?

18  A    There is a guard house, yes.

19  Q    And Thunder Studios has always had a guard stationed at

20  the guard house; right?

21  A    Yes.

22  Q    Even before the protest began?

23  A    Yes.

24  Q    Now, again, as far as you were aware, none of the

25  defendants in this case, none of the Kazals, were physically

1  present among the protestors at Thunder Studios; right?

2  A    Not that I observed.

3  Q    Not that you ever heard from anyone; right?

4  A    I haven't heard from anyone, no.

5  Q    The protestors that you observed at the studio on the

6  26th of October were different racial backgrounds from what

7  you could tell?

8  A    26th of October?

9  Q    That first morning, yeah.

10  A    Yes.

11  Q    Included men and women; right?

12  A    Yes.

13  Q    Now, you were never in fear for your personal safety or

14  security from the protestors at Thunder Studios; isn't that

15  right?

16  A    I was not.

17  Q    And that's because it's a closed building and there is

18  security; right?

19  A    And we have -- the police car was stationed right there

20  about a hundred feet away from the protestors -- or the

21  sheriff's car.  Sorry.

22  Q    You are saying, after someone called the police, the

23  sheriff's department responded?

24  A    No.  I don't know how they got there, but when I got

25  there, there was a sheriff's car there.

```
 1   Q     Okay.  But there's not normally a sheriff's car down
 2   the block from Thunder Studios, is there?
 3   A     It's pretty frequent for us.
 4   Q     Okay.  So there was a sheriff's car parked outside --
 5   about a hundred yards from the studio when you arrived?
 6   A     Approximately.
 7   Q     And there was a sheriff's deputy inside?
 8   A     I don't know.  I didn't pay any attention if anyone is
 9   in the car.
10   Q     When you got out of the car that morning, did you
11   interact with the protestors in anyway?
12   A     I don't think so.
13   Q     Did you speak with any of them?
14   A     I didn't personally, no.
15   Q     How chose did you get to them?
16   A     Well, I must have been close because I got through them
17   to get into car park so a couple of feet.
18   Q     Okay.  But that was while you were in the car.
19   A     Yes.
20   Q     Okay.  I mean once you got out of the car, how close
21   did you approach them?
22   A     I don't recall.  Maybe 10, 15 feet.
23   Q     Did you -- you never heard any of those protestors make
24   any threats of violence towards you; correct?
25   A     Well, they were chanting, but I don't -- I wouldn't
```

 1    specifically say it was threats of violence directly towards

 2    me, no.

 3    Q    They were chanting "Rodric the robber"?

 4    A    That was one of them.

 5    Q    And you never heard any of those protestors who were

 6    gathered outside the gates of Thunder Studios make any calls

 7    to violence whatsoever, did you?

 8    A    I didn't, no.

 9    Q    The protestors at the studio were holding signs;

10    correct?

11    A    They were.

12    Q    And from what you could see, they were similar to the

13    signs that the protestors were holding in your neighborhood?

14    A    They were identical.

15    Q    Identical.

16         And from what you could see, those signs contained

17    no threats of violence, did they?

18    A    No.

19    Q    They didn't include any direct threats towards you, did

20    they?

21    A    No.

22         MR. TAYLOR:  I would like to play an approximately

23    one-minute clip of a video that was produced by Mr. Woodward

24    in response to a subpoena by plaintiff's counsel.  I don't

25    believe it's been admitted into evidence, but this witness

```
 1   has seen it.

 2              May I play the clip, Your Honor?

 3              THE COURT:  What exhibit is this?

 4              MR. TAYLOR:  I believe it's a part of Exhibit 44.

 5              THE COURT:  Any objection?

 6              MR. WIENER:  Your Honor, I'd like to see the

 7   specific clip, and I might request that a longer portion of

 8   it be shown in order that the proper context for it is

 9   established.

10              THE COURT:  Is Mr. Woodward going to testify?

11              MR. TAYLOR:  He is scheduled to testify on Monday,

12   Your Honor.

13              THE COURT:  All right.  I will allow the play of

14   the portion, and if you want to expand the version of the

15   play, you can do so when the witness testifies.

16              MR. WIENER:  All right.  Thank you.

17              THE COURT:  You may proceed.

18              MR. TAYLOR:  Thank you, Your Honor.

19         (Exhibit played.)

20   BY MR. TAYLOR:

21   Q    Can you see it there, Mr. David?

22              Okay.  Now, that's Mr. Price's car arriving at

23   Thunder Studios on the morning of October 26th; right?

24   A    Yes, it is.

25   Q    That's you who just got out of the passenger seat?
```

```
1   A    It is.

2   Q    Who is that with the blond hair with his back to the

3   camera?

4   A    I'm not actually sure.

5   Q    But he wasn't in the car with you though.

6   A    No.  It could be Paul.  I can't see.

7   Q    That might be Paul?

8   A    It could be.

9   Q    We'll see.  I think he might turn here in a minute --

10       THE COURT:  I'm sorry.  When you are referring to

11  "Paul," who are you referring --

12       THE WITNESS:  I'm sorry.  Paul Kolesa.

13       THE COURT:  Go ahead.

14       MR. TAYLOR:  Thank you, Your Honor.

15  Q    That's Mr. Price getting out of the driver's seat?

16  A    Yes.

17  Q    Now, you are lifting your arms up and giving a thumbs

18  up and applauding.

19       Do you see that?

20  A    Yes.

21  Q    You're saying that's towards James, your security

22  guard?

23  A    Yes.

24  Q    That was your greeting to him for having kept some of

25  the protestors out of the Thunder Studios property; right?
```

```
 1   A    Yes, a brave man.

 2   Q    The pedestrian access to the property is through the

 3   security booth?

 4   A    Usually.

 5   Q    Is there another way that pedestrians would get into

 6   property?

 7   A    Except for high-level talent celebrities.  We secure

 8   them through a back entry.

 9   Q    Okay.  But I am talking about through the entrance that

10   we've been talking about by the security.

11   A    There is vehicle and pedestrian entry.

12   Q    Right.

13        So a pedestrian on foot would have to go through

14   the security booth?

15   A    Not through it, but there is a gate at the security

16   booth.

17   Q    Right.

18        So it's not open to the public.  You have to check

19   in with security; right?

20   A    Well, the gate is open.  So someone could run through

21   it if they wanted to, but, yes, they have to -- the way we

22   do it is they would talk to the security guard for access.

23   Q    So you are gesturing towards James, the security guard,

24   and he is in the booth which is off to the right out of the

25   picture; right?
```

```
 1   A     No.  He sits in his chair by the door of the booth.

 2   Q     He is actually outside the booth?

 3   A     Yes.

 4   Q     Inside the property or outside the property?

 5   A     In the property.

 6   Q     Within the gates?

 7   A     Yes.

 8   Q     Now, you seem to be gesturing and talking to someone

 9   there.  Do you see that?

10   A     I do.

11   Q     That's towards James again; right?

12   A     Yes.

13   Q     Now, here you turn and go to the right.  You change

14   direction.

15   A     Yes.

16   Q     Why did you turn and go toward the different direction

17   there?

18   A     I have no idea.

19   Q     Let's keep watching.

20             (Exhibit played.)

21   BY MR. TAYLOR:

22   Q     Is that the security booth you were talking about?

23   A     It's the security booth, yes.

24   Q     And you seem to be stopping and talking to someone

25   there.  It's out of the picture a little bit, but do you see
```

```
 1   that?

 2   A     I do.

 3   Q     And who are you talking to there?

 4   A     I don't know.

 5   Q     Are you standing roughly where the pedestrian gate

 6   would be to access the property?

 7   A     It's near there.  I don't know the angle.

 8   Q     Now, there were protestors outside the gate out of the

 9   view of this camera shot; right?

10   A     I don't know.

11   Q     Do you have any reason to doubt that this video was

12   taken on October 26th, 2016?

13   A     I didn't take the video; so I'm just taking you at your

14   word.

15   Q     But you have no reason to doubt that the time stamp and

16   the date stamp there is wrong?

17   A     No, not directly.

18   Q     Now, you are walking back toward the lobby of the

19   studio?

20   A     Yes.

21   Q     Is that Paul?

22   A     I think so.  A bit blurry, but I think it might be.

23   Q     And then that's the door to the lobby?

24   A     Yes.

25   Q     After speaking with whoever you spoke with and
```

```
 1    gesturing to James, you turned around and walked back into
 2    the building; right?
 3    A    Yes.
 4    Q    And you went on that morning with your day's work?
 5    A    No.  I don't recall the specifics of what I did that,
 6    you know, day, but I'm pretty certain I would have been
 7    talking to my lawyers straight away.
 8    Q    Now, when you went inside the building, did you at any
 9    point that day tell your employees at Thunder Studios to do
10    anything different in their day-to-day routines in response
11    to the protestors outside?
12    A    Yes.
13    Q    Really.  What did you tell them?
14    A    Well, I brought them all together and sought to explain
15    what was going on and what we were going to be doing about
16    it.  I wanted them to ensure -- I wanted to make sure that
17    as a company, if there was any distress or anything being
18    caused upon them, that we would do what was ever necessary
19    to assist with that.
20         We did get a complaint from an employee who was
21    harassed or assaulted trying to get in the property, by one
22    of the protestors.
23         MR. TAYLOR:  Your Honor, I will move to strike as
24    nonresponsive.
25         My question was did you instruct your employees to
```

 1   do anything different in their day-to-day routines in
 2   response to the presence of the protestors outside?
 3          THE COURT:  And your next question was "Really.
 4   What did you tell them?"
 5          MR. TAYLOR:  Right.
 6          THE COURT:  So what are you seeking to strike?
 7          MR. TAYLOR:  Well, he said, yes, I told them to
 8   change their day-to-day routines -- at least that's what I
 9   understood.  And then the answer was, well, if anything
10   happened, you know, we want to make sure there's resources
11   and know who to talk to.
12          My question was how did the company tell the
13   employees to change their routines?
14          THE COURT:  So the answer is stricken.
15          Ask your next question.
16          MR. TAYLOR:  Right.
17   Q    The question specifically is what did you tell them
18   with respect to changing their day-to-day routines, if
19   anything?
20   A    Well, I advised them that the company was concerned for
21   their well-being, and if they didn't want to be here when
22   this was occurring, they didn't have to.
23   Q    Okay.  Now, you mentioned the presence of a sheriff's
24   deputy.
25          Did you actually become aware of someone from

```
1    Thunder Studios calling for the police?
2    A    No.
3    Q    Did you personally interact with the police or the
4    sheriff's department regarding the protests at
5    Thunder Studios?
6    A    I don't recall personally talking to a sheriff, but I
7    know some of my staff did.
8    Q    Okay.  And did the -- how many employees did you have
9    at the time, by the way?
10   A    Direct employees, approximately a dozen.
11   Q    So do you know who spoke to the sheriff's department?
12   A    Possibly Elizabeth Dunigan.
13   Q    Who is that?
14   A    Administration manager.
15   Q    Did Elizabeth report to you what her conversation with
16   the sheriff's department was?
17   A    She would have, yeah.
18   Q    Do you recall what she told you?
19   A    Not the specifics, no.
20   Q    Now, the sheriff's department, as far as you know, did
21   not make any arrests in connection with the protest;
22   correct?
23   A    Not to my knowledge.
24   Q    To your knowledge, the sheriff's department did not
25   instruct the protestors to disperse or shut down their
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   protest; right?

2   A    No, they didn't.

3   Q    As far as you are aware, the sheriff's department

4   allowed the protesters to continue what they were doing;

5   right?

6   A    As far as I am aware.

7   Q    That morning of October 26th when you arrived, it was

8   about maybe 9:20, 9:30 in the morning; right?

9   A    Approximately.

10   Q    And how long had the protestors been there by that

11   point, if you know?

12   A    I recall being told that the first one showed up

13   approximately 7:30.

14   Q    And how long were they there at the studio that day?

15   A    Maybe six hours, maybe through to maybe 1:00,

16   2:00 o'clock.

17   Q    Now, from where you work within the building, could you

18   see the protestors outside?

19   A    No.

20   Q    Could you hear them?

21   A    No.

22   Q    Periodically throughout the day did you go out or go to

23   the front of the building to see if they were still there?

24   A    I don't recall, no.

25   Q    At some point someone came and told you they had left?

```
1    A    Yes.

2    Q    You were -- fair to say you were frustrated to have

3    protestors appear at your place of business; right?

4    A    Shocked and frustrated amongst other emotions.

5    Q    Now, the LAPD officers who came to area of your house

6    that morning, they told you, among other things, to just

7    steer clear of the protestors; right?  Just stay away from

8    them?

9    A    Yes.

10   Q    And you and your wife did that; right?

11   A    Yes.

12   Q    From then on you, sort of, stayed away from the

13   protestors?

14   A    To what we could, yes.

15   Q    From what I understand, you had to pass them in your

16   car to get out of the neighborhood, but you didn't have to

17   get out and interact with them at all?

18   A    No.

19   Q    And as you said, they didn't congregate at your house?

20   A    No, they weren't allowed to.

21   Q    But they never tried to, did they?

22   A    Not at my house, no.

23   Q    It's true, is it not, Mr. David, that in the two-plus

24   years since the protests that are the issue -- at issue in

25   this case, there have been no further protests either in
```

1  your neighborhood or outside Thunder Studios?

2  A    Since the protests in late November, no further.

3  Q    Right.

4        So for more than two years now.

5  A    Approximately.

6  Q    You mentioned that the signs that the protestors were

7  holding in your neighborhood said, "Care of Adam Kazal."

8  A    Yes.

9  Q    Was that, sort of, at the bottom of the sign?

10  A    Yes.

11  Q    And did the signs that the protestors were holding

12  outside of Thunder Studios bear the same "Care of Adam

13  Kazal"?

14  A    On the 26th of October, yes.

15  Q    On the 26th of October, yes.

16  A    Yes.

17  Q    They didn't say "care of the Kazal family" or "care of

18  Charif Kazal"; right?

19  A    No.

20  Q    Just Adam?

21  A    Just Adam.

22  Q    And it's true, is it not, Mr. David, that you have no

23  direct evidence at all that anyone other than Adam Kazal

24  arranged for the protestors to appear at Thunder Studios on

25  October 26th?

```
1    A    Well, we have it in evidence in the exhibits now.

2    Q    Okay.  I am asking you what -- let me ask this, then.

3         What information do you have that someone other

4    than Adam was responsible for the October protests at

5    Thunder Studios?

6    A    So we have the contract between the contractor who did

7    it and Tony Kazal.

8    Q    You have no direct information to suggest that

9    Charif Kazal was involved with the organizing or payment for

10   the protestors outside of Thunder Studios; correct?

11   A    I don't, no.

12   Q    Now, it's true you engaged a private investigator to

13   find out who these protestors were; right?

14   A    Yes.

15   Q    And the private investigator did some investigation to

16   try to learn their identities; correct?

17   A    Correct.

18   Q    Now, at some point did you go into court and seek a

19   restraining order to keep any of these protestors away from

20   you and your family?

21   A    No.

22   Q    Did you go into court and seek a restraining order to

23   keep any of these protestors away from Thunder Studios?

24   A    No.

25   Q    Do you know whether any of your employees sought a
```

```
 1    restraining order to keep any of these protestors away from
 2    them?
 3    A    I don't know.
 4    Q    You never heard any such thing; right?
 5    A    I haven't heard, no.
 6    Q    Now, during the time frame of roughly, I guess,
 7    late 2015 to early 2017, you received regular e-mails
 8    primarily from Charif and Tony Kazal; right?
 9    A    Primarily, yes.
10    Q    You received them on a fairly regular basis from one of
11    them maybe every or every other day?
12    A    To the best of my recollection, I believe we received
13    e-mails every single day.
14    Q    And these e-mails were all of a similar content; right?
15    A    Yes.
16    Q    And these e-mails related to generally their assertion
17    that you had done them wrong in connection with your
18    business dealings in the past; right?
19    A    No.  I think much more varied than that.
20    Q    Much more what?
21    A    Varied.
22    Q    Varied?
23    A    Varied.
24    Q    Okay.  But that was an important theme to the e-mails;
25    right?
```

```
 1    A    Yes.

 2    Q    And the e-mails also would frequently mention, would

 3    they not, that the Kazals felt that you had caused them

 4    significant monetary harm; right?

 5    A    They made outrageous claims, yes.

 6    Q    Okay.  But that was part of the e-mail?

 7    A    Yes.

 8    Q    That they felt that you had harmed them financially;

 9    right?

10    A    In part, yes.

11    Q    Did you also receive e-mails from Adam?

12    A    Yes.

13    Q    I believe you testified at deposition that the

14    communication from Adam was more indirect.  It was through

15    Twitter; right?

16    A    More on Twitter, yes.

17    Q    All right.  So if I understand correctly, you would

18    receive a Twitter notification that Adam had referenced your

19    Twitter handle in a tweet?

20    A    Yes, frequently.

21    Q    Forgive me.  I'm not on Twitter yet, but you would you

22    receive an e-mail notifying you that he had referenced you

23    in a tweet, or you would receive a tweet -- I don't know how

24    it works.

25    A    They are two different things, but I receive a
```

1    notification --

2    Q    Right.

3    A    -- but I also received e-mails, yes, but not specific

4    to the tweet.  They're two different things.

5    Q    Okay.  So you'd receive a notification within Twitter

6    itself?

7    A    No, you just receive a notification on the front screen

8    of your phone that someone has tweeted about you.

9    Q    I see.

10          And then you'd have to click on the notification

11   or go into Twitter to see what the tweet was about?

12   A    And it would link you to it, yes.

13   Q    So you could ignore the notification; right?

14   A    I could.  Well, the notification automatically pops up.

15   I could ignore actually clicking through and going to

16   further detail.

17   Q    Right.

18          So you didn't have to read any of Adam's tweets?

19   A    I didn't have to read the substance, no.

20   Q    And at some point you learned that you could block

21   receiving the notifications altogether; right?

22   A    I know you can do with certain social media accounts,

23   yes.

24   Q    Didn't you do that with respect to Adam Kazal on

25   Twitter?

```
 1   A    No.

 2   Q    You didn't try to block notifications?

 3   A    No.

 4   Q    Now, the e-mails that we were just talking about just a

 5   moment ago were directed to you at your thunderstudios.com

 6   e-mail address; right?

 7   A    Yes.

 8   Q    And, again, those e-mails were frequently or perhaps

 9   every time copied to certain people at Thunder Studios;

10   right?

11   A    Yes.

12   Q    Now, is it fair to say that you did not actually read

13   every single e-mail that you received from the Kazals during

14   that period; right?

15   A    Not the full extent of them, no.

16   Q    In fact, you only read about 20 to 30 percent of those

17   e-mails; right?

18   A    I think I told you between 30 and 50 percent but in and

19   around there.

20   Q    So you ignored at least half of them, maybe more?

21   A    Well, no, I didn't ignore them.

22   Q    Well, if you didn't read them and you didn't ignore

23   them, what did you do with them?

24   A    Ensured that my attorneys both in Australia and

25   United States had got them all.
```

```
 1   Q    So you would forward them to your attorneys.

 2   A    Yes.

 3   Q    Even the ones you didn't read, you would just forward

 4   them --

 5   A    Yes.

 6   Q    Now, during this time frame that we're talking about

 7   with respect to these e-mails, I believe it's late 2015 to

 8   early 2017; correct?

 9   A    Approximately.

10   Q    During that time frame, Thunder Studios had an in-house

11   IT person or IT department -- right? -- information

12   technology?

13   A    What was the range?

14   Q    2015, 2016, 2017?

15   A    I think Matt started mid to late 2015.

16   Q    That was Matthew Price?

17   A    Yes.

18   Q    He was your chief technology officer?

19   A    For a time, yes.

20   Q    And Mr. Price's responsibilities at that time would

21   have included managing Thunder Studios's e-mail server and

22   e-mail accounts?

23   A    Everything technology, IT, yes.

24   Q    It all came within his --

25   A    Purview, yes.
```

```
 1   Q    -- umbrella?

 2   A    Uh-huh.

 3   Q    So when these e-mails started, you spoke to Mr. Price

 4   about the fact that you were receiving these near daily

 5   e-mails; right?

 6   A    Yes.  He was receiving them as well.

 7   Q    Right.

 8        He was aware of them at the same time you became

 9   aware of them?

10   A    Well, he was getting a copy of them, yes.

11   Q    Right.

12        So you and he, obviously, discussed that fact?

13   A    We certainly discussed what we needed to do to try and

14   prevent it being disseminated to the employees.

15   Q    I see.

16        So there was conversation with Mr. Price about

17   trying to stop the employees from receiving these e-mails;

18   right?

19   A    Yeah, what sort of firewalls we could put into the

20   e-mails so as to stop them from going to the staff.

21   Q    Now, in the course of your conversation with Mr. Price

22   on this topic, he told you that he thought there was

23   something he could do about it; right?

24   A    Not in those words, but he told me about the firewalls

25   he could put up.
```

```
 1  Q    Well, he told you he thought he could try to implement

 2  something to stop the e-mails from reaching the employees,

 3  didn't he?

 4  A    He told me he could put up a firewall.

 5  Q    And your understanding at the time was the idea would

 6  be to prevent the employees who were CC'd on those e-mails

 7  from actually receiving them, to block them from their

 8  inboxes; correct?

 9  A    That's my understanding how it works, yes.

10  Q    That was your understanding of what Mr. Price was going

11  to try to do; right?

12  A    Yes.

13  Q    The idea being that, even if Charif Kazal would send an

14  e-mail to you and copy the whole Thunder Studios team, those

15  people would not actually receive the e-mails.  That was the

16  goal; right?

17  A    That was the goal.

18  Q    Now, you instructed Mr. Price to try to implement that

19  firewall; right?

20  A    Yes.

21  Q    And he did install some sort of mechanism to try to

22  divert those incoming e-mails to your employees through the

23  firewall so they wouldn't get them; right?

24  A    Yes.

25  Q    And is that true for the e-mails that Mr. Kazal was
```

1    sending to you as well?

2    A    No.

3    Q    So you did not instruct Mr. Price to block the Kazals

4    e-mail to your e-mail address?

5    A    No.

6    Q    So is it fair to say, then, that you wanted to continue

7    to receive those e-mails, just preventing your employees

8    from receiving them?

9    A    Under instruction from my lawyers, yes.

10   Q    Going back to the Twitter notifications you received

11   with respect to tweets by Adam Kazal, do you know when you

12   started receiving those notifications approximately?

13   A    No, I don't recall.

14   Q    I asked you at your deposition whether you at some

15   point decided to block Adam Kazal's tweets.  Do you recall

16   that?

17   A    No.

18   Q    You don't recall the --

19   A    Not the specific question, not off the top of my head.

20   Q    Do you recall that you blocked Adam Kazal on Twitter at

21   a certain point?

22   A    I recall capturing the screenshots and sending them to

23   my lawyers.  This is all around the time of

24   October 26th when we sought the injunctions and the

25   restraining in federal court.  I may have blocked him after

```
 1  doing those.

 2  Q    So if you blocked him at that point, was it because you

 3  didn't know beforehand that you could have blocked him?

 4  A    No.

 5  Q    So for some other reason?

 6  A    So my lawyers told me to record everything.

 7  Q    So if you would have blocked his tweets, then you

 8  wouldn't have been able to see what he was tweeting about

 9  you.

10  A    In future, I wouldn't have known.

11  Q    So if you would have blocked him -- and, again, forgive

12  me.  I am not on Twitter; so I don't fully know how it

13  works -- but if you would have blocked him, then, when you'd

14  go to your Twitter page or feed, you would not see his

15  tweets that reference you at all.

16  A    Correct, is my understanding.

17  Q    You wanted to continue to be able to access them if you

18  wanted to at any time.

19  A    Well, up to that point, yes.

20  Q    Right.

21          Now, prior to the appearance of the protestors in

22  your neighborhood and outside Thunder Studios in late

23  October of 2016, you had been receiving e-mails fairly

24  regularly from the Kazals from -- primarily from, I think

25  you said, Charif and Tony for about a year.  Is that fair to
```

1    say?

2    A    Yes.

3    Q    So at that point, you maybe received a couple hundred

4    e-mails?

5    A    Yes.

6    Q    Now, it's true, is it not, that you never called the

7    police with respect to the e-mails that you were receiving;

8    right?

9    A    That's correct.  I didn't call the police.

10   Q    You didn't notify the FBI or some other law enforcement

11   agency that you were receiving e-mails from people in

12   Australia?

13   A    No, we notified the FBI.

14   Q    So you did notify the FBI that you were receiving

15   e-mails?

16   A    Yes.

17   Q    Prior to the appearance of the protestors?

18   A    Yes.

19   Q    Okay.  What did the FBI tell you?

20   A    They don't tell you anything.  You actually have to

21   apply through their -- I'm not going to give you the right

22   term, but it's, like, the Internet crimes unit.  So it's an

23   online process you have to go through with them.

24   Q    So you filled out some sort of online report?

25   A    Yes.

```
1    Q    And were you contacted by an agent from the FBI?

2    A    Yes.

3    Q    And was that in person or on the phone?

4    A    Telephone.

5    Q    When was this approximately?

6    A    Mid-2016.

7    Q    So maybe a few months before the protestors appeared?

8    A    Yes.

9    Q    And as far as you know, did the FBI take any action in

10   response to your report?

11   A    I'm not aware.

12   Q    So after your phone conversation with the agent in

13   mid-2016, you never heard anything further about it?

14   A    I heard further about it, yes.

15   Q    What do you mean by that?

16   A    That they were monitoring it.

17   Q    Is that the extent of it?

18   A    Approximately.

19   Q    When was that?

20   A    About six months ago was the last communication I got.

21   Q    From the FBI?

22   A    Yes.

23   Q    But didn't the e-mails stop about a year ago, at least?

24   A    Approximately.

25   Q    So if there is no more e-mails, there is nothing more
```

1  for them to monitor; is that right?

2  A    I don't know.

3  Q    There was no Court order that you are aware of in the

4  United States that prevented Charif or Tony Kazal from

5  sending e-mails to you; right?

6  A    No, not in the United States.

7  Q    So you are saying there was a Court order in Australia

8  that prevented them from e-mailing you?

9  A    No.  I just know there were Court orders in Australia

10  on certain behaviors that they had to cease and desist.

11  Q    Including Tony Kazal?

12  A    No.

13  Q    So you're saying a Court order in Australia prevented

14  Charif Kazal from sending you an e-mail?

15  A    I cannot talk about Charif Kazal in this order.  It's

16  an order to a separate case.

17  Q    Right.  So it has nothing to do with you specifically?

18  A    The language is conjoined.

19  Q    I'm not sure what that means, but it's not your case?

20  A    It's not my case, but the language within it was

21  referenced to the same common language that I have a -- the

22  Court order against Adam Kazal.  That was replicated in the

23  other case against Charif Kazal is my understanding.

24  Q    But, again, you are not a party to that case.

25  A    I am not, no.

```
 1    Q     Now, the report that you made to the FBI with respect
 2    to the e-mails, did you report to them that there was a
 3    certain crime that you believed had taken place?
 4    A     I can't assume the FBI process.  So I was notifying the
 5    FBI what was occurring.
 6    Q     Right.  And what did you tell them?
 7    A     I didn't tell them anything.  I filled out their forms.
 8    Q     Okay.  Well, you reported something to them.
 9    A     Yes.
10    Q     And you reported that you were receiving e-mails on a
11    near daily basis that you didn't want to receive.
12    A     Yes.
13    Q     Was that, basically, the extent of it?
14    A     In terms of the Internet crimes unit, that's how that
15    works, is my understanding, yes.
16    Q     Okay.  Now, when you filled out that report, did you
17    provide exemplars of these e-mails that you were talking
18    about in your communications with the FBI?
19    A     I believe we provided some copies and then links to the
20    Website that was publishing them, I believe.
21    Q     And in your conversation with the agent -- was it a man
22    or woman, by the way?
23    A     A male.
24    Q     Did you tell him -- I'm sorry.
25            Did he tell you anything about whether there was
```

```
 1    something wrongful about what -- the conduct that you were
 2    complaining of?
 3    A     No.
 4    Q     So he just -- fair to say he just took the information
 5    from you and said, "We'll monitor it"?
 6    A     Yes.
 7    Q     And that was the extent of it?
 8    A     Yes.
 9    Q     Okay.  Now, it's correct to say, isn't it, that, prior
10    to the appearance of the protestors in October of 2016 --
11    again, you said you had been receiving e-mails regularly for
12    about a year already?
13    A     Approximately.
14    Q     So prior to the appearance of the protestors in
15    October 2016, it's true, isn't it, that you never made any
16    complaint of any kind with the police or other law
17    enforcement that there was any stalking going on by the
18    Kazals, of you and your family?
19    A     Aside from the e-mails, that's correct.  We felt safe
20    here.
21    Q     And it's true also that, prior to the appearance of the
22    protestors during that year or so that you were receiving
23    regular e-mails from the Kazals, you never filed any kind of
24    claim with the Courts or other body that you felt you were
25    being stalked by those e-mails; correct?
```

```
 1    A    Only as far as it went to our Australian applications.

 2    Q    But you never filed any claim here that you were --

 3    A    No.

 4    Q    -- being stalked in receiving those e-mails; right?

 5    A    No.  Outside of the FBI complaint, no.

 6    Q    Outside of?

 7    A    FBI complaint.

 8    Q    Oh, FBI, right.  I thought you said "FDA."

 9    A    Sorry.

10    Q    No, it's my fault.

11              May I just take a moment for a sip of water.

12              THE COURT:  Let's take a 15-minute recess.

13              Ladies and gentlemen, do not form or express any

14   opinion about the case until the matter is finally submitted

15   to you.  Don't talk about the case with anyone.  Don't allow

16   anyone to talk to you about the case.  And don't conduct any

17   research of any kind on any subject matter connected with

18   this case.  We'll have you come back at 11:15, all right?

19   Thank you.

20              THE CLERK:  All rise for the jury.

21         (The following was heard in open court outside the

22          presence of the jury:)

23              THE COURT:  Sir, you may step down.

24              Mr. Taylor, I am just curious.  How much longer do

25   you think you have with the witness?
```

```
 1                 MR. TAYLOR:  I would say at the rate we're going
 2     hopefully about 45 minutes.
 3                 THE COURT:  All right.
 4                 MR. TAYLOR:  At the most.
 5                 THE COURT:  We'll take a 15-minute recess.  We'll
 6     go to about 12:30 today before the lunch break.
 7                 THE CLERK:  All rise.  This Court is in recess.
 8          (Recess taken 11:02 AM to 11:21 AM)
 9                 THE COURT:  Mr. Taylor, you may continue.
10                 MR. TAYLOR:  Thank you, Your Honor.
11     Q    Now, Mr. David, I believe you testified on Tuesday that
12     you felt that the protests somehow constituted terrorist
13     tactics.
14                 Is that the term that you used?
15     A    Yes.
16     Q    So what -- I want to understand what you mean by that.
17                 You are saying that the appearance of protesters
18     in your neighborhood and outside your studio constituted
19     terror tactics, terrorist tactics?
20     A    So you've got to go to my state of mind.  I've got on
21     the same day an escalating campaign against me, Mr. Singh,
22     my family in Australia being coordinated with the campaign
23     here in the United States.
24                 I had no idea who these people are, what they're
25     doing.  I'm just seeing posters, chanting, my business, my
```

```
 1   home, my families' homes, the suburbs of where my family and
 2   friends live in Sydney, vans driving around the CBD -- yes,
 3   that's an escalation and then coordinated with the
 4   communications that are coming in, yes, that's a terrorist
 5   campaign.
 6   Q    I'm sorry.  You said "the CBD"?
 7   A    Oh, sorry.  Central Business District of Sydney.
 8   Q    Commercial area of town?
 9   A    It's the city of Sydney.
10   Q    In Australia?
11   A    Yes.
12   Q    Okay.  So you are saying that, if I understand you, the
13   appearance of what you said were, obviously, paid protestors
14   in your neighborhood and outside Thunder Studios constituted
15   terrorist tactics.  Is that you're saying?
16   A    It's part of the campaign that I considered terrorist
17   tactics, yes.
18   Q    I see.
19        And that's because the Kazals are of Arab descent;
20   right?  That's the reason you're using that term?
21   A    No.
22        MR. WIENER:  Objection, Your Honor.  Argumentative.
23        THE COURT:  Overruled.
24        He may answer.
25        THE WITNESS:  No, it's not.
```

1   BY MR. TAYLOR:

2   Q     Has nothing to do with the fact that they're originally

3   from Lebanon?

4   A     No, it's not.

5   Q     Now, Mr. David, at some point you learned that your

6   CTO, Mr. Price, had registered and created domains and

7   Websites related to the Kazal family, including

8   kazalfamilytruth.com, adamkazal.com, charifkazal.com,

9   tonykazal.com, and karlkazal.com; right?

10  A     I became aware, yes.

11  Q     And at the time he did so, he was the CTO of

12  Thunder Studios; right?

13  A     When he did what?  I'm sorry.

14  Q     When he created and registered those Websites.

15  A     I don't know when he created them.  I don't know -- you

16  might help me there.

17  Q     I'm sorry?

18  A     You might be able to help me there.

19  Q     Well, does it sound right to you that those Websites

20  first appeared in early 2016?

21  A     I don't know.

22  Q     But you have no reason to doubt that it was around

23  then?

24  A     If that's what you're are saying, no.

25  Q     Did you ever learn at any time that he had created

1  those Websites while he was the CTO of Thunder Studios?

2  A    I learned about them the day I got subpoenaed.   I

3  believe he was still the CTO then.

4  Q    Now, you testified during the initial session this

5  morning that you sometimes drove to work together with

6  Mr. Price because he would drop his daughter off at the

7  school near your house.

8  A    We would sometimes carpool, yes.

9  Q    But how often would you drive to work together?

10  A    It was never until the first protest.  From the first

11  protest, it became quite frequent.

12  Q    So the morning of October 26th was the first time that

13  you and Mr. Price had ever driven together to

14  Thunder Studios?

15  A    Might not be the first, but it was extremely rare if we

16  ever did prior to that.

17  Q    But after that it was pretty often?

18  A    Regular, yes.

19  Q    And from your area of town to Thunder Studios, it's a

20  pretty long drive.  It's probably at least 45 minutes each

21  way; right?

22  A    A bit less.

23  Q    I guess it depends what time you leave, but it's

24  probably 25, 30 miles; right?

25  A    Approximately.

```
 1   Q    On the days that you and Mr. Price would drive together
 2   to Thunder Studios, he would -- you would also drive home
 3   together at the end of the day; right?
 4   A    Sometimes.
 5   Q    If not, then how would you get home?
 6   A    Other employees.
 7   Q    Oh, so other people who lived nearby would then take
 8   you?
 9   A    Yes.
10   Q    And while you were driving to work together, you would
11   speak to Mr. Price during the commute; right?
12   A    Yes.
13   Q    And you would speak about things related to your
14   personal lives?
15   A    Sometimes.
16   Q    And things related to the business, of course?
17   A    Sometimes.
18   Q    And you were working together on a daily basis at that
19   time; right?
20   A    No.
21   Q    What do you mean by that?
22   A    We worked for the same company, yes, but I wouldn't
23   interact with him every day, no.
24   Q    I see.
25              And at that time, there were about 10 or 12
```

1  employees, I think you said?

2  A    Direct employees, but we have potentially sometimes

3  hundreds of contractors.

4  Q    Hundreds of contractors on-site at the studio?

5  A    Yes.

6  Q    Now, at the studio you have offices and you have studio

7  space; right?

8  A    Yes.

9  Q    And Mr. Price worked in an office; right?

10 A    He did.

11 Q    You worked in an office too; right?

12 A    Yes.

13 Q    The majority of those contractors were working in the

14 studios, weren't they?

15 A    Yes.

16 Q    Now, when you became aware of the existence of these

17 Websites that Mr. Price had created, did you go online and

18 take a look at them?

19 A    I had seen them before, yes.

20 Q    I see.

21        So prior to learning that Mr. Price was behind the

22 Websites, you had seen them on your own?

23 A    Yes.

24 Q    When was that that you first saw them?

25 A    I couldn't tell you specifically.

```
1    Q    2016?

2    A    Quite possibly, yes.

3    Q    I'd ask you to turn to Exhibit 43 in the binder in

4    front of you.

5              THE COURT:  Are you going to move this into

6    evidence?

7              MR. TAYLOR:  Oh, yes, I will, Your Honor.

8              Let me ask the witness if he has seen this before.

9    Q    Is this the -- is this a collection of screenshots from

10   the Kazal Family Truth Websites that we were just talking

11   about?

12   A    I'm not sure.

13   Q    Have you seen this before?

14   A    I have seen that montage before, yes.

15   Q    Flipping through the few pages of this exhibit, have

16   you seen any of these other screenshots before, whether in

17   paper or -- format or online or some other medium?

18   A    There seems to be some duplication but, yes, I've seen

19   them.

20             MR. TAYLOR:  Your Honor, I would like to move

21   Exhibit 43 into evidence.

22             THE COURT:  Any objection?

23             MR. WIENER:  Objection, Your Honor.  There is not

24   a proper foundation.  The witness did not testify that he

25   saw all these at the purported Website, just a Sydney -- at
```

 1   least some of the articles in various formats.

 2          THE COURT:  All right.  The objection is

 3   sustained.

 4          Mr. Taylor, you need to ask some follow-up

 5   questions, please.

 6          MR. TAYLOR:   Sure.

 7   Q    When you went to the Website, was it the

 8   kazalfamilytruth.com Website?

 9   A    Honestly, I don't recall.

10   Q    Do you recall seeing pictures of the Kazals on the

11   Website?

12   A    Not specifically, no.

13   Q    Do you recall seeing links to any articles about the

14   Kazals on the Website?

15   A    I remember seeing -- I know all these articles, yes.

16   Q    Do you recall seeing photographs or graphics embedded

17   within the articles on the site?

18   A    Definitely recall this montage of which we are looking

19   at now.

20   Q    Do you recall seeing any terminology, any words,

21   embedded upon any of the photographs on the site?

22   A    No, I don't -- I remember the headlines.  These are

23   all -- these are all headlines from the *Sydney Morning*

24   *Herald* articles, I believe.

25   Q    Do you recall seeing those headlines on the Website?

```
 1   A    Not specifically, no.

 2   Q    Do you recall seeing certain headlines on the Website?

 3   A    I remember the headlines well, but my memory is when I

 4   read them in the newspapers.

 5   Q    How many times did you visit the Kazal Family Truth

 6   Website?

 7   A    I don't recall.  I don't know whether I ever visited

 8   the Kazal Family Truth Website.

 9   Q    I thought you said you learned of its existence before

10   you said you received a subpoena.

11   A    Yes.

12   Q    How did you learn of its existence?

13   A    I was subpoenaed.

14   Q    I'm sorry.  I thought you said you learned of the

15   existence before you were subpoenaed?

16   A    Well, I've seen -- so if you go online and you do a

17   Google search under my name, dozens and dozens and dozens

18   and dozens and dozens and dozens of Websites come up all

19   linking to imagery.

20        This imagery is replicated on the Internet

21   hundreds and hundreds and hundreds of times.  I can't in all

22   honestly tell you specifically which Website I've seen a

23   specific article.  I remember the source articles.

24   Q    You said you have seen the montage that's on the first

25   page of this exhibit?
```

```
1    A    Yes.

2    Q    Where did you see it?

3    A    Sydney Morning Herald.

4    Q    You're saying that montage appeared in the Sydney

5    Morning Herald?

6    A    Yes, created by the Sydney Morning Herald.

7    Q    After you were subpoenaed, did you visit the Websites,

8    any of these five Websites?

9    A    I don't recall.

10   Q    Did you speak to Mr. Price about them?

11   A    No.

12   Q    How was it that you learned Mr. Price had created these

13   Websites?

14   A    The subpoena was to me and Mr. Price by Mr. Kazal

15   for -- I can't remember the technical term.  I want to say

16   cyber piracy, but I think I might be wrong.

17   Q    Essentially, for use of the Kazal family names in these

18   Websites?

19   A    So Thunder Studios was subpoenaed by, I think, a

20   California Court for cite of piracy.  That was the day I

21   found out about it.

22   Q    And you found out about it at the same time you found

23   out that Mr. Price was involved in that claim as well.

24   A    Only because it was in the subpoena.

25   Q    Right.
```

```
 1    A    Yeah.

 2    Q    You saw his name there.

 3    A    Yeah.

 4    Q    And you -- are you saying that you did not subsequently

 5    speak to him about these Websites?

 6    A    No.  I recall standing in the hallway with him and

 7    saying I just got subpoenaed.  I told him I don't want to

 8    know anything about it.

 9    Q    And this was in the hallway of Thunder Studios's

10    office?

11    A    Yes.

12    Q    So, obviously, he was still employed with

13    Thunder Studios at the time?

14    A    When I got subpoenaed for cyber piracy, yeah.

15    Q    So, to your knowledge, at the time that you were

16    subpoenaed, had Mr. Price ever had any dealings or

17    interactions with the Kazal family?

18    A    Not that I am aware of except for the -- as CTO, his

19    role was to deal with the e-mail filters that we spoke about

20    before.

21    Q    And, to your knowledge, as of the time that you

22    received that subpoena and spoke to Mr. Price, had he ever

23    met any of the Kazal family before?

24    A    I don't believe so.

25    Q    Is it your understanding that Mr. Price took it upon
```

```
 1   himself to create these five Websites on his own?

 2   A    That's my understanding.

 3   Q    You never directed him or asked him to do anything like

 4   that; right?

 5   A    No.

 6   Q    You never even discussed it with him?

 7   A    No.

 8   Q    Now, you are aware that there are eight Kazal brothers;

 9   right?

10   A    Yes.

11   Q    And as far as you know, Mr. Price registered domain

12   names for Websites in the names of only four of the eight

13   Kazal brothers.  Is that your understanding?

14   A    Certainly that's my understanding through this process,

15   yes.

16   Q    So is it your understanding that Mr. Price decided to

17   create Websites in the names of only four of those brothers

18   and not the other four?

19   A    I'm not sure.

20   Q    You're not aware of Websites in the names of any of the

21   other four brothers?

22   A    I'm not, no.

23   Q    Three of the four brothers who have Websites created in

24   their names by Mr. Price, Charif, Tony, and Karl, are

25   brothers that you have had business dealings in the past?
```

```
 1   A    Right.
 2   Q    KTC was Karl, Tony, and Charif; right?  That was their
 3   company.
 4   A    Correct.
 5   Q    That was the company that you had a business dispute
 6   with starting in 2010; right?
 7   A    Yes.  Well, starting late in 2009, I believe.
 8   Q    Okay.  Now, Mr. Price is no longer employed with
 9   Thunder Studios; correct?
10   A    No.
11   Q    No, he is not?
12   A    No, he is not.
13   Q    Now, you are aware that Mr. Price is currently a
14   defendant in a lawsuit brought by the Kazals in connection
15   with his creation of these five Websites?
16   A    I'm aware of that.
17   Q    You are aware of the lawsuit?
18   A    Yes.
19   Q    And you have spoken with Mr. Price about the lawsuit;
20   right?
21   A    Not directly, no.
22   Q    Do you know who is paying Mr. Price's legal bills in
23   that lawsuit?
24   A    No.
25   Q    You have no idea?
```

```
 1   A     No.

 2   Q     Do you know who his attorney is in that lawsuit?

 3   A     Yes.

 4   Q     Who is that?

 5   A     A Floridian one, I think, called Sohn, I believe --

 6   Q     I'm sorry, just --

 7   A     A Floridian gentleman by the name of Sohn, I think "S,"

 8   Sohn.

 9   Q     That's your current understanding?

10   A     So I know it's being transferred to California, and I

11   believe Mr. Gebelin will be representing that case here, but

12   I'm not specifically aware of exactly where that stands in

13   the transference between states.

14   Q     Mr. Gebelin, who is sitting right here?

15   A     Yes.

16   Q     Also your attorney?

17   A     Yes.

18   Q     On Tuesday you testified that the Kazals made an

19   offer -- I believe, it was during the liquidation process of

20   ECL -- to purchase the Global Renewables entity; right?

21   A     Yes.

22   Q     And I think you said there were several offers, one

23   better than the last, in the space of a very short time

24   frame; right?

25   A     I wouldn't necessarily say better, but within a
```

```
 1   24-hour, 36-hour period there were multiple offers made.

 2   Q    But "better" meaning more than the previous one.

 3   A    Not necessarily in dollar terms, but I think it had to

 4   do with restrictions.

 5   Q    I see.  And you said -- I think you said -- correct me

 6   if I'm wrong -- that the reason that you didn't give as much

 7   credence to the Kazals' offer and instead accepted an offer

 8   by Iron Bridge was that the Kazals' offer was somehow tied

 9   to the Libyan Investment Authority; is that right?

10   A    In part it is.

11   Q    And you referenced a Mr. Zotti?

12   A    Yes.

13   Q    And who was he again?

14   A    He is the -- he was the signature to the letter of --

15   the qualified letter of financial support.

16   Q    From the Libyan Investment Authority?

17   A    Yes.

18   Q    Did you have an understanding of what his role was?  At

19   the LIA -- sorry, Libyan Investment Authority?

20   A    I don't recall specifically, but I believe he was one

21   of the senior individuals.

22   Q    And, again -- correct me if I am wrong -- but I believe

23   you testified on Tuesday that a search of Mr. Zotti's name

24   at the time would have revealed some allegations of criminal

25   conduct or war crimes.
```

```
 1          Can you clarify that or explain that for me?
 2   A    No.  I just -- Google search on his name comes up with
 3   a past that's, to say the least, interesting.
 4   Q    Can you elaborate.
 5   A    I don't recall the specifics.  It goes back to 2011.
 6   Q    The Google search that you reference, you conducted
 7   such a search at the time?
 8   A    I don't recall.  I don't recall.
 9   Q    I am trying to understand what it was about the fact
10   that the offer was linked to the Libyan Investment Authority
11   that caused you to view it as problematic.
12   A    I wouldn't have said the word "problematic."  I have
13   been chastised by doing some narrative; so -- but I can tell
14   you a little more if you like.
15          THE COURT:  Ask your next question, please,
16   Counsel.
17   BY MR. TAYLOR:
18   Q    My question specifically is what is it about the fact
19   that the offer by the Kazals to purchase Global Renewables
20   was tied to the Libyan Investment Authorities caused you to
21   view it as less desirable?
22   A    So my primary consideration was, under the validation
23   order of the Cayman Court, was to ensure a successful close
24   with a bidder.  The Kazals at the time were known as
25   impecunious.  The dispute that ECL's liquidation was over
```

 1   was because they refused to put in any money.

 2           Charif doesn't have any money.  The only person

 3   supposedly associated with the Kazals that has any money is

 4   brother Karl, and so the offer from an Australian-based

 5   private equity firm in cash was a fairly qualified offer.

 6   The offer from the Kazals, KTC, which had refused to put in

 7   any funding into ECL over the years, and that was what

 8   caused the primary dispute, came with a prequalification

 9   that they had financial support from the Libyan Investment

10   Authority.

11           When you read the letter of that qualified

12   support, it was subject to the Libyan Investment Authority

13   doing due diligence on KTC.  So it wasn't actually a firm

14   support of finances, it was a potential support of finances

15   subject to due diligence of the Kazals and their business.

16           Balance that up with a, sort of, cash offer from

17   an Australian well-known private investment firm.  Clearly,

18   it was a decision to go with achieving a successful close.

19   Q    So if I understand you, you did a Google search on the

20   signatory to that letter, Mr. Zotti, at some point, but you

21   don't know when.

22   A    Correct.

23   Q    Could have been before the decision was made, could

24   have been some time later?

25   A    I just don't recall.  It wasn't something that was that

```
 1    meritorious to me contemporaneously.  My focus was dealing
 2    with the validation order of the Court in reaching a
 3    successful close.
 4    Q    Did you have any reason -- would you have had any
 5    reason to look into Mr. Zotti to conduct a Google search at
 6    some later point?
 7    A    Well, during the course of the overarching dispute with
 8    the Kazals, absolutely.  You know, it was soon after there
 9    were some press articles that emerged about the Kazals'
10    association with Hezbollah, and so that, you know, raised
11    lots of eyebrows associated with, you know, my broader
12    concerns to my health and safety for my family.
13    Q    This was in 2011?
14    A    2011, 2012, 2010.  This is a period of emerging
15    information during the course of that period.
16    Q    Are you familiar with a company called Ace Dairy
17    Company?
18    A    I'm familiar with the acronym ACE.  It stands for
19    Australian Cattle Exporters.  I don't recall specifically
20    "Dairy" but possibly.
21    Q    What was your relationship, if any, with that company?
22    A    I'm a good friend of the CEO.  I was at one stage a
23    shareholder in ACE when it was an exporting company for
24    cattle.
25    Q    How significant of a shareholder were you?
```

1   A    Oh, miniscule.

2   Q    In terms of percentage ownership?

3        MR. WIENER:  If I may object, Your Honor.  I don't

4   understand the relevance, and it's also going into --

5        THE COURT:  Sustained.

6        MR. WIENER:  -- his finances.

7   BY MR. TAYLOR:

8   Q    At any point did you ever seek investment funding from

9   the Libyan Investment Authority on behalf of ACE Dairy

10  Company?

11  A    I recall some communications with Tony Kazal.  He asked

12  me to send some information on certain deals to different

13  individuals.  I don't recall who those individuals are.

14  It's quite possible that the Libyan Investment Authority may

15  be one of them.  I just don't recall.  This must be 2009,

16  2010.

17  Q    Didn't you send at --

18  A    2008.

19  Q    Didn't you send at least one e-mail to Mr. Zotti of the

20  Libyan Investment Authority on behalf of ACE Dairy seeking

21  investment funding?

22  A    Quite possibly.  I don't recall.

23  Q    You said Tony requested.  Was he somehow an owner or

24  officer of ACE Dairy company?

25  A    No.  Tony was a director at the time of Emergent

```
 1    Capital.
 2    Q    So in your communications, if you had them with the
 3    Libyan Investment Authority, you were doing it on behalf of
 4    the company that you owned shares in; right?
 5    A    Well, I was doing it on behalf of ECL.
 6    Q    Why?  Was ECL the owner of ACE Dairy Company?
 7    A    No, not at all.  That -- you know, you've got to
 8    understand.  At the time ECL was seeking to broker
 9    opportunities in the UAE.  So if ECL could broker an
10    opportunity for dairy, it would seek some, sort of, terms,
11    commercial terms, on a successful close.
12    Q    The idea being to expand the reach of a company like
13    ACE Dairy into the Middle East; right?
14    A    I don't recall the specifics of it.  I can only assume
15    it had something to do with dairy, but outside of that I
16    can't recall.
17    Q    You testified on Tuesday that part of the idea in
18    moving to California was to, sort of, lay low and maintain a
19    low profile.  Do you recall that?
20    A    To be able to move on with our lives and get some
21    distance in the hopes that the Kazals would move on.
22    Q    And when did you move to California specifically?
23    A    2012.
24    Q    And at that point, did Thunder Studios exist already?
25    A    No.
```

```
1    Q    When was Thunder Studios founded?

2    A    2013.

3    Q    That's when it opened?

4    A    Yes.

5    Q    Opened for business, meaning?

6    A    Yes.

7    Q    But it's true -- is it not -- and you said on Tuesday,

8    I believe, that you wanted to maintain a low profile here;

9    correct?

10   A    As it pertains to where our children went to school,

11   where we lived, et cetera.

12   Q    I see.

13            So you are saying that opening a Hollywood film

14   and TV and commercial studio was not inconsistent with

15   trying to maintain a low profile?

16   A    Well, it existed.  I bought an existing business.

17   Q    Oh, I see.

18            You didn't found Thunder Studios with your family?

19   A    Well, the name, but it was originally called South Bay

20   Studios.  It's existed for 30 years.

21   Q    So you took over the operation of an existing studio?

22   A    Yes.

23   Q    And that's at the same location that it is now?

24   A    Yes, yes.

25   Q    Mr. David, it's true that, in the last several years,
```

1   you've have been in a couple of different motion picture

2   productions?

3   A    The question's vague.  Me, Thunder Studios?

4   Q    You personally on screen.

5   A    No.

6   Q    No, you've never been on screen on any motion picture

7   production at all?  No TV?

8   A    So I've been on -- I had a cameo in a film called

9   "*9/11*," but it didn't make the cut.

10  Q    So you wound up on the floor of the editing room?

11  A    Yes.

12  Q    "Cameo" meaning playing yourself?

13  A    No, no.  I played a lawyer, in fact.

14  Q    In connection with the broader dispute with the Kazals,

15  with Charif and Tony, in particular, with the incidents that

16  you allege occurred that gave rise to this lawsuit, you've

17  not sought any therapy or counseling from any professional;

18  isn't that right?

19  A    Not personally, no.

20  Q    In Exhibit 31, which we looked at on Tuesday, which I

21  believe Mr. Wiener showed you on direct, we saw a screen

22  screenshot or several pages from the kazalfamilystory.com

23  Website which included an e-mail from Tony Kazal that had

24  been, I guess, paced into the Website.

25          Do you recall that?

```
 1   A    Can I go to it?

 2   Q    Yeah, sure.  Let's take a look.  Exhibit 31, the second

 3   page of the exhibit.  The second page of the exhibit,

 4   Plaintiffs' 1871.

 5            Are you with me?  Are we looking at the same page?

 6   A    At the exhibit --

 7   Q    It should be on the screen now.

 8   A    I think so.  I am almost on the same page with you.

 9   Yeah.

10   Q    You see at the top?  It's a little bit faded because of

11   the, I guess, the header there, but it says, "To,

12   Rodric David," cc info, and various other people.

13            Do you see that?

14   A    I do.

15   Q    And you see at the end of that list above "Subject," it

16   says "Charif Kazal."  He is among the cc recipients as well;

17   right?

18   A    I believe so, yeah.

19   Q    Right before his name says "jcarroll."  Who is that?

20   A    Jacqueline Carroll.

21   Q    Who is she?

22   A    She's the -- at the time she was the sales and

23   marketing manager for the studios.

24   Q    And above her name, it says "mprice."  That's

25   Matthew Price; right?
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   A    Correct.

 2   Q    And "smanpearl."

 3            Who is that?

 4   A    A former employee.

 5   Q    Above that it says "mabend."

 6            Who is that?

 7   A    Former employee.

 8   Q    What's the name?

 9   A    Mike.

10   Q    Mike Abend.

11            And what did he do at Thunder Studios?

12   A    He was business development.

13   Q    Above his name, "dfinger."

14            Who is that?

15   A    David.

16   Q    What did he do?

17   A    He was head of media.

18   Q    Is he still there?

19   A    No.

20   Q    And above his name is "cmartell."

21            Who is that?

22   A    Carey Martell.

23   Q    Is Carey Martell still employed at Thunder Studios?

24   A    No, he is not.

25   Q    What was his title when he was there?
```

1    A    Vice-president, Thunder TV.

2    Q    How long did he work for Thunder Studios?

3    A    Eight months or so.

4    Q    That was in 2015?

5    A    Yes.

6    Q    So by the time you started receiving e-mails from the

7    Kazals, CC'd to Mr. Martell, he wasn't even working at the

8    company anymore; right?  Certainly through 2016?

9    A    Well, I don't understand the question.  This one says

10   it's the E-mail 163.

11   Q    Right.  So I am saying if he left in 2016 --

12   A    What's the date of the e-mail?

13   Q    I don't necessarily know the date of this e-mail, but I

14   am saying, in general, if most of the e-mails were sent in

15   2016 and into 2017, then Mr. Martell wouldn't have received

16   them because he wasn't at Thunder Studios anymore; right?

17   A    I understand your logic.  I just don't know the date of

18   this e-mail to know whether this was something that he

19   possible could have received.

20   Q    Now, Mr. Martell, he had some background in media and

21   TV before joining Thunder Studios?

22   A    I wouldn't have said that, no.

23   Q    So he had no background in media and TV before you

24   hired him?

25   A    No.  His claimed expertise was YouTube agregation.

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    Q    At some point before he joined Thunder Studios, he was

2    in the United States Army; right?

3    A    He claims to, yes.

4    Q    Mr. Martell filed a lawsuit against you and

5    Thunder Studios in 2016.  Isn't that right?

6                 MR. WIENER:  Objection.  No relevance, Your Honor.

7                 THE COURT:  Sustained.

8                 MR. TAYLOR:  Your Honor, may I be heard on the

9    relevance of this line of questioning?

10                THE COURT:  Approach sidebar.

11        (The following proceedings were held at sidebar.)

12                THE COURT:  Mr. Taylor.

13                MR. TAYLOR:  This -- Mr. Martell filed a lawsuit

14   which went to trial last year, and there was a liability

15   finding on fraud and conversion and breach of contract, and

16   that's admissible --

17                THE REPORTER:  I can't hear you.  Start from the

18   beginning.

19                MR. TAYLOR:  From the beginning?

20                There was a lawsuit filed in 2016 which went to a

21   jury trial last December, and there was a liability finding

22   with respect to claims for fraud, misrepresentation,

23   conversion, and breach of contract.

24                So I think under Rule 608, I am allowed to inquire

25   about that lawsuit, Your Honor.

```
 1              THE COURT:  Who was the lawsuit against?  Who are
 2    the parties of the lawsuit?
 3              MR. TAYLOR:  Thunder Studios.
 4              THE COURT:  Hold on.
 5              Who were the parties of the lawsuit?
 6              MR. TAYLOR:  Carey Martell and his company.  I
 7    don't remember the name off the top of my head, something
 8    like Martell Broadcasting.
 9              MR. GEBELIN:  Martell Broadcasting.
10              MR. TAYLOR:  And --
11              THE COURT:  Hold on.
12              Identify yourself for the record because our
13    court reporter is not going to get the record if you're
14    going to interrupt.
15              MR. GEBELIN:  Steven Gebelin for plaintiffs.
16              The other company, plaintiff company, is Martell
17    Broadcasting Systems.
18              MR. TAYLOR:  Right.  And I believe the lawsuit was
19    against --
20              THE COURT:  For what -- okay.
21              MR. TAYLOR:  -- defendants, Mr. David personally,
22    and Thunder Studios.
23              THE COURT:  Is that accurate?  You say you think.
24              MR. TAYLOR:  I mean, I looked at the Complaint.
25    That's my understanding.
```

1    THE COURT:  Wait a minute, Counsel.  You're saying

2    that's your understanding.

3         Do you have a document that shows --

4         MR. TAYLOR:  I have the Complaint but --

5         THE COURT:  Okay.  So, then, why do you say that's

6    your understanding?  You have a Complaint.  Was there -- did

7    you follow up in the lawsuit?  Was it filed against

8    Mr. David personally?  Was the judgment against Mr. David

9    personally?

10         MR. TAYLOR:  Well, that's the thing, Your Honor.

11   There was a verdict in Phase 2 on punitive damages, which

12   hasn't happened yet because it's my understanding that they

13   started that portion of the trial, and there was a mistrial,

14   and it has been rescheduled.  So there's actually no final

15   judgment yet because it's only been a verdict.  But, no --

16         THE COURT:  Okay.  And do you know whether or not

17   the verdict was against Mr. David personally?  I mean --

18         MR. TAYLOR:  I don't have it because it's not

19   public record.  It's not filed because it's not --

20         THE COURT:  So then how can -- so if it's not a

21   judgment, how does it come in under 608?  If there's no

22   judgment and there's been no -- arguably at this stage, as

23   we there stand here -- correct me if I'm wrong -- there's no

24   finding because there's been no judgment.

25         MR. TAYLOR:  Well, I mean, the jury reached a

1   verdict.

2           THE COURT:  But there's no judgment on that,

3   correct?

4           MR. TAYLOR:  That's my understanding, yes.

5           THE COURT:  So I don't see how it comes in

6   because -- you are telling me there is now a Phase 2 that --

7           MR. TAYLOR:  On punitive damages.

8           THE COURT:  There has been a mistrial?

9           MR. TAYLOR:  There was a Phase 2 trial on punitive

10  damages which resulted in a mistrial, and the Court has

11  continued that hearing for a new trial on Phase 2, punitive

12  damages, for early next year.

13          THE COURT:  And let's just -- I just want to jump

14  back for a second.

15          Do you know whether or not the verdict was against

16  Mr. David personally?

17          MR. TAYLOR:  My understanding is that it was, but

18  I don't have a copy of it because it's not available.

19          THE COURT:  So what's the basis of your

20  understanding?

21          MR. TAYLOR:  The basis of my understanding is a

22  phone call I had with Mr. Martell's lawyer.

23          THE COURT:  I'm not sure that's enough, but I will

24  allow the defense to be heard.

25          MR. WIENER:  Do you want to address this?

```
 1              There is no judgment, Your Honor, that we're aware
 2    of, and we simply don't see the relevance to any issue that
 3    has any probative value.
 4              Also prejudicial to introduce an unrelated civil
 5    action that doesn't involve the defendants.
 6              THE COURT:  All right.  Look, after hearing
 7    everything, I am still going to sustain the objection.  I
 8    have no idea what this trial is about.  We don't have a
 9    verdict.  We don't have anything.  It's just your
10    conversation with a lawyer that he says there was a finding
11    against Mr. David personally.
12              MR. TAYLOR:  Well, Mr. Gebelin was counsel for
13    Thunder Studios --
14              THE COURT:  But you have nothing.  Basically, you
15    have a phone call with a lawyer who says there was a
16    judgment or a verdict.
17              MR. TAYLOR:  I don't have --
18              THE COURT:  That verdict has not been finalized.
19    I don't know if it's true or not.  I just don't know.  And
20    to be able to inquire of this witness who -- I can only
21    imagine what his response would be -- who does not have any
22    legal training.  He may think he knows everything on the
23    planet, but he doesn't have any legal training --
24              MR. TAYLOR:  I --
25              THE COURT:  -- I think it's going to be too
```

1    prejudicial and less probative.  If you get some information

2    that you can present to the Court to show the Court that a

3    finding was made specifically against Mr. David, we can

4    revisit this next week.  But until that time, the objection

5    is sustained.  All right.  Thank you.

6        (The following was heard in open court in the presence

7         of the jury:)

8    BY MR. TAYLOR:

9    Q    Mr. David, getting back to the discussion we had

10   earlier about the protestors who appeared in your

11   neighborhood and outside Thunder Studios in October of 2016,

12   you have no specific information to suggest that defendant

13   Charif Kazal was involved in any way of organizing those

14   protests; correct?

15   A    I don't, no.

16   Q    And you don't have any specific information to suggest

17   that -- strike that.

18            You said, I think, you moved to America in 2012?

19   A    Yes.

20   Q    And you got involved in business in Thunder Studios and

21   you bought a home here; correct?

22   A    Yes.

23   Q    It's your intention to stay in the United States;

24   right?  You are not planning to move back to Australia, are

25   you?

```
 1    A    Not at this present time, no.

 2    Q    Is it fair to say you appreciate the rights and

 3    freedoms that the United States accords to its the citizens?

 4    A    Yes.

 5    Q    And you are aware, are you not, that there is a

 6    constitutional right to freedom of speech in the

 7    United States?

 8    A    Yes.

 9    Q    And you are aware also that there is a constitutionally

10    protected right to lawful assembly and peaceful protest;

11    right?

12    A    Yes.

13    Q    That's what the LAPD told you when they came out to

14    your neighborhood in response to your wife's call about the

15    protestors, that there's a lawful right to protest; right?

16    A    Well, I think I said that the police told me that there

17    is a right of peaceful protest.

18    Q    That's what they told you?

19    A    Yes.

20    Q    And you would agree with that, with what they told you;

21    right?

22    A    Yes.

23              MR. TAYLOR:  I have nothing further, Your Honor.

24              THE COURT:  All right.  Redirect.

25              MR. WIENER:  Yes, Your Honor.
```

```
 1                    REDIRECT EXAMINATION

 2    BY MR. WIENER:

 3    Q    Good afternoon, Mr. David.

 4    A    Good afternoon.

 5    Q    I would like for you to turn to Exhibit 42, which is

 6    the ICAC report.

 7         I would like for you to turn to paragraph 159 of

 8    the report and its heading and read that to the jury, and

 9    we'll simultaneously display it.

10    A    (Reading:)

11                    Charif Kazal referred to DPP for

12              knowingly giving false or misleading evidence.

13                    The Commission, however, had another

14              matter involving Charif Kazal, which it did

15              refer to the DPP in the Section 74A(2)

16              statement as to whether or not the Commission

17              should seek DPP's advice with respect to

18              prosecuting Charif Kazal for a specific

19              offense.  The following was reported:  At the

20              commencement of his evidence in the public

21              inquiry, Charif Kazal was asked whether it was

22              ever his intention to settle Mr. Kelly's

23              accounts in relation to his airfare and

24              accommodation in relation to the May 2007 trip

25              to the UAE.  He responded no.  His e-mail of
```

```
 1                  23 May 2007 clearly evidences his intention to

 2                  settle the account for Mr. Kelly's

 3                  accommodation.

 4                          The Commission is of the opinion

 5                  that consideration should be given to

 6                  obtaining the advice of the DPP with respect

 7                  to the prosecution of Charif Kazal for an

 8                  offense under Section 87 of the ICAC Act in

 9                  relation to his evidence that he never

10                  intended to settle Mr. Kelly's accommodation

11                  account for the May 2007 trip.

12  Q   All right.  Is it also your understanding that the ICAC

13  had made a finding that Charif Kazal was corrupt?

14  A   Yes.

15  Q   I'd like you to turn to paragraph 135 of the same

16  document.

17  A   Yes.

18  Q   Can you read the heading above paragraph 135.

19  A   (Reading:)

20                          The finding Charif Kazal engaged in

21                  corrupt conduct.

22                          Chapter 8 of the Commission's Vesta

23                  report contains the finding of the Commission.

24                  In respect of Charif Kazal, the commission

25                  found:
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                      In holding out the prospect of

 2              employment in the UAE to Mr. Kelly and paying

 3              him $11,170 for his May 2007 flight and

 4              accommodation expenses with the intention

 5              these would tend to influence Mr. Kelly to

 6              exercise his official Sydney Harbour Foreshore

 7              Authority functions in a manner favorable to

 8              Kazal business interests, Charif Kazal's

 9              conduct is corrupt.  This is because such

10              conduct could adversely affect, either

11              directly or indirectly, Mr. Kelly's impartial

12              exercise of his official functions (in his

13              dealings with Kazal tenancy matters) and,

14              therefore, comes within Section 8(1)(A) of the

15              Independent Commission Against Corruption Act

16              because it could constitute or involve an

17              offer under Section 249B(2)(b) of the Crimes

18              Act of corruptly giving an agent, Mr. Kelly, a

19              reward, the receipt or expectation of which

20              would tend to influence the agent to show

21              favor to any person in relation to the affairs

22              or business of the agent's principal, the

23              AHFA.

24    Q    Do you know if Mr. Kazal was ever exonerated from his

25    finding that he engaged in corrupt conduct?
```

```
 1    A    No, he was not.

 2    Q    Do you know an individual named Jamie Brown?

 3    A    I'm sorry.

 4    Q    Do you know an individual named Jamie Brown?

 5    A    I know of him.  I don't know him.

 6    Q    I would like you to turn to paragraph 28 of the ICAC

 7    report.

 8    A    Yes.

 9    Q    Can you read the first two sentences of paragraph 28.

10    A    I'm sorry.  I am on the wrong page.  Can you tell me

11    the next -- 128.  I'm sorry.

12              Here?

13    Q    All right.  Can you read the first two sentences of

14    paragraph 28.

15    A    (Reading:)

16                   Jamie Brown is a former police

17              officer and now private investigator.  He has

18              known Charif Kazal for several years.  For

19              reasons that will be detailed later, he came

20              to know of alleged offenses of malicious

21              damage said to have been committed upon a

22              motor vehicle and its owner, another former

23              police officer and now private investigator,

24              then involved in surveillance of David.

25    Q    Do you understand what that reference is to the
```

```
 1    "surveillance of David"?

 2    A    That's in reference to my statement on Tuesday that my

 3    wife was followed and he stole my phone and drove away with

 4    me on the bonnet of his car.

 5    Q    All right.  Do you know if e-mails from Tony Kazal were

 6    posted on the kazalfamilystory.com Website?

 7    A    Yes, all the ones I received were.

 8    Q    And it's also true that Adam Kazal included references

 9    to kazalfamilystory.com on the banner that was circulated in

10    Sydney and in California?

11    A    Yes, and on the flyers and posters and placards and

12    billboards.

13    Q    I would like for you to turn to Exhibit 5 in the

14    binder.

15    A    Yes.

16    Q    When did you first see this service agreement?

17    A    I don't recall the specifics except that it was part of

18    a discovery documentation provided to you by Mark Woodward.

19    Q    And does this agreement relate to surveillance that was

20    conducted upon you and your family?

21            MR. TAYLOR:  Objection, Your Honor.  Lacks

22    foundation.

23            THE COURT:  Sustained.

24            Why don't we ask the witness what is this exhibit.

25            MR. WIENER:  Sure.
```

```
1    Q    Can you explain what this agreement is, Mr. David.

2    A    It's an e-mail exchange with Adam Kazal and a

3    Mr. Victor Fuentes and a Mr. Mark Woodward and an attached

4    service agreement for surveillance and a client information

5    is Adam Kazal, and in the e-mail correspondence, Mr. Kazal

6    agrees to the terms.

7    Q    In paragraph 2 of the page -- that's the first page --

8    does it say, "Details of investigation, 36 surveillance

9    hours"?

10   A    Yes, it does.

11   Q    And does it provide for ICS of California to conduct

12   these surveillance services for Adam Kazal?

13   A    Yes.

14            MR. WIENER:  Your Honor, I would like to move

15   Exhibit 5 into evidence.

16            THE COURT:  All right.  Any objection?

17            MR. TAYLOR:  I would object just to the extent,

18   Your Honor, that there is no evidence that I heard that the

19   witness has ever even seen this document before.

20            THE COURT:  All right.  The objection is noted but

21   overruled.  It's admitted.

22       (Trial Exhibit 5 was admitted into evidence.)

23   BY MR. WIENER:

24   Q    Mr. David, I would like for you to turn to Exhibit 20.

25   A    Yes.
```

1    Q    Can you explain who this e-mail correspondence is

2    between?

3    A    Again, it's communications with a Mr. Victor Fuentes

4    who represents ICS, Mr. Jamie Brown, and a Mr. Mark

5    Woodward, again of ICS.

6            They seem to be talking about the cost to put

7    decals and wrapping on the van, payments to ICS for their

8    services, plus it attaches a services agreement for field

9    work with the client contact information, Tony Kazal/Jamie.

10   Q    All right.  Can you read the sentence that begins,

11   "This professional services agreement" above paragraph 1.

12   A    (Reading:)

13                    This professional services agreement

14           is made between ICS of California, a

15           California corporation, with an address of 300

16           South Harbor Boulevard, Suite 804, Anaheim,

17           California, hereafter ICS, and

18           Tony Kazal/Jamie, hereafter client, to provide

19           the services described below.

20   Q    All right.  And do you believe that Jamie Brown being

21   referenced is the same Jamie Brown referenced in the ICAC

22   report?

23   A    Yes, it is.

24   Q    And that's the individual who knew Charif Kazal for

25   several years?

```
 1   A    Yes, it is.

 2   Q    Does that suggest to you that Charif Kazal was also

 3   involved in this surveillance?

 4   A    Yes, it does.

 5           MR. TAYLOR:  Objection.  Calls for speculation.

 6           THE COURT:  Sustained.  Stricken.

 7   BY MR. WIENER:

 8   Q    Does it suggest to you that Tony Kazal was the one who

 9   commissioned this field work?

10   A    Yes, it does.

11   Q    I'd like you to turn to page 5 of this document.

12   A    Yes.

13   Q    Can you read the e-mail at the top of the page,

14   November 10, 2016, e-mail from Jamie Brown to Victor Fuentes

15   with cc to Mark Woodward.

16   A    Yes.  This is November 10th, 2016, Jamie Brown from --

17   to Victor Fuentes and copied to Mark, Mark Woodward.

18                   (Reading:)  Hi, Victor and Mark.

19              Thanks for the info.  I will pass to Tony.  I

20              know the reply will be for me to ask about the

21              van driver price.  I told them as we discussed

22              a reduced rate for the driver as there was no

23              investigation work, just a licensed PI.  Is

24              the rate quote a reduced rate?  And if not is

25              there another option for the driver at a flat
```

```
 1              daily rate?  We may have to forgo the PI as a

 2              driver at $122 per hour may not be acceptable.

 3                       Let me know your thoughts before I

 4              send info on to Tony.

 5              Thanks, Jamie Brown.

 6              MR. WIENER:  I would like to move Exhibit 20 into

 7    evidence.

 8              THE COURT:  What exhibit?

 9              MR. WIENER:  It's Exhibit 20.

10              THE COURT:  Any objection?

11              MR. TAYLOR:  No objection, Your Honor.

12              THE COURT:  Exhibit 20 will be received into

13    evidence.

14         (Trial Exhibit 20 was admitted into evidence.)

15    BY MR. WIENER:

16    Q    Mr. David, you were shown earlier the video, the only

17    video you were shown today, but it showed you approaching a

18    security guard station; is that correct?

19    A    Yes, that's correct.

20    Q    During the defendants' opening statement, the reported

21    quote that you had walked towards the protestors waving,

22    applauding, and giving a thumbs up, end quote, was that a

23    true statement?

24    A    No.

25    Q    Who was it that you were waving to?
```

```
 1    A    James.

 2    Q    Could you tell James's full name for the record.

 3    A    I've got a mental blank.  James Fitchew.

 4    Q    How old is James?

 5    A    Seventy-two.

 6    Q    How many years has he worked for you?

 7    A    Since I purchased the facility he has been there.  He's

 8  an icon for the studio.  He's been there for a long time.

 9    Q    All right.  And you were appreciative of his efforts to

10  prevent the thugs from entering Thunder Studios's premises?

11    A    More than that, yes.  Very appreciative to James.  He

12  is a wonderful man.

13    Q    You also mentioned there was a Thunder Studios employee

14  who was harassed by the thugs.

15             What was the name of that employee?

16    A    A complaint was made by Jacqueline Carroll.

17    Q    What was Jacqueline Carroll's title at Thunder Studios?

18    A    She was the sales marketing manager.

19    Q    What did she report in the complaint?

20    A    That when she was driving into the main entrance, that

21  her car was hit and they were yelling profanities at her.

22    Q    Were you concerned for her safety?

23    A    Very much so, all of my employees.

24    Q    Did that cause emotional distress to you?

25    A    Absolutely.
```

1  Q    The defendants have apparently faulted you for not

2  seeking a restraining order against the protestors here in

3  California, but did you instruct your attorneys to send a

4  cease and desist letter to the Kazals' attorney in

5  Australia?

6  A    Yes, to all of them.  It's my understanding from

7  talking to my attorneys here in California that it has to be

8  done at the place of residence of the individual that's

9  perpetrating it.

10  Q    And did you and Thunder Studios seek a restraining

11  order against Adam Kazal and Charif Kazal?

12  A    Yes, in the Australian courts.

13  Q    All right.  I would like for you to turn to Exhibit 18.

14  A    Yes.

15  Q    Is this a copy of the restraining order that was

16  issued?

17  A    Yes, on the 11th of November.

18  Q    Do you know if Adam Kazal was sentenced to jail?

19  A    I'm sorry?  Do I know if he was?

20  Q    Correct.

21  A    Yes, he was.

22  Q    All right.  And he testified at some point that the

23  protest ended; correct?

24  A    Yes.

25  Q    And you were still fearful after the protest ended,

1  though?

2  A    Yes.  We thought we were safe in America.  Clearly,

3  because of this, that was shattered --

4           THE COURT:  Next question, Counsel.

5           THE WITNESS:  Sorry.

6  BY MR. WIENER:

7  Q    Do you know what time period Adam Kazal was -- actually

8  served his jail sentence?

9  A    I think he was serving it concurrently.  So I'm not

10  exactly sure of the amount of time he was incarcerated.  It

11  exceeded a year.

12  Q    Do you know the approximate calendar months?

13  A    I think it may have been -- he appealed it, the

14  original judgment, and lost that appeal.  And so, to the

15  best of my recollection, it was probably post of '17.

16  Q    It's correct that there was no protest activity during

17  the time that Mr. Adam Kazal was incarcerated?

18  A    Correct.

19  Q    Is it correct that you want to maintain a low profile

20  when you relocate back to California?

21  A    Yes.

22  Q    And it's correct the defendants had suggested that,

23  because you had a cameo -- or potential cameo in the *9/11*

24  film that you weren't, in fact, trying to maintain a low

25  profile.

```
 1              Do you recall when the 9/11 film was released?
 2   A    I want to say it was released in and around the
 3   anniversary of 9/11 in 2017.
 4   Q    That was approximately a year after the Kazals had
 5   conducted the protest outside your home?
 6   A    Yes.
 7   Q    Is it fair to say that by that point, you were not
 8   going to be able to hide from them?
 9   A    Correct.
10   Q    Thank you.
11              I have nothing further.
12              THE COURT:  Further cross, Mr. Taylor.
13                     RECROSS-EXAMINATION
14   BY MR. TAYLOR:
15   Q    You said that the 9/11 film was released in
16   September 2017?
17   A    I believe that's when it was, yes.
18   Q    But, obviously, it was filmed much earlier than that;
19   right?
20   A    Yes.
21   Q    And your scene was actually filmed in 2016 before the
22   protestors appeared at your house; isn't that true?
23   A    Yes.
24              MR. TAYLOR:  Nothing further.
25              THE COURT:  All right.
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              Mr. Wiener.

 2              MR. WIENER:  Nothing further, Your Honor.

 3              THE COURT:  May this witness step down?

 4              No objection, sir.  You may step down.

 5              Ladies and gentlemen, why don't we take a lunch

 6   recess.  We'll come back at 1:30 this afternoon.

 7              Again, please do not form or express any opinion

 8   about the matter until it's finally submitted to you.  Don't

 9   talk to anyone about the case.  Don't allow anyone to talk

10   to you about the case and do not conduct any research of any

11   kind on any subject matter connected with this case.

12              So we'll see you back at 1:30 this afternoon.

13   Thank you.

14              THE CLERK:  All rise for the jury.

15              Please be seated.

16      (The following was heard in open court outside the

17        presence of the jury:)

18              THE COURT:  Let's have you come back at 1:30,

19   please.

20              Plaintiffs, you have four hours, 59 minutes and 50

21   seconds.

22              Defense, you have four hours, 34 minutes and one

23   second.

24              Mr. Wiener, you're going to call, I assume,

25   Miss David next?
```

```
1          MR. WIENER:  That's correct, Your Honor.

2          THE COURT:  So I would humbly suggest, urge,

3   stress:  You need to talk to the witness.  I am not going to

4   allow witnesses to just engage in narratives over and over

5   and over again.  Question, answer; question, answer.  If it

6   continues, I am going to sustain my own objection.

7          Are we clear on that, sir?

8          MR. WIENER:  Understood, Your Honor.

9          THE COURT:  Thank you.

10          I will see you back at 1:30.

11          THE CLERK:  All rise.  This Court is in recess.

12      (Lunch recess taken 12:28 P.M.)

13

14                          --oOo--

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        CERTIFICATE

 2

 3        I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9

10   Date:  May 1, 2019.

11

12

13

14                  __/S/ CHIA MEI JUI _____

15                  Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**MR. GEBELIN: [4]**
10/15 10/19 108/8
108/14
**MR. TAYLOR: [60]**
4/12 4/15 5/22 6/12
6/15 8/11 8/13 9/8
9/18 10/3 11/5 11/24
16/13 17/24 25/3 25/8
25/24 40/2 54/21 55/3
55/10 55/17 56/13
60/22 61/4 61/6 61/15
81/25 82/3 82/9 88/6
88/19 89/5 107/7
107/12 107/18 108/2
108/5 108/9 108/17
108/20 108/23 109/3
109/9 109/17 109/24
110/3 110/6 110/8
110/16 110/20 111/11
111/16 111/23 113/22
118/20 119/16 121/4
122/10 126/23
**MR. WIENER: [31]**
4/9 4/23 5/11 5/14
5/18 7/10 7/12 7/19
7/21 8/2 8/7 10/4
16/16 28/23 30/21
55/5 55/15 83/21
88/22 100/2 100/5
107/5 110/24 113/24
118/24 119/13 122/5
122/8 127/1 127/25
128/7
**MS. BANI-ESRAILI:**
**[1]** 4/17
**THE CLERK: [5]** 4/5
81/19 82/6 127/13
128/10
**THE COURT: [96]**
4/11 4/14 4/19 5/10
5/12 5/15 5/20 6/8
6/14 7/7 7/11 7/16
7/20 7/24 8/3 8/8 8/12
8/23 9/17 9/19 10/5
10/18 10/22 10/25
15/21 15/24 16/15
16/17 17/23 25/6 26/1
28/25 29/5 30/22
39/23 43/1 43/3 46/13
55/2 55/4 55/9 55/12
55/16 56/9 56/12 61/2
61/5 61/13 81/11
81/22 82/2 82/4 82/8
83/22 88/4 88/21 89/1
97/14 100/4 107/6
107/9 107/11 107/25
108/3 108/10 108/19
108/22 108/25 109/4
109/15 109/19 110/1
110/4 110/7 110/12
110/18 110/22 111/5
111/13 111/17 111/24
113/23 118/22 119/15
119/19 121/5 122/7
122/9 122/11 125/3
126/11 126/24 127/2
127/17 128/1 128/8

**THE REPORTER: [3]**
12/21 13/17 107/16
**THE WITNESS: [9]**
12/1 12/22 13/18
15/23 30/23 43/2
56/11 83/24 125/4

**$**

**$11,170 [1]** 116/3
**$122 [1]** 122/2
**$25 [3]** 12/12 12/16
13/10
**$25 million [3]** 12/12
12/16 13/10
**$49,900 [1]** 12/5

**'**

**'11 [2]** 11/23 12/3
**'12 [2]** 11/23 12/3
**'16 [1]** 22/3
**'17 [1]** 125/15

**-**

**--oOo [1]** 128/14
**-and [1]** 2/6

**0**

**00159 [1]** 16/23

**1**

**10 [3]** 53/22 86/25
121/14
**100 [1]** 1/9
**10th [1]** 121/16
**11 [6]** 18/19 103/9
125/23 126/1 126/3
126/15
**11:02 [1]** 82/8
**11:15 [1]** 81/18
**11:21 [1]** 82/8
**11th of [1]** 124/17
**12 [5]** 18/19 48/8
50/14 50/19 86/25
**128 [1]** 117/11
**12:28 [1]** 128/12
**12:30 today [1]** 82/6
**135 [2]** 115/15 115/18
**15 feet [1]** 53/22
**15-minute [2]** 81/12
82/5
**150 [1]** 19/4
**155 [2]** 16/25 17/2
**156 [1]** 17/13
**157 [1]** 18/3
**158 [1]** 19/3
**159 [1]** 114/7
**160 [2]** 17/24 18/1
**163 [1]** 106/10
**17-0871-AB [2]** 1/7
4/6
**18 [2]** 13/14 124/13
**1871 [1]** 104/4
**1880 [1]** 2/13
**1:00 [1]** 63/15
**1:30 [2]** 127/18 128/10
**1:30 this [2]** 127/6
127/12

**2** **#:3124**

**20 [6]** 70/16 119/24
122/6 122/9 122/12
122/14
**2007 [4]** 114/24 115/1
115/11 116/3
**2008 [1]** 100/18
**2009 [2]** 94/7 100/15
**201-7600 [1]** 2/14
**2010 [8]** 12/19 12/21
13/14 14/25 21/19
94/6 99/14 100/16
**2011 [9]** 11/22 12/17
13/10 13/24 14/15
14/19 97/5 99/13
99/14
**2012 [5]** 11/23 13/24
99/14 101/23 112/18
**2013 [6]** 20/14 23/17
24/2 24/11 27/17
102/2
**2014 [2]** 24/16 25/16
**2015 [5]** 67/7 71/7
71/14 71/15 106/4
**2016 [26]** 22/1 24/6
24/11 27/17 28/17
29/11 33/20 44/13
45/16 59/12 75/23
77/6 77/13 80/10
80/15 84/20 88/1
106/8 106/11 106/15
107/5 107/20 112/11
121/14 121/16 126/21
**2016, 2017 [1]** 71/14
**2017 [7]** 16/3 67/7
71/8 71/14 106/15
126/3 126/16
**2018 [4]** 1/15 3/2 4/1
23/17
**2019 [1]** 129/10
**23 [2]** 28/10 115/1
**24 [1]** 28/10
**24-hour [1]** 96/1
**249B [1]** 116/17
**25 [1]** 85/24
**26th [4]** 33/24 34/17
36/12 37/6 47/11
55/23 59/12 65/25
**26th of [4]** 52/6 52/8
65/14 65/15
**28 [4]** 117/6 117/9
117/14 129/4
**2:00 o'clock [1]** 63/16

**3**

**30 [5]** 5/9 7/14 7/24
70/18 102/20
**30 miles [1]** 85/24
**30 percent [1]** 70/16
**300 [1]** 120/15
**3072 [1]** 2/9
**31 [2]** 103/20 104/2
**310 [2]** 2/9 2/14
**3287 [2]** 1/23 129/15
**34 [1]** 127/22
**341-3072 [1]** 2/9
**350 [1]** 1/24
**36 [1]** 119/8

**36-hour [1]** 96/1
**39 [1]** 19/3

**4**

**40 [1]** 16/22
**42 [4]** 16/10 16/15
16/20 114/5
**43 [2]** 88/3 88/21
**4311 [1]** 1/24
**44 [1]** 55/4
**45 [3]** 7/16 82/2 85/20
**487-5607 [1]** 2/5
**49 [1]** 17/23

**5**

**50 [1]** 127/20
**50 percent [2]** 12/11
70/18
**500 meters [1]** 34/8
46/1
**520 [1]** 2/8
**5607 [1]** 2/5
**59 [1]** 127/20

**6**

**608 [2]** 107/24 109/21
**609 [1]** 2/4

**7**

**714 [1]** 2/13
**74A [1]** 114/15
**753 [1]** 129/3
**76-year-old [1]** 50/11
**7600 [1]** 2/14
**7:00 A.M [2]** 34/17
47/19
**7:00 in [1]** 34/15
**7:30 [1]** 63/13

**8**

**804 [1]** 120/16
**8383 [1]** 2/8
**87 [1]** 115/8

**9**

**9/11 [5]** 103/9 125/23
126/1 126/3 126/15
**90012 [1]** 1/24
**90067 [1]** 2/13
**90211 [1]** 2/8
**925 [1]** 2/5
**94582 [1]** 2/4
**9:19 [2]** 1/16 4/2
**9:20 [1]** 63/8
**9:30 [1]** 63/8

**A**

**AB [2]** 1/7 4/6
**Abend [1]** 105/10
**able [15]** 6/17 6/19 7/6
8/15 18/13 38/12
40/21 41/10 50/12
75/8 75/17 84/18
101/20 111/20 126/8
**absolutely [2]** 99/8
123/25
**acceptable [1]** 122/2
**acceptance [1]** 19/11
**accepted [1]** 96/7

**access [5]** 49/9 57/2
57/22 59/6 75/17
**accessing [1]** 50/21
50/24 51/4
**accommodation [4]**
114/24 115/3 115/10
116/4
**accomplishing [1]**
39/25
**accords [1]** 113/3
**account [2]** 115/2
115/11
**accounts [3]** 69/22
71/22 114/23
**accurate [5]** 23/13
23/20 23/22 23/24
108/23
**Ace [8]** 99/16 99/18
99/23 100/9 100/20
100/24 101/6 101/13
**achieving [1]** 98/18
**acronym [1]** 99/18
**Act [3]** 115/8 116/15
116/18
**action [2]** 25/20 77/9
111/5
**activity [2]** 15/13
125/16
**actual [1]** 9/9
**ADAM [29]** 1/9 8/17
32/24 33/4 35/18
35/19 35/21 65/7
65/12 65/20 65/21
65/23 66/4 68/11
68/14 68/18 69/24
74/11 74/15 74/20
78/22 118/8 119/2
119/5 119/12 124/11
124/18 125/7 125/17
**Adam Kazal [2]** 35/18
35/19 35/21
**Adam's [1]** 69/18
**adamkazal.com [1]**
84/8
**addition [1]** 45/3
**additional [3]** 21/20
24/4 44/13
**address [5]** 31/14
70/6 74/4 110/25
120/15
**addressed [1]** 50/20
**adjourned [1]** 6/17
**Administration [1]**
62/14
**admissible [2]** 17/4
107/16
**ADMIT [1]** 3/12
**admitted [8]** 3/12
16/19 16/20 21/6
54/25 119/21 119/22
122/14
**adverse [1]** 14/5
**adversely [1]** 116/10
**advice [3]** 17/7 114/17
115/6
**advised [1]** 61/20
**affairs [1]** 116/21
**affect [1]** 116/10

**A**

**after [20]** 6/17 7/17
14/14 16/6 21/10
41/20 44/10 47/16
47/19 51/8 52/22
59/25 74/25 77/12
85/17 91/7 99/8 111/6
124/25 126/4
**afternoon [4]** 114/3
114/4 127/6 127/12
**again [16]** 22/3 26/3
43/2 43/7 51/24 58/11
70/8 75/11 78/24
80/11 96/13 96/22
120/3 120/5 127/7
128/5
**against [16]** 20/23
78/22 78/23 82/21
107/4 108/1 108/19
109/7 109/8 109/17
110/15 111/11 112/3
116/15 124/2 124/11
**agency [1]** 76/11
**agent [5]** 77/1 77/12
79/21 116/18 116/20
**agent's [1]** 116/22
**ago [7]** 17/9 19/22
24/1 37/14 70/5 77/20
77/23
**agree [2]** 27/10
113/20
**agreed [1]** 6/11
**agreement [7]** 118/16
118/19 119/1 119/4
120/8 120/11 120/13
**agrees [1]** 119/6
**agregation [1]** 106/25
**ahead [3]** 46/14 56/13
**AHFA [1]** 116/23
**air [1]** 5/8
**airfare [1]** 114/23
**al [1]** 4/7
**allegations [3]** 20/22
23/17 96/24
**allege [2]** 27/21
103/16
**alleged [1]** 117/20
**allow [5]** 55/13 81/15
110/24 127/9 128/4
**allowed [6]** 39/12
39/23 42/21 63/4
64/20 107/24
**almost [1]** 104/8
**alone [1]** 38/11
**already [3]** 9/11 80/12
101/24
**altered [1]** 33/15
**although [1]** 19/6
**altogether [1]** 69/21
**always [1]** 51/19
**Amended [5]** 23/1
23/8 23/8 23/10 23/12
**Amended Complaint
[1]** 23/8
**America [6]** 21/9
25/19 25/21 26/13
112/18 125/2
**American [2]** 25/21

25/21
**among [4]** 34/22 52/1
64/6 104/16
**amongst [1]** 64/4
**amount [2]** 6/21
125/10
**amounts [1]** 13/21
**Anaheim [1]** 120/16
**and/or [1]** 18/19
**ANDRÉ [1]** 1/3
**ANGELES [5]** 1/17
1/24 2/13 4/1 21/8
**angle [1]** 59/7
**anniversary [1]** 126/3
**another [5]** 22/6 57/5
114/13 117/22 121/25
**answer [9]** 25/5 29/4
40/1 40/4 61/9 61/14
83/24 128/5 128/5
**answers [1]** 31/21
**anti [1]** 25/23
**anti-SLAPP [1]** 25/23
**anticipate [2]** 5/18
8/10
**anticipated [2]** 5/9
7/14
**anymore [2]** 106/8
106/16
**anyway [1]** 53/11
**apologies [2]** 40/3
43/3
**apologize [2]** 9/23
15/24 37/20
**apparently [1]** 124/1
**appeal [1]** 125/14
**appealed [1]** 125/13
**appear [4]** 19/10 31/4
64/3 65/24
**appearance [4]** 44/20
75/21 76/17 80/10
80/14 80/21 82/17
83/13
**appearances [2]** 2/1
4/9
**appeared [22]** 24/8
27/16 30/13 30/16
30/21 31/9 32/25
33/13 34/13 44/18
44/19 45/4 45/18
45/19 46/4 46/22
48/10 77/7 84/20 91/4
112/10 126/22
**appeared different [1]**
44/19
**appearing [1]** 24/5
**applauded [1]** 50/3
**applauding [2]** 56/18
122/22
**applications [1]** 81/1
**apply [1]** 76/21
**appreciate [2]** 11/3
113/2
**appreciative [2]** 123/9
123/11
**approach [2]** 53/21
107/10
**approached [2]** 36/3
48/12

**approaching [1]**
122/17
**appropriate [1]** 25/3
**approximate [1]**
125/12
**approximately [16]**
43/20 45/15 53/6
54/22 62/10 63/9
63/13 65/5 71/9 74/12
77/5 77/18 77/24
80/13 85/25 126/4
**Arab [1]** 83/19
**area [8]** 40/9 42/1
42/7 44/11 44/15 64/5
83/8 85/19
**arguably [1]** 109/22
**Argumentive [2]**
30/22 83/22
**arms [1]** 56/17
**Army [1]** 107/2
**around [8]** 11/24
40/22 60/17 70/9
74/23 83/2 84/22
126/2
**arrange [1]** 6/18
**arranged [1]** 65/24
**arrangement [1]** 6/20
**arrangements [2]** 5/4
6/2
**arrests [2]** 42/19
62/21
**arrived [6]** 35/25
38/17 41/6 48/3 53/5
63/7
**arriving [1]** 55/22
**article [2]** 14/24 90/23
**articles [10]** 18/19
20/21 21/19 89/1
89/13 89/15 89/17
89/24 90/23 99/9
**Aside [1]** 80/19
**asked [11]** 22/25 23/9
23/16 36/6 38/8 44/17
50/18 74/14 93/3
100/11 114/21
**asking [3]** 5/8 5/16
66/2
**assaulted [1]** 60/21
**assembled [2]** 39/1
39/2
**assembling [1]** 34/9
**assembly [1]** 113/10
**assertion [1]** 67/16
**asset [1]** 30/14
**assets [4]** 29/23 29/24
30/5 33/7
**assist [1]** 60/19
**associated [3]** 25/19
98/3 99/11
**association [1]** 99/10
**assume [3]** 79/4
101/14 127/24
**assumed [1]** 7/5
**assumption [1]** 12/9
**attached [3]** 30/25
31/3 119/3
**attaches [1]** 120/8
**attachment [1]** 31/7

**attention [1]** 53/8
**attorney-client [2]**
28/24 29/5
**audit [2]** 13/11 13/13
**auditor's [3]** 12/21
12/23 12/24
**auditors [1]** 13/12
**Australia [17]** 5/2 13/5
13/16 15/11 24/16
24/21 25/1 25/2 70/24
76/12 78/7 78/9 78/13
82/22 83/10 112/24
124/5
**Australian [7]** 25/17
33/10 81/1 98/4 98/17
99/19 124/12
**Australian-based [1]**
98/4
**authored [1]** 20/21
**Authorities [1]** 97/20
**Authority [11]** 96/9
96/16 96/19 97/10
98/10 98/12 100/9
100/14 100/20 101/3
116/7
**automatically [1]**
69/14
**available [2]** 17/5
110/18
**awarded [1]** 30/7
**aware [29]** 5/4 14/23
15/1 15/7 15/10 16/8
33/22 43/12 47/12
51/24 61/25 63/3 63/6
72/8 72/9 77/11 78/3
84/10 87/16 92/18
93/8 93/20 94/13
94/16 94/17 95/12
111/1 113/5 113/9
**away [13]** 34/6 42/16
45/25 46/2 51/12
52/20 60/7 64/7 64/12
66/19 66/23 67/1
118/3

**B**

**back [18]** 19/3 41/21
42/2 56/2 57/8 59/18
60/1 74/10 81/18 97/5
110/14 112/9 112/24
125/20 127/6 127/12
127/18 128/10
**background [2]**
106/20 106/23
**backgrounds [1]** 52/6
**Baker [1]** 22/6
**Balance [1]** 98/16
**bald [1]** 47/5
**BANI [2]** 2/12 4/19
**BANI-ESRAILI [2]**
2/12 4/19
**banking [2]** 26/21
26/22
**banner [4]** 20/20
21/12 35/17 118/9
**banners [2]** 35/14
42/13
**based [7]** 5/25 6/23

8/6 8/22 9/16 41/17
98/4
**basically [2]** 79/13
111/14
**basis [6]** 26/17 67/10
79/11 86/18 110/19
110/21
**Bates [1]** 16/22
**Bay [1]** 102/19
**be called [1]** 6/24
**bear [2]** 27/17 65/12
**became [2]** 33/22
43/12 47/12 72/8
84/10 85/11 87/16
**become [1]** 61/25
**before [26]** 10/21
14/19 23/13 28/12
29/11 29/14 51/22
77/7 82/6 87/19 88/8
88/13 88/14 88/16
90/9 90/15 92/20
92/23 98/23 104/19
106/21 106/23 107/1
119/19 122/3 126/21
**beforehand [1]** 75/3
**began [1]** 51/22
**begin [1]** 8/9
**beginning [2]** 107/18
107/19
**begins [1]** 120/10
**behalf [7]** 4/14 4/17
11/9 100/9 100/20
101/3 101/5
**behaviors [1]** 78/10
**behind [2]** 35/12
87/21
**believe [37]** 7/14 10/4
11/4 13/13 16/13
20/25 21/18 21/24
25/12 26/5 28/10
33/20 44/10 46/12
54/25 55/4 67/12
68/13 71/7 79/19
79/20 82/11 85/3
89/24 92/24 94/7 95/5
95/11 95/19 96/20
96/22 102/8 103/21
104/18 108/18 120/20
126/17
**believed [1]** 79/3
**below [1]** 120/19
**BENJAMIN [2]** 2/12
4/17
**Benjamin Taylor [1]**
4/17
**Besser [1]** 22/5
**best [3]** 45/14 67/12
125/15
**better [4]** 15/24 95/23
95/25 96/2
**between [15]** 8/14
13/15 13/15 19/8
23/17 24/11 27/17
34/5 35/9 40/16 66/6
70/18 95/13 120/2
120/14
**between 2013 [3]**
23/17 24/11 27/17

**B**

BEVERLY [1] 2/8
beyond [1] 5/25
bidder [1] 97/24
big [1] 21/12
billboards [1] 118/12
bills [1] 94/22
binder [4] 16/10 28/10 88/3 118/14
BIROTTE [1] 1/3
bit [6] 16/2 28/15 58/25 59/22 85/22 104/10
blank [2] 10/17 123/3
block [8] 40/23 45/24 53/2 69/20 70/2 73/7 74/3 74/15
blocked [7] 74/20 74/25 75/2 75/3 75/7 75/11 75/13
blond [1] 56/2
bloody [1] 21/11
blurry [1] 59/22
board [1] 12/9
body [2] 15/12 80/24
bonnet [1] 118/4
book [1] 18/4
booth [9] 51/16 57/3 57/14 57/16 57/24 58/1 58/2 58/22 58/23
both [1] 70/24
bottom [3] 18/1 27/12 65/9
bought [2] 102/16 112/21
BOULEVARD [2] 2/8 120/16
box [1] 27/11
brave [1] 57/1
braving [1] 11/2
breach [4] 14/6 18/19 107/15 107/23
breached [1] 14/3
break [2] 50/15 82/6
Bridge [2] 13/10 96/8
briefly [1] 34/2
bring [2] 10/8 15/22
broad [1] 29/13
Broadcasting [3] 108/8 108/9 108/17
broader [2] 99/11 103/14
broker [2] 101/8 101/9
brother [1] 98/4
brothers [6] 93/8 93/13 93/17 93/21 93/23 93/25
brought [2] 60/14 94/14
Brown [9] 117/2 117/4 117/16 120/4 120/20 120/21 121/14 121/16 122/5
building [6] 51/13 52/17 60/2 60/8 63/17 63/23
business [17] 12/20 13/20 41/17 64/3

**C**

calendar [1] 125/12
CALIFORNIA [21] 1/2 1/17 1/24 2/4 2/8 2/13 4/1 25/22 43/11 91/20 95/10 101/18 101/22 118/10 119/11 120/14 120/15 120/17 124/3 124/7 125/20
call [15] 6/6 7/1 7/3 8/6 36/8 37/7 37/8 47/14 47/16 47/23 76/9 110/22 111/15 113/14 127/24
called [13] 6/24 6/24 15/11 20/10 23/7 47/25 51/1 52/22 76/6 95/5 99/16 102/19 103/8
calling [6] 4/6 6/14 7/9 8/10 9/8 62/1
calls [5] 28/24 37/3 48/1 54/6 121/5
came [13] 16/6 17/4 21/18 37/12 37/13 38/19 44/5 63/25 64/5 71/24 98/8 113/13 117/19
cameo [4] 103/8 103/12 125/23 125/23
camera [3] 43/24 56/3 59/9
campaign [4] 82/21 82/22 83/5 83/16
Capital [3] 11/20 13/3 101/1
capture [2] 30/14 43/24
captured [2] 30/6 30/7
capturing [1] 74/22
car [24] 36/1 45/23 48/13 48/15 49/5 49/14 49/20 49/24 51/16 52/19 52/21 52/25 53/1 53/4 53/9 53/10 53/17 53/18 53/20 55/22 56/5 64/16 118/4 123/21
care [7] 8/10 8/17 35/17 65/7 65/12 65/17 65/17
Carey [3] 105/22 105/23 108/6
carpool [2] 49/1 85/8
Carroll [2] 104/20 123/16
Carroll's [1] 123/17
cars [7] 37/13 38/18 38/19 40/17 40/19 40/21 49/9
cash [2] 98/5 98/16
cattle [2] 99/19 99/24

cause [1] 23/24
caused [5] 60/18 68/3 97/11 97/20 98/8
Cayman [4] 11/18 13/23 14/2 97/23
Cayman Islands [2] 11/18 13/23
CBD [2] 83/2 83/6
cc [3] 104/12 104/16 121/15
CC'd [3] 32/2 73/6 106/7
CCRR [1] 1/23
cease [3] 25/18 78/10 124/4
celebrities [1] 57/7
cell [1] 43/17
CENTRAL [1] 1/2 83/7
CENTURY [1] 2/13
CEO [2] 29/9 99/22
certain [15] 9/10 9/14 23/19 28/7 32/8 32/9 33/15 60/6 69/22 70/9 74/21 78/10 79/3 90/2 100/12
certainly [6] 14/20 34/15 45/2 72/13 93/14 106/8
CERTIFICATE [1] 129/1
certificates [2] 28/9 28/16
certify [1] 129/3
cetera [1] 102/11
chair [1] 58/1
change [7] 6/3 6/4 6/18 9/3 58/13 61/8 61/13
changed [1] 21/25
changes [1] 9/17
changing [1] 61/18
chanting [3] 53/25 54/3 82/25
Chapter [1] 115/22
Chapter 8 [1] 115/22
chapters [1] 22/4
character [1] 18/12
charged [3] 15/8 17/7 43/13
CHARIF [40] 1/8 4/7 17/5 17/6 17/18 18/11 20/24 20/25 22/10 23/18 32/5 35/2 65/18 66/4 16 118/4 123/25 78/4 78/14 78/15 78/23 93/24 94/2 98/2 103/15 104/16 112/13 114/11 114/14 114/18 114/21 115/7 115/10 115/24 116/8 117/18 120/24 121/2 124/11
Charif Kazal [22] 17/5 17/6 17/18 18/11 20/24 22/10 32/5 35/2 65/18 66/9 73/13 78/23 114/11 114/14 114/18 114/21 115/7

115/13 115/20 115/24 121/2 124/11
charifkazal.com [1] 84/8
chasing [1] 21/10
chastised [1] 97/13
check [2] 27/11 57/18
CHIA [3] 1/23 129/14 129/15
chicken [1] 21/10
chief [2] 48/19 71/18
children [1] 102/10
chose [1] 53/15
circulated [1] 118/9
cite [1] 91/20
citizens [1] 113/3
city [1] 83/9
civil [1] 111/4
claim [3] 80/24 81/2 91/23
claimed [1] 106/25
claims [3] 68/5 107/3 107/22
clarify [1] 97/1
clarifying [1] 32/22
clear [3] 17/19 64/7 128/7
clearer [1] 6/10
clearly [3] 98/17 115/1 125/2
click [6] 22/9 22/12 26/19 27/3 27/9 69/10
clicking [1] 69/15
clicks [1] 22/8
client [7] 6/2 9/15 28/24 29/5 119/4 120/9 120/18
clip [3] 54/23 55/2 55/7
close [11] 43/21 43/23 43/25 49/2 49/3 53/16 53/20 97/23 98/18 99/3 101/11
closed [4] 5/20 49/8 49/17 52/17
closer [1] 15/23
cmartell [1] 105/20
cmjui.csr [1] 1/25
Code [1] 129/4
collection [1] 88/9
comes [3] 97/2 110/5 116/14
comfortable [2] 37/25 38/2
coming [3] 9/22 10/21 83/4
comma [2] 32/18 32/19
commencement [1] 114/20
commercial [3] 83/8 101/11 102/14
commission [13] 15/14 17/4 18/15 19/7 19/8 19/9 19/14 114/13 114/16 115/4 115/23 116/24 116/15
Commission's [2]

19/11 115/22
commissioned [1] 121/9
committed [3] 42/24 43/8 117/21
common [1] 78/21
communication [3] 28/25 68/14 77/20
communications [7] 25/17 29/5 79/18 83/4 100/11 101/2 120/3
commute [1] 86/11
company [26] 12/11 12/15 12/16 13/1 13/3 13/4 14/4 60/17 61/12 61/20 86/22 94/3 94/5 99/16 99/17 99/21 99/23 100/10 100/24 101/4 101/6 101/12 106/8 108/6 108/16 108/16
complaining [1] 80/2
complaint [14] 23/1 23/8 23/8 23/10 23/13 60/20 80/16 81/5 81/7 108/24 109/4 109/6 123/16 123/19
Complaint but [1] 109/4
comply [1] 25/21
concerned [2] 61/20 123/22
concerns [1] 99/12
concluded [1] 14/3
conclusions [1] 19/15
concurrent [1] 25/16
concurrently [1] 125/9
conditions [1] 27/3
conduct [11] 17/3 80/1 81/16 96/25 99/5 115/21 116/9 116/10 116/25 119/11 127/10
conducted [3] 97/6 118/20 126/5
confer [1] 10/6
Conference [1] 129/8
confirm [2] 27/20 32/6
confiscating [1] 42/12
conformance [1] 129/7
confused [1] 33/12
congregate [2] 39/12 64/19
congregating [4] 34/9 40/10 40/11 47/9
conjoined [1] 78/18
connected [2] 81/17 127/11
connection [7] 10/15 15/9 43/13 62/21 67/17 94/14 103/14
consequence [1] 17/18
consideration [2] 97/22 115/5
considered [4] 14/8 18/12 33/11 83/16

**C**

**consistency** [1] 32/9
**consistent** [1] 17/8
**consternation** [1]
 9/14
**constitute** [1] 116/16
**constituted** [3] 82/12
 82/18 83/14
**constitutional** [1]
 113/6
**constitutionally** [1]
 113/9
**contact** [3] 14/18
 41/11 120/9
**contacted** [1] 77/1
**contain** [2] 36/25 37/3
**contained** [2] 19/6
 54/16
**contains** [1] 115/23
**contemporaneously**
 [3] 12/25 14/1 99/1
**content** [3] 29/18
 32/10 67/14
**context** [1] 55/8
**contingent** [1] 5/4
**continue** [7] 7/9 11/5
 42/21 63/4 74/6 75/17
 82/9
**continued** [1] 110/11
**continues** [1] 128/6
**continuity** [1] 32/9
**contract** [4] 35/9 66/6
 107/15 107/23
**contractor** [1] 66/6
**contractors** [3] 87/3
 87/4 87/13
**control** [1] 5/25
**conversation** [9] 41/7
 41/20 42/5 62/15
 72/16 72/21 77/12
 79/21 111/10
**conversations** [1]
 51/7
**conversion** [5] 11/19
 12/5 12/18 107/15
 107/23
**converted** [1] 12/10
**conviction** [1] 15/16
**coordinated** [2] 82/22
 83/3
**copied** [4] 23/18
 32/11 70/9 121/17
**copies** [1] 79/19
**copy** [4] 72/10 73/14
 110/18 124/15
**copyright** [6] 27/18
 28/20 28/20 29/25
 30/6 30/12
**copyrighted** [2] 22/15
 23/19
**copyrights** [3] 28/7
 29/10 29/15
**corporate** [2] 21/14
 36/22
**corporation** [1]
 120/15
**correctly** [1] 68/17
**correspondence** [3]

25/16 119/5 120/1
**corrupt** [5] 17/3
 115/13 115/21 116/9
 116/25
**Corruption** [1] 116/15
**corruptly** [1] 116/18
**cost** [4] 6/3 6/7 6/21
 120/6
**costs** [1] 9/16
**counsel** [14] 2/1 4/9
 6/1 6/25 9/10 10/9
 10/11 25/8 26/12
 54/24 97/16 109/1
 111/12 125/4
**counseling** [1] 103/17
**country** [1] 9/23
**couple** [6] 44/12 46/5
 48/1 53/17 76/3 103/1
**course** [7] 8/12 17/18
 26/16 72/21 86/16
 99/7 99/15
**court reporter** [2]
 20/5 108/13
**Court's** [1] 5/4
**courts** [5] 26/6 26/9
 26/13 80/24 124/12
**create** [2] 93/1 93/17
**created** [8] 84/6 84/14
 84/15 84/25 87/17
 91/6 91/12 93/23
**creates** [3] 6/6 7/2
 9/14
**creation** [1] 94/15
**credence** [1] 96/7
**crew** [1] 45/3
**crime** [6] 15/8 17/10
 42/24 43/8 43/13 79/3
**crimes** [4] 76/22
 79/14 96/25 116/17
**criminal** [3] 15/13
 15/16 96/24
**cross** [5] 3/6 8/14
 11/5 11/12 126/12
**cross-examination** [3]
 3/6 11/5 11/12
**CSR** [2] 1/23 129/15
**CTO** [6] 48/19 84/6
 84/11 85/1 85/3 92/18
**cul** [1] 40/25
**cul-de-sac** [1] 40/25
**curious** [1] 81/24
**current** [1] 95/9
**currently** [1] 94/13
**cut** [1] 103/9
**CV** [2] 1/7 4/6
**cyber** [2] 91/16 92/14

**D**

**daily** [4] 72/4 79/11
 86/18 122/1
**dairy** [9] 99/16 99/20
 100/9 100/20 100/24
 101/6 101/10 101/13
 101/15
**damage** [1] 117/21
**damages** [5] 25/2
 109/11 110/7 110/10
 110/12

**date** [6] 21/27 59/16
 106/12 106/13 106/17
 129/10
**dated** [1] 28/16
**daughter** [4] 48/24
 48/25 48/25 85/6
**DAVID** [39] 1/5 7/10
 7/15 7/15 8/1 8/1 9/1
 10/9 11/7 11/14 15/22
 19/21 22/5 32/23 35/1
 36/22 55/21 64/23
 65/22 82/11 84/5
 102/25 104/12 105/15
 108/21 109/8 109/8
 109/17 110/16 111/11
 112/3 112/9 114/3
 117/24 118/11 119/1
 119/24 122/16 127/25
**David Singh** [1] 22/5
**David's** [1] 11/10
**day** [34] 1/18 4/8 5/5
 5/24 8/21 9/3 9/12
 26/17 26/17 28/12
 46/6 46/18 48/7 50/6
 50/19 60/6 60/9 60/10
 60/10 61/1 61/1 61/8
 61/8 61/18 61/18
 63/14 63/22 67/11
 67/13 82/21 85/2 86/3
 86/23 91/20
**Day 2** [1] 4/8
**day's** [1] 60/4
**day-to-day** [5] 26/17
 60/10 61/1 61/8 61/18
**daylight** [1] 34/13
**days** [1] 86/1
**de** [1] 40/25
**deal** [1] 92/19
**dealing** [1] 99/1
**dealings** [4] 67/18
 92/16 93/25 116/13
**deals** [1] 100/12
**dealt** [2] 26/11 50/9
**debt** [4] 11/19 12/5
 12/10 12/19
**decals** [1] 120/7
**DECEMBER** [6] 1/15
 3/2 4/1 28/16 29/11
 107/21
**December 2016** [1]
 29/11
**decent** [1] 39/25
**decided** [2] 74/15
 93/16
**decision** [9] 28/6
 28/19 28/23 29/9
 29/10 29/25 30/11
 98/18 98/23
**Declaration** [1] 18/20
**declined** [1] 15/20
 17/6
**defamation** [2] 24/17
 25/20
**defendant** [7] 4/19
 32/24 33/4 35/2 35/7
 94/14 112/12
**defendants** [12] 1/10
 2/10 4/17 8/17 30/19

31/20 34/21 51/25
 108/21 111/5 124/1
 125/22
**defendants'** [1]
 122/20
**defense** [2] 110/24
 127/22
**definitely** [3] 32/12
 50/2 89/18
**department** [12]
 15/10 15/12 15/17
 15/19 52/23 62/4
 62/11 62/16 62/20
 62/24 63/3 71/11
**depends** [1] 85/23
**depo** [3] 7/23 8/1
 10/12
**deposition** [13] 7/6
 8/16 9/1 19/21 20/1
 20/4 20/7 22/25 23/16
 38/8 44/17 68/13
 74/14
**depth** [1] 16/9
**deputy** [3] 10/7 53/7
 61/24
**descent** [1] 83/19
**describe** [1] 34/2
**described** [2] 46/25
 120/19
**desirable** [1] 97/21
**desist** [3] 25/18 78/10
 124/4
**detail** [1] 69/16
**detailed** [1] 117/19
**Details** [1] 119/8
**development** [3]
 32/15 33/5 105/12
**dfinger** [1] 105/13
**DIANE** [2] 2/12 4/19
**different** [24] 15/5
 15/6 25/19 26/20
 26/24 26/24 35/8
 44/19 44/19 44/21
 44/22 44/23 44/25
 45/2 48/7 48/9 52/6
 58/16 60/10 61/1
 68/25 69/4 100/12
 103/1
**differing** [1] 25/24
**digital** [3] 29/23 29/24
**diligence** [2] 98/13
 98/15
**direct** [12] 8/14 30/18
 32/13 33/12 35/6
 44/10 54/19 62/10
 65/23 66/8 87/2
 103/21
**directed** [2] 70/5 93/3
**directing** [1] 18/5
**direction** [2] 58/14
 58/16
**directly** [10] 25/5 28/2
 31/10 31/12 31/25
 36/4 54/1 59/17 94/21
 116/11
**director** [3] 14/3
 29/18 100/25
**directors** [3] 12/9

14/6 14/11
**disagree** [2] 18/24
 19/2
**disburse** [1] 42/7
**discovery** [1] 118/18
**discuss** [2] 4/23 10/3
**discussed** [4] 72/12
 72/13 93/6 121/21
**discussion** [1] 112/9
**disperse** [1] 62/25
**display** [1] 114/9
**dispute** [8] 41/13
 41/17 41/19 94/5
 97/25 98/8 99/7
 103/14
**disseminated** [1]
 72/14
**distance** [2] 43/23
 101/21
**distress** [2] 60/17
 123/24
**DISTRICT** [4] 1/1 1/2
 1/3 83/7
**District of** [1] 83/7
**divert** [1] 73/22
**DIVISION** [1] 1/2
**DJ** [1] 5/7
**document** [4] 109/3
 115/16 119/19 121/11
**documentation** [1]
 118/18
**dollar** [1] 96/3
**domain** [1] 93/11
**domains** [1] 84/6
**door** [2] 58/1 59/23
**doubt** [3] 59/11 59/15
 84/22
**down** [12] 24/25
 25/14 26/7 26/14
 34/11 42/14 47/23
 53/1 62/25 81/23
 127/3 127/4
**dozen** [1] 62/10
**dozens** [6] 90/17
 90/17 90/17 90/18
 90/18 90/18
**DPP** [5] 15/19 17/7
 114/11 114/15 115/6
**DPP's** [1] 114/17
**dressed** [1] 47/5
**drive** [4] 85/9 85/20
 86/1 86/2
**driven** [1] 85/13
**driver** [4] 121/21
 121/22 121/25 122/2
**driver's** [1] 56/15
**driving** [5] 48/14
 48/17 83/2 86/10
 123/20
**drop** [2] 48/25 85/6
**drove** [5] 45/23 48/22
 49/11 85/5 118/3
**due** [2] 98/13 98/15
**duly** [1] 11/10
**Dunigan** [1] 62/12
**duplication** [1] 88/18
**during** [15] 24/11
 34/13 42/5 67/6 70/13

**D**

**during...** [10]  71/6 71/10 80/22 85/4 86/11 95/19 99/7 99/15 122/20 125/16
**duties** [1]  14/4
**duty** [1]  14/7

**E**

**e-mail** [26]  31/6 31/14 31/16 68/6 68/22 70/6 70/13 71/21 71/22 73/14 74/4 74/4 78/14 92/19 100/19 103/23 106/10 106/12 106/13 106/18 114/25 119/2 119/5 120/1 121/13 121/14
**e-mailing** [1]  78/8
**e-mails** [53]  22/9 31/1 31/4 31/9 31/10 31/12 31/13 31/18 31/24 32/1 32/10 32/11 67/7 67/13 67/14 67/16 67/24 68/2 68/11 69/3 70/4 70/8 70/17 71/7 72/3 72/5 72/17 72/20 73/2 73/6 73/15 73/22 73/25 74/7 75/23 76/4 76/7 76/11 76/15 77/23 77/25 78/5 79/2 79/10 79/17 80/11 80/19 80/23 80/25 81/4 106/6 106/14 118/5
**each** [2]  39/24 85/20
**earlier** [3]  112/10 122/16 126/18
**early** [10]  9/2 11/23 11/23 12/3 22/1 24/16 67/7 71/8 84/20 110/12
**early 2014** [1]  24/16
**early 2017** [1]  71/8
**EAST** [2]  2/13 101/13
**ECL** [7]  14/4 95/20 98/7 101/5 101/6 101/8 101/9
**ECL's** [1]  97/25
**edge** [1]  40/14
**editing** [1]  103/10
**efforts** [1]  123/9
**eight** [4]  45/15 93/8 93/12 106/3
**either** [2]  64/25 116/10
**elaborate** [1]  97/4
**elementary** [1]  48/24
**Elizabeth** [3]  7/15 62/12 62/15
**embedded** [3]  31/7 89/16 89/21
**emerged** [1]  99/9
**Emergent** [3]  11/19 13/3 100/25
**emerging** [1]  99/14
**emotional** [1]  123/24
**emotions** [1]  64/4

**employed** [3]  92/12 94/8 105/23
**employee** [5]  60/20 105/4 105/7 123/13 123/15
**employees** [20]  32/4 48/2 50/25 51/4 60/9 60/25 61/13 62/8 62/10 66/25 72/14 72/17 73/2 73/6 73/22 74/7 86/6 87/1 87/2 123/23
**employment** [1]  116/2
**end** [5]  9/2 9/5 86/3 104/15 122/22
**ended** [3]  41/20 124/23 124/25
**enforcement** [2] 76/10 80/17
**engage** [2]  38/1 128/4
**engaged** [3]  66/12 115/20 116/25
**enough** [2]  38/1 110/23
**ensure** [3]  25/2 60/16 97/23
**ensure -- I** [1]  60/16
**Ensured** [1]  70/24
**entering** [1]  123/10
**entitled** [1]  129/6
**entity** [1]  95/20
**entrance** [2]  57/9 123/20
**entry** [2]  57/8 57/11
**enunciate** [1]  51/6
**equity** [5]  11/19 12/10 12/11 12/19 98/5
**escalating** [1]  82/21
**escalation** [1]  83/3
**ESRAILI** [2]  2/12 4/19
**Essentially** [1]  91/17
**established** [1]  55/9
**estimated** [1]  7/24
**even** [7]  36/19 51/22 71/3 73/13 93/6 106/7 119/19
**evidence** [29]  16/15 16/20 17/5 19/11 19/15 21/7 30/19 30/24 31/3 32/14 32/24 33/2 33/21 35/5 46/13 54/25 65/23 66/1 88/6 88/21 114/12 114/20 115/9 119/15 119/18 119/22 122/7 122/13 122/14
**evidences** [1]  115/1
**evolutions** [1]  21/24
**evolved** [1]  22/2
**exact** [1]  34/2
**exactly** [2]  95/12 125/10
**examination** [7]  3/6 3/7 3/7 11/5 11/12 114/1 126/13
**example** [2]  26/23 44/25
**exceeded** [1]  125/11

**exception** [2]  31/6 31/20 33/7 35/5 39/12 57/7 92/18 118/17
**exception** [1]  5/20
**exchange** [1]  119/2
**executive** [1]  17/22
**exemplars** [1]  79/17
**exercise** [2]  116/6 116/12
**Exhibit 18** [1]  124/13
**Exhibit 20** [4]  119/24 122/6 122/9 122/12
**Exhibit 31** [2]  103/20 104/2
**Exhibit 42** [3]  16/10 16/15 114/5
**Exhibit 43** [2]  88/3 88/21
**Exhibit 44** [1]  55/4
**Exhibit 5** [2]  118/13 119/15
**Exhibit 7** [1]  46/12
**exhibits** [4]  3/11 3/12 28/10 66/1
**Exhibits 23** [1]  28/10
**exist** [1]  101/24
**existed** [2]  102/16 102/20
**existence** [5]  20/13 87/16 90/9 90/12 90/15
**existing** [2]  102/16 102/21
**exonerated** [1]  116/24
**expand** [2]  55/14 101/12
**expect** [1]  5/19
**expectation** [1] 116/19
**expected** [1]  7/16
**expenses** [1]  116/4
**expertise** [1]  106/25
**explain** [5]  34/4 60/14 97/1 119/1 120/1
**Exporters** [1]  99/19
**exporting** [1]  99/23
**express** [2]  81/13 127/7
**expunged** [1]  18/15
**extent** [8]  9/19 18/17 29/1 70/15 77/17 79/13 80/7 119/17
**extra** [2]  6/4 6/22
**extremely** [1]  85/15
**eyebrows** [1]  99/11

**F**

**faces** [1]  43/24
**facility** [1]  123/20
**fact** [10]  22/19 37/7 70/16 72/4 72/12 84/2 97/9 97/18 103/13 125/24
**faded** [1]  104/10
**fair** [8]  41/4 64/2 70/12 74/6 75/25 80/4 113/2 126/7
**fairly** [3]  67/10 75/23

98/5
**false** [1]  114/12
**familiar** [3]  20/10 99/16 99/18
**families'** [1]  83/1
**family** [16]  35/13 65/17 66/20 80/18 82/22 83/1 84/7 88/10 90/5 90/8 91/17 92/17 92/23 99/12 102/18 118/20
**far** [8]  34/6 51/24 62/20 63/3 63/6 77/9 81/1 93/11
**fault** [1]  81/10
**faulted** [1]  124/1
**favor** [2]  15/22 116/21
**favorable** [1]  116/7
**FBI** [14]  76/10 76/13 76/14 76/19 77/1 77/9 77/21 79/1 79/4 79/5 79/18 81/5 81/7 81/8
**FCRR** [1]  1/23
**FDA** [1]  81/8
**fear** [2]  38/9 52/13
**fearful** [1]  124/25
**federal** [2]  1/23 74/25
**feed** [1]  75/14
**feel** [3]  38/6
**fees** [2]  6/5 9/16
**feet** [4]  43/25 52/20 53/17 53/22
**felt** [6]  37/25 68/3 68/8 80/19 80/24 82/12
**fences** [1]  50/10
**few** [5]  5/24 8/15 21/24 43/19 77/7 88/15
**fiduciary** [2]  14/4 14/7
**field** [2]  120/8 121/9
**figure** [1]  25/24
**filed** [12]  23/1 23/3 23/6 23/7 23/13 80/23 81/2 107/4 107/13 107/20 109/7 109/19
**filled** [3]  76/24 79/7 79/16
**filler** [1]  7/23
**film** [6]  45/3 102/13 103/8 125/24 126/1 126/15
**filmed** [3]  43/19 126/18 126/21
**filters** [1]  92/19
**final** [1]  109/14
**finality** [1]  12/20
**finalized** [1]  111/18
**finally** [2]  81/14 127/8
**finances** [3]  98/14 98/14 100/6
**financial** [2]  96/15 98/9
**financially** [2]  28/2 68/8
**find** [1]  66/13
**finding** [12]  14/6 17/3 18/10 107/15 107/21

109/24 111/10 112/3 115/13 115/20 115/23 116/25
**findings** [2]  18/15 19/6
**firewall** [3]  73/4 73/19 73/23
**firewalls** [2]  72/19 72/24
**firm** [4]  2/11 98/5 98/13 98/17
**first** [25]  1/24 17/12 17/16 20/13 20/18 21/1 21/16 22/14 24/1 24/8 34/16 48/12 52/9 63/12 84/20 85/10 85/10 85/12 85/15 87/24 90/24 117/9 117/13 118/16 119/7
**Fitchew** [1]  123/7
**five** [4]  43/25 91/8 93/1 94/15
**five feet** [1]  43/25
**flat** [1]  121/25
**fled** [1]  21/9
**flight** [2]  6/3 116/3
**Flipping** [1]  88/15
**floor** [1]  103/10
**Floridian** [2]  95/5 95/7
**flow** [1]  40/20
**flyers** [1]  118/11
**focus** [1]  99/7
**follow** [3]  41/14 89/4 109/7
**follow-up** [1]  89/4
**followed** [1]  118/3
**following** [8]  4/4 10/24 17/23 81/21 107/11 112/6 114/19 127/16
**follows** [1]  11/11
**foot** [6]  35/23 35/25 44/1 44/3 44/4 57/13 forcing [1]  42/14
**foregoing** [1]  129/4
**Foreshore** [1]  116/6
**forgive** [2]  68/21 75/11
**forgo** [1]  122/1
**form** [3]  30/20 81/13 127/7
**format** [2]  88/17 129/7
**formats** [1]  89/1
**former** [4]  105/4 105/7 117/16 117/22
**forms** [1]  79/7
**Forty** [1]  16/18
**Forty-two** [1]  16/18
**forward** [2]  71/1 71/3
**found** [5]  91/21 91/22 91/22 102/18 115/25
**foundation** [2]  88/24 118/22
**founded** [1]  102/1
**four** [9]  46/22 47/7 93/12 93/17 93/18 93/21 93/23 127/20 127/22

**F**

frame [5]  21/25 67/6
71/6 71/10 95/24
framed [1]  22/3
fraud [2]  107/15
107/22
freedom [1]  113/6
freedoms [1]  113/3
freeway [1]  21/8
frequent [3]  24/12
53/3 85/11
frequently [3]  68/2
68/20 70/8
Friday [1]  5/9
friend [1]  99/22
friends [1]  83/2
front [7]  16/11 18/6
20/4 34/9 63/23 69/7
88/4
frustrated [2]  64/2
64/4
Fuentes [4]  119/3
120/3 121/14 121/17
full [3]  22/13 70/15
123/2
fully [1]  75/12
functions [2]  116/7
116/12
funding [3]  98/7 100/8
100/21
furniture [2]  39/19
42/15
further [14]  4/23 9/17
10/2 11/11 64/25 65/2
69/16 77/13 77/14
113/23 126/11 126/12
126/24 127/2
future [1]  75/10

**G**

gap [1]  7/23
gate [7]  49/8 49/17
51/16 57/15 57/20
59/5 59/8
gates [4]  47/13 49/5
54/6 58/6
gathered [2]  44/20
54/6
gathering [3]  43/1
43/8 47/12
gave [4]  19/21 50/3
50/4 103/16
GEBELIN [7]  2/7 2/7
4/14 95/11 95/14
108/15 111/12
general [1]  106/14
generally [1]  67/16
gentleman [2]  29/17
95/7
gentlemen [3]  11/1
81/13 127/5
gesture [2]  36/17
49/24
gestured [1]  50/2
gesturing [4]  51/8
57/23 58/8 60/1
getting [3]  56/15
72/10 112/9

give [4]  37/17 49/25
76/21 96/6
given [5]  6/19 9/3 20/4
51/16 115/5
giving [6]  25/6 26/23
56/17 114/12 116/18
122/22
Global [5]  13/4 13/6
13/16 95/20 97/19
gmail.com [1]  1/25
goal [2]  73/16 73/17
goes [2]  48/24 97/5
going into [1]  100/4
good [14]  4/10 4/12
4/13 4/15 4/16 4/18
4/20 11/1 11/14 11/15
18/12 99/22 114/3
114/4
Google [5]  90/17 97/2
97/6 98/19 99/5
gotten [1]  50/22
government [2]  13/17
13/19
graphic [1]  21/11
graphics [4]  21/4
21/12 21/14 89/16
great [1]  49/23
greet [1]  50/8
greeting [1]  56/24
group [3]  45/4 46/22
47/9
guard [10]  50/2 50/4
51/15 51/18 51/19
51/20 56/22 57/22
57/23 122/18
guards [1]  49/22
guess [7]  8/15 10/11
34/16 67/6 85/23
103/24 104/11
guessing [1]  41/8
guys [2]  39/24 47/4

**H**

hair [1]  56/2
half [1]  70/20
halfway [1]  40/17
hallway [2]  92/6 92/9
Hammond [8]  5/1 5/6
5/20 7/5 7/18 8/6 9/7
9/8
hand [2]  19/8 19/9
handle [1]  68/19
handled [1]  29/15
handprint [1]  21/11
happened [3]  8/22
61/10 109/12
happy [1]  9/2
harassed [2]  60/21
123/14
Harbor [1]  120/16
Harbor Boulevard [1]
120/16
Harbour [1]  116/6
harm [1]  68/4
harmed [1]  68/8
having [5]  11/10 17/3
18/10 25/17 56/24
96/1 122/2
he's [3]  29/18 123/7

123/8129
head [3]  74/19 105/17
108/7
header [1]  104/11
heading [2]  114/8
115/18
headline [2]  21/8
22/12
headlines [5]  89/22
89/23 89/25 90/2 90/3
health [1]  99/12
hear [3]  12/1 63/20
107/17
heard [16]  4/4 10/24
52/3 52/24 53/23 54/5
67/4 67/5 77/13 77/14
81/21 107/8 110/24
112/6 119/18 127/16
hearing [4]  14/5 14/10
110/11 111/6
hearsay [1]  33/12
heavily [2]  19/10
19/15
held [2]  107/11 129/6
help [3]  6/9 84/16
84/18
Herald [5]  21/19 89/24
91/3 91/5 91/6
hereafter [2]  120/17
120/18
hereby [1]  129/3
herein [1]  11/8
Hezbollah [1]  99/10
Hi [1]  121/18
hide [1]  126/8
high [1]  57/7
high-level [1]  57/7
highlighted [2]  18/2
18/4
HILLS [1]  2/8
himself [1]  93/1
hired [1]  106/24
Hispanic [1]  38/10
hit [1]  123/21
Hold [4]  7/21 43/2
108/4 108/11
holding [8]  35/14
36/21 38/12 54/9
54/13 65/7 65/11
116/1
Hollywood [1]  102/13
home [9]  37/24 41/23
44/11 44/11 83/1 86/2
86/5 112/21 126/5
homes [1]  83/1
Homewood [4]  34/5
34/5 34/12 46/1
Homewood Road [1]
34/12
honestly [1]  20/16
89/9 90/22
HONORABLE [1]  1/3
hopefully [1]  82/2
hopes [1]  101/21
hotel [2]  6/4 6/22
hour [4]  7/15 96/1
96/1 122/2
hours [6]  8/15 34/14

63/15 119/9 127/20
127/22
house [21]  26/11 34/3
34/6 34/10 39/1 40/25
41/21 42/2 45/2 45/3
45/24 46/2 49/2 51/18
51/20 64/5 64/19
64/22 71/10 85/7
126/22
however [3]  15/7
18/10 114/13
huh [1]  72/2
Human [1]  18/20
humbly [1]  128/2
hundred [4]  46/5
52/20 53/5 76/3
hundreds [5]  87/3
87/4 90/21 90/21
90/21

**I**

I'd [4]  55/6 88/3
115/15 121/11
ICAC [17]  14/13 14/19
14/20 14/23 14/25
15/9 15/10 15/14 16/3
18/15 19/18 19/20
114/6 115/8 115/12
117/6 120/21
icon [1]  123/8
ICS [6]  119/11 120/4
120/5 120/7 120/14
120/17
idea [9]  38/11 58/18
73/5 73/13 82/24
94/25 101/12 101/17
111/8
identical [2]  54/14
54/15
Identify [1]  108/12
identities [1]  66/16
ignore [4]  69/13 69/15
70/21 70/22
ignored [1]  70/20
image [3]  30/6 46/8
imagery [2]  90/19
90/20
images [1]  22/15
imagine [1]  111/21
impacted [1]  18/16
impartial [1]  116/11
impecunious [1]
97/25
implement [2]  73/1
73/18
important [1]  67/24
impression [1]  45/10
in 2013 [1]  24/2
in 2014 [1]  25/16
in 2015 [1]  106/4
in 2016 [1]  106/11
in 2017 [1]  126/3
in-house [2]  26/11
71/10
inadvertently [1]
37/19
inboxes [1]  73/8
INC [2]  1/5 4/7

incarcerated [2]
125/10 125/17
incidents [1]  103/15
include [3]  30/1 30/12
54/19
included [6]  21/13
32/4 52/11 71/21
103/23 118/8
including [2]  78/11
84/7
INCLUSIVE [1]  1/9
incoming [1]  73/22
inconsistent [1]
102/14
inconvenience [1]
9/23
incorrect [2]  12/13
19/17
incurred [1]  9/16
independent [2]  15/14
116/15
indicate [1]  35/16
indirect [1]  68/14
indirectly [1]  116/11
individual [4]  117/2
117/4 120/24 124/8
individuals [3]  96/21
100/13 100/13
influence [2]  116/5
116/20
info [3]  104/12 121/19
122/4
information [13]  33/4
35/2 66/3 66/8 71/11
80/4 99/15 100/12
112/1 112/12 112/16
119/4 120/9
initial [2]  44/11 85/4
injunctions [1]  74/24
injunctive [2]  25/1
26/5
innocence [2]  18/17
18/19
inquire [2]  107/24
111/20
inquiries [2]  15/6 15/7
inquiry [7]  14/14
14/19 14/23 14/25
15/3 15/9 114/21
inside [3]  53/7 58/4
60/8
inspector [1]  16/3
install [1]  73/21
instead [3]  14/8 25/6
96/7
instruct [4]  60/25
62/25 74/3 124/3
instructed [1]  73/18
instruction [1]  74/9
insufficient [1]  17/4
intellectual [2]  29/22
29/23
intend [2]  7/3 7/8
intended [6]  6/1 6/5
30/1 30/12 115/10
intention [2]  112/23
114/22 115/1 116/4
intentionally [1]  23/18

**I**

interact [4] 53/11 62/3
64/17 86/23
interacted [1] 37/23
interactions [1] 92/17
interest [2] 9/20 18/18
interesting [1] 97/3
interests [1] 116/8
interferes [1] 18/18
Internet [4] 18/16
76/22 79/14 90/20
interrupt [1] 108/14
intersection [1] 34/5
into 2017 [1] 106/15
introduce [1] 111/4
investigation [3]
66/15 119/8 121/23
investigator [4] 66/12
66/15 117/17 117/23
investment [14] 96/9
96/16 96/19 97/10
97/20 98/9 98/12
98/17 100/8 100/9
100/14 100/20 100/21
101/3
involve [2] 111/5
116/16
involved [11] 30/20
32/14 32/25 33/5 35/3
66/9 91/23 112/13
112/20 117/24 121/3
involving [1] 114/14
Iron [2] 13/10 96/8
Islands [2] 11/18
13/23
issue [12] 4/21 5/1
6/14 8/25 12/9 14/8
14/9 15/2 19/8 64/24
64/24 111/2
issued [4] 13/24
17/20 29/11 124/16
it's not [1] 109/19
itself [3] 31/6 31/16
69/6

**J**

Jacqueline [3] 104/20
123/16 123/17
jail [2] 124/18 125/8
James [17] 50/5 50/9
50/20 50/23 51/3 51/3
51/7 51/8 51/15 56/21
57/23 58/11 60/1
123/1 123/3 123/4
123/11
James's [1] 123/2
Jamie [11] 117/2
117/4 117/16 120/4
120/9 120/18 120/20
120/21 121/14 121/16
122/5
Jamie Brown [3]
117/16 121/14 121/16
jcarroll [1] 104/19
job [1] 49/23
joined [1] 107/1
joining [1] 106/21
journalist [1] 22/6

journalists [1] 22/5
JR [1] 1/3
judge [2] 1/3 14/7
judgment [10] 13/15
109/8 109/15 109/21
109/22 109/24 110/2
111/1 111/16 125/14
Judicial [1] 129/8
JUI [3] 1/23 129/14
129/15
jump [1] 110/13
June [1] 16/3
June 2017 [1] 16/3
jurors [1] 10/13

**K**

KARINA [1] 2/4
Karl [3] 93/24 94/2
98/4
karlkazal.com [1]
84/9
KAZAL [101] 1/8 1/8
1/9 4/7 6/11 8/12 9/6
15/8 15/20 16/23 17/5
17/6 17/9 17/18 17/24
18/1 18/11 19/3 19/9
20/22 20/24 20/24
20/25 22/10 22/10
23/18 24/17 30/19
30/25 32/5 32/14
32/24 33/4 35/2 35/7
35/10 35/13 35/18
35/19 35/21 65/7
65/13 65/17 65/18
65/23 66/7 66/9 67/8
69/24 73/13 73/25
74/11 74/20 78/4
78/11 78/14 78/15
78/22 78/23 84/7
88/10 90/5 90/8 91/14
91/17 92/17 92/23
93/8 93/13 100/11
103/23 104/16 112/13
114/11 114/14 114/18
114/21 115/7 115/13
115/20 115/24 116/8
116/13 116/24 117/18
118/5 118/8 119/2
119/5 119/5 119/12
120/9 120/18 120/24
121/2 121/8 124/11
124/11 124/18 125/7
125/17
Kazal 00159 [1] 16/23
Kazal 158 [1] 19/3
Kazal 160 [2] 17/24
18/1
Kazal's [2] 74/15
116/8
Kazal, [1] 35/10
kazalfamilystory.com
[14] 20/11 23/20
24/12 24/24 25/13
26/7 30/21 32/15 33/1
33/6 33/13 103/22
118/6 118/9
kazalfamilytruth.com
[2] 84/8 89/8

Kazals [20] 51/25
68/3 70/13 74/5 77/24
80/18 80/23 83/19
89/10 89/14 94/14
95/18 97/19 97/24
98/3 98/6 98/15 99/8
101/21 103/14 106/7
126/4
Kazals' [5] 14/25 96/7
96/8 99/9 124/4
keep [6] 10/14 39/15
58/19 66/19 66/23
67/1
Kelly [4] 19/8 116/2
116/5 116/18
Kelly's [4] 114/22
115/2 115/10 116/11
kept [1] 56/24
kind [10] 27/17 36/12
36/13 36/15 37/1 50/3
80/16 80/23 81/17
127/11
knew [1] 120/24
knowingly [1] 114/12
knowledge [7] 34/23
35/6 42/11 62/23
62/24 92/15 92/21
known [4] 75/10
97/24 98/17 117/18
knows [1] 111/22
Kolesa [6] 7/13 8/3
8/4 9/1 29/17 56/12
KTC [3] 94/2 98/6
98/13

**L**

labeled [2] 16/23 18/1
laborers [1] 38/11
Lacks [1] 118/21
ladies [1] 11/1 81/13
127/5
language [3] 78/18
78/20 78/21
LAPD [3] 37/10 64/5
113/13
last [6] 26/1 77/20
95/23 102/25 107/14
107/21
late [10] 11/23 12/3
22/3 33/20 65/2 67/7
71/7 71/15 75/22 94/7
late 2015 [3] 67/7 71/7
71/15
later [6] 24/4 37/22
98/24 99/6 117/19
law [12] 2/3 2/3 2/7
2/11 2/12 2/12 18/13
18/14 25/21 25/24
76/10 80/16
lawful [3] 39/8 113/10
113/15
laws [1] 25/19
lawsuit [23] 12/20
13/15 22/25 23/6
23/14 23/17 24/21
27/21 94/14 94/17
94/19 94/23 95/2
103/16 107/4 107/13

107/20 107/25 108/1
108/2 108/5 108/18
109/7
lawyer [4] 103/13
110/22 111/10 111/15
lawyers [9] 23/3 23/6
24/19 25/17 41/11
60/7 74/9 74/23 75/6
lay [1] 101/18
learn [4] 20/13 66/16
84/25 90/12
learned [9] 14/14
20/15 20/16 69/20
84/5 85/2 90/9 90/14
91/12
learning [1] 87/21
leases [1] 15/1
least [12] 9/15 26/1
38/20 38/24 44/14
61/8 70/20 77/23
85/20 89/1 97/3
100/19
leave [6] 40/6 41/21
41/24 42/7 42/9 85/23
leaves [1] 18/10
Lebanon [1] 84/3
left [3] 46/20 63/25
106/11
legal [8] 15/12 25/2
30/8 33/10 41/14
94/22 111/22 111/23
legally [1] 41/10
legislative [1] 15/16
legitimate [1] 119/6
LESOWITZ [1] 2/7
less [4] 45/13 85/22
97/21 112/1
let [7] 5/13 7/8 10/6
38/11 66/2 88/8 122/3
letter [5] 96/14 96/15
98/11 98/20 124/4
level [1] 57/7
LIA [1] 96/19
liability [2] 107/14
107/21
libel [1] 25/20
Libyan [11] 96/9
96/16 96/19 97/10
97/20 98/9 98/12
100/9 100/14 100/20
101/3
license [1] 27/22
licensed [1] 121/23
life [1] 26/16
lifting [1] 56/17
like [33] 16/14 21/7
21/8 21/14 22/8 22/9
22/11 26/20 36/6
36/22 36/22 38/10
39/19 39/20 50/1
54/22 55/6 76/22
88/20 93/3 97/14
101/12 108/8 114/5
114/7 115/15 117/6
118/13 119/14 119/24
121/11 122/6 124/13
likely [1] 7/22 8/20
line [1] 107/9

link [1] 69/12
linked [1] 97/10
linking [1] 90/19
links [3] 26/20 79/19
89/13
Linton [1] 22/5
Linton Besser [1]
22/5
liquidation [4] 14/5
14/10 95/19 97/25
list [2] 19/6 104/15
little [10] 6/10 15/23
16/2 28/15 33/12 35/8
51/16 58/25 97/14
104/10
live [1] 83/2
lived [3] 48/22 86/7
102/11
lives [2] 86/14 101/20
lobby [4] 50/10 51/10
59/18 59/23
location [3] 34/2 46/3
102/23
logic [1] 106/17
long [8] 41/7 41/19
41/25 63/10 63/14
85/20 106/2 123/8
long-standing [1]
41/19
longer [3] 55/7 81/24
94/8
look [8] 9/20 17/12
47/3 47/7 87/18 99/5
104/2 111/6
looked [9] 28/9 38/10
44/19 44/23 45/5 47/5
47/9 103/20 108/24
looking [4] 28/12
46/25 89/18 104/5
LOS [5] 1/17 1/24 2/13
4/1 21/8
Los Angeles [1] 21/8
losing [1] 13/20
lost [1] 125/14
lot [6] 6/4 9/16 49/13
49/15 50/15 51/12
lots [2] 21/14 99/11
loud [1] 16/25
low [6] 101/18 101/19
102/8 102/15 125/19
125/24
lunch [3] 82/6 127/5
128/12

**M**

mabend [1] 105/5
made [21] 5/3 6/2 9/10
13/19 14/6 17/3 18/10
19/7 28/6 28/19 29/10
68/5 79/1 80/15 95/18
96/1 98/23 112/3
115/13 120/14 123/16
mail [26] 31/6 31/14
31/16 68/6 68/22 70/6
70/13 71/21 71/22
73/14 74/4 74/4 78/14
92/19 100/19 103/23
106/10 106/12 106/13

**M**

mail... [7] 106/18 114/25 119/2 119/5 120/1 121/13 121/14
mailing [1] 78/8
mails [53] 22/9 31/1 31/4 31/9 31/10 31/12 31/13 31/18 31/24 32/1 32/10 32/11 67/7 67/13 67/14 67/16 67/24 68/2 68/11 69/3 70/4 70/8 70/17 71/7 72/3 72/5 72/17 72/20 73/2 73/6 73/15 73/22 73/25 74/7 75/23 76/4 76/7 76/11 76/15 77/23 77/25 78/5 79/2 79/10 79/17 80/11 80/19 80/23 80/25 81/4 106/6 106/14 118/5
main [1] 123/20
maintain [6] 24/19 101/18 102/8 102/15 125/19 125/24
majority [1] 87/13
make [14] 5/13 6/19 10/16 15/16 15/17 36/12 36/15 42/19 53/23 54/6 60/16 61/10 62/21 103/9
makes [1] 15/15
makeup [1] 44/25
male [1] 79/23
malicious [2] 24/17 117/20
maliciously [1] 23/18
man [4] 50/11 57/1 79/21 123/12
manager [3] 62/14 104/23 123/18
manages [1] 29/24
managing [1] 71/21
manner [1] 116/7
many [9] 15/7 19/5 34/19 37/12 48/6 50/18 62/8 90/5 123/6
Mark [7] 118/18 119/3 120/4 121/15 121/17 121/17 121/18
Mark Woodward [1] 121/15
MARKED [1] 3/12
market [1] 27/22
marketing [2] 104/23 123/18
Martell [11] 105/22 105/23 106/7 106/15 106/20 107/4 107/13 108/6 108/8 108/9 108/16
Martell's [1] 110/22
Matt [1] 71/15
matter [7] 26/10 81/14 81/17 114/14 127/8 127/11 129/6
matters [2] 19/7 116/13

Matthew [3] 48/14 71/16 104/25
Matthew Price [2] 48/14 104/25
May 2007 [4] 114/24 115/1 115/11 116/3
maybe [14] 9/2 24/5 29/13 38/20 41/8 53/22 63/8 63/15 63/15 63/15 67/11 70/20 76/3 77/7
mean [16] 5/17 13/3 18/8 20/24 21/5 29/21 33/14 33/18 43/25 53/20 77/15 82/16 86/21 108/24 109/17 109/25
meaning [6] 39/13 40/6 41/2 96/2 102/5 103/12
means [5] 18/13 25/23 29/22 30/8 78/19
mechanism [1] 73/21
media [4] 69/22 105/17 106/20 106/23
medium [1] 88/17
MEI [3] 1/23 129/14 129/15
memory [1] 90/3
men [1] 52/11
mental [1] 123/3
mention [1] 68/2
mentioned [5] 24/22 37/14 61/23 65/6 123/13
meritorious [1] 99/1
messaging [1] 32/10
met [1] 92/23
meters [3] 34/8 46/1 46/5
mic [1] 15/23
Michael [1] 5/1
microphone [1] 12/1
mid [3] 71/15 77/6 77/13
mid-2016 [2] 77/6 77/13
middle [3] 40/14 40/16 101/13
Middle East [1] 101/13
might [8] 55/7 56/7 56/9 59/22 84/16 84/18 85/15 91/16
might turn [1] 56/9
Mike [2] 19/5 105/10
miles [1] 85/24
million [3] 12/12 12/16 13/10
mind [3] 10/14 15/23 82/20
mine [1] 29/9
mini [1] 22/11
miniscule [1] 100/1
minute [5] 54/23 56/9 81/12 82/5 109/11
minutes [10] 5/10

7/14 7/15 27/24 41/8 43/19 82/2 85/20 127/20 127/22
misappropriated [1] 27/22
misleading [1] 114/12
misrepresentation [1] 107/22
Miss [1] 127/25
Miss David [1] 127/25
mistrial [3] 109/13 110/8 110/10
misunderstood [1] 50/17
mobile [2] 26/21 26/22
modified [1] 33/15
moment [6] 17/8 24/1 37/14 51/16 70/5 81/11
moments [1] 43/6
Monday [8] 5/12 5/14 6/6 6/25 8/5 9/5 9/13 55/11
monetary [1] 68/4
money [6] 6/4 6/21 13/21 98/1 98/2 98/3
monitor [2] 78/1 80/5
monitoring [1] 77/16
montage [4] 88/14 89/18 90/24 91/4
months [5] 13/14 29/14 77/7 77/20 106/3 125/12
more [15] 25/5 45/5 45/13 47/5 65/4 67/19 67/20 68/14 68/16 70/20 77/25 77/25 96/2 97/14 123/11
morning [35] 4/10 4/12 4/13 4/15 4/16 4/18 4/20 10/3 11/1 11/2 11/14 11/15 21/19 34/13 34/15 36/12 37/6 38/9 47/11 47/21 48/10 50/8 52/9 53/10 55/23 60/4 63/7 63/8 64/6 85/5 85/12 89/23 91/3 91/5 91/6 92/5
most [4] 5/10 27/11 82/4 106/14
motion [2] 103/1 103/6
motor [1] 117/22
mourning [3] 5/5 5/25 9/4
move [14] 16/14 25/25 40/5 40/5 42/8 60/23 88/5 88/20 101/20 101/21 101/22 112/24 119/14 122/6
moved [4] 40/11 40/22 46/13 112/18
moving [4] 9/21 39/14 39/15 101/18
mprice [1] 104/24
Mr. Adam [1] 125/17
Mr. and Mrs. David [1] 9/1

Mr. Charif Kazal [1] 20/25
Mr. David [26] 7/10 8/1 10/9 11/14 15/22 19/21 32/23 35/1 55/21 64/23 65/22 82/11 84/5 102/25 108/21 109/8 109/8 109/17 110/16 111/11 112/3 112/9 114/3 119/1 119/24 122/16
Mr. Gebelin [3] 95/11 95/14 111/12
Mr. Hammond [7] 5/6 5/20 7/5 7/18 8/6 9/7 9/8
Mr. Jamie [1] 120/4
Mr. Kazal [14] 6/11 8/12 9/6 15/8 15/20 17/9 20/22 20/24 24/17 30/25 73/25 91/14 116/24 119/5
Mr. Kazal, Mr [1] 35/10
Mr. Kelly [3] 116/2 116/5 116/18
Mr. Kelly's [4] 114/22 115/2 115/10 116/11
Mr. Kolesa [2] 8/3 8/4
Mr. Mark [2] 119/3 120/4
Mr. Martell [5] 106/7 106/15 106/20 107/4 107/13
Mr. Martell's [1] 110/22
Mr. Parlata [1] 8/20
Mr. Price [32] 48/17 48/19 49/11 50/23 56/15 72/3 72/16 72/21 73/10 73/18 74/3 84/6 85/6 85/13 86/1 86/11 87/9 87/17 87/21 91/10 91/12 91/14 91/23 92/16 92/22 92/25 93/11 93/16 93/24 94/8 94/13 94/19
Mr. Price's [3] 55/22 71/20 94/22
Mr. Singh [1] 82/21
Mr. Taylor [7] 7/22 11/4 81/24 82/9 89/4 107/12 126/12
Mr. Tony Kazal [1] 32/14
Mr. Victor [2] 119/3 120/3
Mr. Wiener [6] 7/9 8/7 20/2 103/21 127/1 127/24
Mr. Woodward [3] 8/20 54/23 55/10
Mr. Zotti [4] 96/11 98/20 99/5 100/19
Mr. Zotti's [1] 96/23
Mrs. [2] 8/1 9/1
Mrs. David [1] 8/1

much [8] 19/7 41/4 67/19 67/20 81/24 96/6 123/23 126/18
multiple [1] 96/1
must [5] 51/3 53/16 100/15
myself [2] 21/13 22/4

**N**

n-o [2] 32/18 32/19
name [17] 17/19 22/6 29/17 90/17 92/2 95/7 96/23 97/2 102/19 104/19 104/24 105/8 105/13 105/20 108/7 123/2 123/15
named [2] 5/1 117/2 117/4
names [8] 22/4 35/16 91/17 93/12 93/12 93/17 93/20 93/24
narrative [2] 25/6 97/13
narratives [1] 128/4
national [1] 5/24
near [6] 39/2 48/22 59/7 72/4 79/11 85/7
nearby [1] 86/7
necessarily [4] 6/19 95/25 96/3 106/13
necessary [1] 60/18
need [5] 10/2 10/14 26/10 89/4 128/3
needed [2] 7/4 72/13
needs [2] 25/21
neighborhood [19] 33/23 35/4 37/10 40/6 41/22 42/10 43/9 44/19 47/17 48/10 54/13 64/16 65/1 65/7 75/22 82/18 83/14 112/11 113/14
neighbors' [1] 42/15
never [23] 15/8 17/9 17/19 24/24 25/10 26/5 26/13 43/12 52/13 53/23 54/5 64/21 67/4 76/6 77/13 80/15 80/23 81/2 85/10 93/3 93/6 103/6 115/9
new [3] 13/16 13/19 110/11
newspaper [1] 14/24
newspapers [1] 90/4
next [11] 6/12 25/7 40/2 61/3 61/15 97/15 110/12 112/4 117/11 125/4 127/25
nights [1] 6/22
nil [2] 13/1 13/6
none [3] 34/21 51/24 51/25
nonresponsive [2] 26/1 60/24
normally [2] 49/8 53/1
noted [2] 9/22 119/20
nothing [9] 39/11

**N**

**nothing... [8]** 77/25 78/17 84/2 111/14 113/23 126/11 126/24 127/2
**noticed [1]** 22/14
**notification [7]** 68/18 69/1 69/5 69/7 69/10 69/13 69/14
**notifications [4]** 69/21 70/2 74/10 74/12
**notified [1]** 76/13
**notify [2]** 76/10 76/14
**notifying [2]** 68/22 79/4
**noting [1]** 19/5
**November [11]** 44/13 44/18 45/5 45/16 45/18 45/20 46/23 65/2 121/14 121/16 124/17
**November 10 [1]** 121/14
**November 10th [1]** 121/16
**November 2016 [1]** 45/16
**number [2]** 32/2 45/12

**O**

**o'clock [1]** 63/16
**oath [2]** 11/16 20/4
**object [3]** 5/23 100/3 119/17
**objection [23]** 5/21 9/21 16/16 16/17 28/24 29/2 30/22 55/5 83/22 88/22 88/23 89/2 107/6 111/7 112/4 118/21 119/16 119/20 121/5 122/10 122/11 127/4 128/6
**observation [1]** 24/20
**observe [4]** 21/1 42/12 42/18 42/19
**observed [8]** 20/19 42/5 42/14 48/4 48/12 49/4 52/2 52/5
**obtained [1]** 22/23
**obtaining [1]** 115/6
**obvious [1]** 38/2
**obviously [10]** 5/24 6/4 16/6 28/19 38/22 45/19 72/12 83/13 92/12 126/18
**occasion [1]** 24/12
**occurred [3]** 22/1 35/3 103/16
**occurring [2]** 61/22 79/5
**October [27]** 33/20 33/21 33/24 34/17 35/12 36/12 44/12 44/20 45/13 46/4 47/11 47/11 52/6 52/8 55/23 59/12 63/7 65/14 65/15 65/25 66/4 74/24 75/23

80/10 80/15 85/12 112/11
**October 2016 [2]** 33/20 80/15
**October 26th [7]** 33/24 34/17 36/12 47/11 55/23 59/12 65/25
**October 26th l [1]** 33/21
**October 26th protest [1]** 35/12
**October 26th was [1]** 85/12
**October 26th when [2]** 63/7 74/24
**off [7]** 28/14 37/19 48/25 57/24 74/19 85/6 108/7
**offense [2]** 114/19 115/8
**offenses [1]** 117/20
**offer [11]** 95/19 96/7 96/7 96/8 97/10 97/19 98/4 98/5 98/6 98/16 116/17
**offers [2]** 95/22 96/1
**office [3]** 87/9 87/11 92/10
**officer [6]** 29/20 48/20 71/18 100/24 117/17 117/23
**officers [4]** 37/12 38/18 38/20 64/5
**offices [2]** 2/3 87/6
**official [3]** 1/23 116/6 116/12
**often [2]** 85/9 85/17
**Oh [8]** 12/23 23/5 81/8 83/7 86/7 88/7 100/1 102/17
**old [2]** 50/11 123/4
**on-site [1]** 87/4
**once [1]** 53/20
**one [27]** 7/14 7/21 14/11 15/1 19/3 19/8 19/9 21/18 22/5 30/19 38/24 39/15 54/4 54/23 60/21 63/12 67/10 95/5 95/22 96/2 96/20 99/22 100/15 100/19 106/9 121/8 127/22
**one-minute [1]** 54/23
**ones [3]** 48/9 71/3 118/7
**ongoing [2]** 24/18 41/14
**online [6]** 14/24 76/23 76/24 87/17 88/17 90/16
**only [16]** 6/2 17/22 31/16 31/20 33/10 35/21 70/16 81/1 91/24 93/12 93/17 98/2 101/14 109/15 111/20 122/16
**oOo [1]** 128/14

**open [8]** 3/24 10/24 22/13 57/18 57/20 81/21 112/6 127/16
**opened [3]** 49/11 102/3 102/5
**opening [2]** 102/13 122/20
**opens [1]** 49/9
**operation [1]** 102/21
**opinion [3]** 81/14 115/4 127/7
**opportunities [1]** 101/9
**opportunity [2]** 17/19 101/10
**option [1]** 121/25
**order [24]** 6/24 7/1 9/8 13/23 13/24 14/2 14/3 25/13 42/6 55/8 66/19 66/22 67/1 78/3 78/7 78/13 78/15 78/16 78/22 97/23 99/2 124/2 124/11 124/15
**ordered [2]** 24/24 39/4
**orders [1]** 78/9
**organized [2]** 35/9 38/3
**organizing [3]** 35/3 66/9 112/13
**original [1]** 125/14
**originally [3]** 5/2 84/2 102/19
**out [36]** 5/8 5/17 6/14 6/24 7/1 9/8 10/21 16/6 16/25 19/1 36/1 36/8 37/12 44/5 49/20 49/24 53/10 53/20 55/25 56/15 56/25 57/24 58/25 59/8 63/22 64/16 64/17 66/13 76/24 79/7 79/16 91/21 91/22 91/23 113/13 116/1
**outrageous [1]** 68/5
**outside [28]** 4/4 45/1 45/3 45/24 47/12 47/14 49/18 53/4 54/6 58/2 58/4 59/8 60/11 61/2 63/18 65/1 65/12 66/10 75/22 81/5 81/6 81/21 82/18 83/14 101/15 112/11 126/5 127/16
**over [7]** 9/23 97/25 98/7 102/21 128/4 128/4 128/18
**overarching [1]** 99/7
**overruled [4]** 9/22 30/23 83/23 119/21
**own [4]** 11/8 87/22 93/1 128/6
**owned [1]** 101/4
**owner [3]** 100/23 101/6 117/22
**ownership [1]** 100/2

**P**

**paced [1]** 103/24
**pack [1]** 42/9
**page [19]** 3/5 16/22 17/23 17/23 19/3 19/3 22/13 75/14 90/25 104/3 104/3 104/5 104/8 117/10 119/7 119/7 121/11 121/13 129/7
**page 39 [1]** 19/3
**page 40 [1]** 16/22
**page 49 [1]** 17/23
**page 5 [1]** 121/11
**pages [4]** 20/20 26/20 88/15 103/22
**paid [2]** 38/3 83/13
**paper [1]** 88/17
**paragraph [15]** 16/25 17/2 17/13 18/3 18/21 19/4 19/12 114/7 115/15 115/18 116/6 117/9 117/14 119/7 120/11
**paragraph 1 [1]** 120/11
**paragraph 135 [2]** 115/15 115/18
**paragraph 150 [1]** 19/4
**paragraph 155 [2]** 16/25 17/2
**paragraph 156 [1]** 17/13
**paragraph 157 [1]** 18/3
**paragraph 159 [1]** 114/7
**paragraph 2 [1]** 119/7
**paragraph 28 [3]** 117/6 117/9 117/14
**park [4]** 2/13 49/5 51/17 53/17
**parked [5]** 36/1 40/17 40/19 49/14 53/4
**parking [2]** 49/13 51/12
**Parlata [1]** 8/20
**part [10]** 12/14 24/18 46/12 55/4 68/6 68/10 83/16 96/10 101/17 118/17
**particular [1]** 103/15
**particularly [1]** 25/22
**parties [4]** 27/23 41/14 108/2 108/5
**party [3]** 6/5 8/19 78/24
**pass [3]** 40/21 64/15 121/19
**passed [1]** 44/12
**passenger [2]** 48/15 55/25
**past [4]** 45/23 67/18 93/25 97/3
**patrol [3]** 37/13 38/19
**pattern [2]** 32/9 32/12
**Paul [7]** 7/13 29/17

56/6 56/7 56/11 56/12 59/21
**Paul Kolesa [2]** 29/17 56/12
**pay [1]** 53/8
**paying [2]** 94/22 116/2
**payment [1]** 66/9
**payments [1]** 120/7
**peaceful [3]** 43/11 113/10 113/17
**pedestrian [4]** 57/2 57/11 57/13 59/5
**pedestrians [2]** 49/9 57/5
**people [15]** 27/11 32/2 32/4 38/3 44/18 44/20 46/6 48/9 51/4 70/9 73/15 76/11 82/24 86/7 104/12
**people's [1]** 22/4
**per [1]** 122/2
**perceived [1]** 25/23
**percent [3]** 12/11 70/16 70/18
**percentage [1]** 100/2
**Perfect [1]** 10/23
**perhaps [1]** 70/8
**period [7]** 24/11 27/12 70/14 96/1 99/14 99/15 125/7
**Periodically [1]** 63/22
**perpetrating [1]** 124/9
**perpetrators [1]** 35/9
**persecution [1]** 24/17
**person [6]** 18/12 30/7 71/11 77/3 98/2 116/21
**personal [3]** 26/16 52/13 86/14
**personally [13]** 30/24 35/5 53/14 62/3 62/6 103/4 103/19 108/21 109/8 109/9 109/17 110/16 111/11
**persons [2]** 44/21 44/22
**perspective [1]** 6/8
**pertains [1]** 102/10
**Phase [4]** 109/11 110/6 110/9 110/11
**Phase 2 [4]** 109/11 110/6 110/9 110/11
**phone [12]** 37/19 43/17 44/6 47/14 47/16 48/1 69/8 77/3 77/12 110/22 111/15 118/3
**photo [5]** 21/13 21/18 30/14 30/16 30/16 47/4
**photograph [2]** 21/17 30/12
**photographic [1]** 22/12
**photographs [15]** 21/2 23/19 27/21 27/23 27/25 28/3 28/7 28/20 30/1 30/1 30/25

**P**

**photographs... [4]** 31/4 33/14 89/16 89/21
**photos [13]** 21/21 22/19 22/23 24/5 24/8 27/16 27/19 30/21 31/7 31/15 32/25 33/13 44/5
**physical [2]** 29/21 36/15
**physically [2]** 34/22 51/25
**PI [2]** 121/23 122/1
**pick [1]** 49/1
**picture [4]** 57/25 58/25 103/1 103/6
**pictures [1]** 89/10
**piracy [3]** 91/16 91/20 92/14
**placards [1]** 118/11
**place [4]** 39/15 64/3 79/3 124/8
**plaintiff [2]** 11/8 108/16
**plaintiff's [1]** 54/24
**plaintiffs [8]** 1/6 2/2 4/11 4/14 4/25 5/19 108/15 127/20
**PLAINTIFFS' [2]** 3/4 104/4
**plan [1]** 8/23
**planet [1]** 111/23
**planned [1]** 5/2
**planning [1]** 112/24
**play [4]** 54/22 55/2 55/13 55/15
**played [6]** 46/9 46/15 46/17 55/19 58/20 103/13
**playing [1]** 103/12
**please [11]** 4/9 10/14 12/22 13/18 16/25 26/3 89/5 97/15 127/7 127/15 127/19
**pled [1]** 31/20
**plural [1]** 14/6
**plus [2]** 64/23 120/8
**point [26]** 13/20 16/6 21/20 24/4 28/6 28/19 33/20 38/17 60/9 63/11 63/25 66/18 69/20 74/15 74/21 75/2 75/19 76/3 84/5 98/20 99/6 100/8 101/24 107/1 124/22 126/7
**poles [1]** 39/20
**police [33]** 36/8 37/7 37/8 37/12 38/17 39/5 39/8 39/13 39/21 41/6 41/9 41/20 41/24 41/25 42/2 42/6 42/6 42/12 42/14 42/19 42/21 42/23 43/7 52/19 52/22 62/1 62/3 76/7 76/9 80/16 113/16 117/16 117/23

**pop [2]** 27/8 27/9
**pop-up [2]** 27/8 27/9
**pops [1]** 69/14
**portion [4]** 18/2 55/7 55/14 109/13
**possible [3]** 29/8 100/14 106/19
**possibly [4]** 62/12 88/2 99/20 100/22
**post [1]** 125/15
**posted [5]** 22/16 22/19 22/22 31/22 118/6
**poster [1]** 35/17
**posters [2]** 82/25 118/11
**potential [2]** 98/14 125/23
**potentially [1]** 87/2
**power [1]** 15/16
**predictable [1]** 43/6
**prejudice [2]** 9/7 9/10
**prejudicial [2]** 111/4 112/1
**premises [1]** 123/10
**prequalification [1]** 98/8
**presence [8]** 4/5 10/24 33/22 61/2 61/23 81/22 112/6 127/17
**present [5]** 19/25 34/22 52/1 112/2 113/1
**president [1]** 106/1
**press [1]** 99/9
**presumably [1]** 10/13
**presumption [2]** 18/17 18/18
**pretty [4]** 53/3 60/6 85/17 85/20
**prevent [4]** 50/12 72/14 73/6 123/10
**prevented [6]** 50/21 50/23 51/4 78/4 78/8 78/13
**preventing [1]** 74/7
**previous [1]** 96/2
**previously [2]** 11/10 31/11
**price [36]** 48/14 48/17 48/19 49/11 50/23 56/15 71/16 72/3 72/16 72/21 73/10 73/18 74/3 84/6 85/6 85/13 86/1 86/11 87/9 87/17 87/21 91/10 91/12 91/14 91/23 92/16 92/22 92/25 93/11 93/16 93/24 94/8 94/13 94/19 104/25 121/21
**Price's [3]** 55/22 71/20 94/22
**primarily [4]** 21/14 67/8 67/9 75/24
**primary [2]** 97/22 98/8
**principal [1]** 116/22

**prior [3]** 11/22/19 13/14 18/21 19/12 75/21 76/17 80/9 80/14 80/21 85/16 87/21
**private [7]** 39/18 66/12 66/15 98/5 98/17 117/17 117/23
**probably [3]** 85/20 85/24 125/15
**probative [1]** 111/3 112/1
**problematic [2]** 97/11 97/12
**problems [2]** 6/6 7/2
**proceed [1]** 55/17
**proceedings [3]** 1/14 107/11 129/6
**process [7]** 33/10 33/11 41/15 76/23 79/4 93/14 95/19
**produced [1]** 54/23
**production [3]** 32/15 33/5 103/7
**productions [1]** 103/2
**profanities [1]** 123/21
**profanity [1]** 36/25
**professional [3]** 103/17 120/11 120/13
**profile [5]** 101/19 102/8 102/15 125/19 125/25
**profit [1]** 28/2
**proper [2]** 55/8 88/24
**properties [2]** 42/15
**property [14]** 29/22 29/23 39/19 50/21 50/24 51/5 56/25 57/2 57/6 58/4 58/4 58/5 59/6 60/21
**proposal [2]** 5/22 8/6
**propositions [1]** 19/5
**prosecute [2]** 15/20 17/5
**prosecuted [1]** 17/9
**prosecutes [1]** 15/13
**prosecuting [1]** 114/18
**prosecution [1]** 115/7
**Prosecutions [4]** 15/11 15/12 15/18 15/20
**prosecutor [1]** 15/9
**prospect [1]** 116/1
**protect [1]** 30/8
**protected [1]** 113/10
**protest [20]** 35/3 35/12 35/12 39/9 42/21 43/11 43/13 44/11 51/22 62/21 63/1 85/10 85/11 113/10 113/15 113/17 124/23 124/25 125/16 126/5
**protesters [3]** 43/1 63/4 82/17
**protestors [85]** 33/22 34/19 34/22 35/14 35/23 36/3 36/11

36/12 37/6 37/15 37/15 37/23 38/10 38/25 39/2 39/3 39/5 39/13 40/5 42/7 42/17 43/9 43/16 43/21 44/6 45/1 45/12 45/18 46/3 46/22 46/25 47/7 47/12 47/14 47/16 48/4 49/4 49/17 49/21 49/25 50/9 50/14 50/15 50/18 50/23 52/1 52/5 52/14 52/20 53/11 53/23 54/5 54/9 54/13 56/25 59/8 60/11 60/22 61/2 62/25 63/10 63/18 64/3 64/7 64/13 65/6 65/11 65/24 66/10 66/13 66/19 66/23 67/1 75/21 76/17 77/7 80/10 80/14 80/22 83/13 112/10 113/15 122/21 124/2 126/22
**protestors' [1]** 42/13
**protests [8]** 44/13 62/4 64/24 64/25 65/2 66/4 82/12 112/14
**proud [1]** 50/11
**provide [4]** 25/1 79/17 119/11 120/18
**provided [2]** 79/19 118/18
**public [9]** 15/12 15/17 15/19 25/24 39/19 39/19 57/18 109/19 114/20
**publicly [1]** 16/7
**published [2]** 31/17 31/18
**publishing [1]** 79/20
**publishings [1]** 18/16
**punitive [4]** 109/11 110/7 110/9 110/11
**purchase [2]** 95/20 97/19
**purchased [1]** 123/7
**purported [1]** 88/25
**purpose [2]** 24/15 30/4
**pursuant [1]** 129/3
**Purview [1]** 71/25

**Q**

**qualified [3]** 96/15 98/5 98/11
**qualities [1]** 18/14
**question [23]** 14/22 17/6 25/7 26/3 26/5 29/4 30/11 31/3 35/7 38/8 40/2 60/25 61/3 61/12 61/15 61/17 74/19 97/15 97/18 106/9 125/4 128/5 128/5
**question's [1]** 103/3
**questioning [2]** 23/2 107/9
**questions [5]** 8/25

25/6 36/6 43/6 89/5
**quite [5]** 43/23 85/11 88/2 100/14 100/22
**quote [3]** 121/24 122/21 122/22

**R**

**racial [2]** 44/25 52/6
**raised [1]** 99/10
**RAMON [1]** 2/4
**range [1]** 71/13
**rare [1]** 85/15
**Rarely [1]** 27/4
**rate [5]** 82/1 121/22 121/24 121/24 122/1
**reach [1]** 101/12
**reached [1]** 109/25
**reaching [1]** 19/15 73/2 99/2
**read [34]** 7/6 8/16 13/24 16/8 16/25 17/2 17/15 17/20 17/22 18/2 18/7 19/2 19/4 22/13 26/20 27/3 27/9 27/12 27/13 38/12 69/18 69/19 70/12 70/16 70/22 71/3 90/4 98/11 114/8 115/18 117/9 117/13 120/10 121/13
**reading [6]** 19/1 114/10 115/19 117/15 120/12 121/18
**ready [1]** 11/3
**reality [1]** 9/24
**Really [2]** 60/13 61/3
**rearranged [1]** 9/15
**reason [11]** 8/24 18/24 19/22 59/11 59/15 75/5 83/20 84/22 96/6 99/4 99/5
**reasons [2]** 5/24 117/19
**recall [53]** 12/7 12/8 12/18 14/16 16/4 19/21 20/16 20/18 21/7 23/2 23/9 28/11 41/18 45/6 51/14 53/22 60/5 62/6 62/18 63/12 63/24 74/13 74/15 74/18 74/20 74/22 89/9 89/10 89/13 89/16 89/18 89/20 89/25 90/2 90/7 91/9 92/6 96/20 97/5 97/8 97/8 98/25 99/19 100/11 100/13 100/15 100/22 101/14 101/16 101/19 103/25 118/17 126/1
**recalled [1]** 11/8
**recalls [1]** 6/13
**recapture [1]** 18/13
**receipt [1]** 116/9
**receive [10]** 68/11 68/18 68/22 68/23 68/25 69/5 69/7 73/15 74/7 79/11

**R**

**received [17]** 12/21 12/24 31/12 31/13 67/7 67/10 67/12 69/3 70/13 74/10 76/3 90/10 92/22 106/15 106/19 118/7 122/12
**receiving [17]** 14/19 69/21 72/4 72/6 72/17 73/7 74/8 74/12 75/23 76/7 76/11 76/14 79/10 80/11 80/22 81/4 106/6
**recess [7]** 81/12 82/5 82/7 82/8 127/6 128/11 128/12
**recipients [1]** 104/16
**recollection [3]** 45/14 67/12 125/15
**recommendations [1]** 15/17
**record [6]** 7/7 75/6 108/12 108/13 109/19 123/2
**recorded [1]** 43/16
**records [1]** 18/15
**recourse [1]** 18/14
**RECROSS [2]** 3/7 126/13
**RECROSS-EXAMINATION [2]** 3/7 126/13
**red [1]** 21/12
**REDIRECT [3]** 3/7 113/24 114/1
**reduced [2]** 121/22 121/24
**refer [3]** 17/6 26/10 114/15
**reference [4]** 75/15 97/6 117/25 118/2
**referenced [7]** 32/1 68/18 68/22 78/21 96/11 120/21 120/21
**references [1]** 118/8
**referred [1]** 114/11
**referring [4]** 16/12 46/19 56/10 56/11
**refused [2]** 98/1 98/6
**regarding [2]** 12/20 62/4
**regards [1]** 14/20
**register [7]** 28/6 28/20 29/10 29/25 30/9 30/11 30/15
**registered [4]** 84/6 84/14 93/11
**registration [4]** 28/9 28/16 29/15 30/4
**registrations [1]** 29/11
**regular [4]** 67/7 67/10 80/23 85/18
**regularly [2]** 75/24 80/11
**regulations [1]** 129/8
**relate [1]** 118/19
**related [4]** 67/16 84/7 86/13 86/16

**relates [1]** 9/7
**relating [1]** 14/18
**relation [4]** 114/23 114/24 115/9 116/21
**relationship [1]** 99/21
**relative [1]** 34/2
**released [4]** 5/7 126/1 126/2 126/15
**relevance [4]** 100/4 107/6 107/9 111/2
**relied [1]** 19/14
**relief [4]** 25/1 25/10 26/6 26/9
**relocate [1]** 125/20
**rely [1]** 19/10
**remained [1]** 49/18
**remedy [1]** 25/3
**remember [9]** 13/12 25/15 28/12 89/15 89/22 90/3 90/23 91/15 108/7
**Renewables [1]** 13/5 13/6 13/16 95/20 97/19
**repeat [2]** 12/22 13/18
**replicated [2]** 78/22 90/20
**reply [1]** 121/20
**reported [5]** 79/8 79/10 114/19 122/20 129/5
**reporter [1]** 1/23 20/5 108/13
**REPORTER'S [1]** 1/14 36/22 104/12
**represent [1]** 33/21
**representations [2]** 6/1 9/11
**represented [1]** 9/17
**representing [1]** 95/11
**represents [1]** 120/4
**reputation [1]** 18/11
**reputationally [1]** 28/5
**request [1]** 55/7
**requested [1]** 100/23
**require [1]** 27/8
**requirements [1]** 24/19
**rescheduled [1]** 109/14
**research [3]** 14/24 81/17 127/10
**residence [1]** 124/8
**resources [1]** 61/10
**respect [13]** 4/22 19/7 35/7 61/18 69/24 71/7 74/11 76/7 79/1 107/22 114/17 115/6 115/24
**responded [1]** 37/10 52/23 114/25
**response [6]** 54/24 60/10 61/2 77/10 111/21 113/14
**responsibilities [1]** 71/20
**responsible [2]** 26/12

66/4 **:3134**
**rest [1]** 7/18
**restraining [7]** 66/19 66/22 67/1 74/25 124/2 124/10 124/15
**restrictions [1]** 96/4
**resulted [1]** 110/10
**resume [4]** 9/6 10/9 10/10 11/3
**RESUMED [2]** 3/6 11/12
**retaining [1]** 18/18
**retrieve [1]** 18/13
**revealed [1]** 96/24
**revealing [1]** 29/4
**reversed [1]** 11/19
**reviewed [1]** 23/12
**revisit [1]** 112/4
**reward [1]** 116/19
**right [226]**
**rights [5]** 14/8 18/20 27/25 41/9 113/2
**rise [5]** 81/20 82/7 103/16 127/14 128/11
**road [8]** 34/5 34/12 39/20 40/14 40/16 40/16 40/17 46/1
**robber [1]** 54/3
**Rocks [1]** 15/1
**RODRIC [6]** 1/5 7/15 11/7 36/22 54/3 104/12
**Rodric David [7]** 15 36/22 104/12
**role [2]** 92/19 96/18
**room [2]** 1/24 103/10
**roughly [7]** 44/15 44/16 45/12 46/3 46/5 59/5 67/6
**routines [5]** 60/10 61/1 61/8 61/13 61/18
**Rule [1]** 107/24
**Rule 608 [1]** 107/24
**run [1]** 57/20

**S**

**sac [1]** 40/25
**safe [3]** 37/25 80/19 125/2
**safety [5]** 38/6 38/9 52/13 99/12 123/22
**sale [1]** 12/18
**sales [2]** 104/22 123/18
**same [19]** 15/3 35/7 37/21 41/24 44/15 45/12 46/3 46/6 65/12 72/8 78/21 82/21 86/22 91/22 102/23 104/5 104/8 115/15 120/21
**SAN [1]** 2/4
**saying [23]** 6/11 7/1 14/21 27/13 41/18 47/14 50/14 51/3 52/22 56/21 78/7 78/13 82/17 83/12 83/15 84/24 91/4 92/4

92/7 102/13 106/11 106/14 109/1
**scene [2]** 41/24 126/21
**schedule [3]** 9/3 9/15 28/14
**scheduled [1]** 55/11
**scheduling [2]** 6/7 7/2
**school [4]** 48/24 49/2 85/7 102/10
**screen [13]** 10/12 10/13 10/13 10/15 10/17 18/3 18/5 18/6 69/7 103/4 103/6 103/21 104/7
**screenshot [2]** 46/17 103/22
**screenshots [4]** 21/6 74/22 88/9 88/16
**search [7]** 90/17 96/23 97/2 97/6 97/7 98/19 99/5
**seat [2]** 55/25 56/15
**seated [1]** 127/15
**second [10]** 7/21 9/12 23/1 23/8 23/10 23/12 104/2 104/3 110/14 127/23
**seconds [2]** 10/20 127/21
**section [6]** 18/7 114/15 115/8 116/14 116/17 129/3
**Section 249B [1]** 116/17
**Section 74A [1]** 114/15
**Section 8 [1]** 116/14
**Section 87 [1]** 115/8
**secure [3]** 30/5 49/15 57/7
**security [20]** 29/18 29/20 29/21 49/22 50/2 50/4 51/15 52/14 52/18 56/21 57/3 57/10 57/14 57/15 57/19 57/22 57/23 58/22 58/23 122/18
**see [41]** 8/25 10/16 18/6 21/20 34/24 34/25 50/6 50/13 51/2 51/11 54/12 54/16 55/6 55/21 56/6 56/9 56/19 58/9 58/25 63/18 63/23 69/9 69/11 72/15 75/8 75/14 83/18 86/24 87/20 91/2 96/5 102/12 102/17 104/10 104/13 104/15 110/5 111/2 118/16 127/12 128/10
**seeing [8]** 82/25 89/10 89/13 89/15 89/16 89/20 89/25 90/2
**seek [7]** 26/9 66/18 66/22 100/8 101/10

114/17 124/10
**seeking [5]** 25/18 61/6 100/20 101/8 124/2
**seem [3]** 58/8 58/24 120/6
**seems [1]** 88/18
**seen [17]** 16/7 16/8 18/21 19/12 27/19 55/1 87/19 87/22 88/8 88/13 88/14 88/16 88/18 90/16 90/22 90/24 119/19
**selection [2]** 30/21 32/25
**sell [2]** 12/16 27/25
**send [6]** 73/13 100/12 100/17 100/19 122/4 124/3
**send at [1]** 100/17
**sending [4]** 74/1 74/22 78/5 78/14
**senior [1]** 96/21
**sent [3]** 22/10 31/10 106/14
**sentence [4]** 17/12 17/15 120/10 125/8
**sentenced [1]** 124/18
**sentences [3]** 26/1 117/9 117/13
**separate [3]** 10/17 15/2 78/16
**September [1]** 126/16
**September 2017 [1]** 126/16
**series [4]** 20/20 20/21 20/22 22/4
**served [1]** 125/8
**server [1]** 71/21
**service [5]** 27/10 27/12 27/14 118/16 119/4
**services [6]** 119/12 120/8 120/8 120/11 120/13 120/19
**services agreement [1]** 120/8
**serving [1]** 125/9
**session [2]** 1/18 85/4
**SETH [4]** 2/3 2/3 4/11 4/24
**Seth Wiener [2]** 4/11 4/24
**settle [3]** 114/22 115/2 115/10
**Seventy [1]** 123/5
**Seventy-two [1]** 123/5
**several [5]** 95/22 102/25 103/22 117/18 120/25
**shape [1]** 30/20
**share [1]** 8/10
**shareholder [2]** 99/23 99/25
**shares [1]** 101/4
**shattered [1]** 125/3
**sheriff [1]** 62/6
**sheriff's [13]** 52/21

**S**

sheriff's... [12] 52/23
52/25 53/1 53/4 53/7
61/23 62/4 62/11
62/16 62/20 62/24
63/3
Shocked [1] 64/4
short [1] 95/23
shortly [2] 29/11
29/13
shot [1] 59/9
show [3] 46/8 112/2
116/20
showed [3] 63/12
103/21 122/17
shown [3] 55/8
122/16 122/17
shows [1] 109/3
shut [1] 62/25
side [1] 4/22
sidebar [2] 107/10
107/11
sidewalk [2] 40/12
49/18
sign [3] 21/7 21/8 65/9
signatory [1] 98/20
signature [1] 96/14
signed [1] 35/8
significant [4] 6/21
13/21 68/4 99/25
signs [11] 35/14
36/21 36/25 38/12
39/20 42/13 54/9
54/13 54/16 65/6
65/11
similar [2] 54/12
67/14
simply [1] 111/2
simultaneously [1]
114/9
since [3] 64/24 65/2
123/7
Singh [2] 22/5 82/21
single [2] 67/13 70/13
sip [1] 81/11
sir [3] 81/23 127/4
128/7
site [14] 21/2 21/16
21/20 21/24 21/25
24/2 24/5 24/12 26/13
26/20 31/9 87/4 89/17
89/21
sites [2] 26/16
sits [1] 58/1
sitting [1] 95/14
situated [1] 5/2
six [5] 19/22 34/20
36/11 63/15 77/20
SLAPP [1] 25/23
smanpearl [1] 105/2
social [1] 69/22
Sohn [3] 95/5 95/7
95/8
sold [1] 13/9
solicitors [1] 24/16
somehow [3] 82/12
96/8 100/23
someone [10] 21/10

33/18 52/22 57/20
58/8 58/24 61/25
63/25 66/3 69/8
something [8] 72/23
73/2 79/8 80/1 98/25
101/15 106/18 108/7
sometime [1] 47/19
sometimes [9] 26/19
27/5 27/15 85/5 85/8
86/4 86/15 86/17 87/2
soon [2] 30/6 99/8
sorry [29] 8/4 11/25
12/2 13/21 17/1 17/25
19/19 32/21 37/18
43/3 44/2 46/11 52/21
56/10 56/12 79/24
81/9 83/6 83/7 84/13
84/17 90/14 95/6
96/19 117/3 117/10
117/11 124/19 125/5
sort [9] 49/5 64/12
65/9 72/19 73/21
76/24 98/16 101/10
101/18
sought [7] 25/10
25/13 26/5 60/14
66/25 74/24 103/17
sound [1] 84/19
source [1] 90/23
South [4] 13/16 13/19
102/19 120/16
South Bay [1] 102/19
space [2] 87/7 95/23
speak [7] 6/16 38/25
53/13 86/11 86/13
91/10 92/5
speaking [1] 59/25
specific [12] 13/4
14/9 30/25 32/24 35/2
55/7 69/3 74/19 90/23
112/12 112/16 114/18
specifically [17] 12/3
15/5 20/16 41/18 54/1
61/17 78/17 87/25
89/12 90/1 90/22
95/12 96/20 97/18
99/19 101/22 112/3
specifics [6] 12/7
60/5 62/19 97/5
101/14 118/17
speculation [1] 121/5
speech [1] 113/6
spoke [12] 37/14
37/15 37/22 38/22
38/24 41/6 51/9 59/25
62/11 72/3 92/19
92/22
spoken [1] 94/19
staff [2] 62/7 72/20
stage [2] 99/22
109/22
stain [1] 18/11
stalked [2] 80/25 81/4
stalking [1] 80/17
stamp [2] 59/15 59/16
stand [3] 10/9 39/15
109/23
standing [7] 34/7

40/19 40/25 41/19
49/5 59/5 92/6
stands [2] 95/12
99/18
start [2] 10/21 107/17
started [5] 71/15 72/3
74/12 106/6 109/13
starting [2] 94/6 94/7
state [3] 4/9 25/22
82/20
statement [9] 17/21
19/17 23/21 23/22
23/24 114/16 118/2
122/20 122/23
states [14] 1/1 25/10
26/6 70/25 78/4 78/6
82/23 95/13 107/2
112/23 113/3 113/7
129/4 129/8
station [1] 122/18
stationed [2] 51/19
52/19
stay [7] 6/12 6/22 6/25
40/9 40/11 64/7
112/23
stayed [3] 9/12 42/1
64/7
steer [1] 64/7
stenographically [1]
129/5
step [3] 81/23 127/3
127/4
stepping [2] 20/22
39/24
STEVEN [3] 2/7 4/13
108/15
Steven Gebelin [1]
108/15
stock [1] 21/11
stole [1] 118/3
stop [4] 72/17 72/20
73/2 77/23
stopping [1] 58/24
straight [2] 19/1 60/7
street [7] 1/24 39/19
40/12 40/13 40/15
41/2 42/15
stress [1] 128/3
stricken [2] 56/2
61/14 121/6
strike [4] 25/25 60/23
61/6 112/17
studio [13] 50/11 52/5
53/5 54/9 59/19 63/14
82/18 87/4 87/6 87/6
102/14 102/21 123/8
studios [69] 1/5 4/7
27/22 28/2 29/16
29/19 30/2 32/4 45/2
47/13 47/15 47/21
48/3 48/13 48/14
48/20 49/6 50/15
51/19 52/1 52/14 53/2
54/6 55/23 56/25 60/9
62/1 62/5 65/1 65/12
65/24 66/5 66/10
66/23 70/9 71/10
73/14 75/22 83/14

84/12 85/1 85/14
85/19 86/2 87/14
91/19 92/13 94/9
101/24 102/1 102/18
102/20 103/3 104/23
105/11 105/23 106/2
106/16 106/21 107/1
107/5 108/3 108/22
111/13 112/11 112/20
123/13 123/17 124/10
Studios's [4] 23/19
71/21 92/9 123/10
stuff [1] 39/20
style [1] 28/4
subject [5] 81/17
98/12 98/15 104/15
127/11
submitted [3] 15/10
81/14 127/8
subpoena [6] 14/19
54/24 90/10 91/14
91/24 92/22
subpoenaed [9] 14/14
85/2 90/13 90/15 91/7
91/19 92/7 92/14
92/16
subsequently [1] 92/4
subsidiary [2] 12/20
13/4
substance [1] 69/19
suburbs [1] 83/1
successful [4] 97/23
98/18 99/3 101/11
such [5] 25/10 26/9
67/4 97/7 116/9
sued [1] 24/17
suggest [7] 33/4 66/8
112/12 112/16 121/2
121/8 128/2
suggested [2] 12/25
125/22
SUITE [3] 2/8 2/13
120/16
Suite 804 [1] 120/16
summary [1] 17/22
support [5] 96/15 98/9
98/12 98/14 98/14
suppose [2] 8/18 9/9
supposedly [1] 98/3
sure [19] 5/13 5/17
8/25 10/17 12/3 14/21
31/21 40/3 56/4 60/16
61/10 78/19 88/12
89/6 93/19 104/2
110/23 118/25 125/10
surveillance [7]
117/24 118/1 118/19
119/4 119/8 119/12
121/3
sustain [2] 111/7
128/6
sustained [8] 26/2
29/2 89/3 100/5 107/7
112/5 118/23 121/6
sworn [1] 11/10
Sydney [12] 5/2 21/19
83/2 83/7 83/9 88/25
89/23 91/3 91/4 91/6

116/6 118/10
symbol [2] 27/18
35/18
symbols [1] 27/19
system [1] 25/2
Systems [1] 108/17
SYVERSON [1] 2/7

**T**

tactics [5] 82/13
82/19 82/19 83/15
83/17
take [14] 8/17 10/20
25/20 42/14 42/16
59/13 77/9 81/11
81/12 82/5 86/7 87/18
104/2 127/5
taken [10] 5/8 5/16
24/25 25/14 26/7
26/13 59/12 79/3 82/8
128/12
taking [1] 59/13
talent [1] 57/7
talk [9] 25/15 57/22
61/11 78/15 81/15
81/16 127/9 127/9
128/3
talked [1] 6/17
talking [17] 13/11
15/3 17/24 57/9 57/10
58/8 58/22 58/24 59/3
60/7 62/6 70/4 71/6
79/17 88/10 120/6
124/7
TAYLOR [12] 2/11
2/12 3/6 3/7 4/17 7/22
11/4 81/24 82/9 89/4
107/12 126/12
team [1] 73/14
technical [1] 91/15
technology [4] 48/19
71/12 71/18 71/23
Telephone [1] 77/4
telling [1] 110/6
ten [1] 41/8
tenancy [1] 116/13
tend [2] 116/5 116/20
tendered [1] 35/5
term [4] 76/22 82/14
83/20 91/15
terminology [1] 89/20
terms [12] 6/7 27/3
27/10 27/12 27/13
32/10 79/14 96/3
100/2 101/10 101/11
119/6
terror [1] 82/19
terrorist [5] 82/12
82/19 83/4 83/15
83/16
testified [16] 11/11
11/18 14/13 17/8 20/7
33/25 44/10 44/18
45/4 68/13 82/11 85/4
95/18 96/23 101/17
124/22
testifies [1] 55/15
testify [6] 5/3 8/22

**T**

**testify... [4]** 13/9
55/10 55/11 88/24
**testifying [1]** 7/5
**testimony [12]** 5/9
7/14 7/16 8/1 8/18
10/10 14/9 14/16 16/2
23/9 23/23 38/15
**Thank [15]** 11/2 11/6
15/25 25/9 32/22 43/4
55/16 55/18 56/14
81/19 82/10 112/5
126/10 127/13 128/9
**thanked [1]** 49/22
**Thanks [2]** 121/19
122/5
**them [111]** 22/16
22/22 27/10 27/18
27/19 28/4 28/4 31/15
32/6 32/12 33/15
34/15 34/16 34/24
34/25 35/16 36/4 36/6
37/25 38/1 38/1 38/7
38/22 38/24 38/25
40/22 41/6 41/16
41/19 42/8 42/9 42/14
42/14 42/16 43/19
45/19 45/23 47/2 48/5
48/12 49/23 49/25
50/12 50/21 53/13
53/15 53/16 53/21
54/4 57/8 60/13 60/14
60/16 60/18 61/4 61/7
61/17 61/20 63/20
64/8 64/15 64/17 67/2
67/10 67/11 67/17
68/3 68/8 70/15 70/20
70/21 70/22 70/23
70/23 70/25 71/1 71/4
72/6 72/8 72/9 72/10
72/20 73/7 73/7 73/23
74/8 74/22 75/17
76/23 78/1 78/8 79/2
79/6 79/7 79/8 79/20
84/15 85/2 87/18
87/19 87/22 87/24
88/19 90/4 91/10
100/15 101/2 106/16
121/21 124/6 126/8
**theme [1]** 67/24
**themselves [1]** 45/1
**therapy [1]** 103/17
**there's [12]** 4/21 9/9
35/8 53/1 61/10
109/14 109/21 109/22
109/23 109/24 110/2
113/15
**thereafter [1]** 42/6
**therefore [2]** 17/5
116/14
**thief [2]** 21/14 36/22
**thing [2]** 67/4 109/10
**things [8]** 26/24 36/21
36/22 64/6 68/25 69/4
86/13 86/16
**think [33]** 15/11 19/17
22/7 28/14 37/13
38/17 51/10 53/12

56/9 59/22 59/22
67/19 70/18 71/15
75/24 81/25 87/1
91/16 91/19 95/5 95/7
95/22 96/3 96/5 104/8
107/24 108/23 111/22
111/25 112/18 113/16
125/9 125/13
**third [3]** 6/5 8/19
27/23
**third-party [2]** 6/5
8/19
**though [4]** 24/9 47/19
56/5 125/1
**thought [11]** 14/7 24/5
29/13 32/20 45/14
72/22 73/1 81/8 90/9
90/14 125/2
**thoughts [1]** 122/3
**threat [3]** 36/13 36/15
38/6
**threats [5]** 37/3 53/24
54/1 54/17 54/19
**three [4]** 6/22 29/14
38/20 93/23
**throughout [3]** 48/7
50/19 63/22
**thrown [1]** 28/14
**thuggish [6]** 45/5 47/1
47/3 47/6 47/8 47/10
**thugs [2]** 123/10
123/14
**thumbnails [1]** 22/9
**thumbs [4]** 49/25 50/4
56/17 122/22
**THUNDER [72]** 1/5
4/6 23/19 27/22 28/2
29/16 29/19 30/2 32/4
45/2 47/13 47/15
47/21 48/1 48/3 48/13
48/14 48/20 49/6
50/15 51/19 52/1
52/14 53/2 54/6 55/23
56/25 60/9 62/1 62/5
65/1 65/12 65/24 66/5
66/10 66/23 70/9
71/10 71/21 73/14
75/22 83/14 84/12
85/1 85/14 85/19 86/2
91/19 92/9 92/13 94/9
101/24 102/1 102/18
103/3 105/11 105/23
106/1 106/2 106/16
106/21 107/1 107/5
108/3 108/22 111/13
112/11 112/20 123/10
123/13 123/17 124/10
**Thunder Studios [61]**
27/22 29/16 29/19
30/2 45/2 47/13 47/15
47/21 48/3 48/13
48/14 48/20 49/6
50/15 51/19 52/1
52/14 53/2 54/6 55/23
56/25 60/9 62/1 62/5
65/1 65/12 65/24 66/5
66/10 66/23 70/9
71/10 73/14 75/22

83/14 83/22 85/1
85/14 85/19 86/2
91/19 92/13 94/9
101/24 102/1 102/18
103/3 105/11 105/23
106/2 106/16 106/21
107/1 107/5 108/3
108/22 111/13 112/11
112/20 123/13 124/10
**Thunder Studios's [4]**
23/19 71/21 92/9
123/10
**thunderstudios.com
[4]** 27/16 30/13 31/14
70/5
**THURSDAY [2]** 1/15
4/1
**ticket [2]** 5/6 6/18
**tied [2]** 96/8 97/20
**till [1]** 6/12
**timing [1]** 6/7
**title [3]** 105/25 123/17
129/4
**to early [1]** 67/7
**today [76]** 5/6 5/8
5/18 5/20 6/2 6/6 7/4
7/7 7/9 8/2 8/5 8/17
8/21 9/5 18/21 19/12
38/15 82/6 122/17
**together [8]** 60/14
85/5 85/9 85/13 86/1
86/3 86/10 86/18
**told [35]** 7/3 8/20 37/6
37/22 39/5 39/8 39/13
40/5 41/11 41/16
41/18 42/8 42/23 43/7
44/8 44/9 50/25 51/3
61/7 62/18 63/12
63/25 64/6 70/18
72/22 72/24 73/1 73/4
75/6 92/7 113/13
113/16 113/18 113/20
121/21
**tomorrow [1]** 5/11
**TONY [26]** 1/8 8/17
22/10 30/19 32/1
32/14 35/7 35/10 66/7
67/8 75/25 78/4 78/11
93/24 94/2 100/11
100/23 100/25 103/15
103/23 118/5 120/9
120/18 121/8 121/19
122/4
**Tony Kazal [11]** 22/10
30/19 35/7 66/7 67/8
78/4 78/11 100/11
103/23 118/5 121/8
**Tony Kazal/Jamie [2]**
120/9 120/18
**tonykazal.com [1]**
84/9
**too [2]** 87/11 111/25
**took [4]** 44/5 80/4
92/25 102/21
**top [5]** 20/20 74/19
104/10 108/7 121/13
**topic [1]** 72/22
**total [2]** 45/15 48/8

**totality [1]** 22/13
**touch [1]** 39/18
**toward [2]** 58/16
59/18
**towards [14]** 36/4
36/17 40/16 49/20
49/22 49/25 51/8
53/24 54/1 54/19
56/21 57/23 58/11
122/21
**town [2]** 83/8 85/19
**traffic [3]** 40/20 40/23
41/4
**training [2]** 111/22
111/23
**transcript [5]** 1/14 9/1
39/25 129/5 129/7
**transcripts [4]** 7/6
7/23 8/16 10/12
**transference [1]**
95/13
**transferred [1]** 95/10
**travel [1]** 5/3
**trial [14]** 1/18 3/12 4/7
9/21 13/11 16/20
107/14 107/21 109/13
110/9 110/11 111/8
119/22 122/14
**tried [3]** 50/14 50/15
64/21
**trip [2]** 114/24 115/11
**true [24]** 14/4 22/17
30/18 31/5 32/8 32/13
32/23 33/3 35/1 45/8
64/23 65/22 66/12
73/25 76/6 80/15
80/21 102/7 102/25
111/19 118/8 122/23
126/22 129/4
**Truth [3]** 88/10 90/5
90/8
**truthfully [1]** 20/7
**try [7]** 66/16 70/2
72/13 73/1 73/11
73/18 73/21
**trying [7]** 10/16 50/10
60/21 72/17 97/9
102/15 125/24
**Tuesday [19]** 6/1 6/3
6/17 8/22 9/17 11/18
13/9 14/13 16/2 33/25
46/10 46/11 82/11
95/18 96/23 101/17
102/7 103/20 118/2
**turn [20]** 5/9 5/17 6/14
16/10 16/22 17/23
19/3 37/19 56/9 58/13
58/16 88/3 114/5
114/7 115/15 117/6
118/13 119/24 121/11
124/13
**turned [4]** 49/20 49/22
51/12 60/1
**TV [5]** 102/14 103/7
106/1 106/21 106/23
**tweet [5]** 68/19 68/23
68/23 69/4 69/11
**tweeted [1]** 69/8

**tweeting [1]** 75/8
**tweets [5]** 69/18 74/11
74/15 75/7 75/15
**Twitter [12]** 68/15
68/16 68/18 68/19
68/21 69/5 69/11
69/25 74/10 74/20
75/12 75/14
**two [22]** 7/23 8/19
10/20 13/14 15/5 15/5
16/18 26/1 29/14
37/13 38/18 38/18
38/19 38/20 45/24
64/23 65/4 68/25 69/4
117/9 117/13 123/5
**two-plus [1]** 64/23
**typically [2]** 27/2 50/8

**U**

**UAE [3]** 101/9 114/25
116/2
**Uh [1]** 72/2
**Uh-huh [1]** 72/2
**ultimately [1]** 29/9
**umbrella [1]** 72/1
**unable [2]** 5/6 5/7
**under [10]** 11/16 20/4
25/23 74/9 90/17
97/22 107/24 109/21
115/8 116/17
**understand [16]** 4/21
5/13 6/9 11/16 14/21
64/15 68/17 82/16
83/12 97/9 98/19
100/4 101/8 106/9
106/17 117/25
**understanding [26]**
19/14 30/5 35/11 73/5
73/9 73/10 75/16
78/23 79/15 92/25
93/2 93/13 93/14
93/16 95/9 96/18
108/25 109/2 109/6
109/12 110/4 110/17
110/20 110/21 115/12
124/6
**understood [2]** 61/9
128/8
**unit [2]** 76/22 79/14
**UNITED [13]** 1/1
25/10 26/6 70/25 78/4
78/6 82/23 107/2
112/23 113/3 113/7
129/4 129/8
**Universal [1]** 18/20
**unplug [2]** 10/14
10/22
**unrelated [1]** 111/4
**until [6]** 6/25 9/13
81/14 85/10 112/4
127/8
**up [29]** 10/18 13/20
22/11 22/13 27/8 27/9
34/11 36/3 38/1 42/9
49/1 49/9 49/11 49/25
50/4 56/17 56/18
63/12 69/14 72/25
73/4 75/19 89/4 90/18

**U**

up... [5]  97/2 98/16
103/10 109/7 122/22
upon [9]  18/11 18/16
19/10 19/15 60/18
89/21 92/25 117/21
118/20
urge [1]  128/2
us [5]  8/23 28/14
28/15 33/17 53/3
use [7]  7/23 22/14
26/20 26/24 28/4 45/5
91/17
used [1]  82/14
using [1]  83/20
Usually [1]  57/4

**V**

vague [1]  103/3
validation [2]  97/22
99/2
valuation [1]  12/15
value [3]  12/25 13/6
111/3
van [4]  45/16 46/19
120/7 121/21
vans [1]  83/2
varied [4]  67/19 67/21
67/22 67/23
various [4]  26/17 48/1
89/1 104/12
vehicle [4]  35/24
35/25 57/11 117/22
verbal [1]  36/13
verdict [8]  109/11
109/15 109/17 110/1
110/15 111/9 111/16
111/18
version [1]  55/14
versus [1]  4/7
Vesta [1]  115/22
via [1]  35/25
viable [1]  13/20
Vice [1]  106/1
Vice-president [1]
106/1
Victor [5]  119/3 120/3
121/14 121/17 121/18
video [10]  33/7 43/16
44/5 46/8 46/17 54/23
59/11 59/13 122/16
122/17
videos [1]  33/8
view [5]  17/4 39/3
59/9 97/11 97/21
violence [5]  37/4
53/24 54/1 54/7 54/17
visit [4]  21/20 26/17
90/5 91/7
visited [2]  24/1 90/7
vote [1]  12/9
vulgarity [1]  36/25

**W**

wait [2]  40/1 109/1
Wales [2]  13/16 13/19
walked [3]  51/10 60/1
122/21

walking [3]  34/11 40/7
59/18
wanted [8]  43/23
57/21 60/16 60/16
74/6 75/17 75/18
102/8
wants [2]  4/22 25/2
war [1]  96/25
Warning [2]  21/12
21/13
watching [1]  58/19
water [1]  81/11
watermark [1]  27/18
wave [2]  49/25 50/3
waving [2]  122/21
122/25
weather [1]  11/2
Website [39]  20/10
20/15 20/18 21/1
21/25 22/16 22/20
22/23 24/13 24/20
24/24 25/14 26/7 30/2
30/16 31/4 31/6 31/17
31/19 31/24 32/16
33/1 33/6 33/8 33/14
79/20 88/25 89/7 89/8
89/11 89/14 89/25
90/2 90/6 90/8 90/22
103/23 103/24 118/6
Website's [1]  27/3
Websites [24]  26/17
26/24 27/1 27/2 27/8
84/7 84/14 84/19 85/1
87/17 87/22 88/10
90/18 91/7 91/8 91/13
91/18 92/5 93/1 93/12
93/17 93/20 93/23
94/15
Wednesday [2]  5/3
5/5
week [4]  6/12 28/14
44/14 112/4
weekend [1]  6/3
weeks [2]  19/22 44/12
well-being [1]  61/21
well-known [1]  98/17
went [16]  20/18 21/1
21/16 21/24 36/3
41/23 42/2 51/8 51/12
60/4 60/8 81/1 89/7
102/10 107/14 107/20
WEST [1]  1/24
WESTERN [1]  1/2
who -- I [1]  111/20
whole [3]  9/15 20/22
73/14
why [10]  8/24 18/5
23/6 27/7 47/3 58/16
101/6 109/5 118/24
127/5
WIENER [11]  2/3 2/3
3/7 4/11 4/24 7/9 8/7
20/2 103/21 127/1
127/24
wife [7]  7/15 37/7
37/15 37/21 44/5
64/10 118/3
wife's [1]  113/14

WILSHIRE [1]  2/8
window [3]  22/11 27/8
27/9
wire [2]  21/25 22/3
without [1]  29/4
witness [18]  4/22 5/1
7/1 9/11 10/9 11/8
25/5 40/1 54/25 55/15
81/25 88/8 88/24
111/20 118/24 119/19
127/3 128/3
witnesses [7]  3/5 6/5
7/3 8/19 9/6 9/22
128/4
woman [1]  79/22
women [1]  52/11
wonderful [1]  123/12
Woodward [8]  8/20
54/23 55/10 118/18
119/3 120/5 121/15
121/17
word [5]  29/13 36/19
45/5 59/14 97/12
WordPress [1]  21/25
words [3]  21/3 72/24
89/20
work [11]  5/7 26/16
60/4 63/17 85/5 85/9
86/10 106/2 120/9
121/9 121/23
worked [4]  86/22 87/9
87/11 123/6
working [3]  86/18
87/13 106/7
works [4]  68/24 73/9
75/13 79/15
worth [2]  12/11 19/5
wound [1]  103/10
wrapping [1]  120/7
written [1]  20/21
wrong [8]  12/14 59/16
67/17 91/16 96/6
96/22 109/23 117/10
wrongful [1]  80/1

**Y**

yards [1]  53/5
year [10]  20/14 50/11
75/25 77/23 80/12
80/22 107/14 110/12
125/11 126/4
years [9]  13/14 64/24
65/4 98/7 102/20
102/25 117/18 120/25
123/6
yelling [1]  123/21
Yep [1]  49/19
yesterday [3]  28/10
28/12 46/9
you referring [1]
56/11
Your Honor [35]  4/13
4/24 5/23 5/24 8/12
10/4 10/5 11/25 16/14
16/17 17/25 25/25
46/13 55/2 55/6 55/12
60/23 83/22 88/7
88/20 88/23 100/3

107/6 107/8 107/25
109/10 111/1 113/23
113/25 118/21 119/14
122/11 127/2 128/1
128/8
YouTube [1]  106/25

**Z**

Zotti [4]  96/11 98/20
99/5 100/19
Zotti's [1]  96/23