1      UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5   THUNDER STUDIOS, INC.; RODRIC    )
    DAVID,                           )
6                                    )
                   PLAINTIFFS,       )
7                                    )
            vs.                      ) No. CV 17-0871-AB
8                                    )
    CHARIF KAZAL; TONY KAZAL;        )
9   ADAM KAZAL; AND DOES 1 TO 100,   )
    INCLUSIVE,                       )
10                                   )
                   DEFENDANTS.       )
11  _____ )

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15             MONDAY, DECEMBER 10, 2018

16                    1:20 P.M.

17             LOS ANGELES, CALIFORNIA

18        Day 3 of Jury Trial, P.M. Session

19

20

21

22  _____

23         **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
           FEDERAL OFFICIAL COURT REPORTER
24         350 WEST FIRST STREET, ROOM 4311
           LOS ANGELES, CALIFORNIA 90012
25              cmjui.csr@gmail.com

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFFS:

 3          LAW OFFICES OF SETH W. WIENER
            BY:  SETH W. WIENER, ATTORNEY AT LAW
 4          609 KARINA COURT
            SAN RAMON, CALIFORNIA 94582
 5          (925) 487-5607

 6                -and-

 7          SYVERSON, LESOWITZ & GEBELIN
            BY:  STEVEN GEBELIN, ATTORNEY AT LAW
 8          8383 WILSHIRE BOULEVARD, SUITE 520
            BEVERLY HILLS, CALIFORNIA 90211
 9          (310) 341-3072

10
      FOR THE DEFENDANTS:
11
            THE TAYLOR LAW FIRM
12          BY:  BENJAMIN TAYLOR, ATTORNEY AT LAW
            AND DIANE BANI-ESRAILI, ATTORNEY AT LAW
13          1880 CENTURY PARK EAST, SUITE 714
            LOS ANGELES, CALIFORNIA 90067
14          (310) 201-7600

15

16

17

18

19

20

21

22

23

24

25
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
             I N D E X

          DECEMBER 10, 2018


DEFENDANTS'
WITNESSES                                    PAGE

MARK WOODWARD
   DIRECT EXAMINATION BY MR. TAYLOR             5
   CROSS-EXAMINATION BY MR. WIENER             23
   REDIRECT EXAMINATION BY MR. TAYLOR          34

ANTONELLO PARLATO
   DIRECT EXAMINATION BY MR. TAYLOR            37
   CROSS-EXAMINATION BY MR. WIENER             45




                    EXHIBITS

TRIAL
EXHIBITS                    MARKED  ADMITTED  NOT ADMIT

14                                    13

29                                    30
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1          LOS ANGELES, CALIFORNIA; MONDAY, DECEMBER 10, 2018

 2                          1:20 P.M.

 3                            - - -

 4      (The following was heard in open court in the presence

 5       of the jury:)

 6          THE COURT:  All right.  Good afternoon, ladies and

 7   gentlemen.

 8          Mr. Taylor, you may call your next witness.

 9          MR. TAYLOR:  Thank you, Your Honor.  The defense

10   calls Mark Woodward, who is just outside.  I will go get

11   him.

12          THE COURT:  All right.  Great.  Thank you.

13                       MARK WOODWARD,

14            having been first duly sworn,

15                testified as follows:

16          THE CLERK:  Do you solemnly swear that the

17   testimony you shall give in the cause now before this Court

18   shall be the truth, the whole truth, and nothing but the

19   truth, so help you God?

20          THE WITNESS:  I do.

21          THE CLERK:  Thank you.  Please be seated.  Please

22   state and spell your name for the record.

23          THE WITNESS:  Mark Woodward.  M-a-r-k,

24   W-o-o-d-w-a-r-d.

25          THE COURT:  Thank you.
```

```
 1              You may proceed.
 2              MR. TAYLOR:  Thank you, Your Honor.
 3                      DIRECT EXAMINATION
 4  BY MR. TAYLOR:
 5  Q    Good afternoon, Mr. Woodward.
 6              Are you appearing today pursuant to a subpoena
 7  that was served by my office?
 8  A    Yes, sir.
 9  Q    Do you and I know each other?
10  A    Just met you today for the first time.
11  Q    Have we ever worked together at all?
12  A    No, sir.
13  Q    What is your profession, sir?
14  A    I am a private investigator.
15  Q    And where do you work?
16  A    I am self-employed.  I own International
17  Counterintelligence Services of California.
18  Q    Is that sometimes abbreviated ICS?
19  A    It is.
20  Q    And where is that business located?
21  A    We're in Anaheim.
22  Q    Anaheim?
23  A    Uh-huh.
24              THE COURT:  Is that a "Yes"?
25              THE WITNESS:  Yes.
```

```
 1              MR. TAYLOR:  If you could just speak up a drop so
 2   we can all --
 3              THE WITNESS:  Okay.  Sounds loud up here.
 4              MR. TAYLOR:  Right.  Well, it's a big room.
 5   Q    And how long have you worked in this capacity as an
 6   investigator?
 7   A    As a private investigator?  I have been at this for
 8   about 15 years.
 9   Q    And are you licensed by the state?
10   A    I am.
11   Q    Are you familiar with an individual named Jamie Brown?
12   A    Yes.
13   Q    How do you know that person?
14   A    Jamie coordinated an investigation that I worked on a
15   couple years ago.
16   Q    Did Mr. Brown engage your firm to conduct work here in
17   California?
18   A    Yes.
19   Q    Do you recall what he asked you to do?
20   A    It was multi-facetted, but a lot of it involved some
21   surveillance.  We had a van that we were using, things like
22   that.
23   Q    And you said "some surveillance."
24   A    Uh-huh, yes.
25   Q    Could you elaborate on that.  Surveillance of what?
```

1    A    Well, there was a van that was deployed that was -- I

2    would say -- provocative, and so we had surveillance

3    investigators undercover, covert, who were watching to

4    monitor what's going on, to document what's going on, to

5    make sure nobody was getting out of line, everybody was

6    safe, things of that nature.

7    Q    And were you paid for the services that --

8    A    Yes.

9    Q    How were you paid?

10   A    Jamie paid with his credit card.

11   Q    Are you familiar with an individual named Adam Kazal?

12   A    I know the name, yes, sir.

13   Q    How do you know that name?

14   A    Through Jamie Brown.

15   Q    Have you ever spoken to or otherwise interacted with an

16   individual named Tony Kazal?

17   A    I wouldn't know him if he walked in the room.

18   Q    How about an individual named Charif Kazal?

19   A    I never heard that name before.

20   Q    In the course of asking you to do these certain

21   activities you described in California, did Mr. Brown ask

22   you to do anything that you felt was illegal?

23   A    No, he never asked me to do anything illegal.

24   Q    Did Adam Kazal ever ask you to do anything illegal?

25   A    No.

1    Q    So it was your belief that whatever they were asking

2    you to do was lawful?

3    A    Absolutely.

4    Q    Did Mr. Brown ask you to have Mr. David followed around

5    town?

6    A    Followed -- you mean -- let me clarify.

7         We conducted covert surveillance prior to any of

8    the provocative activity.  That was to establish patterns

9    and stuff like that.  It was completely covert.

10        As far as in the van, no, we weren't following him

11   in that thing, absolutely not.

12   Q    Your office received a subpoena some months ago from

13   plaintiffs' counsel in this case; is that correct?

14   A    We received a subpoena from Seth Wiener, Wiener.  I

15   don't know.

16   Q    Mr. Wiener.

17        And you were asked to produce documents related to

18   the allegations in this lawsuit, the activities you were

19   engaged --

20   A    I'll be honest.  I'm not familiar with the allegations

21   in the lawsuit, but he asked for some papers, and we

22   complied.  Yes, sir.

23   Q    Papers related to --

24   A    To this case yes, sir.

25   Q    And did you produce your file in that regard?

```
 1   A    Absolutely.

 2   Q    And did that include e-mails?

 3   A    I sent him everything I could find on this case --

 4   videos, reports, I believe.

 5   Q    You should have an exhibit binder.  I don't see it, but

 6   it should be there.  Yes, there it is.

 7              If you could turn to Exhibit 5 -- they are

 8   numbered with tabs at the right.

 9   A    Okay.

10   Q    Have you seen this document before?

11   A    This e-mail, yes, sir.

12   Q    Can you tell us what it is.

13   A    Yes.  This is an e-mail that we typically send with our

14   personal service agreement.  It was generated by

15   Victor Fuentes, who was my case analyst at the time who

16   works directly underneath me and with me, that he was

17   sending to -- it spells out the agreement of what we're

18   going to do and what they're going to pay us and what the

19   parameters are of that.

20   Q    And who would this agreement have been with in this

21   case?

22   A    This agreement was between ICS and Jamie Brown.

23   Q    Okay.  And how can you tell by looking at this

24   document?

25   A    Well, you're going to need some clarification because,
```

1    initially, this document here stated Adam Kazal.  We were

2    contacted by Jamie.  We were working we knew -- I believe

3    Jamie was working with Adam.  I -- honestly, I don't know.

4            And we initially started the contract.  It was

5    with Adam Kazal, and then subsequent to that pretty much all

6    of our communication and directives came directly from

7    Jamie Brown, including the payment.

8    Q    So is it your testimony that your office did not

9    communicate directly with Tony Kazal?

10   A    Never, that I am aware of, no, and it's my office.  So,

11   no.

12   Q    And it says that you are cc'd on this e-mail.

13           Is that typical practice that you would be cc'd on

14   the e-mails with the client?

15   A    For a service agreement, absolutely, absolutely.

16   Q    It's your company; right?

17   A    Yes.

18   Q    And if you could turn within that same binder to

19   Exhibit 20.

20           THE COURT:  Counsel, is this item in evidence?

21           MR. TAYLOR:  I thought --

22           THE COURT:  Exhibit 20?

23           MR. TAYLOR:  I thought it was.

24           THE COURT:  Okay.  It is.  Okay.

25

```
 1   BY MR. TAYLOR:

 2   Q    Do you have the document there, sir?

 3   A    Yes, sir.

 4   Q    And what is this Exhibit 20 that we are looking at?

 5   A    This -- given the date, this would have been another

 6   agreement.  This investigation, it took some time, and so we

 7   had to go and produce another service agreement for the next

 8   segment of work.

 9         So it's kind of what the first thing was, but it's

10   a continuation, as well.  That stuff is finished.  Now we're

11   doing this.

12   Q    And you are cc'd on this e-mail; right?

13   A    Yes.

14   Q    And this e-mail looks like it was sent from Mr. Fuentes

15   to JRT Brown.

16         Is that Jamie Brown?

17   A    That's Jamie Brown, yes, sir.

18   Q    Who was the client on this agreement?

19   A    Again, it was Jamie.

20   Q    And how can you tell by looking at that?

21   A    Point of contact is Jamie, and then the contact

22   information is Jamie's.

23   Q    Do you see the reference in the middle of the page at

24   paragraph 1 to Tony Kazal/Jamie?

25         Do you see that?
```

```
 1   A    Yes, I do.

 2   Q    What's your understanding of why it says that there?

 3   A    That's just a mistake.  I had no idea why Victor put

 4   that in there.  He didn't send it to Jamie.  We didn't

 5   e-mail it to Jamie -- or excuse me -- to Tony.  Tony never

 6   signed it.  I don't know why his name is even there to be

 7   honest with you.

 8   Q    That was going to be my next question to be clear.

 9             This agreement was sent only to Mr. Brown;

10   correct, not to --

11   A    Absolutely, yes.

12   Q    Not to Tony Kazal.

13   A    No.

14   Q    You never had a signed agreement with Tony Kazal.

15   A    No.

16   Q    If you could please turn, sir, to Exhibit 14 in the

17   binder.

18             What is this document that we are looking at?

19   A    You said Number 14?

20   Q    Yes.  It says "Invoice."

21   A    Looking at the -- okay.  I'm sorry.  I didn't know what

22   you were talking about.  I was on the wrong number.

23             This is an invoice that we generated from our

24   company for the work we did.

25   Q    And do you know who this invoice would have been sent
```

```
 1   to?

 2   A    This was e-mailed to -- it would have been Jamie.

 3   Jamie made all the payments.

 4   Q    And page 2 of the document --

 5        Well, actually, if I could, Your Honor, I would

 6   like to move Exhibit 14 into evidence.

 7        THE COURT:  Any objection?

 8        MR. WIENER:  No objection, Your Honor.

 9        THE COURT:  Fourteen will be admitted.

10        (Trial Exhibit 14 was admitted into evidence.)

11   BY MR. TAYLOR:

12   Q    Again, this is page 1.  This is the actual invoice?

13   A    Uh-huh.

14   Q    And it says, "Bill to Adam Kazal"?

15   A    Yes, sir.

16   Q    And then page 2, what is this -- a page that we're

17   looking at?

18   A    That is the paid receipt that's generated by our

19   merchant services whenever we collect.

20   Q    So you get an e-mail receipt?

21   A    Uh-huh, yes, sir.

22   Q    It shows that payment was made?

23   A    Yes, sir.

24   Q    And who does it indicate the customer is on this

25   invoice?
```

```
 1   A    Adam Kazal.

 2   Q    Were you personally present for any protest activity

 3   that was directed at Mr. Rodric David?

 4   A    I was there on one or two occasions, I believe, yes,

 5   sir.

 6   Q    Where were you exactly?

 7   A    I would have been just standing in the street, I think,

 8   probably by the video crew.

 9   Q    Was this in his neighborhood or near Thunder Studios?

10   A    Both.

11   Q    Did you observe people protesting at those locations?

12   A    Yes, at both locations.

13   Q    How would you describe the protest that you observed?

14   A    The protestors --

15   Q    What did you observe?

16   A    They were just walking up and down the street with

17   signs.

18   Q    And then you mentioned a van -- there was a van that

19   would circulate?

20   A    Yes, sir.

21   Q    What was written on the van?

22   A    The van was a RAV.  It had the name of -- is it

23   Mr. David?  I always get confused of whether it's Rodric

24   David or David Rodric.  I apologize -- with his name and

25   face on it.
```

```
 1   Q      Did you observe the protestors acting in an aggressive

 2   manner in any way?

 3   A      No.

 4   Q      Did they make any threats that you observed?

 5   A      None that I saw.

 6   Q      I'd like to show you an excerpt from a video that was

 7   produced by your office in response to the subpoena.

 8          I believe it's part of Exhibit 44, Your Honor, and

 9   I believe we already moved it into evidence.

10          THE COURT:  All right.  You may proceed.

11          MR. TAYLOR:  Thank you, Your Honor.

12      (Exhibit played.)

13   BY MR. TAYLOR:

14   Q      Do you recognize this video?

15   A      Yes, sir.

16   Q      Can you describe what it is.

17   A      This is surveillance video from the studio.  This was

18   covertly obtained.

19   Q      And you produced it to Mr. Wiener in response to the

20   subpoena that he served?

21   A      I believe we did, yes, sir.  I provided a lot of stuff.

22   I assume so.

23   Q      And have you seen it before?

24   A      Yes.

25   Q      Do you know who filmed this footage?
```

```
 1   A    Yes.  Private investigator David Gomez.

 2   Q    He is with your office?

 3   A    We subcontracted with him.  He is independently

 4   licensed in California.

 5   Q    And how did you obtain this footage?  Did he provide it

 6   to you?

 7   A    Yes.

 8   Q    Can you describe what the video depicts?

 9   A    It looks to me like it's Mr. David arriving for work at

10   the studio.

11   Q    Did Mr. -- was it Mr. Gomez, you said?

12   A    Yes, sir.

13   Q    Did -- is he a private investigator, by the day?

14   A    Yes.

15   Q    Licensed?

16   A    He is licensed in California.

17   Q    Did Mr. Gomez describe for you -- well, let me ask you

18   this:  Did he have any discussion with you at the time of

19   the events, the video that we are looking at?  Did he

20   discuss with you afterwards what he observed at the

21   Thunder Studios location?

22   A    I'm not sure I'm clear on what you're asking.

23   Q    Did he tell you what he saw there?

24   A    These videos tell me what he saw.  Did he give me a

25   briefing?  I'm sure he did.  I don't recall off the top of
```

```
 1    my head what he may have said.
 2    Q    Do you recall what day it was that you were at the
 3    studio?  Was it October --
 4    A    That I was at the studio?
 5    Q    Yes.
 6    A    I don't recall which day.  I don't believe it was the
 7    26th.  I don't believe David was working the day I was
 8    there.  David Gomez was the investigator.
 9    Q    When you were at the Thunder Studios location, did you
10    ever observe the police or sheriff's deputy interacting with
11    the protestors at all?
12    A    Well, yes and no.  I was there.  The van was parked in
13    front of the studios.  The protestors were there.  Law
14    enforcement was called either by Mr. David or the studios
15    because a couple of law enforcement showed up.  I believe
16    might have been one or two cars.  They showed up.
17            I saw him and another unidentified woman from the
18    studio.  They approached the police.  They talked to them,
19    and being the owner of the company, I walked up and asked
20    the police if they needed anything, and he basically told me
21    to shoo.  He says, "Go away.  I don't need you."
22            And after he conversed a few moments with
23    Mr. David and the lady, police left, they went back in the
24    studio, and we just kept doing what we were doing.
25    Q    And the protestors continued doing what they were
```

```
 1   doing?
 2   A    Yes, they did.
 3   Q    When you were in the area of the neighborhood of
 4   Mr. David's home, did you see the police there as well?
 5   A    We had a similar interaction.  They showed up.  They
 6   talked to him and left.  They didn't to anything to us.  I
 7   don't think they even spoke to us.
 8   Q    Did you observe any interaction with the police and the
 9   protestors in the area of the neighborhood?
10   A    I don't know if I did.  I don't know if I did.  I may
11   have left by that time.
12   Q    If you observed, did the protest continue in the
13   neighborhood after the police left?
14   A    Yes.
15   Q    Now, I'd like to show you another brief video clip, if
16   I may.
17        I think it's part of Exhibit 7, Your Honor, which
18   I believe was already moved into evidence.
19             THE COURT:  Yes.  Go ahead.
20             MR. TAYLOR:  Thank you, Your Honor.  Just a
21   moment.  This video is just about a minute long.  I will
22   play the whole thing, if I could.
23             THE COURT:  Go ahead.
24             MR. TAYLOR:  Thank you.
25        (Exhibit played.)
```

```
 1   BY MR. TAYLOR:
 2   Q    I will just pause it right there.
 3          Does this frame that we're looking at depict the
 4   scene that you observed when you were in the area of the
 5   neighborhood?
 6   A    Yes, sir.
 7   Q    Those are the protestors that you saw there?
 8   A    Yes, they are.
 9   Q    That's the van that you were referring to?
10   A    Yes, it is.
11          (Exhibit Played.)
12   BY MR. TAYLOR:
13   Q    And in these clips, we're seeing the protestors
14   appearing to interact with passersby.
15          Did you have any observation of the protestors
16   interacting with people passing by?
17   A    Yes, sir, several interactions like that.
18   Q    Were they cordial interactions?
19   A    Yes.  The neighbors were curious, as you can imagine.
20   So they would ask them what's going on, and I was actually
21   standing in a position probably behind where this video was
22   taking place.  So I wasn't privy to the actual
23   back-and-forth, but they were smiling and laughing, and none
24   of the neighbors yelled at us that I was aware of.  They
25   just kept on going about walking their dog or whatever they
```

```
1    were doing.
2    Q    Do you know who recorded the images in this video that
3    we're looking at?
4    A    Yeah, this was recorded by Adam Hyatt.  He is a
5    videographer, professional videographer.  I couldn't do it
6    this well.
7    Q    And did he provide this footage to your office?
8    A    He did.  He edited it.  The music you hear, he put all
9    that in here.  They did all of that.  They produced the
10   whole thing.
11   Q    Does this image that we're looking at depict the scene
12   that you observed when you were in the area of
13   Thunder Studios?
14   A    Yes, sir.
15   Q    And those are the protestors that you were describing?
16   A    Yes, sir.
17   Q    Is that the sheriff's deputy that you were referring to
18   earlier?
19   A    Yes, sir.  He's the one who shooed me away.
20   Q    Is that the same van that was in the area of the
21   neighborhood?
22   A    Yes, sir.
23   Q    Did your office do anything to arrange for the
24   protestors to appear either in the neighborhood or outside
25   the --
```

```
1    A    No.  We had nothing to do with arranging that.

2    Q    Do you know how that was arranged?

3    A    My understanding is Jamie Brown arranged that.

4    Q    At some point were you approached at your office by an

5    investigator on behalf of Mr. David?

6    A    Yes, sir.

7    Q    And was this after the protest activity?

8    A    Yes.

9    Q    Do you recall roughly when it was that this happened?

10   A    I believe it was early December, probably a little --

11   about four-ish weeks of the protest, I guess.

12   Q    December of 2016?

13   A    Yes, sir.

14   Q    Did he tell you what his purpose was in visiting you?

15        MR. WIENER:  Objection.  Calls for hearsay.

16        THE COURT:  Sustained.

17   BY MR. TAYLOR:

18   Q    Did this individual tell you what his name was?

19        MR. WIENER:  Objection.  Calls for hearsay.

20        THE COURT:  Overruled.

21        THE WITNESS:  Yes, he did.

22   BY MR. TAYLOR:

23   Q    Do you recall the name?

24   A    His name was Joshua Gardener, maybe, Joshua something.

25   Q    And what did he tell you?
```

```
 1                MR. WIENER:  Objection.  Calls for hearsay.

 2                THE COURT:  It does, Counsel.  What's the

 3     relevance of this?

 4                MR. TAYLOR:  Your Honor, may we be heard at

 5     sidebar perhaps?

 6                THE COURT:  Quickly.

 7          (The following proceedings were held at sidebar.)

 8                THE COURT:  Go ahead.

 9                MR. TAYLOR:  He's prepared to testify that he was

10     approached by an investigator on behalf of Mr. David who

11     threatened him and told him to back off --

12                THE REPORTER:  Please speak into the mic.

13                MR. TAYLOR:  Go back to the beginning?

14                THE COURT:  Yes.

15                MR. TAYLOR:  He was approached by an investigator

16     on behalf Mr. David who told him he would -- wanted him to

17     stop, he prepared to destroy him, he had unlimited

18     resources, he would bury him.

19                THE COURT:  What's the relevance as relates to

20     this case?

21                MR. TAYLOR:  Well --

22                THE COURT:  Other than to just dirty the witness

23     up, which seems to be the theme of this trial?

24                MR. TAYLOR:  I don't want to waste time with it,

25     then.  So we'll try --
```

```
 1              THE COURT:  All right.  The objection is
 2   sustained.
 3              MR. TAYLOR:  Okay.
 4         (The following was heard in open court in the presence
 5          of the jury:)
 6              MR. TAYLOR:  Nothing further, Your Honor.
 7              THE COURT:  All right.  Cross-examination.
 8              MR. WIENER:  Yes, Your Honor.
 9                        CROSS-EXAMINATION
10   BY MR. WIENER:
11   Q    Good afternoon, Mr. Woodward.  My name is Seth Wiener.
12   I'm the attorney for the plaintiffs Thunder Studios and
13   Rodric David.
14              Did you conduct surveillance on behalf of Rodric
15   David's wife, Elizabeth David?
16   A    Not particular on the wife.  We were watching the house
17   in general, and she was caught in several clips that I
18   understand, yes, sir.
19   Q    All right.  I'd like you to turn to Exhibit 28.
20              Are these photos that you took of Elizabeth David?
21   A    Yes, sir, I believe they are still captures from video.
22   Q    Why did you see fit to -- it's correct that you
23   forwarded these photos to Jamie Brown?
24   A    I'm sorry?
25   Q    Did you forward these photographs to Jamie Brown?
```

```
 1   A    Yes, sir.

 2   Q    Did you also put the statement they're not all

 3   flattering?

 4   A    Yes, sir.

 5   Q    What was the purpose of that statement?

 6             THE COURT:  Counsel, let's move on.  What's the

 7   relevance of this?

 8             MR. WIENER:  Your Honor, the relevance -- if I can

 9   be heard -- is that it demonstrates that this wasn't solely

10   surveillance; it was done in an effort to harass Mr. David.

11             THE COURT:  All right.  The objection is

12   sustained.  Let's move on.

13   BY MR. WIENER:

14   Q    How much did you charge in total for the surveillance

15   activities you performed?

16   A    I don't know.  Would you like me to ballpark it?

17   Q    Ballpark estimate is fine.

18   A    Fifteen, 20,000.  I'm not sure in total for everything.

19   Q    All right.  Did you understand who is the client who is

20   ultimately behind the payments?

21   A    Yes, I understood that Jamie was paying us directly

22   with funds he got from Adam.

23   Q    All right.  Do you know where Adam got those funds?

24   A    Don't know.

25   Q    Did you know that Adam was bankrupt at this time?
```

```
 1   A    Don't know, don't care.

 2   Q    Did you have any direct interactions with -- strike

 3   that.

 4        Were you aware that the results of your

 5   investigation were being passed on to Tony Kazal by

 6   Jamie Brown?

 7   A    I have no knowledge of that.

 8   Q    I would like for you to turn to Exhibit 20.  All right.

 9   And it's correct that this is the service agreement that

10   lists Tony Kazal as being the client, along with Jamie?

11   A    Yes, sir.

12   Q    And it's your testimony that you have no idea who

13   Tony Kazal was?

14   A    No, I have never met him.  I've never spoken to him.

15   Q    All right.  I would like you to turn to page 5 of 8 of

16   this document.

17        Did you -- were you copied on the e-mail dated

18   November 10th, 2016, at 2:30 P.M.?

19   A    Yes.

20   Q    It's an email from Jamie Brown to Victor Fuentes?

21   A    Yes.

22   Q    And does it say, "Thanks for the info"?

23   A    It does.

24   Q    Do you recall what information he is referring to?

25   A    Right here sitting here, no.
```

```
 1   Q    Does it say, "I will pass to Tony"?

 2   A    It does say that.

 3   Q    And does Jamie Brown also ask, quote, "Let me know your

 4   thoughts before I send info on to Tony"?

 5   A    He does.

 6   Q    Is it still your testimony that you don't have any idea

 7   who Tony Kazal is?

 8   A    I mean, I know he is Adam's brother.  I'm not an idiot.

 9   Q    Did you have any involvement with an entity called

10   Crowds On Demand, LLC?

11   A    I'm sorry.  Do I have a what?

12   Q    Did you have any involvement in contracting with a

13   company called Crowds On Demand?

14   A    Those are the protestors?

15   Q    Correct.

16   A    No.

17   Q    Do you understand where the van was obtained that was

18   used in the protest?

19   A    Absolutely.

20   Q    Where was it obtained from?

21   A    From a used car lot in L.A.

22   Q    Did you purchase the van?

23   A    I did.

24   Q    Was it subsequently -- during what dates did you

25   perform services for the Kazals?
```

```
 1   A    October, November of 2016, I believe.

 2   Q    What became of the van?

 3   A    I sold it earlier this year, I believe, maybe six

 4   months ago.

 5   Q    Did you buy the van with money you obtained from

 6   Jamie Brown?

 7   A    Yeah, they gave me the money for the van.  You bet.

 8   Q    Did you return the sales proceeds to Jamie Brown?

 9   A    No.  Part of our agreement was when it was over, that

10   van was mine.

11   Q    Who is responsible for putting the signage on the van?

12   A    I had the wrap done.  I have a friend who does wraps.

13   Had them do the artwork, put it on.

14   Q    Who drove the van?

15   A    Who drove the van?

16   Q    Yes.

17   A    Nester Gomez, my business partner, drove it for, I

18   believe -- I think he drove it for all the times it was out

19   there.

20   Q    Did you have any direct correspondence with Adam Kazal?

21   A    We had a couple of emails that I'm aware of.

22   Q    All right.  And were those in November of 2016?

23   A    I would suspect so, yes, sir.

24   Q    Did Adam Kazal send you an e-mail on November 7th,

25   2016, stating, quote --
```

```
 1                      (Reading:)  Now this action has
 2              started against me in Australia.  Can you also
 3              have the wrap guys print up stickers to cover
 4              whatever my name is, care of Adam Kazal and
 5              overstick with care of Tony Kazal?
 6   A    Yes, he asked me to do that.
 7   Q    Did you comply with that request?
 8   A    There was no need.  His name and Tony's name were never
 9   on the wrap.
10   Q    Do you know why he made that request?
11   A    I have no clue.
12   Q    Did Adam Kazal also write to you in the same e-mail,
13   quote --
14                      (Reading:)  Rodric made the
15              complaint through his lawyers, Staying safe in
16              the USA.  So to further screw with him,
17              overstick my name, then by Friday we should be
18              able to go back to my name, end quote?
19   A    Yeah, it was my understanding he didn't want to create
20   any legal problems.  That's why he wanted his name covered
21   up.
22   Q    What did you understand Adam Kazal to mean by -- that
23   he wanted to screw with Mr. David?
24   A    I mean, his entire operation was kind of designed to
25   provoke, don't you think?
```

```
 1   Q    Do you think it was designed to harass Mr. David?

 2   A    No.

 3   Q    What's the difference in your mind between provoking

 4   and harassing?

 5   A    We didn't do anything illegal.  Harassment is illegal.

 6   It's a pretty clear line.

 7   Q    Were you aware that Adam Kazal was found in criminal

 8   contempt?

 9   A    After the fact I did.

10   Q    How did you learn that fact?

11   A    Jamie Brown told me.

12   Q    Did Adam Kazal also write you on November 7, 2016,

13   11:05 A.M., and write to you, quote --

14                        (Reading:)  So to be seen complying,

15               we just changed names.  He will not expect

16               action in the U.S.

17   A    I'm sorry.  I didn't understand -- I didn't hear a

18   question.

19   Q    Did he say that?

20   A    Yes.

21   Q    All right.  Do you have any understanding why Adam

22   Kazal was seeking to provoke Mr. David?

23   A    My understanding is limited.  I can -- I understand

24   there was a business dispute, and the two guys were pretty

25   mad at each other, it seems like.
```

1    Q    I'd like you to turn to Exhibit 29 in the binder.

2    A    Yes, sir.

3    Q    Did you draft this investigation report?

4    A    I did.

5    Q    What date did you draft this report?

6    A    If it says February 22nd, that's probably the day I did

7    it.

8         MR. WIENER:  Your Honor, I would like to move

9    Exhibits 28 and 29 into evidence.

10        THE COURT:  I believe 28 is already in evidence

11   but 29, any objection?

12        MR. TAYLOR:  No, Your Honor.

13        THE COURT:  Twenty-nine will be admitted.

14        (Trial Exhibit 29 was admitted into evidence.).

15   BY MR. WIENER:

16   Q    Is it correct that you are instructed to cease working

17   for or at the behest of Adam Kazal on November 8, 2016?

18   A    Yes, sir.

19   Q    Is it correct that, from that date forward, you had no

20   contact with Mr. Kazal either verbally or written?

21   A    After this date?

22   Q    Correct.

23   A    In the case, the work we did, no, not until he

24   requested the letter.

25   Q    All right.  What date did he request the letter?

```
 1   A    It would have been within a day or so of this.  I'm a
 2   pretty proficient guy.
 3   Q    Do you know why he requested this letter?
 4   A    I don't think I can -- I don't think I can answer that
 5   with any real knowledge.
 6   Q    Do you know if Adam Kazal wanted you to drive the van
 7   to provide him with certain protection from the police?
 8   A    I don't understand your question, sir.
 9   Q    Did Adam Kazal ever state anything to the effect that
10   he wanted you to drive the van to provide certain protection
11   from the police?
12   A    I don't know how the van will protect anyone from the
13   police.  I'm sorry.  I don't understand your question, sir.
14   Q    All right.
15   A    But he never asked me for protection of any kind.
16   Private investigators, typically, can't provide executive
17   protection in California.  It's precluded.
18   Q    Did you have any communications with a individual named
19   Adam Swart?
20   A    Adam?
21   Q    Swart?
22   A    I don't believe I have ever heard that name.
23   Q    Who do you understand carried out the protest at
24   Thunder Studios?  Or do you have any --
25   A    Who carried it out?
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1   Q    Right, in November 2016.

2   A    Well, there were hired protestors.  I don't know them.

3   Q    So is it correct that you organized -- which protest

4   did ICS organize?

5   A    We didn't organize any protest.  We handled the van and

6   surveillance.  We had nothing to do with those protestors

7   other than making sure the van was there, and they showed

8   up.  And we videotaped it and documented it in the event

9   things got out of hand;

10           And to be honest, it was pretty boring stuff with

11  the exception of some of the employees at the studios coming

12  out and videotaping the protestors, kind of trying to get

13  back out of them.  This is pretty boring and uneventful.

14  Q    All right.  And you have -- you mentioned at one point

15  the police shooed you from Thunder Studios; is that correct?

16  A    No, he shooed me from the conversation.  He was

17  speaking with Mr. David and another female about what was

18  going on, and I went up to see if they -- because my van was

19  there.

20           I'm the registered owner of the van.  I'm not

21  hiding from anything.  And so I went up and asked him, "Do

22  you need anything from me?"

23           And he goes "No.  We don't need you.  Go away."

24           In all honesty, he was pretty rude, but I went

25  away because who wants to talk to the police if you don't

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1  have to?  So I went away, and then he finished talking, and
 2  then the police left, and we kept doing what we were doing.
 3        I'm sorry if I wasn't clear on that.
 4  Q   Did Jamie Brown represent to you who the protestors
 5  were?
 6  A   Did he represent who they were?
 7  Q   Right.
 8  A   I don't understand your question.
 9  Q   Do you have any knowledge where the protestors came
10  from?
11  A   They're just -- I don't know, just some company around
12  L.A., I would assume.  I mean, I spoke with them briefly the
13  things -- they just seemed to be, like, just normal people
14  out doing a job.
15  Q   Did Jamie Brown tell you what his relationship was to
16  the Kazal brothers?
17  A   My understanding was he was the investigator on the
18  other side of the globe because Jamie is from Australia.
19  That's was my understanding.
20  Q   Did he explain why they didn't come here to coordinate
21  activities?
22  A   No, he didn't explain that.  I didn't ask.
23        MR. WIENER:  Thank you.  Nothing further.
24        THE COURT:  Redirect.
25
```

```
 1                    REDIRECT EXAMINATION
 2   BY MR. TAYLOR:
 3   Q     Thank you, Mr. Woodward.
 4            Counsel asked you a question a few moments ago,
 5   and he used the term "the Kazals."
 6            I want to be very clear.  Did you deal with the
 7   Kazals, or was it your understanding you were only dealing
 8   with Adam Kazal?
 9   A     Just the one, just Adam.
10            MR. TAYLOR:  Okay.  Nothing further, Your Honor.
11            THE COURT:  All right.
12            Mr. Wiener.
13            MR. WIENER:  Nothing further.
14            THE COURT:  Sir, you may step down.  Thank you for
15   coming in.
16            THE WITNESS:  Thank you, Your Honor.
17            THE COURT:  Mr. Taylor, do you want to call your
18   next witness, please.
19            MR. TAYLOR:  Yes.  Thank you, your Honor.  The
20   defense would call Antonello Parlato, who, again, I
21   understand is outside.
22            THE COURT:  All right.
23            MR. WIENER:  Your Honor, I would like to make an
24   objection and discuss this briefly with the Court during a
25   sidebar.
```

```
 1              THE COURT:  All right.  So why don't we do this:
 2    Perhaps co-counsel can get the witness while we have the
 3    sidebar.
 4         (The following proceedings were held at sidebar.)
 5              THE COURT:  Yes, Counsel.
 6              MR. WIENER:  Parlato is a former disgruntled
 7    employee of Thunder Studios.  He's subject to a
 8    confidentiality agreement, which precludes him from giving
 9    the testimony today.  I'm also not aware of any relevance
10    his testimony has to any issues.  He takes -- photographs,
11    but beyond that I don't know if there is any proper
12    relevance.
13              THE COURT:  Can you give me a proffer, briefly, as
14    it relates to this witness.
15              MR. TAYLOR:  Certainly.  He's -- as counsel
16    said -- indicated as being the photographer of all the
17    photos at issue.  He's also featured in the video that we
18    have seen taking pictures and video outside.
19              I want to ask about that, and I want to ask about
20    the experience the day of the protest at Thunder Studios.  I
21    want to ask him about Mr. David's reaction.  I want to ask
22    him what Mr. David said about it at the time at the studio,
23    one witness about all that, Your Honor.
24              THE COURT:  It seems relevant.  I mean, if we're
25    talking about your client, whether or not he was -- I assume
```

```
 1    trying to challenge whether he was fearful or upset -- more

 2    specifically fearful as it relates to the stalking claim.

 3    Another employee can testify to that.  I don't think he's

 4    going to testify to any state secrets from Thunder Studios,

 5    I don't believe.  I don't believe Mr. --

 6              MR. TAYLOR:  Nothing that --

 7              THE COURT:  -- Taylor will elicit it.  But if he

 8    can testify, I guess, as to what he observed, what the

 9    reaction was within the company -- you went on at length

10    with your witnesses as it relates to, sort of, rightfully

11    so, to establish fear or concerns in the company.  If they

12    have a witness that perhaps can rebut that, I'll allow it.

13              All right.  Thank you.

14              MR. WIENER:  Thank you, Your Honor.

15              THE COURT:  Thank you.

16              MR. TAYLOR:  Thank you, Your Honor.

17         (The following was heard in open court in the presence

18          of the jury:)

19                    ANTONELLO PARLATO,

20               having been first duly sworn,

21                  testified as follows:

22              THE CLERK:  Do you solemnly swear that the

23    testimony you shall give in the cause now before this Court

24    shall be the truth, the whole truth, and nothing but the

25    truth, so help you God?
```

```
 1                    THE WITNESS:  I yes, I do.
 2                    THE CLERK:  Please state and spell your name for
 3   the record.
 4                    THE WITNESS:  Antonello Parlato,
 5   A-n-t-o-n-e-l-l-o, last name P-a-r-l-a-t-o.
 6                    THE COURT:  Thank you.  You may proceed.
 7                         DIRECT EXAMINATION
 8   BY MR. TAYLOR:
 9   Q    Good afternoon, Mr. Parlato.
10         You are appearing here today pursuant to a
11   subpoena that was served to you by my office; is that right?
12   A    That's correct.
13   Q    And do you and I know each other?
14   A    No, we do not.
15   Q    Have we ever met before today?
16   A    No, we have not.
17   Q    Do you know personally know any of the defendants in
18   this case?
19   A    I do not personally, no.
20   Q    What is your profession, sir?
21   A    Film editor.
22   Q    How long have you worked in the film industry?
23   A    Past eight years now.
24   Q    Are you familiar with the plaintiff in this case,
25   Mr. David?
```

1    A    Yes, not too familiar but very -- pretty familiar.

2    Q    You know who he is; right?

3    A    Yeah, of course.  He was my boss for 2 1/2 years.

4    Q    Where was he your boss?

5    A    I was employed by Thunder Studios from

6    February 5th, 2015, to about August 2017.

7    Q    If you had a specific title, could you share with us

8    your job title.

9    A    I was the in-house creative producer and film editor.

10   I mainly worked in the film -- sorry -- the marketing

11   department mostly handling the creation of marketing

12   materials for the organization's marketing Website and film

13   clients.  I also assisted many times in the sales and

14   operation department as well.

15   Q    And during that period, were you full time at

16   Thunder Studios?

17   A    I was full time for the full 2 1/2 years I was employed

18   there, yes.

19   Q    Did you physically work at their offices in Long Beach

20   at the studio?

21   A    Yes, everyday, Monday through Friday and many times on

22   the weekends.

23   Q    At some point in 2016, did you become aware of the

24   presence of any protestors outside the gates of the studio?

25   A    Yes, I have.

```
 1   Q    How did the protestors come to your attention?
 2   A    Just regular day at work.  I was requested to stop what
 3   I was doing and take my camera and take photos and videos of
 4   the protestors that were standing on the sidewalk outside
 5   the fence of Thunder Studios.
 6   Q    Who requested that you do that?
 7   A    Rodric David and Matt Price.
 8   Q    So did you comply with that request?
 9   A    Yes, of course.  I felt obligated as an employee there.
10   So I took the camera, and I went outside to film the
11   protestors on the other side of the fence for about 15 to 20
12   minutes.
13   Q    If you recall how many pictures did you take?
14   A    Quite a few.  I'm not too certain because I don't have
15   access to that media.  That's under -- that's
16   Thunder Studios's property, and it happened a little while
17   ago.  So, I mean, at least 20 photos, video footage,
18   probably ten minutes' worth of footage.
19   Q    When you were filming the protestors, how close were
20   you to them?
21   A    I got pretty close.  Didn't touch any of them or
22   anything.  I just was literally probably five feet away, no
23   more than three or four feet at the closest.
24   Q    And during the 15 minutes or so that you were outside
25   documenting the protestors, did you have any fear for your
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1   personal safety?

 2   A     No, not at all.  They were regular protesting

 3   standards.  They just stood on the sidewalk, you know.  Cars

 4   were coming in and out of the studio as normal.  They just

 5   stayed on the sidewalk and did their thing.

 6   Q     Did they seem dangerous or threatening to you in any

 7   way?

 8   A     No, they were just holding up signs.  That's it.

 9   Q     While you were outside among the protestors, did you

10   observe any of them trying to gain access to the

11   Thunder Studios property?

12   A     No, not at all.  They weren't trying to shake down the

13   fence or anything like that.  They literally just stood on

14   the sidewalk outside the studio and were holding up their

15   signs.

16   Q     I want to show you a very brief excerpt from a video

17   clip that's already been admitted into evidence in this

18   case.

19             If I may, Your Honor?

20             THE COURT:  You may.

21   BY MR. TAYLOR:

22   Q     Does the image appear on the screen in front of you,

23   sir?

24   A     Yes, there is an image.

25   Q     Is that a fairly accurate depiction of the scene that
```

```
 1   you were just describing the protestors outside the gate of

 2   Thunder Studios?

 3   A    Yeah, that's the exact image.

 4        (Exhibit played.)

 5   BY MR. TAYLOR:

 6   Q    And the gate that's pictured in the middle of the image

 7   there, it says, "Thunder Studios" on it with a big "T" in

 8   the circle --

 9   A    Yep.

10   Q    Do you see that?

11   A    Yes, I do.

12   Q    Is that the gate that cars would have to drive through

13   to get into the studio?

14   A    Yes, that is the main gate.  There is another gate, but

15   that's the main gate, yes.

16   Q    And then sort of to the left of that in the image we're

17   looking at, there's a little bit of a space next to an

18   orange cone.

19        Do you see that?

20   A    Yes, I do see that.

21   Q    Is that where a pedestrian would gain access to the

22   studio if he was coming to visit someone there on foot?

23   A    Yeah, if they're not going to drive in and park by

24   getting through the security first, that's where they would

25   go if they were just walking.  Usually that door is locked,
```

```
 1   and you would need security access.

 2   Q    And it appears to be open in this picture.

 3        Is that what it looks like to you?

 4   A    Yes, it does look like that.

 5   Q    There is a little structure right next to it with a

 6   blue sign.  Do you see that?

 7   A    The security shelter?

 8   Q    Is that what that is?

 9   A    Yeah, that's where the security guards mainly stay.

10   Q    Okay.  I am going to play and move the video along a

11   little bit here.

12        (Exhibit played.)

13   BY MR. TAYLOR:

14   Q    Is that you at the left there?

15   A    That is me.

16   Q    Looks like you're a few feet away from the protestors.

17        Is that fair to say?

18   A    That's correct.

19   Q    Did you speak to the protestors at all while you were

20   outside?

21   A    No.  I don't recall, no, if they mumbled something at

22   me, but I don't remember saying anything back or -- no.

23   Q    Did they shout or yell at you at in any way?

24   A    No, not me personally.

25   Q    Were they chanting?
```

```
 1   A     Yes, they were.

 2   Q     Is that you right there?

 3   A     Yes, that's me.

 4   Q     And this is an image of the 15 or so minutes that you

 5   were outside taking pictures and video that day; right?

 6   A     That is correct.

 7   Q     Other than the conversation you described a few moments

 8   ago where you were asked to stop what you were doing and go

 9   outside and take some pictures and video, did you have other

10   interactions with Mr. David that same day?

11   A     No.  I mean, he went on to do his -- you know, after

12   that, went on to do his business, and it was a regular

13   workday.

14   Q     So is it fair to say that he appeared to go on with his

15   routine that day?

16   A     Yeah, everyone went down to the lobby, five minutes,

17   checked it out to see what was going on, and then everyone

18   else went back to their workday per usual.

19   Q     But you observed -- did Mr. David seem to be in fear

20   for his safety from the presence of the protestors outside

21   the gates?

22   A     No, he did not.

23   Q     When is the last time you spoke with Mr. David?

24   A     Back in May.

25   Q     And did he call you?
```

```
 1    A     He did, yes.

 2    Q     What was the purpose of the call?

 3    A     Mr. David called me to, basically, touch base and

 4    inform me about his current legal matters he has going on

 5    with the Kazal family.

 6              He requested that I stay out of his legal matters

 7    and that, if any one tries to contact me regarding his legal

 8    matters, it's best for me to not get involved, stay out of

 9    it, don't answer any phone calls or e-mails.

10              MR. WIENER:   Objection, Your Honor.   Hearsay and

11    should be stricken.

12              THE COURT:   A statement of the plaintiff.

13              Overruled.

14    BY MR. TAYLOR:

15    Q     Did you ask him to clarify what he meant by that?

16    A     Yes.   He responded with, well, you know, I can do

17    whatever I want to, but it's in my best interest not to get

18    involved because I will have to spend time in court,

19    testify, do a lot of things I don't want to do.

20    Q     So did you understand Mr. David to be telling you that

21    you shouldn't testify in this case?

22    A     Sorry.   Repeat that again.

23    Q     I am asking you, sir, if you understood Mr. David to be

24    telling you that, if you were called upon to do so, you

25    should not testify in this case?
```

```
 1   A     Yeah, he requested for me not to testify.

 2   Q     Did you find that request strange?

 3   A     Yeah, I would say so.

 4              MR. TAYLOR:  Nothing further, Your Honor.

 5              THE COURT:  All right.  Cross-examination.

 6                        CROSS-EXAMINATION

 7   BY MR. WIENER:

 8   Q     Mr. Parlato, what was the real reason that Mr. David

 9   contacted you at the end of May 2018?

10   A     The real reason --

11   Q     Correct?

12   A     -- at the end of 2016 was he called me to inform me to

13   not be involved in any of his legal matters.

14   Q     Was he -- did you send an e-mail to Thunder Studios

15   employees on May 26th, 2018, telling them to, quote, "Do

16   yourself a favor and get the fuck out of that toxic,

17   egotistical hell hole"?

18   A     Yes, I did say that.

19   Q     Did you also, on May 28,2018, send an e-mail to

20   Rodric David demanding a referral kickback commission?

21   A     Yes, I did.

22   Q     Is it possible that that's what prompted Mr. David's

23   call to you?

24   A     No, it's not correct.

25   Q     Did you receive a cease and desist letter on or about
```

```
1    June 26th, 2018?

2    A    Yes, I did.

3    Q    Did it remind you of your confidentiality agreement

4    with Thunder Studios?

5    A    I didn't read it in full detail, but I got a cease and

6    desist letter, yes.

7    Q    All right.  Did it ask that you refrain from further

8    contact with Thunder Studios employees?

9    A    I didn't read the cease and desist in full detail, but

10   I haven't had contact since then.

11   Q    Did you also tell Mr. David at one time that he was,

12   quote, "A lying coward and not a very good businessman"?

13   A    Yes, I said that.

14   Q    And did you also tell him that he was a clown running a

15   circus?

16   A    Yeah, I said that.

17   Q    Is it fair to say that you have a fair amount of

18   animosity toward Mr. David?

19   A    Six months ago there was a situation where I sent

20   Mr. David a client who spent a significant amount of money,

21   and he treated that client very unprofessionally and poorly

22   and got into an argument with that client.

23        I spent over six months building a relationship

24   with that client.  At the time I was upset, but I have

25   learned to not hold grudges, and what's in the past is in
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1    the past, and now I have moved on with my future.
 2    Q    All right.  So you are no longer demanding a, quote,
 3    "referral kick back commission" from Mr. David?
 4    A    No.
 5    Q    And you've decided to take your revenge by your
 6    testimony today?
 7              MR. TAYLOR:  Your Honor, argumentive.
 8              THE WITNESS:  No.
 9              THE COURT:  Overruled.
10    BY MR. WIENER:
11    Q    Did any other employees at Thunder Studios ever also
12    tell you not to contact them?
13    A    One.
14    Q    Was that Jacqueline Carroll?
15    A    Yes.
16    Q    Why did she ask you not to contact her?
17    A    Feels obligated to.
18              MR. WIENER:  Nothing further, Your Honor.
19              THE COURT:  All right.
20              Mr. Taylor.
21              MR. TAYLOR:  We have nothing further, Your Honor.
22              THE COURT:  All right.  May this witness be
23    excused?
24              MR. TAYLOR:  He may.
25              MR. WIENER:  Yes, Your Honor.
```

```
 1              THE COURT:  Thank you, sir.  You may step down.
 2              All right, Mr. Taylor.  You may call your next
 3   witness.
 4              MR. TAYLOR:  We have no further witnesses at this
 5   time.
 6              THE COURT:  All right.  So does the defense rest?
 7              MR. TAYLOR:  We do, Your Honor.
 8              THE COURT:  Does the plaintiff wish to call any
 9   rebuttal witnesses?
10              MR. WIENER:  No, Your Honor.
11              THE COURT:  All right.  So ladies and gentlemen,
12   why don't we take a break.  The end is near, so to speak, so
13   it may be a little while because I need to go over some
14   matters with them.  So let's take a 20-minute break.  Let's
15   have you come back at 2:45.
16              So, again, please do not form or express any
17   opinion about the case until the matter is finally submitted
18   to you.  Don't talk about the case.  Don't allow anyone to
19   talk to you about the case.  And do not conduct any research
20   of any kind on any subject matter connected with this case.
21              So we'll see you back at 2:45 please.  Thank you.
22              THE CLERK:  All rise for the jury.
23              Please be seated.
24         (The following was heard in open court outside the
25          presence of the jury:)
```

```
 1          THE COURT:  All right.  So couple matters.  I am
 2    going to have my law clerks start printing out the closing
 3    jury instructions.  I will, once I get agreement of the
 4    parties as it relates to the jury instructions and the
 5    verdict form, we'll instruct the jurors, and then you guys
 6    will begin your closing argument.
 7          With respect to the verdict form, we're working on
 8    it.  We'll give you a proposed draft of what we think makes
 9    sense.  I think there was some dispute about whether or not
10    the jurors should be asked questions about punitive damages.
11          What I do here is I ask the first question of
12    whether the acts were done with malice, et cetera.  If the
13    answer is yes, then we'll proceed on to the punitive damages
14    phase, and you will argue that portion of it, and then
15    they'll go back and deliberate as to the second phase.
16          Mr. Taylor, did you have anything further that you
17    wish to state with respect to your Rule 50(a) motion?
18          MR. TAYLOR:  Yes, a couple of comments if I may.
19          THE COURT:  All right.
20          MR. TAYLOR:  Just with respect to the argument
21    that counsel made about the First Amendment.  Obviously, we
22    didn't brief these issues in advance of today, and, during
23    the lunch break, I didn't have time to read all the
24    authorities that counsel mentioned but --
25          THE COURT:  I had a chance to read at least the
```

```
 1   two cases, the Supreme Court case and the Ninth Circuit
 2   case.  I don't think they apply here.  I mean, in one
 3   case -- let me double-check.  I just want to pull it up
 4   again.  I think it was U.S. v. Verdugo-Urquidez, 110 S.Ct.
 5   1056.  It's a 1990 case with Justice Rehnquist filing the
 6   opinion.
 7            But in that case, you're talking about American
 8   law enforcement searching the residence of a Mexican
 9   national in Mexico.  That's what strikes me as far different
10   than what we have in this case.
11            The other case, Orozco-Santillan, although I don't
12   know if it's on point necessarily for what Mr. Wiener
13   pointed out, it does say something that I think doesn't bode
14   well for the defense as it relates to the 50(a) motion, the
15   "alleged threat should be considered in light of their
16   entire factual context, including the surrounding events and
17   the reactions of the listener."
18            So I know you -- both sides are doing what you are
19   expected to do -- focusing on the important parts of your
20   case in their isolation.
21            But in fairness, as it relates to this claim, it
22   looks like, when you're talking about threats, I think
23   you're supposed to consider it in its entire context, and so
24   I leave it at that.
25            But go ahead, Mr. Taylor.
```

```
 1              MR. TAYLOR:  I was just going to say, Your Honor,
 2    having not had a chance, of course, to read all these cases,
 3    it seems to me, from what counsel described, that the
 4    conduct of people who are physically here in the
 5    United States has to be entitled to First Amendment
 6    protection even if someone outside of the country is behind
 7    part of the activity.
 8              It can't be that activity that takes place here by
 9    people who are, without any indication to the contrary, U.S.
10    citizens is not entitled to First Amendment protection.  And
11    the statute 1708.7 is clear that the pattern can't include
12    constitutionally protected activity, and also the statute
13    says that the purpose of the statute is not intended to
14    freeze or -- the word is escaping me -- but to limit or to
15    repress constitutionally protected speech.  So I would just
16    point that out as well.
17              With respect to the -- sorry.  Just a moment,
18    Your Honor.
19              THE COURT:  Take your time.
20              MR. TAYLOR:  Oh, that's right.
21              With respect to the copyright infringement claim
22    as it relates to, for example, defendant Adam Kazal, he put
23    "kazalfamilystory.com" on the banners.
24              I think it's a bit of a stretch to say that, if I
25    put a Website on the side of my car or on a sign or if I
```

```
 1   direct people to it in some way, then I'm, therefore,

 2   responsible for anything that's on the site, that I am

 3   liable for any copyright infringement that's on the side of

 4   me -- I can write the words "Coca-Cola.com" on the side of

 5   my car and drive around L.A., and if Coca-Cola.com has a

 6   picture on there that's not theirs and they infringed

 7   someone's copyright theory, I'm not liable for that.  I

 8   wouldn't know about that.  So that's --

 9        THE COURT:  I get that.  But look -- maybe I will

10   regret doing this, but let's just be honest here.  That's

11   not what this case is about.

12        This case is, when you look at the entirety of the

13   scenario, it's two individuals that have gone at each other

14   like pit bulls in a pen, and they're just going for it.  I

15   mean, so it's not a function of one person putting a

16   Website -- his or her name on a banner and, therefore, being

17   attributable for everything on it.

18        The plaintiffs' theory is all of the brothers were

19   in on this together.  I'm not placing judgment on that.  I'm

20   just saying that's the theory.  The jury will decide if

21   that's accurate or not, but I don't think it's enough to

22   say -- I don't think you can say, well, the name on there

23   alone doesn't make that person liable for anything and

24   everything on the Website.  That's somewhat in a vacuum.

25        MR. TAYLOR:  That's true, Your Honor.  I'm giving
```

```
1    an extreme example because I am trying to point out,
2    Your Honor, that plaintiffs' theory is not supported by any
3    evidence here.
4            They're related -- obviously, Adam had no problem
5    with what Charif was writing on the Website, but that
6    doesn't make him responsible for it as long as there was no
7    evidence presented at all that Adam had anything to do with
8    the Website.  So that's what I am trying to point out,
9    Your Honor.
10           THE COURT:  Okay.  All right.  Well, anything
11   further?
12           MR. TAYLOR:  Not at the moment, Your Honor.  Thank
13   you.
14           THE COURT:  All right.  Well, look.  I've heard
15   and considered the arguments on both sides.  I think at this
16   juncture I'm going to deny the motion.  I think there's just
17   enough factual disputes as it relates to the copyright claim
18   and the stalking claim, although both really are on the
19   margins.  It's enough to let the wonderful eight individuals
20   seated in the jury box make that ultimate decision.
21           So why don't we take a ten-minute recess at this
22   time.  I am having the jury instructions printed out.  Once
23   they are printed out, I would ask you to come back.
24           My courtroom deputy will give you the
25   instructions, give you some time to look at them.  We can
```

1   fight about the instructions and the verdict form, and then,

2   once we get that nailed down, I will instruct the jurors,

3   and then each side will make their arguments.  All right?

4   So let's take a recess.  Thank you.

5           THE CLERK:  All rise.  This Court is in recess.

6       (Recess taken 2:31 PM to 3:07 PM)

7           THE COURT:  All right.  So I provided for you all

8   a copy of the proposed jury instructions, closing jury

9   instructions, special verdict form, and special verdict form

10  for punitive damages if we get to that phase.

11          Have the parties had a chance to review the

12  documents, Mr. Wiener?

13          MR. WIENER:  Yes, Your Honor.  Plaintiffs have no

14  objections to either the verdict forms or to the closing

15  jury instructions.

16          THE COURT:  All right.  Mr. Taylor.

17          MR. TAYLOR:  Yes, Your Honor.  We just have a few

18  questions or points of clarification I think we need to

19  address.

20          THE COURT:  All right.  Go ahead.  Let's do that,

21  then, please.

22          MR. TAYLOR:  Thank you, Your Honor.  With respect

23  to the special verdict form?

24          THE COURT:  Just the first special verdict form.

25  Okay.

```
 1              MR. TAYLOR:  Yes.  And I realize that our verdict

 2     form had a similar chart.  I didn't put it side by side, but

 3     just now that testimony is concluded and I'm looking at it,

 4     I'm concerned that the headings at the top could be

 5     confusing if the jury just uses this page.  And I realize

 6     the form includes the questions spelled out more clearly on

 7     the previous page.  But the use, for example, in Column 2 of

 8     willful/ignorance --

 9              THE COURT:  All right.

10              MR. TAYLOR:  -- I'm concerned that there may be

11     confusion about that wording or that usage of the slash.

12     The column eight doesn't have a question mark; so I am

13     thinking that that should probably be amended as well to

14     avoid confusion.  But I am just concerned that the jury

15     could look at that and think that those are the two options

16     that it must choose from, and that's not necessarily the

17     case if they find no liability in the first place.

18              THE COURT:  Okay.  So, then, what do you propose

19     in light of the fact that this was the joint document that

20     was submitted?  And just so the record is clear, I raised a

21     lot questions about this chart.  I asked you to all meet and

22     confer.  You all weren't able to do so.  So I said, okay.

23     If the parties want this, then so be it.

24              And so you are now asking for a change, fine.  But

25     you are not just going to be able to throw this on my lap
```

1    and tell me to go back in chambers and figure this out.

2           MR. TAYLOR:  No.  What I'm suggesting is that

3    perhaps -- and I know the Court will go through this and

4    explain it.  Perhaps it could be just made very clear what

5    the columns --

6           THE COURT:  Well, to be clear, I'm only going to

7    explain it to the extent it's explained in these jury

8    instructions.  So I'm not going -- there is no extra

9    tutorial for the verdict form.  I am just concerned your

10   comments -- and I know that I will make this clear.

11          They're going to get the instruction, they're

12   going to get this verdict form, and then they have to

13   deliberate.

14          So it sounds like you think I was going to do

15   something more.  I do not intend to.  I don't believe I am

16   authorized to.  I'm supposed to give them the instructions

17   and their verdict form.

18          MR. TAYLOR:  No, I understand, Your Honor.  I

19   guess with respect to the eighth column, there really should

20   be a question mark there.  It's going to be --

21          THE COURT:  That's fine.  We can make that change.

22   But you raised an earlier concern about Charif, willful,

23   ignorant -- again, I share your concern.  I'm not sure how

24   the jury is supposed to understand what that means.  Are

25   they picking one or the other?

```
 1          Now, the questions before asked, for example,
 2   Question Number 5 or Number 2, whether Charif Kazal
 3   committed copyright infringement willfully or out of
 4   ignorance/by accident.  That's the question that you all
 5   framed.
 6          MR. TAYLOR:  Right.  And that question, as it's
 7   worded here, makes sense to me if they've answered
 8   Question 1 in the affirmative.
 9          And I suppose, now that I think about it further,
10   that if they understand to look at this in conjunction with
11   the preceding page, because it does say chart follows, it
12   should be clear.  I guess I just want to bring that --
13          THE COURT:  You want to be a lawyer and dot your
14   i's and cross your t's.  I respect that.
15          MR. TAYLOR:  I appreciate that.  Thank you.
16          THE COURT:  All right.  Any other objections you
17   have?
18          MR. TAYLOR:  Not to this form, no.
19          THE COURT:  Okay.  What about with respect to the
20   instructions?
21          MR. TAYLOR:  Yes.  With respect to the
22   instructions, on the -- let's see -- page -- with respect to
23   the instructions on page 41 of the statute of limitations --
24          THE COURT:  Forty-one.  Yes.
25          MR. TAYLOR:  So I read it twice to make sure I
```

```
 1    wasn't mistaken.  I think there is a mistake here.  It says,
 2    "Defendants claim that plaintiffs'" --
 3              THE COURT:  What line, just so we're --
 4              MR. TAYLOR:  Oh, I'm sorry.  Line 14.
 5              THE COURT:  Line 14.
 6              MR. TAYLOR:  "Defendants claim" --
 7              THE COURT:  All right.
 8              MR. TAYLOR:  "plaintiffs' claims based on
 9    publication of certain photographs on Kazalfamilystory.com
10    are barred because Thunder Studios knew or should have known
11    by February 2nd, 2017, that the photographs appear on the
12    Website" -- I think that should be 2014.
13              THE COURT:  I think you are correct.  Okay.  All
14    right.
15              MR. TAYLOR:  One other issue I wanted to raise
16    with respect to the instructions -- and, again, I know this
17    is the draft joint instruction we submitted with respect to
18    stalking.  It's Instruction 14 --
19              THE COURT:  All right.
20              MR. TAYLOR:  -- on page 17.
21              As the Court knows by now from having probably
22    reviewed the statutes, it's a very long statute --
23    170.7 [sic], and there's a lot in there --
24              THE REPORTER:  Pardon me?
25              MR. TAYLOR:  I'm sorry.
```

1          It's a very long statute, and there's a lot in

2    there, and I think perhaps we didn't include initially

3    because it seems like a question of law, but I wonder if

4    there shouldn't be anything in here about constitutionally

5    protected activity being part of the pattern.

6          THE COURT:  Let's see.  I don't know if I have a

7    copy of 1708.  I am just trying to pull the full version of

8    1708.  Just bear with me, please.

9          So what would you propose, then?  I guess -- I

10   don't know if it is an instruction, so to speak,

11   particularly in light -- well, what would you propose?  Let

12   me just leave it at that.

13         MR. TAYLOR:  Well, I mean, I guess the concern

14   that we had, I think, was trading a hopelessly long and

15   confusing instruction which mimics all of the language of

16   the statute which defines ten different terms; but, I mean,

17   with respect to the definition of pattern of conduct, I

18   think it might be hard for the jury to reach a proper

19   conclusion on what that means without having the term

20   "pattern of conduct" defined.  And the term is defined in

21   (b)(1), what is the pattern.  "What is the pattern of

22   conduct" --

23         THE COURT:  I see it here, and it says

24   "Constitutionally protected activity is not included within

25   the meaning of pattern of conduct."

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1              Is that what you are referring to?

 2              MR. TAYLOR:  That's what I am talking about.  I

 3    mean, we could include in this instruction every single

 4    definition, and I think it would be unwieldy.  But I

 5    think --

 6              THE COURT:  But then --

 7              MR. TAYLOR:  -- stalking is a pattern of conduct.

 8    So if the jury can't be informed in advance what is by

 9    definition of pattern of conduct under the statute, I don't

10    know how they reach the right -- reach the right conclusion.

11              THE COURT:  So are you proposing add some language

12    that says, "Pattern of conduct means conduct" -- just

13    include (b)(1) verbatim?

14              MR. TAYLOR:  I mean, I think -- I mean, I think

15    that would make sense.  I think it could even be done at the

16    bottom after the elements are laid out:  For purposes of

17    this claim, the term "pattern of conduct" means X.

18              THE COURT:  And so, then, what happens when -- I

19    assume you want this because you're going to try to argue to

20    the jury that it's somehow constitutionally protected

21    activity?

22              MR. TAYLOR:  Well, that's my -- that would be my

23    intention if that's something that a jury can determine.

24              THE COURT:  That's why I ask.  Because then what

25    happens when the jury asks the question what is
```

```
 1    constitutionally protected activity?
 2            MR. TAYLOR:  That's why I initially thought maybe
 3    it's actually just a legal question for the Court.
 4            THE COURT:  Right.  I think it is.  But, I mean --
 5    so I'm raising all this to say, look.  I think your point is
 6    well taken that the jury has no idea what "pattern of
 7    conduct" means, but we have to recognize that, if we go the
 8    route of adding that language to the end of the instruction,
 9    do we then also have to add language that also defines what
10    "credible threat" is, as well, or any other definitions, and
11    then do we run the risk of inviting a question about what is
12    constitutionally protected activity?  Again, I'm throwing
13    this out more for discussion than anything.
14            MR. TAYLOR:  I mean, I don't know the answer to
15    that, Your Honor, and I -- I've actually not come across
16    this exact issue before.  It's a lot easier when it's
17    contract, breach, perform -- damages, you know.  This is a
18    lot more complicated, and I don't know how the Court would
19    normally want to handle a situation where you have a
20    Civil Code section with four, five, six definitions of
21    defined terms that could overwhelm a jury looking at one
22    instruction.
23            But I have to raise the issue because I am
24    thinking about it now that we've had a chance to hear all
25    the evidence, and I am concerned that, reading this
```

 1   instruction, the jury won't be armed with the statutory

 2   definitions that the code includes.

 3          THE COURT:  All right.  Let's hear from the person

 4   who brought the case.

 5          So Mr. Wiener.

 6          MR. TAYLOR:  I do have one other point unrelated

 7   afterwards.  Thank you, Your Honor.

 8          THE COURT:  All right.

 9          MR. WIENER:  Your Honor, we agree to the slight

10   revision to the verdict form and to the correction of the

11   date on the statute of limitations.

12          Closing Instruction Number 14 --

13          THE COURT:  I missed your point there.  The

14   correction of the date?

15          MR. WIENER:  On the statute of limitations from

16   the defense.  I believe it's 35.

17          Closing Instruction Number 14 is taken directly

18   from the statute.  I would submit simply not the duty of the

19   Court to rewrite a jury instruction that's taken directly

20   from the statute.

21          THE COURT:  Where did this instruction come from?

22          MR. WIENER:  This was almost verbatim, the text

23   is -- I believe it is verbatim the text is Civil Code

24   1708.7.

25          THE COURT:  Right.  And so but do you -- if it is,

```
 1    in fact, the text, it doesn't include the definition.  So

 2    it's not the entire text of the statute.

 3            I guess I am confused because I am looking at (1),

 4    (2), (A) and (B) and it goes on, but you stop at where it

 5    says "For purposes of this section," and then it defines

 6    what arguably could be the key terms of the statute.

 7            First, pattern of conduct; second, credible

 8    threat; third, electronic communication device; four,

 9    follows; five, harass; sixth, place under surveillance.  It

10    goes on and on.

11            I mean, on the one hand, you say that you have

12    taken it directly from the statute.  You have taken it

13    verbatim but not from the entirety of the statutory.

14            MR. WIENER:  We picked the elements that need to

15    be proven to the extent there's -- but I would argue that

16    the element of constitutionally protected activity is not

17    part of the statute and is subsumed in subparagraph (3)

18    of the -- subparagraph 3(A) where it talks about a credible

19    threat.  It places the plaintiff in reasonable fear for his

20    safety.  That is the equivalent of the true threat that is

21    not constitutionally protected.

22            THE COURT:  What about pattern of conduct?  How is

23    that defined?  Or how should this jury know what that means?

24            MR. WIENER:  I'm not sure if 1708.7 provides a

25    separate definition, but subsection (1) says, a pattern of
```

```
 1   conduct is conduct whose intent is to follow, alarm, place
 2   under surveillance, or harass the plaintiff.
 3            I'm not sure if that's the -- I don't have the
 4   statute in front of me.  So I'm not able to --
 5            THE COURT:  I think I'm looking at the statute.
 6   It says --
 7                      (Reading:)  Pattern of conduct means
 8                 conduct comprised of a series of acts over a
 9                 period of time, however short, evidencing a
10                 continuity of purpose.  Constitutionally
11                 protected activity is not included within the
12                 meaning of pattern of conduct.
13            Now, we can have a debate on whether the second
14   sentence should come in, but, I guess, don't you think a
15   definition about pattern of conduct should come in; and,
16   secondly, what credible threat means?
17            MR. WIENER:  I would agree with the Court on both
18   those points.  I would object to the constitutionally
19   protected activity as -- it's our position, as a matter of
20   law, that there is no constitutionally protected activity on
21   behalf of the defendants.
22            THE COURT:  Mr. Gebelin, this is a tag-team
23   effort.  So go ahead, jump on in.
24            MR. GEBELIN:  Just briefly, Your Honor.
25            In this instance, I believe part of the difficulty
```

```
 1    is there is not a CACI instruction on point for stalking.
 2                THE COURT:  Right.
 3                MR. GEBELIN:  In fact, there was previously a CACI
 4    instruction on stalking, but there was a revision of the
 5    statute in about 2004 or 2005 that changed the elements
 6    slightly that made it unwieldy to make a jury instruction
 7    workable.
 8                THE COURT:  To your knowledge, if you don't
 9    mind -- and I don't know if you were around in 2004 -- but
10    do you know if the CACI instruction included definitions of
11    terms like "pattern of conduct," "credible threat" --
12                MR. GEBELIN:  Actually, Your Honor, that's exactly
13    where I was going with this.  I was going to say, while it
14    did revise the statute, it did not change the provisions
15    relating to constitutionally protected activity, that
16    revision.
17                The prior CACI instruction did not include a
18    definition of pattern of conduct, and it did not include a
19    reference to constitutionally protected activity.
20                THE COURT:  And do you know whether or not it
21    included a definition for credible threat or -- in other
22    words, all these other terms that are listed in the statute?
23                MR. GEBELIN:  I believe credible threat was part
24    of the revision.  So it didn't -- not that I can tell.
25                THE COURT:  All right.
```

```
 1              MR. GEBELIN:  There was a portion of the prior
 2    instruction that read, "As a result of the conduct,
 3    plaintiff reasonably feared for his or her own safety."
 4              So I think that would have addressed that portion
 5    in the since-revoked CACI instruction.
 6              THE COURT:  Okay.  All right.  Thank you.  I'm
 7    just looking here at all the definitions.
 8              MR. GEBELIN:  Oh, Your Honor?
 9              THE COURT:  Yes.
10              MR. GEBELIN:  I think I misspoke.  There was a
11    definition of pattern of conduct in the prior instruction,
12    and it said, "A pattern of conduct means a series of words
13    or actions over a period of time, however short, that
14    reflects an ongoing purpose."
15              THE COURT:  And that was included in the CACI
16    instruction?
17              MR. GEBELIN:  That was included in the CACI
18    instruction that has been since revoked.
19              THE COURT:  "Credible threat," was that in the
20    prior CACI instruction?
21              MR. GEBELIN:  There is part of the instruction
22    that reads, "That as part of the pattern of conduct,
23    defendant made a believable threat with the intent to place
24    plaintiff in a reasonable fear," but no definition of that
25    phrase.
```

```
 1            THE COURT:  Okay.  And I'm sorry.  I'm just going
 2   to keep asking about these other terms that I think I'm
 3   worried that the jury may come back and say, "What does this
 4   mean?"
 5            "Harass," was that part of it?
 6            MR. GEBELIN:  Yes.  "Harass" was defined.  So
 7   there were two defined terms:  "Harass" and "pattern of
 8   conduct."
 9            "Harass" was defined as --
10                 (Reading:)  Harass means a knowing
11            and willful course of conduct directed at
12            plaintiff that seriously alarms, annoys,
13            torments, or terrorizes him or her and which
14            serves no legitimate purpose.  The course of
15            conduct must be such as would cause a
16            reasonable person to suffer substantial
17            emotional distress and must actually cause
18            substantial emotional distress to plaintiff.
19            THE COURT:  So it seems to me, based on just
20   hearing that -- and I appreciate your insights in that
21   regard -- it would seem to me that we would need to include
22   pattern of conduct, credible threat, and harass in this
23   instruction because those are terms of art, if you will, as
24   it relates to this Civil Code section.
25            I don't think it's unreasonable to assume that a
```

```
 1    juror may ask, "Well, what does pattern of conduct mean?"
 2    "What does it mean to harass?"  "What is a credible threat?"
 3    I mean, that's -- those are fair questions.
 4           So it seems to me that those three definitions
 5    should be included.  And I am saying this, recognizing that
 6    it's difficult for me to imagine a scenario where we would
 7    include the words "constitutionally protected activity is
 8    not included within the meaning of pattern of conduct"
 9    because I think that's a question that's a matter of law.
10           But I will, at least, allow you both to be heard
11    as it relates to that.  But it's -- my strong inclination is
12    to add to this instruction stalking, the definition of the
13    terms "pattern of conduct," "credible threat," and "harass."
14           Mr. Wiener, do you wish to be heard as it relates
15    to -- and I guess -- specifically as it relates to pattern
16    of conduct, I believe your position is that that definition
17    should not include the sentence, "Constitutionally protected
18    activity is not included within the meaning of pattern of
19    conduct"; correct?
20           MR. WIENER:  That's correct, Your Honor.  And just
21    to restate my position, it's our position that it's subsumed
22    within the statement that the credible threat has to place a
23    plaintiff in reasonable fear for their safety.  That, by
24    definition, is not constitutionally protected activity; so
25    that way the Court avoids the issue.
```

```
 1              THE COURT:  I tend to agree with you, but I will

 2   allow Mr. Taylor to be heard as to the proposal that I put

 3   out.

 4              MR. TAYLOR:  I'm fine with that proposal,

 5   Your Honor, but I have to apologize.  I didn't hear the last

 6   thing Mr. Wiener said or the whole thing.  I didn't catch

 7   it.

 8              THE COURT:  His position is that, when you look

 9   at, for example, Jury Instruction Number 14, lines 22

10   through 24, he believes that that verbiage, made a credible

11   threat with either the intent to place the plaintiff in

12   reasonable fear for his safety, you can't do that -- if you

13   do that, it's not constitutionally protected.

14              So if the jurors believe that the plaintiff made

15   a -- defendant made a credible threat with the intent to

16   place the plaintiff in reasonable fear of his or her safety,

17   it's no longer constitutionally protected.

18              So -- and his argument is, therefore, you don't

19   need the end of the phrase, "Pattern of conduct" because, if

20   the juror is going to believe that, then we don't need to

21   confuse this further by including language of

22   "constitutionally protected activity" when the plaintiff

23   needs to prove that the threat was made with the intent to

24   place the plaintiff in reasonable fear of his or her safety.

25              MR. TAYLOR:  I understand the argument, and we've
```

```
 1    made our motion under 50(a) on that basis.  We've reserved
 2    that argument.  We can make that motion later again.
 3            So I am comfortable with that instruction as the
 4    Court's proposed to amend it with the understanding that
 5    it's going to be reserved as a question of law if need be.
 6            THE COURT:  And your objection is noted and
 7    preserved.  So I'm going to include this Instruction 14 --
 8    I'm going to add verbiage along the lines of, for purposes
 9    of this instruction, pattern of conduct means X, credible
10    threat means X, and harass means X, and leave it at that.
11            Mr. Taylor, you had some other objection.
12            MR. TAYLOR:  I do have one point, Your Honor, with
13    respect to the questions on page 5 of the special verdict
14    form relating to the claim for relief for stalking.
15            THE COURT:  Question 5.  All right.
16            MR. TAYLOR:  As we get to the bottom of the page
17    starting at Question 9, there are questions that relate to,
18    obviously, punitive damages, malice, oppression, or fraud.
19    And as I read that, I was thinking that there might be a
20    need for some instruction on what those terms mean.
21            Maybe I missed it, but I am thinking that those
22    won't be easily understood.  I'm an attorney.  I don't fully
23    always think I understand --
24            THE COURT:  You're right, and I think that was my
25    mistake.  I think I originally had them in this instruction,
```

 1    and I had them pulled thinking that that would apply in the

 2    punitive damages phase; but hearing your comments, I think

 3    we need to put those back.  So they at least -- what the

 4    definition is for those.

 5           I will look at those instructions again, and it's

 6    just, when you look at those punitive damages instructions,

 7    it suggests that the phase has already occurred.

 8           MR. TAYLOR:  I know.

 9           THE COURT:  That makes me think should the -- I

10    mean, I've done it in the past where we asked them the

11    question at the front end so that we know whether or not

12    there is a punitive damages phase, but let me look at the

13    instruction, and then I will bring back another packet with

14    a proposal as it relates to that.

15           MR. TAYLOR:  Okay.  I think that's all for us,

16    Your Honor.  Thank you.

17           THE COURT:  Okay.  So here is the question I have

18    for you all.  This is what I'm inclined to do -- to try to

19    get this done and then give the jurors the bad news that

20    they're going to have to come back tomorrow.  And we can

21    either instruct this evening and argue tomorrow or we can

22    start at 9:00 with instructions and closing.

23           Do either side have a preference?  And some of it

24    may be dictated by how long it takes for me to get these

25    instructions, but I don't know if either side has a

```
 1   preference.
 2              Since you are at the lectern, Mr. Taylor, I will
 3   ask you first.
 4              MR. TAYLOR:  I don't know how long it would take
 5   the Court to read these 50 pages of instructions but --
 6              THE COURT:  Probably going to be about 45 minutes.
 7              MR. TAYLOR:  -- but I would say that we have no
 8   problem with having the Court do it today if we can fit it
 9   in.
10              THE COURT:  Mr. Wiener?
11              MR. WIENER:  Yes, Your Honor, I prefer to use
12   our -- as much time as we can today.
13              THE COURT:  All right.  So then let me work on
14   these instructions, and we'll bring them back out, and let's
15   see if we can get that finalized, hopefully, by 4:00 so I
16   can read the instructions and have them come back tomorrow
17   morning for closing argument.  All right?  Thank you.
18              THE CLERK:  All rise.  This Court is in recess.
19         (Recess taken 3:34 to 4:10 PM)
20              THE COURT:  All right.  Counsel, I understand
21   there is an issue with Jury Instruction 16.
22              MR. GEBELIN:  Yes, Your Honor.
23              THE COURT:  Go ahead.
24              MR. GEBELIN:  Just briefly.  Because we're
25   bifurcating the punitive damage calculation from the rest of
```

```
 1    the trial, I think we're in agreement that, starting from
 2    line 20 on page 21 through the end should be omitted because
 3    it refers to setting the amount of punitive damages.
 4              THE COURT:  So you want that part stricken?
 5              MR. WIENER:  Yes.
 6              THE COURT:  Okay.  Now, again, just so we're
 7    clear, this was the instruction you all both submitted.  So
 8    that's the reason why I put it in this way.  But you're both
 9    requesting that lines 20 on page 21 through line 4 through
10    page 24 stricken.  Is that correct?
11              MR. GEBELIN:  Yes, Your Honor.
12              THE COURT:  Is that correct, Mr. Taylor?
13              MR. TAYLOR:  Yes, Your Honor.  That's correct.
14              THE COURT:  All right.  So we're going to make
15    that change, and then I'm going to make copies for the
16    jurors, and then I'm going to bring the jury in, and we're
17    going to -- I will give them the bad new that we're going to
18    instruct, and then we'll come back tomorrow for closing
19    argument.  All right?  So, hopefully, this won't take more
20    than 15 minutes or so to make the copies.  All right?
21              Anything further, Mr. Gebelin?
22              MR. GEBELIN:  No, Your Honor.
23              THE COURT:  Mr. Taylor?
24              MR. TAYLOR:  No.
25              THE COURT:  All right.  Thank you.
```

```
 1              THE CLERK:  All rise.  This Court is in recess.

 2         (Recess taken 4:11 PM to 4:43 PM)

 3         (The following was heard in open court in the presence

 4          of the jury:)

 5              THE COURT:  All right, ladies and gentlemen, again

 6    I apologize for the delays.  But as I said to you in the

 7    beginning of the trial, while you are back there, we are

 8    working.  And so what we are going to do this evening is you

 9    have a copy of the jury instructions.  I am going to read

10    the jury instructions to you.

11              Unfortunately, we did not meet our deadline.  So

12    you are going to have to come back tomorrow morning, but I

13    want us to have these instructions done so that tomorrow

14    morning you would hear closing arguments, and then you could

15    begin your deliberation.

16              So we anticipate, if you're here at 9:00 o'clock

17    tomorrow, you should begin deliberating the case by no later

18    than 10:15, 10:30, after the lawyers get a chance to argue.

19    So with that, let me begin with the closing instructions.

20    You all have copies with you.  Okay.  All right.

21              So these instructions are going to serve as a

22    guide for your consideration of the evidence in this case.

23              Now that you have heard all of the evidence, it is

24    my duty to instruct you on the law that applies to this

25    case.  A copy of these instructions will be sent to the jury
```

```
 1    room for you to consult during your deliberations.
 2              It is your duty to find the facts from all the
 3    evidence in the case.  To those facts, you will apply the
 4    law as I give it to you.  You must follow the law as I give
 5    it to you whether you agree with it or not and you must not
 6    be influenced by any personal likes or dislikes, opinions,
 7    prejudice or sympathy.  That means you must decide the case
 8    solely on the evidence before you.  You will recall that you
 9    took an oath to do so.
10              Please do not read into these instructions
11    anything that I may say or do or have said or done that I
12    have an opinion regarding the evidence or what your verdict
13    should be.
14              To help you follow the evidence, I will give you a
15    brief summary of the position of the parties.  Plaintiff
16    Thunder Studios, Inc. asserts a claim for copyright
17    infringement.  Plaintiff Rodric David asserts a claim for
18    stalking.  Plaintiffs have the burden of proving these
19    claims.  Defendants deny these claims.
20              When a party has a burden of proving any claim or
21    affirmative defense by a preponderance of the evidence, it
22    means you must be persuaded by the evidence that a claim or
23    affirmative defense is more probably true than not true.
24              You should base your decision on all of the
25    evidence regardless of which party presented it.
```

 1              You should decide the case as to each party

 2     separately.  Unless otherwise stated the instructions apply

 3     to all parties.

 4              The evidence you are to consider in deciding what

 5     the facts are consist of:

 6              1.   The sworn testimony of any witness;

 7              2.   The exhibits which are received into

 8     evidence;

 9              3.   Any facts to which the lawyers have agreed;

10     and;

11              4.   Any facts that I have instructed you to accept

12     as proved.

13              In reaching your verdict, you may consider only

14     the testimony and exhibits received into evidence.  Certain

15     things are not evidence, and you may not consider them in

16     deciding what the facts are.  I will list them for you.

17              1.   Arguments and statements by lawyers are not

18     evidence.  The lawyers are not witnesses.  What they have

19     said in their opening statements, closing arguments and at

20     other times is intended to help you interpret the evidence,

21     but it is not evidence.  If the facts as you remember them

22     differ from the way the lawyers have stated them, your

23     memory of them controls.

24              2.   Questions and objections by lawyers are not

25     evidence.  Attorneys have a duty to their clients to object

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    when they believe a question is improper or under the rules

2    of evidence.  You should not be influenced by the objection

3    or by the Court's ruling on it.

4              3. testimony that is excluded or stricken or that

5    you have been instructed to disregard is not evidence and

6    must not be considered.  In addition, some evidence may have

7    been received only for a limited purpose.  When I instruct

8    you to consider certain evidence only for a limited purpose,

9    you must do so and you may not consider that evidence for

10   any other purpose.

11             4.  Anything you have seen or heard when the Court

12   is not in session is not evidence.  You are to decide the

13   case solely on the evidence received at the trial.

14             Evidence may be direct or circumstantial.  Direct

15   evidence is direct proof of a fact such as testimony by a

16   witness about what that witness personally saw or heard or

17   did.  Circumstantial evidence is proof of one or more facts

18   from which you could find another fact.  You should consider

19   both kinds of evidence.  The law makes no distinction

20   between the weight to be given to either direct or

21   circumstantial evidence.  It is for you to decide how much

22   weight to give any evidence.

23             There are rules of evidence that control what can

24   be received into evidence.  When a lawyer asks a question or

25   offers an exhibit into evidence and a lawyer on the other

1   side thinks that it is not permitted by the rules of

2   evidence, that lawyer may object.  If I overruled the

3   objection, the question was answered or the exhibit

4   received.  If I sustained the objection, the question was

5   not answered, and the exhibit cannot be received.  Whenever

6   I sustained an objection to a question, you were to ignore

7   the question and must not guess what the answer might have

8   been.

9            Sometimes I ordered that the evidence be stricken

10  from the record and that you disregard or ignore the

11  evidence.  That means, when you are deciding the case, you

12  must not consider the stricken evidence for any purpose.

13           From time to time during the trial it became

14  necessary for me to talk to the attorneys out of the hearing

15  of the jury either by having a conference at the bench when

16  the jury was present or by calling a recess.  Please

17  understand that, while you were waiting, we were working.

18  The purpose of these conferences is not to keep relevant

19  information from you but to decide how certain evidence is

20  to be treated under the rules of evidence and to avoid

21  confusions and error.

22           Of course, we've done what we could to keep the

23  number and the length of these conferences to a minimum.  I

24  did not always grant an attorney's request for a conference

25  but do not consider my granting or denying a request for a

conference as any indication of my opinion of the case or what your verdict should be.

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account.

1.  The opportunity or the ability of a witness to see or know the things testified to;

2.  The witness's memory;

3.  The witness's manner while testifying;

4.  The witness's interest in the outcome of the case, if any;

5.  The witness's bias or prejudice, if any;

6.  Whether other evidence contradicted the witness's testimony;

7.  The reasonableness of the witness's testimony in light of all the evidence and;

8.  Any other factors that bear on believability.

Sometimes a witness my say something that is inconsistent with something else he or she says.  Sometimes different witnesses will give different answers of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event

```
 1   but remember it differently.  You may consider these
 2   differences but do not decide the testimony is untrue just
 3   because it differs from other testimony.
 4          However, if you decide that a witness has
 5   deliberately testified untruthfully about something
 6   important, you may choose not to believe anything that
 7   witness says.  On the other hand, if you think the witness
 8   testified truthfully about some things but told the truth
 9   about others, you may accept the part that you think is true
10   and ignore the rest.
11          The weight of the evidence as to a fact does not
12   necessarily depend on the number of witnesses who testify.
13   What is important is how believable the witnesses were and
14   how much weight you think their testimony deserves.
15          A deposition is the sworn testimony of a witness
16   taken before trial.  The witness is placed under oath to
17   tell the truth and lawyers for each party may ask questions.
18   The questions and answers are reported.
19          Insofar as possible, you should consider
20   deposition testimony presented to you in court in lieu of
21   live testimony in the same way as if the witness had been
22   present to testify.
23          Evidence was presented to you in terms of answers
24   of one of the parties to written interrogatories submitted
25   by the other side.  These answers were given in writing and
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

1    under oath before the trial in response to questions that

2    were submitted under established court procedures.  You

3    should consider the answers insofar as possible in the same

4    way as if they were made from the witness stand.

5          The exhibits received into evidence that are

6    capable of being displayed electronically will be provided

7    to you in that form, and you will be able to view them in

8    the jury room.  A computer, projector, printer, and

9    accessory equipment will be available to you in the jury

10   room.

11         A Court technician will show you how to operate

12   the computer and other equipment, how to located and view

13   exhibits on the computer, and how to print the exhibits.

14   You will also be provided with a paper list of all exhibits

15   received in evidence.  You may request a paper copy of any

16   exhibit received in evidence by sending a note through the

17   clerk.  If you need additional equipment or supplies or if

18   you have questions about how to operate the computer or

19   equipment, you may send a note to the clerk, signed by your

20   foreperson or by one or more members of the jury.  Do not

21   refer to or discuss any exhibit you were attempting to view.

22         If a technical problem or question requires

23   hands-on maintenance or instruction, a court technician may

24   enter the jury room with the bailiff present for the sole

25   purpose of assuring that the only matter that is discussed

1    is the technical problem.  When the court technician or any

2    nonjuror is in the room, the jury shall not deliberate.  No

3    juror may say anything to the court technician or any

4    nonjuror other than to describe the technical problem or to

5    seek information about operation of the equipment.  Do not

6    discuss any exhibit or any aspect of the case.  The sole

7    purpose of providing the computer in the jury room is to

8    enable jurors to view the exhibits received in evidence in

9    this case.  You may not use the computer for any other

10   purpose.  At my direction technicians have taken steps to

11   ensure that the computer does not permit access to the

12   Internet or to any outside Website, database, directory,

13   game, or other material.  Do not attempt to alter the

14   computer to obtain access to such materials.  If you

15   discover that the computer provides or allows access to such

16   materials, you must inform the Court immediately and refrain

17   from viewing such materials.  Do not remove the computer or

18   any electronic data from the jury room and do not photocopy

19   any such data.

20          Defendants are liable for the tort of stalking

21   when plaintiff Rodric David proves all of the following

22   elements of the tort:

23          (1)  The defendant engaged in a pattern of

24   conduct, the intent of which was to follow, alarm, place

25   under surveillance, or harass the plaintiff.  In order to

1    establish this element, the plaintiff shall be required to

2    support his or her allegations with independent

3    corroborating evidence.

4              (2)  As a result of that pattern or conduct,

5    either the following occurred:

6                   (A), the plaintiff reasonably feared for his

7    or her safety or the safety of an immediate family member.

8    For purposes of this subparagraph, immediate family means a

9    spouse, parent, child, any person related by consanguinity

10   or affinity within the second degree, or any person who

11   regularly resides or, within the six months preceding any

12   portion of the pattern of conduct, regularly resided in the

13   plaintiffs' household.

14                  (B)  Plaintiff suffered substantial emotional

15   distress and the pattern of conduct would cause an emotional

16   person substantial emotional distress.

17             (3)  One of the following:

18                  (A)  The defendant, as part of the pattern of

19   conduct specified in paragraph 1 made a credible threat with

20   either (i) the intent to place the plaintiff in reasonable

21   fear for his or her safety or the safety of an immediate

22   family member or (ii) reckless disregard for the safety of

23   the plaintiff or that of an immediate family member.  In

24   addition the plaintiff must have on at least one occasion

25   clearly and definitively demanded that the defendant cease

1   and abate his or her pattern of conduct and the defendant

2   persisted in his or her pattern of conduct unless exigent

3   circumstances made the plaintiffs' communication of the

4   demand practical or unsafe.

5           (B)   The defendant violated a restraining order

6   including, but not limited to, any order issued pursuant to

7   Section 527.6 of the Code of Civil Procedure prohibiting any

8   act described in Subdivision (a).

9           For the purposes of this instruction:

10          (1)   "Pattern of conduct" means conduct composed

11  of a series of acts over a period of time, however short,

12  evidencing continuity of purpose.

13          (2)   "Credible threat" means a verbal or written

14  threat, including that communicated by means of an

15  electronic communication device or a threat implied by a

16  pattern of conduct, including, but not limited to, acts in

17  which a defendant directly, indirectly, or through third

18  parties by any action, method, device, or means follows,

19  harasses, monitors, surveils, threatens, or interferes with,

20  or damages the plaintiffs' property or a combination of

21  verbal, written or electronically communicated statements

22  and conduct made with the intent and apparent ability to

23  carry out the threat so as to cause the person who is the

24  target of the threat to reasonably fear for her safety, for

25  the safety of his or her immediate family.

1          (3)  "Harass" means a knowing and willful course

2     of conduct directed at a specific person which seriously

3     alarms, annoys, torments, or terrorizes the person and which

4     serves no legitimate purpose.  The course of conduct must be

5     such as would cause a reasonable person to suffer

6     substantial emotional distress and must actually cause

7     substantial emotional distress to the person.

8          It is the duty of the Court to instruct you about

9     the measure of damages.  By instructing you on damages, the

10    Court does not mean to suggest for which party your verdict

11    should be rendered.

12         If you find for plaintiff Rodric David on his

13    stalking claim, you must determine the plaintiffs' damages.

14    The plaintiff has the burden of proving damages by a

15    preponderance of the evidence.  Damages means the amount of

16    money that will reasonably and fairly compensate the

17    plaintiff for any injury you find was caused by the

18    defendant.  You should consider the following:

19         The nature and extent of injuries;

20         The loss of enjoyment of life experience and that

21    with reasonable probability will be experienced in the

22    future;

23         The mental and emotional pain and suffering

24    experienced and that with reasonable probability will be

25    experienced in the future;

1          It is for you to determine what damages, if any,

2    have been proved.

3          Your award must be based upon the evidence and not

4    upon speculation, guesswork, or conjecture.

5          If you find for either the plaintiffs, you may but

6    are not required to award punitive damages.

7          The purposes of punitive damages are to punish a

8    defendant and to deter similar acts in the future.  Punitive

9    damages may not be awarded to compensate the plaintiff.

10         Plaintiffs have the burden of proving by a

11   preponderance of the evidence that punitive damages should

12   be awarded and, if so, the amount of any such damages.

13         You may award punitive damages only if you find

14   that the defendants' conduct that harmed the plaintiff was

15   malicious, oppressive, or in reckless disregard of the

16   plaintiffs' rights.  Conduct is malicious if it is

17   accompanied by ill will or spite or if it is for the purpose

18   of injuring the plaintiff.  Conduct is in reckless disregard

19   of the plaintiffs' rights if under the circumstances it

20   reflects complete indifference to the plaintiffs' safety or

21   rights or if the defendant acts in the face of a perceived

22   risk that its action will violate the plaintiffs' rights

23   under federal law.  An act or omission is oppressive if the

24   defendant injures or damages or otherwise violates the

25   rights of the plaintiff with unnecessary harshness or

```
 1    severity such as by misusing or abusing authority or power

 2    or by taking advantage of some weakness or disability or

 3    misfortune of the plaintiff.

 4            The plaintiff Thunder Studios claims ownership or

 5    copyrights and seeks damages against defendants for

 6    copyright infringement.  The defendants deny infringing

 7    copyrights.  To help you understand the evidence in this

 8    case, I will explain some of the legal terms you will have

 9    heard throughout the trial.  The owner of a copyright has

10    the right to exclude any other person from reproducing,

11    distributing, performing, displaying, or preparing

12    derivative works from the work covered by the copyright for

13    a specific period of time.  The copyrighted work can be a

14    literary work, musical work, dramatic work, pantomime,

15    choreographic work, pictorial work, graphic work, sculptural

16    work, motion picture, audio-visual work, sound recording,

17    architectural work, or computer program.  Facts, ideas,

18    procedures, processes, systems, methods of operation,

19    concepts, principles, or discoveries cannot themselves be

20    copyrighted.  The copyrighted work must be original.  And

21    original work that closely resembles other works can be

22    copyrighted so long as the similarity between the two works

23    is not the result of copying.  Copyright automatically

24    attaches to a work the moment the work is fixed in any

25    tangible medium or expression.  The owner of the copyright
```

```
 1    may register the copyright by completing a registration form

 2    and depositing a copy of the copyrighted work with the

 3    Copyright Office.  After determining that the material

 4    deposited constitutes copyrightable subject matter and that

 5    certain legal and formal requirements are satisfied, the

 6    register of copyrights registers the work and issues a

 7    certificate of registration to the copyright owner.

 8             In this case, plaintiff, Thunder Studios, Inc.,

 9    contends that defendants have infringed the plaintiffs'

10    copyrights.  The plaintiffs have the burden of proving by a

11    preponderance of the evidence that the plaintiffs are the

12    owner of the copyright and that the defendant copied

13    original expression from the copyrighted work.

14    Preponderance of the evidence means that you must be

15    persuaded by the evidence that it is more probably true than

16    not true that the copyrighted work was infringed.  The

17    plaintiff must also prove that the defendants' use of the

18    copyrighted work was substantial.  In determining whether

19    the defendants' use of the copyrighted work was substantial,

20    you may consider how important the copied portion was to the

21    copyrighted work as a whole.  To prove that the defendants

22    copied the plaintiffs' work, the plaintiff may show that the

23    defendant had access to the plaintiffs' copyrighted work and

24    that there are substantial similarities between the

25    defendants' work and the plaintiffs' copyrighted work.
```

1            One who reproduces, publicly distributes, publicly

2    displays and/or prepares derivative works from a copyrighted

3    work without authority from the owner during the term of the

4    copyright infringes the copyright.  Copyright may also be

5    infringed by contributorily or vicariously infringing.  A

6    person is liable for copyright infringement by another if

7    the person knows or should have known of the infringing

8    activity and induces or materiality contributes to the

9    activity.

10           A person is liable for copyright infringement by

11   another if the person has profited directly from the

12   infringing activity and had the right and ability to

13   supervise or control the infringing activity whether or not

14   the person knew of the infringing.

15           Copyright is the exclusive right to copy.  The

16   right to copy includes the exclusive rights to (1) reproduce

17   the copyrighted works in copies; (2) recast, transform, or

18   adapt the work that is prepared, derivative works, based on

19   the copyrighted work and/or (3), display publicly a

20   copyrighted work.

21           The photographs involved in this trial are known

22   as pictorial work.  Copyright law allows the author of an

23   original work to stop others from copying the original

24   expression in the author's work.  Only the particular

25   expression of an idea can be copyrighted and protected.

1    Copyright law does not give the author the right to prevent

2    others from copying or using the underlying ideas contained

3    in the work, such as any procedures, processes, system,

4    methods of operation, concept, principles, or discoveries.

5            Anyone who copies original expression from a

6    copyrighted work during the term of the copyright without

7    the owner's permission infringes the copyright.  On the

8    plaintiffs' copyright infringement claim, the plaintiff has

9    the burden of proving by a preponderance of the evidence

10   that (1), the plaintiff is the owner of a valid copyright

11   and (2), the defendant copied original expression from the

12   copyrighted work.

13           If you find that the plaintiff has proved both of

14   these elements, your verdict should be for the plaintiff.

15   If, on the other hand, you find that the plaintiff has

16   failed to prove either of these elements, your verdict

17   should be for the defendant.  The plaintiff is the owner of

18   a valid copyright in the photographs -- I'm sorry -- the

19   plaintiff is the owner of a valid copyright in the

20   photographs if the plaintiff proves by a preponderance of

21   the evidence that (1) the plaintiffs' work is original and

22   (2) the plaintiff is the author or creator of the work.  A

23   copyright owner may obtain a certificate of registration

24   from the Copyright Office.  The evidence in this case

25   includes Exhibits 23 and 24, which are certificates of

1    copyright registration from the Copyright Office.  You are

2    instructed that the certificates are sufficient to establish

3    that there is a valid copyright in the photographs in

4    question.  A copyright owner is entitled to exclude others

5    from copying a work made for hire.  A work made for hire is

6    one that is prepared by an employee and is within the scope

7    of employment.  A work is made for hire within the scope of

8    employment if (1) it is the kind of work the employee is

9    employed to create; (2) it occurs substantially within the

10   authorized time and space limits; and (3) it is made at

11   least in part for the purpose of serving the employer.  The

12   employer is considered to be the author of the work and owns

13   the copyright.  A copyright owner of a work made for hire

14   may enforce the right to exclude others in an action for

15   copyright infringement.  Instruction 21 states that the

16   plaintiff has the burden of proving that the defendant

17   copied original elements from the plaintiffs' copyrighted

18   work.  The plaintiff may show the defendants copied from the

19   work by proving by a preponderance of the evidence that the

20   defendant had access to the plaintiffs' copyrighted work and

21   that there are substantial similarities between the

22   defendants' work and the original elements of the

23   plaintiffs' work.  As part of its burden in

24   Instruction Number 21, the plaintiff must prove by a

25   preponderance of the evidence that the defendants had access

```
 1   to the plaintiffs' work.  You may find that the defendants
 2   had access to the plaintiffs' work if the defendants had a
 3   reasonable opportunity to view the plaintiffs' work before
 4   the defendants' work was created.  A plaintiff must prove
 5   that its work and the defendants' work are substantially
 6   similar.  Substantial similarity exists when there is a
 7   material -- or material overlap between the works' creative
 8   expressions.  If you find that one or more of the defendants
 9   infringed the plaintiffs' copyright in the photographs, you
10   must determine whether the other defendants vicariously
11   infringed that copyright.  The plaintiff has the burden of
12   proving each of the following elements by a preponderance of
13   the evidence:
14            (1)  The defendants -- I'm sorry -- the other
15   defendants directly benefited financially from the
16   infringing activity of the direct infringer;
17            (2)  The other defendants had the right and
18   ability to supervise and control the infringing activity of
19   the direct infringer and;
20            (3)  The other defendants failed to exercise that
21   right and ability.
22            If you find that the plaintiff has proved each of
23   these elements, your verdict should be for the plaintiff if
24   you also find the direct infringer infringed plaintiffs'
25   copyright.  If, on the other hand, the plaintiff has failed
```

```
 1   to prove any of these elements, your verdict should be for

 2   the other defendants.

 3          A defendant may be liable for copyright

 4   infringement engaged in by another if he knew or had reason

 5   to know of the infringing activity and intentionally induced

 6   or materially contributed to that infringing activity.  If

 7   you find that any of the defendants infringed the

 8   plaintiffs' copyright in the photographs, you must determine

 9   whether the other defendants contributorily infringed that

10   copyright.

11          The plaintiff has the burden of proving each of

12   the following elements by a preponderance of the evidence:

13          (1)  The defendant knew or had reason to know of

14   the infringing activity of the direct infringer and;

15          (2)  The defendant intentionally induced or

16   materially contributed to direct infringer's infringing

17   activity.

18          If you find that direct infringer infringed

19   plaintiffs' copyright and you also find that the plaintiff

20   has proved both of these elements, your verdict should be

21   for the plaintiff.  If, on the other hand, the plaintiff has

22   failed to prove either or both of these elements, your

23   verdict should be for the defendant.  One who is not the

24   owner of the copyright may use the copyrighted work in a

25   reasonable way under the circumstances without the consent
```

```
 1   of the copyright owner if it would advance the public
 2   interest.  Such use of a copyright use is called fair use.
 3   The owner of the copyright cannot prevent others from making
 4   a fair use of the owner's copyrighted work.  Defendant
 5   contends that the defendant made fair use of the copyrighted
 6   work for the purpose protest.  The defendant has the burden
 7   of proving this defense by a preponderance of the evidence.
 8   In determining whether the use was made of the work was
 9   fair, you should consider the following factors:
10            (1)  The purpose and character of the use,
11   including whether the use is of commercial nature or is for
12   nonprofit educational purposes;
13            (2)  The nature of the copyrighted work;
14            (3)  The amount and substantiality of the portion
15   used in relation to the copyrighted work as a whole, and;
16            (4)  The effect of the use upon the potential
17   market for or value of the copyrighted work.
18            If you find that the defendant has proved by a
19   preponderance of the evidence that defendant made a fair use
20   of the plaintiffs' work, your verdicts should be for the
21   defendant.  If you find for the plaintiffs' copyright
22   infringement claim, you must determine the plaintiffs'
23   damages.  The plaintiff is entitled to recover the actual
24   damages suffered as a result of the infringement.
25            In addition the plaintiff is also entitled to
```

```
 1    recover any profits of the defendant attributable to the
 2    infringer.  The plaintiff must prove damages by a
 3    preponderance of the evidence.  The copyright owner is
 4    entitled to recover actual damages suffered as a result of
 5    the infringement.  Actual damages means the amount of money
 6    adequate to compensate the copyright owner for the reduction
 7    of the fair market value of the copyrighted work caused by
 8    the infringer.  The reduction of the fair market value of
 9    the copyrighted work is the amount a willing buyer would
10    have reasonably required to pay a willing seller at the time
11    of the infringement for the actual use made by the defendant
12    of the plaintiffs' work.  That amount also could be
13    represented by the lost license fees the plaintiff would
14    have received for the defendants' unauthorized use of the
15    plaintiffs' work.  If you find for the plaintiff on
16    plaintiffs' copyright claim, you must determine the
17    plaintiff's damages.  The plaintiff may seek and the jury
18    may award statutory damages instead of actual damages and
19    profits.  The plaintiff here seeks a statutory damage award
20    established by Congress for each work infringed.  Its
21    purpose is not only to compensate the plaintiff for its
22    losses, which may be hard to prove, but also to penalize the
23    infringer and deter future violations of the copyright laws.
24    The amount you may award as statutory damages is not less
25    than $750 nor more than $30,000 for each work you conclude
```

```
1   was infringed; however, if you find the infringement was
2   innocent, you may award as little as $200 for each work
3   innocently infringed.  However, if you find the infringement
4   was willful, you may award as much as $150,000 for each work
5   wilfully infringed.
6          Instruction Numbers 34 and 35 will tell you what
7   constitutes innocent infringement and what constitutes
8   willful infringement.  An infringement is considered
9   innocent when the defendant has proved both of the following
10  elements by a preponderance of the evidence:
11         The defendant was not aware that his acts
12  constitutes infringement of the copyright, and the
13  defendants had no reason to believe that his acts constitute
14  infringement of the copyright.
15         An infringement is considered willful when the
16  plaintiff has proved both of the following elements by a
17  preponderance of the evidence:
18         The defendant engaged in acts that infringed the
19  copyright and;
20         2.  The defendant new that those acts infringed
21  the copyright or the defendant acted with reckless disregard
22  for, or willful blindness to, the copyright holder's right.
23         Defendant asserts a defense that the statute of
24  limitations prohibits plaintiff Thunder Studios's copyright
25  claims.  Statutes of limitations are laws that prevent the
```

1    plaintiff from recovering damages based on conduct that the

2    plaintiff knew about or should have known about by failing

3    to bring suit within a prescribed period of time.

4            The time period within which a suit must be

5    brought begins when Thunder Studios first knew or should

6    have known that defendants were using its copyrighted

7    photographs on kazalfamilystory.com.  The applicable statute

8    of limitations is three years.  Statute of limitations does

9    not prohibit recovery of damages that were incurred more

10   than three years prior to the filing of the suit if the

11   copyright plaintiff was aware of the infringement and that

12   lack of knowledge was reasonable under the circumstances.

13           Plaintiff Thunder Studios brought this suit on

14   February 2nd, 2017.  Defendants claim that plaintiffs' claim

15   based on publication of certain photographs on

16   kazalfamilystory.com are barred here because Thunder Studios

17   knew or should have known by February 2nd, 2014, that the

18   photographs appeared on that Website.  Defendants have the

19   burden of proving the statute of limitation defense.  In

20   other words, the defendants must prove by a preponderance of

21   the evidence that the plaintiff Thunder Studios knew or

22   should have known of the alleged infringement prior to

23   February 2nd, 2014.

24           Before you begin your deliberations, elect one

25   member of the jury as your presiding juror.  The presiding

1  juror will preside over the deliberations and serve as your

2  spokesperson for the jury in court.  You shall diligently

3  strive to reach agreement with all of the other jurors if

4  you can do so.  Your verdict must be unanimous.

5          Each of you must decide the case for yourself, but

6  you should do so only after you have considered all of the

7  evidence, discussed it fully with the other jurors, and

8  listened to their views.  It is important that you attempt

9  to reach a unanimous verdict but, of course, only if each of

10  you can do so after having made your own conscientious

11  decision.  Do not be unwilling to change your opinion if the

12  decision persuades you -- I should say -- if the evidence

13  persuades you that you should.  But do not come to a

14  decision simply because other jurors think it is right or

15  change an honest belief about the weight and effect of the

16  evidence simply to reach a verdict.  Because you must base

17  your verdict only on the evidence received in this case and

18  the instructions, I remind you that you must not be exposed

19  to any other information about the case or to the issues it

20  involves.  Except for discussing the case with your fellow

21  jurors during your deliberations, do not communicate with

22  anyone in any way and do not let anyone else communicate

23  with you in any way about the merits of the case or anything

24  to do with it.  This includes discussing the case in person,

25  in writing, by phone or electronic means, via e-mail, via

```
 1    text messaging, or any Internet chat room, blog, Website or
 2    application, including, but not limited to, Facebook,
 3    YouTube, Twitter, Instagram, LinkedIn, Snapchat, or any
 4    other forms of social media.  This applies to communicating
 5    with your family members, your employer, the media or press,
 6    and the people involved in the trial.  If you are asked or
 7    approached in any way about your jury service or anything to
 8    do with it, you must respond that you have been ordered not
 9    to discuss the matter and to report the contact to the
10    Court.  Do not read, watch, or listen to any news or media
11    accounts or commentary about the case or anything to do with
12    it.  Do not do any research such as consulting dictionaries,
13    searching the Internet or using other reference materials
14    and do not make any investigation or in any other way try to
15    learn about the case on your own.  Do not visit or view any
16    place discussed in this case and do not use Internet
17    programs or other devices to search for or view any place
18    discussed during the trial.  Also, do not do any research
19    about the case, the law, the people involved, including the
20    parties, the witnesses, or the lawyers until you have been
21    excused as jurors.  If you happen to read or hear anything
22    touching on this case in the media, turn away and report it
23    to me as soon as possible.  These rules protect each party's
24    right to have this case decided only on evidence that has
25    been presented here in court.  Witnesses here in court take
```

1    an oath to tell the truth, and the accuracy of their

2    testimony is tested through the trial process.  If you do

3    any research or investigation outside the courtroom or gain

4    any information through improper communication, then your

5    verdict may be influenced by inaccurate, incomplete, or

6    misleading information that has not been tested by the trial

7    process.

8         Each of the parties is entitled to a fair trial by

9    an impartial jury, and if you decide the case based on

10   information not presented in court, you will have denied the

11   parties a fair trial.  Remember, you have taken an oath to

12   follow the rules, and it is very important that you follow

13   these rules.

14        A juror who violates these restrictions

15   jeopardizes the fairness of these proceedings, and a

16   mistrial could result that would require the entire trial

17   process to start over.  If any juror is exposed to any

18   outside information, please notify the Court immediately.

19        If it becomes necessary during your deliberations

20   to communicate with me, you may send a note through the

21   clerk signed by any one or more of you.  No member of the

22   jury should ever attempt to communicate with me except by a

23   signed writing.  I will not communicate with any member of

24   the jury on anything concerning the case except in writing

25   or here in open court.

1        If you send out a question, I will consult with

2   the lawyers before answering it, which may take some time.

3   You may continue your deliberations while waiting for the

4   answer to any question.  Remember, you are not to tell

5   anyone, including the Court, how the jury stands, whether in

6   terms of vote count or otherwise, until after you have

7   reached a unanimous verdict or have been discharged.  I will

8   now say a few words about your conduct as jurors.

9        First, keep an open mind throughout the trial and

10  do not decide what your verdict should be until you and your

11  fellow jurors have completed your deliberations at the end

12  of the case.  Second, because you must decide the case based

13  only on the evidence received in the case and on my

14  instructions as to the law that applies, you must not be

15  exposed to any other information about the case or to the

16  issues it involves during the course of your jury duty.

17  Thus, until the end of the case or unless I tell you

18  otherwise, do not communicate with anyone in any way and do

19  not let anyone else communicate with you in any way about

20  the merits of the case or anything to do with it.  This

21  includes discussing the case in person, in writing, by phone

22  or electronic means, via e-mail, text messaging, or Internet

23  chat room, blog or including, but not limited to, Facebook,

24  YouTube, Twitter, Instagram, LinkedIn, Snapchat, or any

25  other form of social media.  This applies to communicating

```
 1   with your fellow jurors until I give you the case for
 2   deliberation, and it applies to communicating with everyone
 3   else, including your family members, your employer, the
 4   media or press, and the people involved in the trial.
 5   Although, as I said earlier, you may notify your family and
 6   your employer that you have been seated as a juror in the
 7   case and how long you expect the trial to last.  But if you
 8   are asked or approached in any way about your jury service
 9   or anything about this case, you must respond that you have
10   been ordered not to discuss the matter and to report the
11   contact to the Court.  Because you will receive all the
12   evidence and legal instruction you are properly -- you
13   properly may consider to return a verdict, don't read, watch
14   or listen to any news or media accounts or commentary about
15   the case or anything to do with it, although I have no
16   information that there will be news reports about this case.
17   Do not do any research such as consulting dictionaries,
18   searching the Internet, or using other reference materials,
19   and do not make any investigation or in any other way try to
20   learn about this case on your own.  Do not view or visit any
21   place discussed in this case.  Do not use any Internet
22   programs or other devices to search for or view any place
23   discussed during the trial and also do not do any research
24   about this case, the law, or the people involved, including
25   the parties, the witnesses or the lawyers until you have
```

1  been excused as jurors.  If you happen to read or hear

2  anything touching on this case in the media, turn away and

3  report it to me as soon as possible.

4  As I said earlier, these rules are to protect each

5  parties' rights to have this case decided only on evidence

6  that has been presented here in court.  Witnesses here in

7  court take an oath to tell the truth and the accuracy of

8  their testimony is tested through the trial process.  If you

9  do any research or investigation outside the courtroom or

10  gain any information through improper communications, then

11  your verdict may be influenced by inaccurate, complete, or

12  misleading information that has not been tested by the trial

13  process.  Each of the parties is entitled to a fair trial by

14  an impartial jury, and if you decide the case based on

15  information not presented in court, you will have denied the

16  parties a fair trial.  Remember you have taken an oath to

17  follow the rules, and it's very important that you do follow

18  the rules.

19  A juror who violates these restrictions

20  jeopardizes the fairness of these proceedings, and a

21  mistrial could result that will require the entire trial

22  process to start over.  If any juror is exposed to any

23  outside information, please notify the Court immediately.

24  During the deliberations, you will have to make

25  your decision based on what you recall of the evidence.  You

```
 1   will not have a transcript of the trial.  Some of you took
 2   notes during the trial.  You may take your notes with you
 3   into the jury room for deliberations.  Whether or not you
 4   took notes, you should rely on your own memory of the
 5   evidence.  Notes are only to assist your memory.  You should
 6   not be overly influenced by your notes or those of your
 7   fellow jurors.  When you leave, your notes should be left in
 8   the jury room.  No one will read your notes, and they will
 9   be destroyed at the conclusion of the case.
10           A verdict form has been prepared for you.  After
11   you have reached a unanimous agreement on a verdict, your
12   presiding juror should complete the verdict form according
13   to your deliberations, sign and date it, and advise the
14   bailiff that you are ready to return to the courtroom.
15           So that concludes the jury instructions.  Tomorrow
16   morning at 9:00 A.M. I will have a quiz on all of these
17   instructions you will have to take -- I'm kidding.  At
18   9:00 A.M. tomorrow, we will begin with closing arguments,
19   and then the case will be submitted to you for your
20   deliberation.  So do your best to be here tomorrow at
21   9:00 A.M. so we can get the process started.
22           Thank you for indulging me and staying with me
23   late this evening.  Have a good evening, and I will see you
24   all tomorrow at 9:00 A.M.
25           THE CLERK:  All rise for the jury.
```

```
1          (The following was heard in open court outside the

2           presence of the jury:)

3               THE CLERK:  Please be seated.

4               THE COURT:  All right.  Counsel, let's have you

5    here at -- let's say, 20 till 9:00 just in case there are

6    any issues that either side wishes to bring up before

7    closing because I really to want to start at 9:00.  I

8    believe -- and correct me if I am wrong -- I think I gave

9    each side 30 minutes for closing.

10              Is that your memory, Mr. Wiener?

11              MR. WIENER:  I actually thought was 20 minutes,

12   but I could be mistaken about that.

13              MR. TAYLOR:  I recall 20 for opening, 30 for

14   closing.

15              THE COURT:  All right.  Well, hopefully, you all

16   won't need more than 30 minutes for closing.  All right?  So

17   I will see you tomorrow at 20 till 9:00.  Have a good

18   evening.

19              THE CLERK:  All rise.  This Court is adjourned.

20         (Proceedings concluded at 5:44 P.M.)

21                        --oOo--

22

23

24

25
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3       I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9

10   Date:  May 2, 2019.

11

12

13

14                    ___/S/ CHIA MEI JUI _____

15                    Chia Mei Jui, CSR No. 3287

16

17

18

19

20

21

22

23

24

25
```

CHIA MEI JUI, CSR 3287, CRR, FCRR
UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA

**MR. GEBELIN: [14]**
64/23 65/2 65/11
65/22 65/25 66/7 66/9
66/16 66/20 67/5
72/21 72/23 73/10
73/21

**MR. TAYLOR: [71]**
4/8 5/1 5/25 6/3 10/20
10/22 15/10 18/19
18/23 22/3 22/8 22/12
22/14 22/20 22/23
23/2 23/5 30/11 34/9
34/18 35/14 36/5
36/15 45/3 47/6 47/20
47/23 48/3 48/6 49/17
49/19 50/25 51/19
52/24 53/11 54/16
54/21 54/25 55/9 56/1
56/17 57/5 57/14
57/17 57/20 57/24
58/3 58/5 58/7 58/14
58/19 58/24 59/12
60/1 60/6 60/13 60/21
61/1 61/13 62/5 69/3
69/24 70/11 70/15
71/7 71/14 72/3 72/6
73/12 73/23 105/12

**MR. WIENER: [27]**
13/7 21/14 21/18
21/25 23/7 24/7 30/7
33/22 34/12 34/22
35/5 36/13 44/9 47/17
47/24 48/9 54/12 62/8
62/14 62/21 63/13
63/23 64/16 68/19
72/10 73/4 105/10

**THE CLERK: [11]**
4/15 4/20 36/21 37/1
48/21 54/4 72/17
73/25 104/24 105/2
105/18

**THE COURT: [118]**

**THE REPORTER: [2]**
22/11 58/23

**THE WITNESS: [9]**
4/19 4/22 5/24 6/2
21/20 34/15 36/25
37/3 47/7

**$**
**$150,000 [1]** 96/4
**$200 [1]** 96/2
**$30,000 [1]** 95/25
**$750 [1]** 95/25

**-**
**--oOo [1]** 105/21
**-and [1]** 2/6

**1**
**10 [3]** 1/15 3/2 4/1
**100 [1]** 1/9
**1056 [1]** 50/5
**10:15 [1]** 74/14
**10:30 [1]** 74/18
**10th [1]** 25/18
**110 [1]** 50/4

**11:05 A.M [1]** 29/13
**14 [11]** 12/16 12/19
13/6 13/10 58/4 58/5
58/18 62/12 62/17
69/9 70/7
**15 [5]** 6/8 39/11 39/24
43/4 73/20
**16 [1]** 72/21
**17 [1]** 58/20
**17-0871-AB [1]** 1/7
**170.7 [1]** 58/23
**1708 [2]** 59/7 59/8
**1708.7 [3]** 51/11 62/24
63/24
**1880 [1]** 2/13
**1990 [1]** 50/5
**1:20 [2]** 1/16 4/2

**2**
**2 1/2 [2]** 38/3 38/17
**20 [12]** 10/19 10/22
11/4 25/8 39/11 39/17
73/2 73/9 105/5
105/11 105/13 105/17
**20,000 [1]** 24/18
**20-minute [1]** 48/14
**2004 [2]** 65/5 65/9
**2005 [1]** 65/5
**201-7600 [1]** 2/4
**2014 [3]** 58/12 97/17
97/23
**2015 [1]** 38/6
**2016 [10]** 21/12 25/18
27/1 27/22 27/25
29/12 30/17 32/1
38/23 45/12
**2017 [3]** 38/6 58/11
97/14
**2018 [6]** 1/15 3/2 4/1
45/9 45/15 46/1
**2019 [1]** 106/10
**21 [4]** 73/2 73/9 91/15
91/24
**22 [1]** 69/9
**22nd [1]** 30/6
**23 [1]** 90/25
**24 [3]** 69/10 73/10
90/25
**26th [1]** 17/7 45/15
46/1
**28 [4]** 23/19 30/9
30/10 106/4
**28,2018 [1]** 45/19
**29 [4]** 30/1 30/9 30/11
30/14
**2:30 P.M [1]** 25/18
**2:31 [1]** 54/6
**2:45 [1]** 48/15
**2:45 please [1]** 48/21
**2nd [3]** 58/11 97/17
97/23

**3**
**30 [3]** 105/9 105/13
105/16
**3072 [1]** 2/9
**310 [2]** 2/9 2/14
**3287 [2]** 1/23 106/15

**34 [1]** 43/14
**341-3072 [1]** 2/9
**35 [2]** 62/16 96/6
**350 [1]** 1/24
**3:07 [1]** 54/6
**3:34 [1]** 72/19

**4**
**41 [1]** 57/23
**4311 [1]** 1/24
**44 [1]** 15/8
**45 [1]** 72/16
**487-5607 [1]** 2/5
**4:00 so [1]** 72/15
**4:10 [1]** 72/19
**4:11 [1]** 74/2
**4:43 [1]** 74/2

**5**
**50 [4]** 49/17 50/14
70/1 72/5
**520 [1]** 2/8
**527.6 [1]** 84/7
**5607 [1]** 2/5
**5:44 [1]** 105/20

**6**
**609 [1]** 2/4

**7**
**714 [1]** 2/13
**753 [1]** 106/3
**7600 [1]** 2/14
**7th [1]** 27/24

**8**
**8383 [1]** 2/8

**9**
**90012 [1]** 1/24
**90067 [1]** 2/13
**90211 [1]** 2/8
**925 [1]** 2/5
**94582 [1]** 2/4
**9:00 [3]** 104/16 105/7
105/17
**9:00 A.M [3]** 104/18
104/21 104/24
**9:00 just [1]** 105/5
**9:00 o'clock [1]** 74/16
**9:00 with [1]** 71/22

**A**
**A-n-t-o-n-e-l-l-o [1]**
37/5
**AB [1]** 1/7
**abate [1]** 84/1
**abbreviated [1]** 5/18
**ability [5]** 79/9 84/22
89/12 92/18 92/21
**able [5]** 28/18 55/22
55/25 64/4 81/7
**absolutely [7]** 8/3
8/11 9/1 10/15 10/15
12/11 26/19
**abusing [1]** 87/1
**accept [2]** 76/11 80/9
**access [11]** 39/15
40/10 41/21 42/1

**82/11 82/14 82/15**
88/23 91/20 91/25
92/2
**accessory [1]** 81/9
**accident [1]** 57/4
**accompanied [1]**
86/17
**according [1]** 104/12
**account [1]** 79/8
**accounts [2]** 99/11
102/14
**accuracy [2]** 100/1
103/7
**accurate [2]** 40/25
52/21
**across [1]** 61/15
**act [2]** 84/8 86/23
**acted [1]** 96/21
**acting [1]** 15/1
**action [5]** 28/1 29/16
84/18 86/22 91/14
**actions [1]** 66/13
**activities [4]** 7/21 8/18
24/15 33/21
**activity [31]** 8/8 14/2
21/7 51/7 51/8 51/12
59/5 59/24 60/21 61/1
61/12 63/16 64/11
64/19 64/20 65/15
65/19 68/7 68/18
68/24 69/22 89/8 89/9
89/12 89/13 92/16
92/18 93/5 93/6 93/14
93/17
**acts [10]** 49/12 64/8
84/11 84/16 86/8
86/21 96/11 96/13
96/18 96/20
**actual [7]** 13/12 19/22
94/23 95/4 95/5 95/11
95/18
**ADAM [30]** 1/9 7/11
7/24 10/1 10/3 10/5
13/14 14/1 20/4 24/22
24/23 24/25 27/20
27/24 28/4 28/12
28/22 29/7 29/12
29/21 30/17 31/6 31/9
31/19 31/20 34/8 34/9
51/22 53/4 53/7
**Adam Kazal [1]** 28/4
**Adam's [1]** 26/8
**adapt [1]** 89/18
**add [4]** 60/11 61/9
68/12 70/8
**adding [1]** 61/8
**addition [3]** 77/6
83/24 94/25
**additional [1]** 81/17
**address [1]** 54/19
**addressed [1]** 66/4
**adequate [1]** 95/6
**adjourned [1]** 105/19
**ADMIT [1]** 3/13
**admitted [6]** 3/13 13/9
13/10 30/13 30/14
40/17
**advance [3]** 49/22

**60/8 94/1**
**advantage [1]** 87/2
**advise [1]** 104/13
**affinity [1]** 83/10
**affirmative [3]** 57/8
75/21 75/23
**after [13]** 17/22 18/13
21/7 29/9 30/21 43/11
60/16 74/18 88/3 98/6
98/10 101/6 104/10
**afternoon [4]** 4/6 5/5
23/11 37/9
**afterwards [2]** 16/20
62/7
**again [13]** 11/19
13/12 34/20 44/22
48/16 50/4 56/23
58/16 61/12 70/2 71/5
73/6 74/5
**against [2]** 28/2 87/5
**aggressive [1]** 15/1
**ago [6]** 6/15 8/12 27/4
34/4 39/17 43/8 46/19
**agree [4]** 62/9 64/17
69/1 75/5
**agreed [1]** 76/9
**agreement [18]** 9/14
9/17 9/20 9/22 10/15
11/6 11/7 11/18 12/9
12/14 25/9 27/9 35/8
46/3 49/3 73/1 98/3
104/11
**ahead [7]** 18/19 18/23
22/8 50/25 54/20
64/23 72/23
**alarm [2]** 64/1 82/24
**alarms [2]** 67/12 85/3
**allegations [3]** 8/18
8/20 83/2
**alleged [2]** 50/15
97/22
**allow [4]** 36/12 48/18
68/10 69/2
**allows [2]** 82/15 89/22
**almost [1]** 62/22
**alone [1]** 52/23
**along [3]** 25/10 42/10
70/8
**already [5]** 15/9 18/18
30/10 40/17 71/7
**alter [1]** 82/13
**although [4]** 50/11
53/18 102/5 102/15
**always [3]** 14/23
70/23 78/24
**amend [1]** 70/4
**amended [1]** 55/13
**Amendment [3]** 49/21
51/5 51/10
**American [1]** 50/7
**among [1]** 40/9
**amount [10]** 46/17
46/20 73/3 85/15
86/12 94/14 95/5 95/9
95/12 95/24
**Anaheim [2]** 5/21 5/22
**analyst [1]** 9/15
**and/or [2]** 89/2 89/19

**A**

ANDRÉ [1] 1/3
ANGELES [4] 1/17
1/24 2/13 4/1
animosity [1] 46/18
annoys [2] 67/12 85/3
another [12] 11/5 11/7
17/17 18/15 32/17
36/3 41/14 71/13
77/18 89/6 89/11 93/4
answer [6] 31/4 44/9
49/13 61/14 78/7
101/4
answered [1] 57/7
78/3 78/5
answering [1] 101/2
answers [5] 79/23
80/18 80/23 80/25
81/3
anticipate [1] 74/16
Antonello [3] 34/20
36/19 37/4
apologize [3] 14/24
69/5 74/6
apparent [1] 84/22
appear [3] 20/24
40/22 58/11
APPEARANCES [1]
2/1
appeared [2] 43/14
97/18
appearing [3] 5/6
19/14 37/10
appears [1] 42/2
applicable [1] 97/7
application [1] 99/2
applies [5] 74/24 99/4
101/14 101/25 102/2
apply [4] 50/2 71/1
75/3 76/2
appreciate [2] 57/15
67/20
approached [6] 17/18
21/4 22/10 22/15 99/7
102/8
architectural [1]
87/17
area [5] 18/3 18/9
19/4 20/12 20/20
arguably [1] 63/6
argue [5] 49/14 60/19
63/15 71/21 74/18
argument [8] 46/22
49/6 49/20 69/18
69/25 70/2 72/17
73/19
argumentive [1] 47/7
arguments [6] 53/15
54/3 74/14 76/17
76/19 104/18
armed [1] 62/1
around [4] 8/4 33/11
52/5 65/9
arrange [1] 20/23
arranged [2] 21/2
21/3
arranging [1] 21/1
arriving [1] 16/9

art [1] 67/23
artwork [1] 27/13
asked [16] 6/19 7/23
8/17 8/21 17/19 28/6
31/15 32/21 34/4 43/8
49/10 55/21 57/1
71/10 99/6 102/8
asking [6] 7/20 8/1
16/22 44/23 55/24
67/2
asks [2] 60/25 77/24
aspect [1] 82/6
asserts [3] 75/16
75/17 96/23
assist [1] 104/5
assisted [1] 38/13
assume [5] 15/22
33/12 35/25 60/19
67/25
assuring [1] 81/25
attaches [1] 87/24
attempt [3] 82/13 98/8
100/22
attempting [1] 81/21
attention [1] 39/1
attributable [2] 52/17
95/1
audio [1] 87/16
audio-visual [1] 87/16
August [1] 38/6
August 2017 [1] 38/6
Australia [2] 28/2
33/18
author [4] 89/22 90/1
90/22 91/12
author's [1] 89/24
authorities [1] 49/24
authority [2] 87/1 89/3
authorized [2] 56/16
91/10
automatically [1]
87/23
available [1] 81/9
avoid [2] 55/14 78/20
avoids [1] 68/25
award [8] 86/3 86/6
86/13 95/18 95/19
95/24 96/2 96/4
awarded [2] 86/9
86/12
awarded to [1] 86/9
aware [9] 10/10 19/24
25/4 27/21 29/7 35/9
38/23 96/11 97/11
away [9] 17/21 20/19
32/23 32/25 33/1
39/22 42/16 99/22
103/2

**B**

back [24] 17/23 19/23
22/11 22/13 28/18
32/13 42/22 43/18
43/24 47/3 48/15
48/21 49/15 53/23
56/1 67/3 71/3 71/13
71/20 72/14 72/16
73/18 74/7 74/12
back-and-forth [1]
19/23
bad [2] 71/19 73/17
bailiff [2] 81/24
104/14
ballpark [2] 24/16
24/17
BANI [1] 2/12
BANI-ESRAILI [1]
2/12
bankrupt [1] 24/25
banner [1] 52/16
banners [1] 51/23
barred [2] 58/10 97/16
base [3] 44/3 75/24
98/16
based [10] 58/8 67/19
86/3 89/18 97/1 97/15
100/9 101/12 103/14
103/25
basically [2] 17/20
44/3
basis [1] 70/1
be 2014 [1] 58/12
Beach [1] 38/19
bear [2] 59/8 79/20
became [2] 27/2
78/13
become [1] 38/23
becomes [1] 100/19
before [16] 4/17 7/19
9/10 15/23 26/4 36/23
37/15 57/1 61/16 75/8
80/16 81/1 92/3 97/24
101/2 105/6
begin [6] 49/6 74/15
74/17 74/19 97/24
104/18
beginning [2] 22/13
74/7
begins [1] 97/5
behalf [5] 21/5 22/10
22/16 23/14 64/21
behest [1] 30/17
behind [3] 19/21
24/20 51/6
belief [2] 8/1 98/15
believability [1] 79/20
believable [2] 66/23
80/13
believe [34] 9/4 10/2
14/4 15/8 15/9 15/21
17/6 17/7 17/15 18/18
21/10 23/21 27/1 27/3
27/18 30/10 31/22
36/5 36/5 56/15 62/16
62/23 64/25 65/23
68/16 69/14 69/20
77/1 79/4 79/5 79/5
80/6 96/13 105/8
believes [1] 69/10
bench [1] 78/15
benefited [1] 92/15
BENJAMIN [1] 2/12
best [3] 44/8 44/17
104/20
bet [1] 27/7
between [7] 9/22 29/3

77/20 87/22 88/24
91/21 92/7
BEVERLY [1] 2/8
beyond [1] 35/11
bias [1] 79/15
bifurcating [1] 72/25
big [2] 6/4 41/7
Bill [1] 13/14
binder [1] 9/5 10/18
12/17 30/1
BIROTTE [1] 1/3
bit [3] 41/17 42/11
51/24
blindness [1] 96/22
blog [2] 99/1 101/23
blue [1] 42/6
bode [1] 50/13
boring [2] 32/10 32/13
boss [2] 38/3 38/4
both [15] 14/10 14/12
50/18 53/15 53/18
64/17 68/10 73/7 73/8
77/19 90/13 93/20
93/22 96/9 96/16
bottom [2] 60/16
70/16
BOULEVARD [1] 2/8
box [1] 53/20
breach [1] 61/17
break [3] 48/12 48/14
49/23
brief [4] 18/15 40/16
49/22 75/15
briefing [1] 16/25
briefly [5] 33/12 34/24
35/13 64/24 72/24
bring [6] 57/12 71/13
72/14 73/16 97/3
105/6
brother [1] 26/8
brothers [2] 33/16
52/18
brought [3] 62/4 97/5
97/13
Brown [22] 6/11 6/16
7/14 7/21 8/4 9/22
10/7 11/15 11/16
11/17 12/9 21/3 23/23
23/25 25/6 25/20 26/3
27/6 27/8 29/11 33/4
33/15
building [1] 46/23
bulls [1] 52/14
burden [12] 75/18
75/20 85/14 86/10
88/10 90/9 91/16
91/23 92/11 93/11
94/6 97/19
bury [1] 22/18
business [4] 5/20
27/17 29/24 43/12
businessman [1]
46/12
buy [1] 27/5
buyer [1] 95/9

**C**

CACI [8] 65/1 65/3

65/10 65/17 66/5
66/15 66/17 66/20
calculation [1] 72/25
CALIFORNIA [13] 1/2
1/17 1/24 2/4 2/8 2/13
4/1 5/17 6/17 7/21
16/4 16/16 31/17
call [8] 4/8 34/17
34/20 43/25 44/2
45/23 48/2 48/8
called [7] 17/14 26/9
26/13 44/3 44/24
45/12 94/2
calling [1] 78/16
calls [5] 4/10 21/15
21/19 22/1 44/9
came [2] 10/6 33/9
camera [2] 39/3 39/10
can all [1] 6/2
capable [1] 81/6
capacity [1] 6/5
captures [1] 23/21
car [3] 26/21 51/25
52/5
card [1] 7/10
care [3] 25/1 28/4
28/5
carried [2] 31/23
31/25
Carroll [1] 47/14
carry [1] 84/23
cars [3] 17/16 40/3
41/12
cases [2] 50/1 51/2
catch [1] 69/6
caught [1] 23/17
cause [8] 4/17 36/23
67/15 67/17 83/15
84/23 85/5 85/6
caused [2] 85/17 95/7
cc'd [3] 10/12 10/13
11/12
CCRR [1] 1/23
cease [5] 30/16 45/25
46/5 46/9 83/25
CENTRAL [1] 1/2
CENTURY [1] 2/13
certain [10] 7/20 31/7
31/10 39/14 58/9
76/14 77/8 78/19 88/5
97/15
Certainly [1] 35/15
certificate [3] 88/7
90/23 106/1
certificates [2] 90/25
91/2
certify [1] 106/3
cetera [1] 49/12
challenge [1] 36/1
chambers [1] 56/1
chance [5] 49/25 51/2
54/11 61/24 74/18
change [5] 55/24
56/21 65/14 73/15
98/11 98/15
changed [2] 29/15
65/5
chanting [1] 42/25

**C**

character [1] 94/10
charge [1] 24/14
CHARIF [5] 1/8 7/18
53/5 56/22 57/2
chart [3] 55/2 55/21
57/11
chat [2] 99/1 101/23
check [1] 50/3
checked [1] 43/17
CHIA [3] 1/23 106/14
106/15
child [1] 83/9
choose [2] 55/16 80/6
choreographic [1]
87/15
circle [1] 41/8
Circuit [1] 50/1
circulate [1] 14/19
circumstances [4]
84/3 86/19 93/25
97/12
circumstantial [3]
77/14 77/17 77/21
circus [1] 46/15
citizens [1] 51/10
Civil [4] 61/20 62/23
67/24 84/7
Civil Code [2] 61/20
67/24
claim [19] 36/2 50/21
51/21 53/17 53/18
58/2 58/6 60/17 70/14
75/16 75/17 75/20
75/22 85/13 90/8
94/22 95/16 97/14
97/14
claims [5] 58/8 75/19
75/19 87/4 96/25
clarification [2] 9/25
54/18
clarify [2] 8/6 44/15
clear [12] 12/8 16/22
29/6 33/3 34/6 51/11
55/20 56/4 56/6 56/10
57/12 73/7
clearly [2] 55/6 83/25
clerk [3] 81/17 81/19
100/21
clerks [1] 49/2
client [9] 10/14 11/18
24/19 25/10 35/25
46/20 46/21 46/22
46/24
clients [2] 38/13
76/25
clip [2] 18/15 40/17
clips [2] 19/13 23/17
close [2] 39/19 39/21
closely [1] 87/21
closest [1] 39/23
closing [17] 49/2 49/6
54/8 54/14 62/12
62/17 71/22 72/17
73/18 74/14 74/19
76/19 104/18 105/7
105/9 105/14 106/15
clown [1] 46/14

clue [1] 28/11
cmjui.csr [1] 1/25
co [1] 35/2
co-counsel [1] 35/2
Coca [2] 52/4 52/5
Coca-Cola.com [2]
52/4 52/5
code [6] 61/20 62/2
62/23 67/24 84/7
106/4
Cola.com [2] 52/4
52/5
collect [1] 13/19
column [1] 55/7 55/12
56/19
Column 2 [1] 55/7
columns [1] 56/5
combination [1] 84/20
comfortable [1] 70/3
coming [4] 32/11
34/15 40/4 41/22
commentary [2]
99/11 102/14
comments [3] 49/18
56/10 71/2
commercial [1] 94/11
commission [2] 45/20
47/3
committed [1] 57/3
communicate [8] 10/9
98/21 98/22 100/20
100/22 100/23 101/18
101/19
communicated [2]
84/14 84/21
communicating [3]
99/4 101/25 102/2
communication [5]
10/6 63/8 84/3 84/15
100/4
communications [2]
31/18 103/10
company [7] 10/16
12/24 17/19 26/13
33/11 36/9 36/11
compensate [4] 85/16
86/9 95/6 95/21
complaint [1] 28/15
complete [3] 86/20
103/11 104/12
completed [1] 101/11
completely [1] 8/9
completing [1] 88/1
complicated [1] 61/18
complied [1] 8/22
comply [2] 28/7 39/8
complying [1] 29/14
composed [1] 84/10
comprised [1] 64/8
computer [11] 81/8
81/12 81/13 81/18
82/7 82/9 82/11 82/14
82/15 82/17 87/17
concept [1] 90/4
concepts [1] 87/19
concern [3] 56/22
56/23 59/13
concerned [5] 55/4

55/4 55/16 56/9
61/25
concerning [1] 100/24
concerns [1] 36/11
conclude [1] 95/25
concluded [2] 55/3
105/20
concludes [1] 104/15
conclusion [3] 59/19
60/10 104/9
conduct [57] 6/16
23/14 48/19 51/4
59/17 59/20 59/22
59/25 60/7 60/9 60/12
60/12 60/17 61/7 63/7
63/22 64/1 64/1 64/7
64/8 64/12 64/15
65/11 65/18 66/2
66/11 66/12 66/22
67/8 67/11 67/15
67/22 68/1 68/8 68/13
68/16 68/19 69/19
70/9 82/24 83/4 83/12
83/15 83/19 84/1 84/2
84/10 84/10 84/16
84/22 85/2 85/4 86/14
86/16 86/18 97/1
101/8
conducted [1] 8/7
cone [1] 41/18
confer [1] 55/22
conference [4] 78/15
78/24 79/1 106/8
conferences [2] 78/18
78/23
confidentiality [2]
35/8 46/3
conformance [1]
106/7
confuse [1] 69/21
confused [2] 14/23
63/3
confusing [1] 55/5
59/15
confusion [2] 55/11
55/14
confusions [1] 78/21
Congress [1] 95/20
conjecture [1] 86/4
conjunction [1] 48/20
connected [1] 48/20
consanguinity [1]
83/9
conscientious [1]
98/10
consent [1] 93/25
consider [16] 50/23
76/4 76/13 76/15 77/8
77/9 77/18 78/12
78/25 80/1 80/19 81/3
85/18 88/20 94/9
102/13
consideration [1]
74/22
considered [7] 50/15
53/15 77/6 91/12 96/8
96/15 98/6
considering [1] 79/7

consist [1] 76/5
constitute [1] 96/13
constitutes [4] 88/4
96/7 96/7 96/12
constitutionally [20]
51/12 51/15 59/4
59/24 60/20 61/1
61/12 63/16 63/21
64/10 64/18 64/20
65/15 65/19 68/7
68/17 68/24 69/13
69/17 69/22
consult [2] 75/1 101/1
consulting [2] 99/12
102/17
contact [10] 11/21
11/21 30/20 44/7 46/8
46/10 47/12 47/16
99/9 102/11
contacted [2] 10/2
45/9
contained [1] 90/2
contempt [1] 29/8
contends [2] 88/9
94/5
context [2] 50/16
50/23
continuation [1]
11/10
continue [2] 18/12
101/3
continued [1] 17/25
continuity [2] 64/10
84/12
contract [2] 10/4
61/17
contracting [1] 26/12
contradicted [1]
79/16
contrary [1] 51/9
contributed [2] 93/6
93/16
contributes [1] 89/8
contributorily [2] 89/5
93/9
control [3] 77/23
89/13 92/18
controls [1] 76/23
conversation [2]
32/16 43/7
conversed [1] 17/22
coordinate [1] 33/20
coordinated [1] 6/14
copied [7] 25/17
88/12 88/20 88/22
90/11 91/17 91/18
copies [5] 73/15
73/20 74/20 89/17
90/5
copy [8] 54/8 59/7
74/9 74/25 81/15 88/2
89/15 89/16
copying [4] 87/23
89/23 90/2 91/5
copyright [61] 51/21
52/3 52/7 53/17 57/3
75/16 87/6 87/9 87/12
87/23 87/25 88/1 88/3

88/7 88/12 89/4 89/4
89/4 89/6 89/10 89/15
89/22 90/1 90/6 90/7
90/8 90/10 90/18
90/19 90/23 90/24
91/1 91/1 91/3 91/4
91/13 91/13 91/15
92/9 92/11 92/25 93/3
93/8 93/10 93/19
93/24 94/1 94/2 94/3
94/21 95/3 95/6 95/16
95/23 96/12 96/14
96/19 96/21 96/22
96/24 97/11
copyrightable [1]
88/4
copyrighted [30]
87/13 87/20 87/20
87/22 88/2 88/13
88/16 88/18 88/19
88/21 88/23 88/25
89/2 89/17 89/19
89/20 89/25 90/6
90/12 91/17 91/20
93/24 94/4 94/5 94/13
94/15 94/17 95/7 95/9
97/6
copyrights [4] 87/5
87/7 88/6 88/10
cordial [1] 19/18
correction [2] 62/10
62/14
correspondence [1]
27/20
corroborating [1]
83/3
counsel [14] 2/1 8/13
10/20 22/2 24/6 34/4
35/2 35/5 35/15 49/21
49/24 51/3 72/20
105/4
count [1] 101/6
Counterintelligence
[1] 5/17
country [1] 51/6
couple [5] 6/15 17/15
27/21 49/1 49/18
course [1] 7/20 38/3
39/9 51/2 67/11 67/14
78/22 85/1 85/4 98/9
101/16
Court's [2] 70/4 77/3
cover [1] 28/3
covered [1] 28/20
87/12
covert [3] 7/3 8/7 8/9
covertly [1] 15/18
coward [1] 46/12
create [2] 28/19 91/9
created [1] 92/4
creation [1] 38/11
creative [2] 38/9 92/7
creator [1] 90/22
credible [17] 61/10
63/7 63/18 64/16
65/11 65/21 65/23
66/19 67/22 68/2
68/13 68/22 69/10

**C**

credible... [4] 69/15 70/9 83/19 84/13
credit [1] 7/10
crew [1] 14/8
criminal [1] 29/7
cross [7] 3/6 3/9 23/7 23/9 45/5 45/6 57/14
CROSS-EXAMINATIO N [6] 3/6 3/9 23/7 23/9 45/5 45/6
Crowds [2] 26/10 26/13
CSR [2] 1/23 106/15
curious [1] 19/19
current [1] 44/4
customer [1] 13/24
CV [1] 1/7

**D**

damage [2] 72/25 95/19
damages [35] 49/10 49/13 54/10 61/17 70/18 71/2 71/6 71/12 73/3 84/20 85/9 85/9 85/13 85/14 85/15 86/1 86/6 86/7 86/9 86/11 86/12 86/13 86/24 87/5 94/23 94/24 95/2 95/4 95/5 95/17 95/18 95/18 95/24 97/1 97/9
dangerous [1] 40/6
data [2] 82/18 82/19
database [1] 82/12
date [9] 11/5 30/5 30/19 30/21 30/25 62/11 62/14 104/13 106/10
dated [1] 25/17
dates [1] 26/2
DAVID [41] 1/5 8/4 14/3 14/23 14/24 14/24 16/1 16/9 17/7 17/8 17/14 17/23 21/5 22/10 22/16 23/13 23/15 23/20 24/10 28/23 29/1 29/22 32/17 35/22 37/25 39/7 43/10 43/19 43/23 44/3 44/20 44/23 45/8 45/20 47/3 75/17 82/21 85/12
David's [4] 18/4 23/15 35/21 45/22
day [12] 1/18 16/13 17/2 17/6 17/7 30/6 31/1 35/20 39/2 43/5 43/10 43/15
deadline [1] 74/11
deal [1] 34/6
dealing [1] 34/7
debate [1] 64/13
DECEMBER [5] 1/15 3/2 4/1 21/10 21/12

decide [14] 52/20 75/7 76/1 77/12 77/21 78/19 79/4 80/2 80/4 98/5 100/9 101/10 101/12 103/14
decided [3] 47/5 99/24 103/5
deciding [4] 76/4 76/16 78/11 79/3
decision [6] 53/20 75/24 98/11 98/12 98/14 103/25
defendant [37] 51/22 66/23 69/15 82/23 83/18 83/25 84/1 84/5 84/17 85/18 86/8 86/21 86/24 88/12 88/23 90/11 90/17 91/16 91/20 93/3 93/13 93/15 93/23 94/4 94/5 94/6 94/18 94/19 94/21 95/1 95/11 96/9 96/11 96/18 96/20 96/21 96/23
defendants [30] 1/10 2/10 37/17 58/2 58/6 64/21 75/19 82/20 87/5 87/6 88/9 88/21 91/18 91/25 92/1 92/2 92/8 92/10 92/14 92/15 92/17 92/20 93/2 93/7 93/9 96/13 97/6 97/14 97/18 97/20
defendants' [9] 3/4 86/14 88/17 88/19 88/25 91/22 92/4 92/5 95/14
defense [10] 4/9 34/20 48/6 50/14 62/16 75/21 75/23 94/7 96/23 97/19
defined [7] 59/20 59/20 61/21 63/23 67/6 67/7 67/9
defines [3] 59/16 61/9 63/5
definition [14] 59/17 60/4 60/9 63/1 63/25 64/15 65/18 65/21 66/11 66/24 68/12 68/16 68/24 71/4
definitions [6] 61/10 61/20 62/2 65/10 66/7 68/4
definitively [1] 83/25
degree [1] 83/10
delays [1] 74/6
deliberate [3] 49/15 56/13 82/2
deliberately [1] 80/5
deliberating [1] 74/17
deliberation [3] 74/15 102/2 104/20
deliberations [10] 75/1 97/24 98/1 98/21 100/19 101/3 101/11

103/2 104/3 104/13
demand [3] 26/10 26/13 84/4
demanded [1] 83/25
demanding [2] 45/20 47/2
demonstrates [1] 24/9
denied [2] 100/10 103/15
deny [3] 53/16 75/19 87/6
denying [1] 78/25
department [2] 38/11 38/14
depend [1] 80/12
depict [2] 19/3 20/11
depiction [1] 40/25
depicts [1] 16/8
deployed [1] 7/1
deposited [1] 88/4
depositing [1] 88/2
deposition [2] 80/15 80/20
deputy [3] 17/10 20/17 53/24
derivative [1] 87/12
describe [5] 14/13 15/16 16/8 16/17 82/4
described [4] 7/21 43/7 51/3 84/8
describing [2] 20/15 41/1
deserves [1] 80/14
designed [2] 28/24 29/1
desist [3] 45/25 46/6 46/9
destroy [1] 22/17
destroyed [1] 104/9
detail [2] 46/5 46/9
deter [2] 86/8 95/23
determine [7] 60/23 85/13 86/1 92/10 93/8 94/22 95/16
determining [3] 88/3 88/18 94/8
device [3] 63/8 84/15 84/18
devices [2] 99/17 102/22
DIANE [1] 2/12
dictated [1] 71/24
dictionaries [2] 99/12 102/17
differ [1] 76/22
difference [1] 29/3
differences [1] 80/2
different [4] 50/9 59/16 79/23 79/23
differently [1] 80/1
differs [1] 80/3
difficult [1] 68/6
difficulty [1] 64/25
diligently [1] 80/2
direct [17] 3/6 3/8 5/3 25/2 27/20 37/7 52/1

77/14 77/14 77/15 77/20 92/16 92/19 92/24 93/14 93/16 93/18
directed [3] 14/3 67/11 85/2
direction [1] 82/10
directives [1] 10/6
directly [10] 9/16 10/6 10/9 24/21 62/17 62/19 63/12 84/17 89/11 92/15
directory [1] 82/12
dirty [1] 22/22
disability [1] 87/2
discharged [1] 101/7
discover [1] 82/15
discoveries [2] 87/19 90/4
discuss [6] 16/20 34/24 81/21 82/6 99/9 102/10
discussed [6] 81/25 98/7 99/16 99/18 102/21 102/23
discussing [3] 98/20 98/24 101/21
discussion [2] 16/18 61/13
disgruntled [1] 35/6
dislikes [1] 75/6
display [1] 89/19
displayed [1] 81/6
displaying [1] 87/11
displays [1] 89/2
dispute [2] 29/24 49/9
disputes [1] 53/17
disregard [6] 77/5 78/10 83/22 86/15 86/18 96/21
distinction [1] 77/19
distress [6] 67/17 67/18 83/15 83/16 85/6 85/7
distributes [1] 89/1
distributing [1] 87/11
DISTRICT [3] 1/1 1/2 1/3
DIVISION [1] 1/2
document [9] 7/4 9/10 9/24 10/1 11/2 12/18 13/4 25/16 55/19
documented [1] 32/8
documenting [1] 39/25
documents [2] 8/17 54/12
dog [1] 19/25
door [1] 41/5
dot [1] 57/13
double [1] 50/3
double-check [1] 50/3
down [6] 14/16 34/14 40/12 43/16 48/1 54/2
draft [4] 30/3 30/5 49/8 58/17
dramatic [1] 87/14
drive [5] 31/6 31/10

41/12 41/23 52/5
drop [1] 6/1
drove [4] 27/14 27/15 27/17 27/18
duly [2] 4/14 36/20
during [16] 26/24 34/24 38/15 39/24 49/22 75/1 78/13 89/3 90/6 98/21 99/18 100/19 101/16 102/23 103/24 104/2
duty [6] 62/18 74/24 75/2 76/25 85/8 101/16

**E**

e-mail [14] 9/11 9/13 10/12 11/12 11/14 12/5 13/20 25/17 27/24 28/12 45/14 45/19 98/25 101/22
e-mailed [1] 13/2
e-mails [3] 9/2 10/14 44/9
each [21] 5/9 29/25 37/13 52/13 54/3 76/1 80/17 92/12 92/22 93/11 95/20 95/25 96/2 96/4 98/5 98/9 99/23 100/8 103/4 103/13 105/9
earlier [5] 20/18 27/3 56/22 102/5 103/4
early [1] 21/10
easier [1] 61/16
easily [1] 70/22
EAST [1] 2/13
edited [1] 20/8
editor [2] 37/21 38/9
educational [1] 94/12
effect [3] 31/9 94/16 98/15
effort [1] 24/10 64/23
egotistical [1] 45/17
eight [3] 37/23 53/19 55/12
eighth [1] 56/19
either [16] 17/14 20/24 30/20 54/14 69/11 71/21 71/23 71/25 77/20 78/15 83/5 83/20 86/5 90/16 93/22 105/6
elaborate [1] 6/25
elect [1] 97/24
electronic [5] 63/8 82/18 84/15 98/25 101/22
electronically [2] 81/6 84/21
element [2] 63/16 83/1
elements [16] 60/16 63/14 65/5 82/22 90/14 90/16 91/7 91/22 92/12 92/23 93/1 93/12 93/20 93/22 96/10 96/16

**E**

elicit [1] 36/7
Elizabeth [2] 23/15
23/20
email [1] 25/20
emails [1] 27/21
emotional [8] 67/17
67/18 83/14 83/15
83/16 85/6 85/7 85/23
employed [4] 5/16
38/5 38/17 91/9
employee [5] 35/7
36/3 39/9 91/6 91/8
employees [4] 32/11
45/15 46/8 47/11
employer [5] 91/11
91/12 99/5 102/3
102/6
employment [2] 91/7
91/8
enable [1] 82/8
end [10] 28/18 45/9
45/12 48/12 61/8
69/19 71/11 73/2
101/11 101/17
enforce [1] 91/14
enforcement [3]
17/14 17/15 50/8
engage [1] 6/16
engaged [4] 8/19
82/23 93/4 96/18
enjoyment [1] 85/20
enough [3] 52/21
53/17 53/19
ensure [1] 82/11
enter [1] 81/24
entire [6] 28/24 50/16
50/23 63/2 100/16
103/21
entirety [2] 52/12
63/13
entitled [9] 51/5 51/10
91/4 94/23 94/25 95/4
100/8 103/13 106/6
entity [1] 26/9
equipment [5] 81/9
81/12 81/17 81/19
82/5
equivalent [1] 63/20
error [1] 78/21
escaping [1] 51/14
ESRAILI [1] 2/12
establish [1] 8/8
36/11 83/1 91/2
established [2] 81/2
95/20
estimate [1] 24/17
even [4] 12/6 18/7
51/6 60/15
evening [5] 71/21
74/8 104/23 104/23
105/18
event [2] 32/8 79/25
events [2] 16/19 50/16
everybody [1] 7/5
everyday [1] 38/21
evidence [90] 10/20
13/6 13/10 15/9 18/18
30/9 30/10 30/14
40/17 53/3 53/7 61/25
74/22 74/23 75/3 75/8
75/12 75/14 75/21
75/22 75/25 76/4 76/8
76/14 76/15 76/18
76/20 76/21 76/25
77/2 77/5 77/6 77/8
77/9 77/12 77/13
77/14 77/15 77/17
77/19 77/21 77/22
77/23 77/24 77/25
78/2 78/9 78/11 78/12
78/19 78/20 79/16
79/19 80/11 80/23
81/5 81/15 81/16 82/8
83/3 85/15 86/3 86/11
87/7 88/11 88/14
88/15 90/9 90/21
90/24 91/19 91/25
92/13 93/12 94/7
94/19 95/3 96/10
96/17 97/21 98/7
98/12 98/16 98/17
99/24 101/13 102/12
103/5 103/25 104/5
evidencing [2] 64/9
84/12
exact [2] 41/3 61/16
exactly [2] 14/6 65/12
examination [12] 3/6
3/6 3/7 3/8 3/9 5/3
23/7 23/9 34/1 37/7
45/5 45/6
example [5] 51/22
53/1 55/7 57/1 69/9
except [3] 98/20
100/22 100/24
exception [1] 32/11
excerpt [2] 15/6 40/16
91/4 91/14
exclude [3] 87/10
91/4 91/14
excluded [1] 77/4
exclusive [2] 89/15
89/16
excuse [1] 12/5
excused [3] 47/23
99/21 103/1
executive [1] 31/16
exercise [1] 92/20
Exhibit 14 [2] 12/16
13/6
Exhibit 20 [4] 10/19
10/22 11/4 25/8
Exhibit 28 [1] 23/19
Exhibit 29 [1] 30/1
Exhibit 44 [1] 15/8
Exhibit 5 [1] 9/7
exhibits [11] 3/12
3/13 30/9 76/7 76/14
81/5 81/13 81/13
81/14 82/8 90/25
Exhibits 23 [1] 90/25
Exhibits 28 [1] 30/9
exigent [1] 84/2
exists [1] 92/6
expect [2] 29/15
102/7

expected [3] 50/19
experience [2] 35/20
85/20
experienced [3] 85/21
85/24 85/25
explain [5] 33/20
33/22 56/4 56/7 87/8
explained [1] 56/7
exposed [4] 98/18
100/17 101/15 103/22
express [1] 48/16
expression [6] 87/25
88/13 89/24 89/25
90/5 90/11
expressions [1] 92/8
extent [3] 56/7 63/15
85/19
extra [1] 56/8
extreme [1] 53/1

**F**

face [2] 14/25 86/21
Facebook [2] 99/2
101/23
facetted [1] 6/20
fact [8] 29/9 29/10
55/19 63/1 65/3 77/15
77/18 80/11
factors [2] 79/20 94/9
facts [10] 75/2 75/3
76/5 76/9 76/11 76/16
76/21 77/17 79/3
87/17
factual [2] 50/16
53/17
failed [4] 90/16 92/20
92/25 93/22
failing [1] 97/2
fair [16] 42/17 43/14
46/17 46/17 68/3 94/2
94/4 94/5 94/9 94/19
95/7 95/8 100/8
100/11 103/13 103/16
fairly [2] 40/25 85/16
fairness [3] 50/21
100/15 103/20
familiar [6] 6/11 7/11
8/20 37/24 38/1 38/1
family [9] 44/5 83/7
83/8 83/22 83/23
84/25 99/5 102/3
102/5
far [2] 8/10 50/9
favor [1] 45/16
FCRR [1] 1/23
fear [11] 36/11 39/25
43/19 63/19 66/24
68/23 69/12 69/16
69/24 83/21 84/24
feared [2] 66/3 83/6
fearful [2] 36/1 36/2
featured [1] 35/17
February [6] 30/6 38/6
58/11 97/14 97/17
97/23
February 22nd [1]
30/6
February 2nd [2]

rebuttal [3] 50/19
58/11 97/17
February 2nd, 2017
[1] 97/14
February 5th, 2015 [1]
38/6
federal [2] 1/23 86/23
Feels [1] 47/17
fees [1] 95/13
feet [3] 39/22 39/23
42/16
fellow [4] 98/20
101/11 102/1 104/7
felt [1] 7/22 39/9
female [1] 32/17
fence [3] 39/5 39/11
40/13
few [7] 17/22 34/4
39/14 42/16 43/7
54/17 101/8
Fifteen [1] 24/18
fight [1] 54/1
figure [1] 56/1
filing [2] 50/5 97/10
film [6] 37/21 37/22
38/9 38/10 38/12
39/10
filmed [1] 15/25
filming [1] 39/19
finalized [1] 72/15
finally [1] 48/17
financially [1] 92/15
find [23] 91/3 45/2
55/17 75/2 77/18
85/12 85/17 86/5
86/13 90/13 90/15
92/1 92/8 92/22 92/24
93/7 93/18 93/19
94/18 94/21 95/15
96/1 96/3
fine [4] 24/17 55/24
56/21 69/4
finished [2] 11/10
33/1
firm [2] 2/11 6/16
first [16] 1/24 4/14
5/10 11/9 36/20 41/24
49/11 49/21 51/5
51/10 54/24 55/17
63/7 72/3 97/5 101/9
First Amendment [3]
49/21 51/5 51/10
fit [2] 23/22 72/8
five [4] 39/22 43/16
61/20 63/9
five feet [1] 39/22
fixed [1] 87/24
flattering [1] 24/3
focusing [1] 50/19
follow [8] 64/1 75/4
75/14 82/24 100/12
100/12 103/17 103/17
followed [2] 8/4 8/6
following [18] 4/4
8/10 22/7 23/4 35/4
36/17 48/24 74/3
82/21 83/5 83/17
85/18 92/12 93/12
94/9 96/9 96/16 105/1

follows [5] 4/15 36/21
57/11 63/9 84/18
foot [1] 41/22
footage [5] 15/25 16/5
20/7 39/17 39/18
foregoing [1] 106/4
foreperson [1] 81/20
forget [1] 79/24
form [21] 48/16 49/5
49/7 54/1 54/9 54/9
54/23 54/24 55/2 55/6
56/9 56/12 56/17
57/18 62/10 70/14
81/7 88/1 101/25
104/10 104/12
formal [1] 88/5
format [1] 106/7
former [1] 35/6
forms [2] 54/14 99/4
forth [1] 19/23
Forty [1] 57/24
Forty-one [1] 57/24
forward [2] 23/25
30/19
forwarded [1] 23/23
found [1] 29/7
four [4] 21/11 39/23
61/20 63/8
four feet [1] 39/23
four-ish [1] 21/11
Fourteen [1] 13/9
frame [1] 19/3
framed [1] 57/5
fraud [1] 70/18
freeze [1] 51/14
Friday [2] 28/17 38/21
friend [1] 27/12
front [4] 17/13 40/22
64/4 71/11
fuck [1] 45/16
Fuentes [3] 9/15
11/14 25/20
full [6] 38/15 38/17
38/17 46/5 46/9 59/7
fully [2] 70/22 98/7
function [1] 52/15
funds [2] 24/22 24/23
further [15] 23/6
28/16 33/23 34/10
34/13 45/4 46/7 47/18
47/21 48/4 49/16
53/11 57/9 69/21
73/21
future [5] 47/1 85/22
85/25 86/8 95/23

**G**

gain [4] 40/10 41/21
100/3 103/10
game [1] 82/13
Gardener [1] 21/24
gate [6] 41/1 41/6
41/12 41/14 41/14
41/15
gates [2] 38/24 43/21
gave [2] 27/7 105/8
GEBELIN [4] 2/7 2/7
64/22 73/21

**G**

general [1]  23/17
generated [3]  9/14
12/23 13/18
gentlemen [3]  4/7
48/11 74/5
getting [2]  7/5 41/24
give [17]  4/17 16/24
35/13 36/23 49/8
53/24 53/25 56/16
71/19 73/17 75/4 75/4
75/14 77/22 79/23
90/1 102/1
given [3]  11/5 77/20
80/25
giving [2]  35/8 52/25
globe [1]  33/18
gmail.com [1]  1/25
God [2]  4/19 36/25
goes [3]  32/23 63/4
63/10
Gomez [5]  16/1 16/11
16/17 17/8 27/17
gone [1]  52/13
good [7]  4/6 5/5 23/11
37/9 46/12 104/23
105/17
grant [1]  78/24
granting [1]  78/25
graphic [1]  87/15
Great [1]  4/12
grudges [1]  46/25
guards [1]  42/9
guess [10]  21/11 36/8
56/19 57/12 59/9
59/13 63/3 64/14
68/15 78/7
guesswork [1]  86/4
guide [1]  74/22
guy [1]  31/2
guys [3]  28/3 29/24
49/5

**H**

hand [6]  32/9 63/11
80/7 90/15 92/25
93/21
handle [1]  61/19
handled [1]  32/5
handling [1]  38/11
hands [1]  81/23
hands-on [1]  81/23
happen [2]  99/21
103/1
happened [3]  21/9
39/16 79/24
happens [2]  60/18
60/25
harass [15]  24/10
29/1 63/9 64/2 67/5
67/6 67/7 67/9 67/10
67/22 68/2 68/13
70/10 82/25 85/1
harasses [1]  84/19
harassing [1]  29/4
Harassment [1]  29/5
hard [2]  59/18 95/22
harmed [1]  86/14

harshness [1]  86/25
having [9]  4/14 36/20
51/2 53/22 58/21
59/19 72/8 78/15
98/10
he's [6]  20/19 22/9
35/7 35/15 35/17 36/3
head [1]  17/1
headings [1]  55/4
hear [8]  20/8 29/17
61/24 62/3 69/5 74/14
99/21 103/1
heard [18]  4/4 7/19
22/4 23/4 24/9 31/22
36/17 48/24 53/14
68/10 68/14 69/2 74/3
74/23 77/11 77/16
87/9 105/1
hearing [3]  67/20 71/2
78/14
hearsay [4]  21/15
21/19 22/1 44/10
held [2]  22/7 35/4
106/6
hell [1]  45/17
help [5]  4/19 36/25
75/14 76/20 87/7
hereby [1]  106/3
hiding [1]  32/21
HILLS [1]  2/8
hire [4]  91/5 91/5 91/7
91/13
hired [1]  32/2
hold [1]  46/25
holder's [1]  96/2
holding [2]  40/8 40/14
hole [1]  45/17
home [1]  18/4
honest [5]  8/20 12/7
32/10 52/10 98/15
honestly [1]  10/3
honesty [1]  32/24
HONORABLE [1]  1/3
hopefully [3]  72/15
73/19 105/15
hopelessly [1]  59/14
house [2]  23/16 38/9
household [1]  83/13
however [6]  64/9
66/13 80/4 84/11 96/1
96/3
huh [4]  5/23 6/24
13/13 13/21
Hyatt [1]  20/4

**I**

I'd [4]  15/6 18/15
23/19 30/1
i's [1]  57/14
ICS [3]  5/18 9/22 32/4
idea [5]  12/3 25/12
26/6 61/6 89/25
ideas [2]  87/17 90/2
idiot [1]  26/8
if they [1]  32/18
ignorance [2]  55/8
57/4
ignorance/by [1]  57/4

ignorant [1]  56/23
ignore [3]  78/6 78/10
80/10
ii [1]  83/22
ill [1]  86/17
illegal [5]  7/22 7/23
7/24 29/5 29/5
image [7]  20/11 40/22
40/24 41/3 41/6 41/16
43/4
images [1]  20/2
imagine [2]  19/19
68/6
immediate [5]  83/7
83/8 83/21 83/23
84/25
immediately [3]  82/16
100/18 103/23
impartial [2]  100/9
103/14
implied [1]  84/15
important [7]  50/19
80/6 80/13 88/20 98/8
100/12 103/17
improper [3]  77/1
100/4 103/10
in-house [1]  38/9
inaccurate [2]  100/5
103/11
INC [1]  1/5 75/16 88/8
inclination [1]  68/11
inclined [1]  71/18
include [12]  9/2 51/11
59/2 60/3 60/13 63/1
65/17 65/18 67/21
68/7 68/17 70/7
included [9]  59/24
64/11 65/10 65/21
66/15 66/17 68/5 68/8
68/18
includes [6]  55/6 62/2
89/16 90/25 98/24
101/21
including [13]  10/7
50/16 69/21 84/6
84/14 84/16 94/11
99/2 99/19 101/5
101/23 102/3 102/24
INCLUSIVE [1]  1/9
incomplete [1]  100/5
inconsistent [1]  79/22
incurred [1]  97/9
independent [1]  83/2
independently [1]
16/3
indicate [1]  13/24
indicated [1]  35/16
indication [2]  51/9
79/1
indifference [1]  86/20
indirectly [1]  84/17
individual [6]  6/11
7/11 7/16 7/18 21/18
31/18
individuals [2]  52/13
53/19
induced [1]  93/5
93/15

induces [1]  89/8
indulging [1]  104/22
industry [1]  37/22
influenced [5]  75/6
77/2 100/5 103/11
104/6
info [2]  25/22 26/4
inform [3]  44/4 45/12
82/16
information [15]
11/22 25/24 78/19
82/5 98/19 100/4
100/6 100/10 100/18
101/15 102/16 103/10
103/12 103/15 103/23
informed [1]  60/8
informed [16]  52/6
88/9 88/16 89/5 92/9
92/11 92/24 93/7 93/9
93/18 95/20 96/1 96/3
96/5 96/18 96/20
infringement [24]
51/21 52/3 57/3 75/17
87/6 89/6 89/10 90/8
91/15 93/4 94/22
94/24 95/5 95/11 96/1
96/3 96/7 96/8 96/8
96/12 96/14 96/15
97/11 97/22
infringer [8]  92/16
92/19 92/24 93/14
93/18 95/2 95/8 95/23
infringer's [1]  93/16
infringes [2]  89/4 90/7
infringing [12]  87/6
89/5 89/7 89/12 89/13
89/14 92/16 92/18
93/5 93/6 93/14 93/16
initially [4]  10/1 10/4
59/2 61/2
injures [1]  86/24
injuries [1]  85/19
injuring [1]  86/18
injury [1]  85/17
innocent [3]  96/2 96/7
96/9
innocently [1]  96/3
insights [1]  67/20
insofar [2]  80/19 81/3
Instagram [2]  99/3
101/24
instance [1]  64/25
instead [1]  95/18
instruct [7]  49/5 54/2
71/21 73/18 74/24
77/7 85/8
instructed [4]  30/16
76/11 77/5 91/2
instructing [1]  89/13
instruction [42]  56/11
58/17 58/18 59/10
59/15 60/3 61/8 61/22
62/1 62/12 62/17
62/19 62/21 65/1 65/4
65/6 65/10 65/17 66/2
66/5 66/11 66/16
66/18 66/20 66/21
67/23 68/12 69/9 70/3

70/7 70/9 70/20 70/25
71/13 72/21 73/7
81/23 84/9 91/15
91/24 96/6 102/12
Instruction 14 [2]
58/18 70/7
Instruction 21 [1]
91/15
Instruction Number
14 [2]  62/12 62/17
Instruction Number
21 [1]  91/24
instructions [33]  49/3
49/4 53/22 53/25 54/1
54/8 54/9 54/9 54/15 56/8
56/16 57/20 57/22
57/23 58/16 71/5 71/6
71/22 71/25 72/5
72/14 72/16 74/9
74/10 74/13 74/19
74/21 74/25 75/10
76/2 98/18 101/14
104/15 104/17
intend [1]  56/15
intended [2]  51/13
76/20
intent [8]  64/1 66/23
69/11 69/15 69/23
82/24 83/20 84/22
intention [1]  60/23
intentionally [2]  93/5
93/15
interact [1]  19/14
interacted [1]  7/15
interacting [2]  17/10
19/16
interaction [2]  18/5
18/8
interactions [1]  19/17
19/18 25/2 43/10
interest [3]  44/17
79/13 94/2
interferes [1]  84/19
International [1]  5/16
Internet [7]  82/12 99/1
99/13 99/16 101/22
102/18 102/21
interpret [1]  76/20
interrogatories [1]
80/24
investigation [8]  6/14
11/6 25/5 30/3 99/14
100/3 102/19 103/9
investigator [10]  5/14
6/6 6/7 16/1 16/13
17/8 21/5 22/10 22/15
33/17
investigators [2]  7/3
31/16
inviting [1]  61/11
invoice [5]  12/20
12/23 12/25 13/12
13/25
involved [9]  6/20 44/8
44/18 45/13 89/21
99/6 99/19 102/4
102/24
involvement [2]  26/9

**I**

involvement... [1]
26/12
involves [2] 98/20
101/16
ish [1] 21/11
isolation [1] 50/20
issue [6] 35/17 58/15
61/16 61/23 68/25
72/21
issued [1] 84/6
issues [6] 35/10 49/22
88/6 98/19 101/16
105/6
it October [1] 17/3
item [1] 10/20

**J**

Jacqueline [1] 47/14
Jamie [31] 6/11 6/14
7/10 7/14 9/22 10/2
10/3 10/7 11/16 11/17
11/19 11/21 11/24
12/4 12/5 13/2 13/3
21/3 23/23 23/25
24/21 25/6 25/10
25/20 26/3 27/6 27/8
29/11 33/4 33/15
33/18
Jamie Brown [13]
10/7 11/16 11/17 21/3
23/23 23/25 25/6
25/20 26/3 27/6 27/8
33/4 33/15
Jamie's [1] 11/22
jeopardizes [2]
100/15 103/20
job [2] 33/14 38/8
joint [2] 55/19 58/17
Joshua [2] 21/24
21/24
JR [1] 1/3
JRT [1] 11/15
JUDGE [1] 1/3
judgment [1] 52/19
Judicial [1] 106/8
JUI [3] 1/23 106/14
106/15
jump [1] 64/23
juncture [1] 53/16
June [1] 46/1
June 26th [1] 46/1
juror [11] 68/1 69/20
82/3 97/25 98/1
100/14 100/17 102/6
103/19 103/22 104/12
jurors [17] 49/5 49/10
54/2 69/14 71/19
73/16 82/8 98/3 98/7
98/14 98/21 99/21
101/8 101/11 102/1
103/1 104/7
Justice [1] 50/5

**K**

KARINA [1] 2/4
KAZAL [37] 1/8 1/8
1/9 7/11 7/16 7/18

7/24 10/1 10/5 10/9
11/24 12/12 12/14
13/14 14/1 25/5 25/10
25/13 26/7 27/20
27/24 28/4 28/5 28/12
28/22 29/7 29/12
29/22 30/17 30/20
31/6 31/9 33/16 34/8
44/5 51/22 57/2
kazalfamilystory.com
[4] 51/23 58/9 97/7
97/16
Kazals [3] 26/25 34/5
34/7
keep [4] 67/2 78/18
78/22 101/9
kept [3] 17/24 19/25
33/2
key [1] 63/6
kick [1] 47/3
kickback [1] 45/20
kidding [1] 104/17
kind [6] 11/9 28/24
31/15 32/12 48/20
91/8
kinds [1] 77/19
knew [9] 10/2 58/10
89/14 93/4 93/13 97/2
97/5 97/17 97/21
knowing [2] 67/10
85/1
knowledge [5] 25/7
31/5 33/9 65/8 97/12
known [7] 58/10 89/7
89/21 97/2 97/6 97/17
97/22
knows [2] 58/21 89/7

**L**

L.A [3] 26/21 33/12
52/5
lack [1] 97/12
ladies [3] 4/6 48/11
74/5
lady [1] 17/23
laid [1] 60/16
language [5] 59/15
60/11 61/8 61/9 69/21
lap [1] 55/25
last [4] 37/5 43/23
69/5 102/7
late [1] 104/23
later [2] 70/2 74/17
laughing [1] 19/23
law [24] 2/3 2/3 2/7
2/11 2/12 2/12 17/13
17/15 49/2 50/8 59/3
64/20 68/9 70/5 74/24
75/4 75/4 77/19 86/23
89/22 90/1 99/19
101/14 102/24
lawful [1] 8/2
laws [2] 95/23 96/25
lawsuit [2] 8/18 8/21
lawyer [4] 57/13 77/24
77/25 78/2
lawyers [11] 28/15
74/18 76/9 76/17

76/18 76/22 76/24
80/17 99/20 101/2
102/25
learn [3] 29/10 99/15
102/20
learned [1] 46/25
least [6] 19/17 49/25
68/10 71/3 83/24
91/11
leave [4] 50/24 59/12
70/10 104/7
lectern [1] 72/2
left [8] 17/23 18/6
18/11 18/13 33/2
41/16 42/14 104/7
legal [9] 28/20 44/4
44/6 44/7 45/13 61/3
87/8 88/5 102/12
legitimate [2] 67/14
85/4
length [2] 36/9 78/23
LESOWITZ [1] 2/7
less [1] 95/24
let [11] 8/6 16/17 26/3
50/3 53/19 59/11
71/12 72/13 74/19
98/22 101/19
letter [5] 30/24 30/25
31/3 45/25 46/6
liability [1] 55/17
liable [7] 52/3 52/7
52/23 82/20 89/6
89/10 93/3
license [1] 95/13
licensed [4] 6/9 16/4
16/15 16/16
lieu [1] 80/20
life [1] 85/20
light [4] 50/15 55/19
59/11 79/19
like [26] 6/21 8/9
11/14 13/6 15/6 16/9
18/15 19/17 23/19
24/16 25/8 25/15
29/25 30/1 30/8 33/13
34/23 40/13 42/3 42/4
42/16 50/22 52/14
56/14 59/3 65/11
likes [1] 75/6
limit [1] 51/14
limitation [1] 97/19
limitations [7] 57/23
62/11 62/15 96/24
96/25 97/8 97/8
limited [7] 29/23 77/7
77/8 84/6 84/16 99/2
101/23
limits [1] 91/10
line [7] 7/5 29/6 58/3
58/4 58/5 73/2 73/9
Line 14 [1] 58/4
line 20 [1] 73/2
line 4 [1] 73/9
lines [3] 69/9 70/8
73/9
lines 22 [1] 69/9
LinkedIn [1] 99/3
101/24

list [2] 76/16 81/14
listed [1] 65/22
listen [1] 99/10
102/14
listened [1] 98/8
listener [1] 50/17
lists [1] 25/10
literally [1] 39/22
40/13
literary [1] 87/14
little [7] 21/10 39/16
41/17 42/5 42/11
48/13 96/2
live [1] 80/21
LLC [1] 26/10
lobby [1] 43/16
located [2] 5/20 81/12
location [2] 16/21
17/9
locations [2] 14/11
14/12
locked [1] 41/25
long [12] 6/5 18/21
37/22 38/19 53/6
58/22 59/1 59/14
71/24 72/4 87/22
102/7
Long Beach [1] 38/19
longer [2] 47/2 69/17
look [12] 42/4 52/9
52/12 53/14 53/25
55/15 57/10 61/5 69/8
71/5 71/6 71/12
looking [16] 9/23 11/4
11/20 12/18 12/21
13/17 16/19 19/3 20/3
20/11 41/17 55/3
61/21 63/3 64/5 66/7
looks [5] 11/14 16/9
42/3 42/16 50/22
LOS [4] 1/17 1/24 2/13
4/1
loss [1] 85/20
losses [1] 95/22
lost [1] 95/13
lot [9] 6/20 15/21
26/21 44/19 55/21
58/23 59/1 61/16
61/18
loud [1] 6/3
lunch [1] 49/23
lying [1] 46/12

**M**

M-a-r-k [1] 4/23
mad [1] 29/25
made [27] 13/3 13/22
28/10 28/14 49/21
56/4 65/6 66/23 69/10
69/14 69/15 69/23
70/1 81/4 83/19 84/3
84/22 91/5 91/5 91/7
91/10 91/13 94/5 94/8
94/19 95/11 98/10
mail [14] 9/11 9/13
10/12 11/12 11/14
12/5 13/20 25/17
27/24 28/12 45/14

45/19 98/25 101/22
mailed [1] 10/14
mails [3] 9/2 10/14
44/9
main [2] 41/14 41/15
mainly [2] 38/10 42/9
maintenance [1]
81/23
make [20] 7/5 15/4
34/23 52/23 53/6
53/20 54/3 56/10
56/21 57/25 60/15
65/6 70/2 73/14 73/15
73/20 79/24 99/14
102/19 103/24
makes [4] 49/8 57/7
71/9 77/19
making [2] 32/7 94/3
malice [2] 49/12 70/18
malicious [2] 86/15
86/16
manner [2] 15/2 79/12
many [3] 38/13 38/21
39/13
margins [1] 53/19
mark [5] 4/10 4/13
4/23 55/12 56/8
Mark Woodward [2]
4/10 4/23
MARKED [1] 3/13
market [3] 94/17 95/7
95/8
marketing [3] 38/10
38/11 38/12
material [4] 82/13
88/3 92/7 92/7
materiality [1] 89/8
materially [2] 93/6
93/16
materials [6] 38/12
82/14 82/16 82/17
99/13 102/18
Matt [1] 39/7
matter [9] 48/17 48/20
64/19 68/9 81/25 88/4
99/9 102/10 106/6
matters [6] 44/4 44/6
44/8 45/13 48/14 49/1
May 26th [1] 45/15
May 28,2018 [1] 45/19
maybe [5] 21/24 27/3
52/9 61/2 70/21
mean [25] 8/6 26/8
28/22 28/24 33/12
35/24 39/17 43/11
50/2 52/15 59/13
59/16 60/3 60/14
60/14 61/4 61/14
63/11 67/4 68/1 68/2
68/3 70/20 71/10
85/10
meaning [4] 59/25
64/12 68/8 68/18
means [27] 56/24
59/19 60/12 60/17
61/7 63/23 64/7 64/16
66/12 67/10 70/9
70/10 70/10 75/7

**M**

**means...** [13] 75/22 78/11 83/8 84/10 84/13 84/14 84/18 85/1 85/15 88/14 95/5 98/25 101/22
**meant** [1] 44/15
**measure** [1] 85/9
**media** [9] 39/15 99/4 99/5 99/10 99/22 101/25 102/4 102/14 103/2
**medium** [1] 87/25
**meet** [2] 55/21 74/11
**MEI** [1] 1/23 106/14 106/15
**member** [6] 83/7 83/22 83/23 97/25 100/21 100/23
**members** [3] 81/20 99/5 102/3
**memory** [5] 76/23 79/11 104/4 104/5 105/10
**mental** [1] 85/23
**mentioned** [3] 14/18 32/14 49/24
**merchant** [1] 13/19
**merits** [2] 98/23 101/20
**messaging** [2] 99/1 101/22
**met** [3] 5/10 25/14 37/15
**method** [1] 84/18
**methods** [2] 87/18 90/4
**Mexican** [1] 50/8
**Mexico** [1] 50/9
**mic** [1] 22/12
**middle** [2] 11/23 41/6
**might** [4] 17/16 59/18 70/19 78/7
**mimics** [1] 59/15
**mind** [3] 29/3 65/9 101/9
**mine** [1] 27/10
**minimum** [1] 78/23
**minute** [3] 18/21 48/14 53/21
**minutes** [9] 39/12 39/24 43/4 43/16 72/6 73/20 105/9 105/11 105/16
**minutes'** [1] 39/18
**misfortune** [1] 87/3
**misleading** [2] 100/6 103/12
**missed** [2] 62/13 70/21
**misspoke** [1] 66/10
**mistake** [3] 12/3 58/1 70/25
**mistaken** [2] 58/1 105/12
**mistakes** [1] 79/24
**mistrial** [2] 100/16 103/21

**misusing** [1] 87/1
**moment** [4] 18/21 51/17 53/12 87/24
**moments** [3] 17/22 34/4 43/7
**MONDAY** [3] 1/15 4/1 38/21
**money** [5] 27/5 27/7 46/20 85/16 95/5
**monitor** [1] 7/4
**monitors** [1] 84/19
**months** [5] 8/12 27/4 46/19 46/23 83/11
**more** [16] 36/1 39/23 55/6 56/15 61/13 61/18 73/19 75/23 77/17 81/20 88/15 92/8 95/25 97/9 100/21 105/16
**morning** [4] 72/17 74/12 74/14 104/16
**mostly** [1] 38/11
**motion** [6] 49/17 50/14 53/16 70/1 70/2 87/16
**move** [5] 13/6 24/6 24/12 30/8 42/10
**moved** [1] 15/9 18/18 47/1
**Mr. Brown** [4] 6/16 7/21 8/4 12/9
**Mr. David** [26] 8/4 14/23 16/9 17/14 17/23 21/5 22/10 22/16 24/10 28/23 29/1 29/22 32/17 35/22 37/25 43/10 43/19 43/23 44/3 44/20 44/23 45/8 46/11 46/18 46/20 47/3
**Mr. David's** [3] 18/4 35/21 45/22
**Mr. Fuentes** [1] 11/14
**Mr. Gebelin** [1] 73/21
**Mr. Gomez** [2] 16/11 16/17
**Mr. Kazal** [1] 30/20
**Mr. Parlato** [1] 37/9
**Mr. Rodric David** [1] 14/3
**Mr. Taylor** [12] 4/8 34/17 47/20 48/2 49/16 50/25 54/16 69/2 70/11 72/2 73/12 73/23
**Mr. Wiener** [10] 8/16 15/19 34/12 50/12 54/12 62/5 68/14 69/6 72/10 105/10
**Mr. Woodward** [3] 5/5 23/11 34/3
**much** [6] 10/5 24/14 72/12 77/21 80/14 96/4
**multi** [1] 6/20
**multi-facetted** [1] 6/20

**mum-n925** [1] 42/21
**music** [1] 20/8
**musical** [1] 87/14
**must** [37] 55/16 67/15 67/17 75/4 75/5 75/7 75/22 77/6 77/9 78/7 78/12 82/16 83/24 85/4 85/6 85/13 86/3 87/20 88/14 88/17 91/24 92/4 92/10 93/8 94/22 95/2 95/16 97/4 97/20 98/4 98/5 98/16 98/18 99/8 101/12 101/14 102/9

**N**

**nailed** [1] 54/2
**name** [22] 4/22 7/12 7/13 7/19 12/6 14/22 14/24 21/18 21/23 21/24 23/11 28/4 28/8 28/8 28/17 28/18 28/20 31/22 37/2 37/5 52/16 52/22
**named** [5] 6/11 7/11 7/16 7/18 31/18
**names** [1] 29/15
**national** [1] 50/9
**nature** [4] 7/6 85/19 94/11 94/13
**near** [2] 14/9 48/12
**necessarily** [3] 50/12 55/16 80/12
**necessary** [2] 78/14 100/19
**need** [17] 9/25 17/21 28/8 32/22 32/23 42/1 48/13 54/18 63/14 67/21 69/19 69/20 70/5 70/20 71/3 81/17 105/16
**needed** [1] 17/20
**needs** [1] 69/23
**neighborhood** [7] 14/9 18/3 18/9 18/13 19/5 20/21 20/24
**neighbors** [2] 19/19 19/24
**Nester** [1] 27/17
**never** [9] 7/19 7/23 10/10 12/5 12/14 25/14 25/14 28/8 31/15
**new** [2] 73/17 96/20
**news** [4] 71/19 99/10 102/14 102/16
**next** [7] 4/8 11/7 12/8 34/18 41/17 42/5 48/2
**nine** [1] 30/13
**Ninth** [1] 50/1
**Ninth Circuit** [1] 50/1
**nobody** [1] 7/5
**none** [3] 15/5 19/23 79/6
**nonjuror** [2] 82/2 82/4
**nonprofit** [1] 94/12
**normal** [2] 33/13 40/4
**normally** [1] 61/19

**note** [3] 81/16 81/19 100/20
**noted** [1] 70/6
**notes** [7] 104/2 104/2 104/4 104/5 104/6 104/7 104/8
**nothing** [12] 4/18 21/1 23/6 32/6 33/23 34/10 34/13 36/6 36/24 45/4 47/18 47/21
**notify** [3] 100/18 102/5 103/23
**November** [7] 25/18 27/1 27/22 27/24 29/12 30/17 32/1
**November 10th** [1] 25/18
**November 2016** [1] 32/1
**November 7th** [1] 27/24
**November 8** [1] 30/17
**November of** [1] 27/22
**number** [10] 12/19 12/22 57/2 57/2 62/12 62/17 69/9 78/23 80/12 91/24
**Number 14** [2] 12/19 69/9
**Number 2** [1] 57/2
**numbered** [1] 9/8
**Numbers** [1] 96/6

**O**

**o'clock** [1] 74/16
**oath** [7] 75/9 80/16 81/1 100/1 100/11 103/7 103/16
**object** [3] 64/18 76/25 78/2
**objection** [16] 13/7 13/8 21/15 21/19 22/1 23/1 24/11 30/11 34/24 44/10 70/6 70/11 77/2 78/3 78/4 78/6
**objections** [3] 54/14 57/16 76/24
**obligated** [2] 39/9 47/17
**observation** [1] 19/15
**observe** [6] 14/11 14/15 15/1 17/10 18/8 40/10
**observed** [8] 14/13 15/4 16/20 18/12 19/4 20/12 36/8 43/19
**obtain** [3] 16/5 82/14 90/23
**obtained** [5] 15/18 26/17 26/20 27/5 50/23 70/18
**obviously** [3] 49/21 53/4 70/18
**occasion** [1] 83/24
**occasions** [1] 14/4
**occurred** [2] 71/7 83/5

**occurs** [1] 91/9
**October** [2] 17/3 27/1
**of the** [1] 63/18
**off** [2] 16/25 22/11
**offers** [1] 77/25
**office** [13] 5/7 8/12 10/8 10/10 15/7 16/2 20/7 20/23 21/4 37/11 88/3 90/24 91/1
**offices** [2] 2/3 38/19
**OFFICIAL** [1] 1/23
**often** [1] 79/24
**Oh** [3] 51/20 58/4 66/8
**omission** [1] 86/23
**omitted** [1] 73/2
**once** [3] 49/3 53/22 54/2
**one** [30] 14/4 17/16 20/19 32/14 34/9 35/23 44/7 46/11 47/13 50/2 52/15 56/25 57/24 58/15 61/21 62/6 63/11 70/12 77/17 80/24 81/20 83/17 83/24 89/1 91/6 92/8 93/23 97/24 100/21 104/8
**ongoing** [1] 66/14
**only** [17] 12/9 34/7 56/6 76/13 77/7 77/8 81/25 86/13 89/24 95/21 98/6 98/9 98/17 99/24 101/13 103/5 104/5
**oOo** [1] 105/21
**open** [9] 4/4 23/4 36/17 42/2 48/24 74/3 100/25 101/9 105/1
**opening** [2] 76/19 105/13
**operate** [2] 81/11 81/18
**operation** [5] 28/24 38/14 82/5 87/18 90/4
**opinion** [5] 48/17 50/6 75/12 79/1 98/11
**opinions** [1] 75/6
**opportunity** [2] 79/9 92/3
**oppression** [1] 70/18
**oppressive** [2] 86/15 86/23
**options** [1] 55/15
**orange** [1] 41/18
**order** [3] 82/25 84/5 84/6
**ordered** [3] 78/9 99/8 102/10
**organization's** [1] 38/12
**organize** [2] 32/4 32/5
**organized** [1] 32/3
**original** [10] 87/20 87/21 88/13 89/23 89/23 90/5 90/11 90/21 91/17 91/22
**originally** [1] 70/25
**Orozco** [1] 50/11

**O**

Orozco-Santillan [1] 50/11
others [6] 80/9 89/23 90/2 91/4 91/14 94/3
otherwise [5] 7/15 76/2 86/24 101/6 101/18
out [31] 7/5 9/17 27/18 31/23 31/25 32/9 32/12 32/13 33/14 40/4 43/17 44/6 44/8 45/16 49/2 50/13 51/16 53/1 53/8 53/22 53/23 55/6 56/1 57/3 60/16 61/13 69/3 72/14 78/14 84/23 101/1
outcome [1] 79/13
outside [23] 4/10 20/24 34/21 35/18 39/24 40/9 40/14 41/1 42/20 43/5 43/9 43/20 48/24 51/6 82/12 100/3 100/18 103/9 103/23 105/1
over [9] 27/9 46/23 48/13 64/8 66/13 84/11 98/1 100/17 103/22
overlap [1] 92/7
overly [1] 104/6
overruled [4] 21/20 44/13 47/9 78/2
overstick [2] 28/5 28/17
overwhelm [1] 61/21
own [6] 5/16 66/3 98/10 99/15 102/20 104/4
owner [18] 17/19 32/20 87/9 87/25 88/7 88/12 89/3 90/10 90/17 90/19 90/23 91/4 91/13 93/24 94/1 94/3 95/3 95/6
owner's [2] 90/7 94/4
ownership [1] 87/4
owns [1] 91/12

**P**

P-a-r-l-a-t-o [1] 37/5
packet [1] 71/13
page [19] 3/4 11/23 13/4 13/12 13/16 13/16 25/15 55/5 55/7 57/11 57/22 57/23 58/20 70/13 70/16 73/2 73/9 73/10 106/7
page 1 [1] 13/12
page 2 [2] 13/4 13/16
page 21 [1] 73/2
page 41 [1] 57/23
page 5 [2] 25/15 70/13
pages [1] 72/5
pages of [1] 72/5

paid [4] 7/7 7/9 7/10 13/18
pain [1] 85/23
pantomime [1] 87/14
paper [2] 81/14 81/15
papers [2] 8/21 8/23
paragraph [2] 11/24 83/19
paragraph 1 [2] 11/24 83/19
parameters [1] 9/19
Pardon [1] 58/24
parent [1] 83/9
park [2] 2/13 41/23
parked [1] 17/12
Parlato [1] 34/20 35/6 36/19 37/4 37/9 45/8
part [17] 15/8 18/17 27/9 51/7 59/5 63/17 64/25 65/23 66/21 66/22 67/5 73/4 79/6 80/9 83/18 91/11 91/23
particular [2] 23/16 89/24
particularly [1] 59/11
parties [13] 49/4 54/11 55/23 75/15 76/3 80/24 84/18 99/20 100/8 100/11 102/25 103/13 103/16
parties' [1] 103/5
partner [1] 27/17
parts [1] 50/19
party [5] 75/20 75/25 76/1 80/17 85/10
party's [1] 99/23
pass [1] 26/1
passed [1] 25/5
passersby [1] 19/14
passing [1] 19/16
past [4] 37/23 46/25 47/1 71/10
pattern [41] 51/11 59/5 59/17 59/20 59/21 59/21 59/25 60/7 60/9 60/12 60/17 61/6 63/7 63/22 63/25 64/7 64/12 64/15 65/11 65/18 66/11 66/12 66/22 67/7 67/22 68/1 68/8 68/13 68/15 68/18 69/19 70/9 82/23 83/4 83/12 83/15 83/18 84/1 84/2 84/10 84/16
patterns [1] 8/8
pause [1] 19/2
pay [2] 9/18 95/10
paying [1] 24/21
payment [2] 10/7 13/22
payments [2] 13/3 24/20
pedestrian [1] 41/21
pen [1] 52/14
penalize [1] 95/22
people [12] 14/11

19/4 23/12 51/4 51/9 52/1 79/24 79/25 99/6 99/19 102/4 102/24
per [1] 43/18
perceived [1] 86/21
perform [2] 26/25 61/17
performed [1] 24/15
performing [1] 87/11
perhaps [6] 22/5 35/2 36/12 56/3 56/4 59/2 83/14 83/20 83/23 83/24 85/12 85/14 85/17 86/9 86/14 86/18 86/25 87/3 87/4 88/8 88/17 88/22 90/8 90/10 90/13 90/14 90/15 90/17 90/19 90/20 90/22 91/16 91/18 91/24 92/4 92/11 92/22 92/23 92/25 93/11 93/19 93/21 93/21 94/23 94/25 95/2 95/13 95/15 95/17 95/19 95/21 96/16 96/24 97/1 97/2 97/11 97/13 97/21
plaintiff's [1] 95/17
plaintiffs [9] 1/6 2/2 23/12 54/13 75/18 86/5 86/10 88/10 88/11
plaintiffs' [36] 8/13 52/18 53/2 58/2 58/8 83/13 84/3 84/20 85/13 86/16 86/19 86/20 86/22 88/9 88/22 88/23 88/25 90/8 90/21 91/17 91/20 91/23 92/1 92/2 92/3 92/9 92/24 93/8 93/19 94/20 94/21 94/22 95/12 95/15 95/16 97/14
play [2] 18/22 42/10
played [5] 15/12 18/25 19/11 41/4 42/12
please [16] 4/21 4/21 12/16 22/12 34/18 37/2 48/16 48/21 48/23 54/21 59/8 75/10 78/16 100/18 103/23 105/3
PM [5] 54/6 54/6 72/19 74/2 74/2
point [13] 11/21 21/4 32/14 38/23 50/12 51/16 53/1 53/8 61/5 62/6 62/13 65/1 70/12 pointed [1] 50/13
points [2] 54/18 64/18
police [13] 17/10 17/18 17/20 17/23 18/4 18/18 18/13 31/7 31/11 31/13 32/15 32/25 33/2
poorly [1] 46/21

paid [4] ... (placed) ...

102/22
placed [1] 80/16
places [1] 63/19
placing [1] 52/19
plaintiff [73] 37/24 44/12 48/8 49/19 64/2 66/3 66/24 67/12 67/18 68/23 69/11 69/14 69/16 69/22 69/24 75/15 75/17 82/21 82/25 83/1 83/6 83/14 83/20 83/23 83/24 85/12 85/14 85/17 86/9 86/14 86/18 86/25 87/3 87/4 88/8 88/17 88/22 90/8 90/10 90/13 90/14 90/15 90/17 90/19 90/20 90/22 91/16 91/18 91/24 92/4 92/11 92/22 92/23 92/25 93/11 93/19 93/21 93/21 94/23 94/25 95/2 95/13 95/15 95/17 95/19 95/21 96/16 96/24 97/1 97/2 97/11 97/13 97/21

portion [6] 49/14 66/1 66/4 83/12 88/20 94/14
position [7] 19/21 64/19 68/16 68/21 68/21 69/8 75/15
possible [5] 45/22 80/19 81/3 99/23 103/3
potential [1] 94/16
power [1] 87/1
practical [1] 84/4
practice [1] 10/13
preceding [2] 57/11 83/11
precluded [1] 31/17
precludes [1] 35/8
prefer [1] 72/1
preference [2] 71/23 72/1
prejudice [2] 75/7 79/15
prepared [5] 22/9 22/17 89/18 91/6 104/10
prepares [1] 89/2
preparing [1] 87/11
preponderance [17] 75/21 85/15 86/11 88/11 88/14 90/9 90/20 91/19 91/25 92/12 93/12 94/7 94/19 95/3 96/10 96/17 97/20
prescribed [1] 97/3
presence [8] 4/4 23/4 36/17 38/24 43/20 48/25 74/3 105/2
present [4] 14/2 78/16 80/22 81/24
presented [8] 53/7 75/25 80/20 80/23 99/25 100/10 103/6 103/15
preserved [1] 70/7
preside [1] 98/1
presiding [3] 97/25 97/25 104/12
press [2] 99/5 102/4
pretty [9] 10/5 29/6 29/24 31/2 32/10 32/13 32/24 38/1 39/21
prevent [3] 90/1 94/3 96/25
previous [1] 55/7
previously [1] 65/3
Price [1] 39/7
principles [2] 87/19 90/4
print [2] 28/3 81/13
printed [2] 53/22 53/23
printer [1] 81/8
printing [1] 49/2
prior [7] 8/7 65/17 66/1 66/11 66/20 97/10 97/22

**P**

private [5]  5/14 6/7 16/1 16/13 31/16
privy [1]  19/22
probability [2]  85/21 85/24
probably [11]  14/8 19/21 21/10 30/6 39/18 39/22 55/13 58/21 72/6 75/23 88/15
problem [5]  53/4 72/8 81/22 82/1 82/4
problems [1]  28/20
Procedure [1]  84/7
procedures [3]  81/2 87/18 90/3
proceed [4]  5/1 15/10 37/6 49/13
proceedings [1]  1/14 22/7 35/4 100/15 103/20 105/20 106/6
proceeds [1]  27/8
process [7]  100/2 100/7 100/17 103/8 103/13 103/22 104/21
processes [2]  87/18 90/3
produce [3]  8/17 8/25 11/7
produced [3]  15/7 15/19 20/9
producer [1]  38/9
profession [2]  5/13 37/20
professional [1]  20/5
proffer [1]  35/13
proficient [1]  31/2
profited [1]  89/11
profits [2]  95/1 95/19
program [1]  87/17
programs [2]  99/17 102/22
prohibit [1]  97/9
prohibiting [1]  84/7
prohibits [1]  96/24
projector [1]  81/8
prompted [1]  45/22
proof [2]  77/15 77/17
proper [2]  35/11 59/18
properly [2]  102/12 102/13
property [3]  39/16 40/11 84/20
proposal [2]  69/2 69/4 71/14
propose [3]  55/18 59/9 59/11
proposed [3]  49/8 54/8 70/4
proposing [1]  60/11
protect [3]  31/12 99/23 103/4
protected [7]  51/12 51/15 59/5 59/24 60/20 61/1 61/12 63/16 63/21 64/11

64/19 64/20 65/15 65/19 68/7 68/17 68/24 69/13 69/17 69/22 89/25
protection [6]  31/7 31/10 31/15 31/17 51/6 51/10
protest [11]  14/2 14/13 18/12 21/7 21/11 26/18 31/23 32/3 32/5 35/20 94/6
protesting [2]  14/11 40/2
protestors [28]  14/14 15/1 17/11 17/13 17/25 18/9 19/7 19/13 19/15 20/15 20/24 26/14 32/2 32/6 32/12 33/4 33/9 38/24 39/1 39/4 39/11 39/19 39/25 40/9 41/1 42/16 42/19 43/20
prove [11]  69/23 88/17 88/21 90/16 91/24 92/4 93/1 93/22 95/2 95/22 97/20
proved [8]  76/12 86/2 90/13 92/22 93/20 94/18 96/9 96/16
proven [1]  63/15
proves [2]  82/21 90/20
provide [5]  16/5 20/7 31/7 31/10 31/16
provided [4]  15/21 54/7 81/6 81/14
provides [2]  63/24 82/15
providing [1]  82/7
proving [12]  75/18 75/20 85/14 86/10 88/10 90/9 91/16 91/19 92/12 93/11 94/7 97/19
provisions [1]  65/14
provocative [2]  7/2 8/8
provoke [2]  28/25 29/22
provoking [1]  29/3
public [1]  94/1
publication [2]  58/9 97/15
publicly [3]  89/1 89/1 89/19
pull [1]  50/3 59/7
pulled [1]  71/1
punish [1]  86/7
punitive [14]  49/10 49/13 54/10 70/18 71/2 71/6 71/12 72/25 73/3 86/6 86/7 86/8 86/11 86/13
purchase [1]  26/22
purpose [22]  21/14 24/5 44/2 51/13 64/10 66/14 67/14 77/7 77/8 77/10 78/12 78/18

81/25 82/3 82/10 84/12 85/4 86/17 91/11 94/6 94/10 95/21
purposes [7]  60/16 63/5 70/8 83/8 84/9 86/7 94/12
pursuant [4]  5/6 37/10 84/6 106/3
putting [2]  27/11 52/15

**Q**

question [33]  12/8 29/18 31/8 31/13 33/8 34/4 49/11 55/12 56/20 57/2 57/4 57/6 57/8 59/3 60/25 61/3 61/11 68/9 70/5 70/15 70/17 71/1 71/17 77/1 77/24 78/3 78/4 78/6 78/7 81/22 91/4 101/1 101/4
Question 1 [1]  57/8
Question 5 [1]  70/15
Question 9 [1]  70/17
Question Number 5 [1]  57/2
questions [18]  49/10 54/18 55/6 55/21 57/1 68/3 70/13 70/17 76/24 80/17 80/18 81/1 81/18
Quickly [1]  22/6
Quite [1]  39/14
quiz [1]  104/16
quote [8]  26/3 27/25 28/13 28/18 29/13 45/15 46/12 47/2

**R**

raise [2]  58/15 61/23
raised [2]  55/20 56/22
raising [1]  61/5
RAMON [1]  2/4
RAV [1]  14/22
reach [6]  59/18 60/10 60/10 98/3 98/9 98/16
reached [2]  101/7 104/11
reaching [1]  76/13
reaction [2]  35/21 36/9
reactions [1]  50/17
read [17]  46/5 46/9 49/23 49/25 51/2 57/25 66/2 70/19 72/5 72/16 74/9 75/10 99/10 99/21 102/13 103/1 104/8
reading [6]  28/1 28/14 29/14 61/25 64/7 67/10
reads [1]  66/22
ready [1]  104/14
real [3]  31/5 45/8 45/10
realize [2]  55/1 55/5

really [3]  53/18 56/19 105/7
reason [6]  45/8 45/10 73/8 93/4 93/13 96/13
reasonable [14]  63/19 66/24 67/16 68/23 69/12 69/16 69/24 83/20 85/5 85/21 85/24 92/3 93/25 97/12
reasonableness [1]  79/18
reasonably [5]  66/3 83/6 84/24 85/16 95/10
rebut [1]  36/12
rebuttal [1]  48/9
recall [12]  6/19 16/25 17/2 17/6 21/9 21/23 25/24 39/13 42/21 75/8 103/25 105/13
recast [1]  89/17
receipt [2]  13/18 13/20
receive [2]  45/25 102/11
received [16]  8/12 8/14 76/7 76/14 77/7 77/13 77/24 78/4 78/5 81/5 81/15 81/16 82/8 95/14 98/17 101/13
recess [9]  53/21 54/4 54/5 54/6 72/18 72/19 74/1 74/2 78/16
reckless [4]  83/22 86/15 86/18 96/21
recognize [2]  15/14 61/7
recognizing [1]  68/5
record [4]  4/22 37/3 55/20 78/10
recorded [2]  20/2 20/4
recording [1]  87/16
recover [3]  94/23 95/1 95/4
recovering [1]  97/1
recovery [1]  97/9
REDIRECT [3]  3/7 33/24 34/1
reduction [2]  95/6 95/8
refer [1]  81/21
reference [4]  11/23 65/19 99/13 102/18
referral [2]  45/20 47/3
referring [4]  19/9 20/17 25/24 60/1
refers [1]  73/3
reflects [2]  66/14 86/20
refrain [2]  46/7 82/16
regard [2]  8/25 67/21
regarding [2]  44/7 75/12
regardless [1]  75/25
register [2]  88/1 88/6
registered [1]  32/20

registers [1]  88/6
registration [4]  88/1 88/7 90/23 91/1
regret [1]  52/10
regular [3]  39/2 40/2 43/12
regularly [2]  83/11 83/12
regulations [1]  106/8
Rehnquist [1]  50/5
relate [1]  70/17
related [4]  8/17 8/23 53/4 83/9
relates [14]  22/19 35/14 36/2 36/10 49/4 50/14 50/21 51/22 53/17 67/24 68/11 68/14 68/15 71/14
relating [2]  65/15 70/14
relation [1]  94/15
relationship [2]  33/15 46/23
relevance [6]  22/3 22/19 24/7 24/8 35/9 35/12
relevant [2]  35/24 78/18
relief [1]  70/14
rely [1]  104/4
remember [7]  42/22 76/21 79/25 80/1 100/11 101/4 103/16
remind [2]  46/3 98/18
remove [1]  82/17
rendered [1]  85/11
Repeat [1]  44/22
reported [2]  80/18 106/5
REPORTER [1]  1/23
REPORTER'S [1]  1/14
reports [2]  9/4 102/16
represent [2]  33/4 33/6
represented [1]  95/13
repress [1]  51/15
reproduce [1]  89/16
reproduces [1]  89/1
reproducing [1]  87/10
request [8]  28/7 28/10 30/25 39/8 45/2 78/24 78/25 81/15
requested [6]  30/24 31/3 39/2 39/6 44/6 45/1
requesting [1]  73/9
require [2]  100/16 103/21
required [3]  83/1 86/6 95/10
requirements [1]  88/5
requires [1]  81/22
research [7]  48/19 99/12 99/18 100/3 102/17 102/23 103/9
resembles [1]  87/21
reserved [2]  70/1 70/5
resided [1]  83/12

**R**

**residence** [1]  50/8
**resides** [1]  83/11
**resources** [1]  22/18
**respect** [15]  49/7
 49/17 49/20 51/17
 51/21 54/22 56/19
 57/14 57/19 57/21
 57/22 58/16 58/17
 59/17 70/13
**respond** [2]  99/8
 102/9
**responded** [1]  44/16
**response** [3]  15/7
 15/19 81/1
**responsible** [3]  27/11
 52/2 53/6
**rest** [3]  48/6 72/25
 80/10
**restate** [1]  68/21
**restraining** [1]  84/5
**restrictions** [2]
 100/14 103/19
**result** [7]  66/2 83/4
 87/23 94/24 95/4
 100/16 103/21
**results** [1]  25/4
**return** [3]  27/8 102/13
 104/14
**revenge** [1]  47/5
**review** [1]  54/11
**reviewed** [1]  58/22
**revise** [1]  65/14
**revision** [4]  62/10
 65/4 65/16 65/24
**revoked** [2]  66/5
 66/18
**rewrite** [1]  62/19
**right** [90]  4/6 4/12 6/4
 9/8 10/16 11/12 15/10
 19/2 23/1 23/7 23/19
 24/11 24/19 24/23
 25/8 25/15 25/25
 27/22 29/21 30/25
 31/14 32/1 32/14 33/7
 34/11 34/22 35/1
 36/13 37/11 38/2 42/5
 43/2 43/5 45/5 46/7
 47/2 47/19 47/22 48/2
 48/6 48/11 49/1 49/19
 51/20 53/10 53/14
 54/3 54/7 54/16 54/20
 55/9 57/6 57/16 58/7
 58/14 58/19 60/10
 60/10 61/4 62/3 62/8
 62/25 65/2 65/25 66/6
 70/15 70/24 72/13
 72/17 72/20 73/14
 73/19 73/20 73/25
 74/5 74/20 87/10
 89/12 89/15 89/16
 90/1 91/14 92/17
 92/21 96/22 98/14
 99/24 105/4 105/15
 105/16
**rightfully** [1]  36/10
**rights** [7]  86/16 86/19
 86/21 86/22 86/25

**rise** [6]  48/22 54/5
 72/18 74/1 104/25
 105/19
**risk** [2]  61/11 86/22
**RODRIC** [12]  1/5 14/3
 14/23 14/24 23/13
 23/14 28/14 39/7
 45/20 75/17 82/21
 85/12
**Rodric David** [6]
 23/13 39/7 45/20
 75/17 82/21 85/12
**room** [14]  1/24 6/4
 7/17 75/1 81/8 81/10
 81/24 82/2 82/7 82/18
 99/1 101/23 104/3
 104/8
**roughly** [1]  21/9
**route** [1]  61/8
**routine** [2]  43/15
 68/4
**rude** [1]  32/24
**Rule** [1]  49/17
**Rule 50** [1]  49/17
**rules** [10]  77/1 77/23
 78/1 78/20 99/23
 100/12 100/13 103/4
 103/17 103/18
**ruling** [1]  77/3
**run** [1]  61/11
**running** [1]  46/14

**S**

**S.Ct** [1]  50/4
**safe** [2]  7/6 28/15
**safety** [16]  40/1 43/20
 63/20 66/3 68/23
 69/12 69/16 69/24
 83/7 83/7 83/21 83/21
 83/22 84/24 84/25
 86/20
**sales** [2]  27/8 38/13
**same** [7]  10/18 20/20
 28/12 43/10 79/25
 80/21 81/3
**SAN** [1]  2/4
**Santillan** [1]  50/11
**satisfied** [1]  88/5
**saying** [3]  42/22 52/20
 68/5
**scenario** [2]  52/13
 68/6
**scene** [3]  19/4 20/11
 40/25
**scope** [2]  91/6 91/7
**screen** [1]  40/22
**screw** [2]  28/16 28/23
**sculptural** [1]  87/15
**search** [2]  99/17
 102/22
**searching** [3]  50/8
 99/13 102/18
**seated** [5]  4/21 48/23
 53/20 102/6 105/3
**second** [5]  49/15 63/7
 64/13 83/10 101/12
**secondly** [1]  64/16
**secrets** [1]  36/4

**section** [5]  61/20 63/5
 67/24 84/7 106/3
**Section 527.6** [1]  84/7
**security** [4]  41/24
 42/1 42/7 42/9
**see** [20]  9/5 11/23
 11/25 18/4 23/22
 32/18 41/10 41/19
 41/20 42/6 43/17
 48/21 57/22 59/3
 59/23 72/15 79/10
 79/25 104/23 105/17
**seeing** [1]  19/13
**seek** [2]  82/5 95/17
**seeking** [1]  29/22
**seeks** [2]  87/5 95/19
**seem** [3]  40/6 43/19
 67/21
**seemed** [1]  33/13
**seems** [7]  22/23 29/25
 35/24 51/3 59/3 67/19
 68/4
**seen** [5]  9/10 15/23
 29/14 35/18 77/11
**segment** [1]  11/8
**self** [1]  5/16
**self-employed** [1]
 5/16
**seller** [1]  95/10
**send** [9]  9/13 12/4
 26/4 27/24 45/14
 45/19 81/19 100/20
 101/1
**sending** [2]  9/17
 81/16
**sense** [3]  49/9 57/7
 60/15
**sent** [6]  9/3 11/14
 12/9 12/25 46/19
 74/25
**sentence** [2]  64/14
 68/17
**separate** [1]  63/25
**separately** [1]  76/2
**series** [2]  64/8 66/12
 84/11
**seriously** [2]  67/12
 85/2
**serve** [2]  74/21 98/1
**served** [3]  5/7 15/20
 37/11
**serves** [2]  67/14 85/4
**service** [6]  9/14 10/15
 11/7 25/9 99/7 102/8
**services** [4]  5/17 7/7
 13/19 26/25
**serving** [1]  91/11
**session** [2]  1/18
 77/12
**SETH** [4]  2/3 2/3 8/14
 23/11
**Seth Wiener** [2]  8/14
 23/11
**setting** [1]  73/3
**several** [2]  19/17
 23/17
**severity** [1]  87/1
**shake** [1]  40/12

**shall** [7]  4/17 4/18
 36/23 36/24 82/2 83/1
 98/2
**share** [2]  38/7 56/23
**shelter** [1]  42/7
**sheriff's** [2]  17/10
 20/17
**shoo** [1]  17/21
**shooed** [3]  20/19
 32/15 32/16
**short** [3]  64/9 66/13
 84/11
**shout** [1]  42/23
**show** [6]  15/6 18/15
 40/16 81/11 88/22
 91/18
**showed** [4]  17/15
 17/16 18/5 32/7
**shows** [1]  13/22
**sic** [1]  58/23
**side** [14]  33/18 39/11
 51/25 52/3 52/4 54/3
 55/2 55/2 71/23 71/25
 78/1 80/25 105/6
 105/9
**sidebar** [5]  22/5 22/7
 34/25 35/3 35/4
**sides** [2]  50/18 53/15
**sidewalk** [4]  39/4 40/3
 40/5 40/14
**sign** [3]  42/6 51/25
 104/13
**signage** [1]  27/11
**signed** [5]  12/6 12/14
 81/19 100/21 100/23
**significant** [1]  46/20
**signs** [3]  14/17 40/8
 40/15
**similar** [4]  18/5 55/2
 86/8 92/6
**similarities** [1]  88/24
 91/21
**similarity** [2]  87/22
 92/6
**simply** [3]  62/18 98/14
 98/16
**since** [4]  46/10 66/5
 66/18 72/2
**since-revoked** [1]
 66/5
**single** [1]  60/3
**sir** [42]  5/8 5/12 5/13
 7/12 8/22 8/24 9/11
 11/2 11/3 11/17 12/16
 13/15 13/21 13/23
 14/5 14/20 15/15
 15/21 16/12 19/6
 19/17 20/14 20/16
 20/19 20/22 21/6
 21/13 23/18 23/21
 24/1 24/4 25/11 27/23
 30/2 30/18 31/8 31/13
 34/14 37/20 40/23
 44/23 48/1
**site** [1]  52/2
**sitting** [1]  25/25
**situation** [2]  46/19
 61/19

**six** [5]  27/3 46/19
 46/23 61/20 83/11
**sixth** [1]  63/9
**slash** [1]  55/11
**slight** [1]  62/9
**slightly** [1]  65/6
**smiling** [1]  19/23
**Snapchat** [2]  99/3
 101/24
**social** [2]  99/4 101/25
**sold** [1]  27/3
**sole** [2]  81/24 82/6
**solely** [3]  24/9 75/8
 77/13
**solemnly** [2]  4/16
 36/22
**somehow** [1]  60/20
**someone** [2]  41/22
 51/6
**someone's** [1]  52/7
**something** [8]  21/24
 42/21 50/13 56/15
 60/23 79/21 79/22
 80/5
**sometimes** [4]  5/18
 78/9 79/21 79/22
**somewhat** [1]  52/24
**soon** [2]  99/23 103/3
**sorry** [14]  12/21 23/24
 26/11 29/17 31/13
 33/3 38/10 44/22
 51/17 58/4 58/25 67/1
 90/18 92/14
**sort** [2]  36/10 41/16
**sound** [1]  87/16
**sounds** [2]  6/3 56/14
**space** [2]  41/17 91/10
**speak** [5]  6/1 22/12
 42/19 48/12 59/10
**speaking** [1]  32/17
**special** [5]  54/9 54/9
 54/23 54/24 70/13
**specific** [3]  38/7 85/2
 87/13
**specifically** [2]  36/2
 68/15
**specified** [1]  83/19
**speculation** [1]  86/4
**speech** [1]  51/15
**spell** [2]  4/22 37/2
**spelled** [1]  55/6
**spells** [1]  9/17
**spend** [1]  44/18
**spent** [2]  46/20 46/23
**spite** [1]  86/17
**spoke** [3]  18/7 33/12
 43/23
**spoken** [2]  7/15 25/14
**spokesperson** [1]
 98/2
**spouse** [1]  83/9
**stalking** [11]  36/2
 53/18 58/18 60/7 65/1
 65/4 68/12 70/14
 75/18 82/20 85/13
**stand** [1]  81/4
**standards** [1]  40/3
**standing** [3]  14/7

**S**

**standing... [2]** 19/21 39/4
**stands [1]** 101/5
**start [5]** 49/2 71/22 100/17 103/22 105/7
**started [3]** 10/4 28/2 104/21
**starting [2]** 70/17 73/1
**state [6]** 4/22 6/9 31/9 36/4 37/2 49/17
**stated [3]** 10/1 76/2 76/22
**statement [4]** 24/2 24/5 44/12 68/22
**statements [3]** 76/17 76/19 84/21
**states [5]** 1/1 51/5 91/15 106/4 106/8
**stating [1]** 27/25
**statute [25]** 51/11 51/12 51/13 57/23 58/22 59/1 59/16 60/9 62/11 62/15 62/18 62/20 63/2 63/6 63/12 63/17 64/4 64/5 65/5 65/14 65/22 96/23 97/7 97/8 97/19
**statutes [2]** 58/22 96/25
**statutory [5]** 62/1 63/13 95/18 95/19 95/24
**stay [3]** 42/9 44/6 44/8
**stayed [1]** 40/5
**staying [2]** 28/15 104/22
**stenographically [1]** 106/5
**step [2]** 34/14 48/1
**steps [1]** 82/10
**STEVEN [1]** 2/7
**stickers [1]** 28/3
**stood [2]** 40/3 40/13
**stop [5]** 22/17 39/2 43/8 63/4 89/23
**strange [1]** 46/12
**street [3]** 1/24 14/7 14/16
**stretch [1]** 51/24
**stricken [6]** 44/11 73/4 73/10 77/4 78/9 78/12
**strike [1]** 25/2
**strikes [1]** 50/9
**strive [1]** 98/3
**strong [1]** 68/11
**structure [1]** 42/5
**studio [13]** 15/17 16/10 17/3 17/4 17/18 17/24 35/22 38/20 38/24 40/4 40/14 41/13 41/22
**studios [31]** 1/5 14/9 16/21 17/9 17/13 17/14 20/13 23/12 31/24 32/11 32/15 35/7 35/20 36/4 38/5

38/16 39/5 40/11 41/2 41/7 45/14 46/4 46/8 47/11 58/10 87/4 88/8 97/5 97/13 97/16 97/21
**Studios's [2]** 39/16 96/24
**Studios, [1]** 75/16
**stuff [4]** 8/9 11/10 15/21 32/10
**subcontracted [1]** 16/3
**Subdivision [1]** 84/8
**subject [3]** 35/7 48/20 88/4
**submit [1]** 62/18
**submitted [7]** 48/17 55/20 58/17 73/7 80/24 81/2 104/19
**subparagraph [1]** 63/17 63/18 83/8
**subpoena [6]** 5/6 8/12 8/14 15/7 15/20 37/11
**subsection [1]** 63/25
**subsequent [1]** 10/5
**subsequently [1]** 26/24
**substantial [11]** 67/16 67/18 83/14 83/16 85/6 85/7 88/18 88/19 88/24 91/21 92/6
**substantiality [1]** 94/14
**substantially [2]** 91/9 92/5
**subsumed [2]** 63/17 68/21
**such [13]** 67/15 77/15 82/14 82/15 82/17 82/19 85/5 86/12 87/1 90/3 94/2 99/12 102/17
**suffer [2]** 67/16 85/15
**suffered [3]** 83/14 94/24 95/4
**suffering [1]** 85/23
**sufficient [1]** 91/2
**suggest [1]** 85/10
**suggesting [1]** 56/2
**suggests [1]** 71/7
**suit [4]** 97/3 97/4 97/10 97/13
**SUITE [2]** 2/8 2/13
**summary [1]** 75/15
**supervise [2]** 89/13 92/18
**supplies [1]** 81/17
**support [1]** 83/2
**supported [1]** 53/2
**suppose [1]** 57/9
**supposed [3]** 50/23 56/16 56/24
**Supreme [1]** 50/1
**sure [9]** 7/5 16/22 16/25 24/18 32/7 56/23 57/25 63/24 64/3
**surrounding [1]** 50/16

**surveillance [13]** 6/21 6/23 6/25 7/2 8/7 15/17 23/14 24/10 24/14 32/6 63/9 64/2 82/25
**surveils [1]** 84/19
**suspect [1]** 27/23
**sustained [5]** 21/16 23/2 24/12 78/4 78/6
**Swart [2]** 31/19 31/21
**swear [2]** 4/16 36/22
**sworn [4]** 4/14 36/20 76/6 80/15
**sympathy [1]** 75/7
**system [1]** 90/3
**systems [1]** 87/18
**SYVERSON [1]** 2/7

**T**

**t's [1]** 57/14
**tabs [1]** 9/8
**tag [1]** 64/22
**tag-team [1]** 64/22
**take [18]** 39/3 39/3 39/13 43/9 47/5 48/12 48/14 51/19 53/21 54/4 72/4 73/19 79/8 99/25 101/2 103/7 104/2 104/17
**taken [12]** 54/6 61/6 62/17 62/19 63/12 63/12 72/19 74/2 80/16 82/10 100/11 103/16
**takes [3]** 35/10 51/8 71/24
**taking [4]** 19/22 35/18 43/5 87/2
**talk [4]** 32/25 48/18 48/19 78/14
**talked [2]** 17/18 18/6
**talking [6]** 12/22 33/1 35/25 50/7 50/22 60/2
**talks [1]** 63/18
**tangible [1]** 87/25
**target [1]** 84/24
**TAYLOR [18]** 2/11 2/12 3/6 3/7 3/8 4/8 34/17 36/7 47/20 48/2 49/16 50/25 54/16 69/2 70/11 72/2 73/12 73/23
**team [1]** 64/22
**technical [3]** 81/22 82/1 82/4
**technician [4]** 81/11 81/23 82/1 82/3
**technicians [1]** 82/10
**telling [3]** 44/20 44/24 45/15
**ten [3]** 39/18 53/21 53/25
**ten-minute [1]** 53/21
**tend [1]** 69/1
**term [6]** 34/5 59/19 59/20 60/17 89/3 90/6
**terms [13]** 59/16 61/21 63/6 65/11

65/22 67/2 67/7 67/23 68/13 70/20 80/23 87/8 101/6
**terrorizes [2]** 67/13 85/3
**tested [4]** 100/2 100/6 103/8 103/12
**testified [5]** 4/15 36/21 79/10 80/5 80/8
**testify [10]** 22/9 36/3 36/4 36/8 44/19 44/21 44/25 45/1 80/12 80/22
**testifying [1]** 79/12
**testimony [26]** 4/17 10/8 25/12 26/6 35/9 35/10 36/23 47/6 55/3 76/6 76/14 77/4 77/15 79/4 79/4 79/7 79/17 79/18 80/2 80/3 80/14 80/15 80/20 80/21 100/2 103/8
**text [6]** 62/22 62/23 63/1 63/2 99/1 101/22
**Thank [30]** 4/9 4/12 4/21 4/25 5/2 15/11 18/20 18/24 33/23 34/3 34/14 34/16 34/19 36/13 36/14 36/15 36/16 37/6 48/1 48/21 53/12 54/4 54/22 57/15 62/7 66/6 71/16 72/17 73/25 104/22
**Thanks [1]** 25/22
**theirs [1]** 52/6
**them [26]** 17/18 19/20 27/13 32/2 32/13 33/12 39/20 39/21 40/10 45/15 47/12 48/14 53/25 56/16 70/25 71/1 71/10 72/14 72/16 73/17 76/15 76/16 76/21 76/22 76/23 81/7
**theme [1]** 22/23
**themselves [1]** 87/19
**theory [4]** 52/7 52/18 52/20 53/2
**there's [5]** 41/17 53/16 58/23 59/1 63/15
**therefore [3]** 52/1 52/16 69/18
**thing [7]** 8/11 11/9 18/22 20/10 40/5 69/6 69/6
**things [9]** 6/21 7/6 32/9 33/13 44/19 76/15 79/10 79/24 80/8
**think [56]** 14/7 18/7 18/17 27/18 28/25 29/1 31/4 31/4 36/3 49/8 49/9 50/2 50/4 50/13 50/22 51/24 52/21 52/22 53/15 53/16 54/18 55/15

56/14 57/9 58/1 58/12 58/13 59/2 59/14 59/18 60/4 60/5 60/14 60/14 60/15 61/4 61/5 64/5 64/14 66/4 66/10 67/2 67/25 68/9 70/23 70/24 70/25 71/2 71/9 71/15 73/1 80/7 80/9 80/14 98/14 105/8
**thinking [5]** 55/13 61/24 70/19 70/21 71/1
**thinks [1]** 78/1
**third [2]** 63/8 84/17
**thought [4]** 10/21 10/23 61/2 105/11
**thoughts [1]** 26/4
**threat [25]** 50/15 61/10 63/8 63/19 63/20 64/16 65/11 65/21 65/23 66/19 66/23 67/22 68/2 68/13 68/22 69/11 69/15 69/23 70/10 83/19 84/13 84/14 84/15 84/23 84/24
**threatened [1]** 22/11
**threatening [1]** 40/6
**threatens [1]** 84/19
**threats [2]** 15/4 50/22
**three [4]** 39/23 68/4 97/8 97/10
**throughout [2]** 87/9 101/9
**throw [1]** 55/25
**throwing [1]** 61/12
**THUNDER [31]** 1/5 14/9 16/21 17/9 20/13 23/12 31/24 32/15 35/7 35/20 36/4 38/5 38/16 39/5 39/16 40/11 41/2 41/7 45/14 46/4 46/8 47/11 58/10 75/16 87/4 88/8 96/24 97/5 97/13 97/16 97/21
**Thunder Studios [22]** 14/9 16/21 17/9 20/13 23/12 31/24 32/15 35/20 36/4 38/5 38/16 39/5 40/11 41/2 45/14 46/4 46/8 47/11 87/4 97/5 97/13 97/16
**Thunder Studios's [2]** 39/16 96/24
**Thunder Studios, Inc [1]** 75/16
**Thus [1]** 101/17
**till [2]** 105/5 105/17
**title [3]** 38/7 38/8 106/4
**today [9]** 5/6 5/10 35/9 37/10 37/15 47/6 49/22 72/8 72/12
**together [2]** 5/11 52/19
**told [5]** 17/20 22/11 22/16 29/11 80/8

**T**

**tomorrow [12]** 71/20
71/21 72/16 73/18
74/12 74/13 74/17
104/15 104/18 104/20
104/24 105/17
**TONY [15]** 1/8 7/16
10/9 11/24 12/5 12/5
12/12 12/14 25/5
25/10 25/13 26/1 26/4
26/7 28/5
**Tony Kazal [8]** 7/16
10/9 12/12 12/14 25/5
25/10 25/13 26/7
**Tony Kazal/Jamie [1]**
11/24
**Tony's [1]** 28/8
**too [2]** 38/1 39/14
**took [6]** 11/6 23/20
39/10 75/9 104/1
104/4
**top [2]** 16/25 55/4
**torments [2]** 67/13
85/3
**tort [2]** 82/20 82/22
**total [2]** 24/14 24/18
**touch [2]** 39/21 44/3
**touching [2]** 99/22
103/2
**toward [1]** 46/18
**town [1]** 8/5
**toxic [1]** 45/16
**trading [1]** 59/14
**transcript [4]** 1/14
104/1 106/5 106/7
**transform [1]** 89/17
78/20
**treated [2]** 46/21
78/20
**trial [31]** 1/18 3/13
13/10 22/23 30/14
73/1 74/7 77/13 78/13
80/16 81/1 87/9 89/21
99/6 99/18 100/2
100/6 100/8 100/11
100/16 101/9 102/4
102/7 102/23 103/8
103/12 103/13 103/16
103/21 104/1 104/2
**tries [1]** 44/7
**true [8]** 52/25 63/20
75/23 75/23 80/9
88/15 88/16 106/4
**truth [10]** 4/18 4/18
4/19 36/24 36/24
36/25 80/8 80/17
100/1 103/7
**truthfully [1]** 80/8
**try [5]** 22/25 60/19
71/18 99/14 102/19
**trying [7]** 32/12 36/1
40/10 40/12 53/1 53/8
59/7
**turn [9]** 9/7 10/18
12/16 23/19 25/8
25/15 30/1 99/22
103/2
**tutorial [1]** 56/9
**Twenty [1]** 30/13

**Twenty-nine [1]** 30/13
**twice [1]** 57/25
**Twitter [1]** 99/3
101/24
**two [9]** 14/4 17/16
29/24 50/1 52/13
55/15 67/7 79/25
87/22
**typical [1]** 10/13
**typically [2]** 9/13
31/16

**U**

**Uh [4]** 5/23 6/24 13/13
13/21
**Uh-huh [4]** 5/23 6/24
13/13 13/21
**ultimate [1]** 53/20
**ultimately [1]** 24/20
**unanimous [4]** 98/4
98/9 101/7 104/11
**unauthorized [1]**
95/14
**under [1]** 39/15 60/9
63/9 64/2 70/1 77/1
78/20 80/16 81/1 81/2
82/25 86/19 86/23
93/25 97/12
**undercover [1]** 7/3
**underlying [1]** 90/2
**underneath [1]** 9/16
**understand [20]**
23/18 24/19 26/17
28/22 29/17 29/23
31/8 31/13 31/23 33/8
34/21 44/20 56/18
56/24 57/10 69/25
70/23 72/20 78/17
87/7
**understanding [9]**
12/2 21/3 28/19 29/21
29/23 33/17 33/19
34/7 70/4
**understood [3]** 24/21
44/23 70/22
**uneventful [1]** 32/13
**Unfortunately [1]**
74/11
**unidentified [1]** 17/17
**UNITED [4]** 1/1 51/5
106/4 106/8
**unless [3]** 76/2 84/2
101/17
**unlimited [1]** 22/17
**unnecessary [1]**
86/25
**unprofessionally [1]**
46/21
**unreasonable [1]**
67/25
**unrelated [1]** 62/6
**unsafe [1]** 84/4
**until [8]** 30/23 48/17
99/20 101/6 101/10
101/17 102/1 102/25
**untrue [1]** 80/2
**untruthfully [1]** 80/5
**unwieldy [2]** 60/4

65/6
**unwilling [1]** 98/11
**up [17]** 6/1 6/3 14/16
17/15 17/16 17/19
18/5 22/23 28/3 28/21
32/8 32/18 32/21 40/8
40/14 50/3 105/6
**upon [4]** 44/24 86/3
86/4 94/16
**upset [2]** 36/1 46/24
**Urquidez [1]** 50/4
**us [9]** 9/12 9/18 18/6
18/7 19/24 24/21 38/7
71/15 74/13
**USA [1]** 28/16
**usage [1]** 55/11
**use [20]** 55/7 72/11
82/9 88/17 88/19
93/24 94/2 94/2 94/2
94/14 94/5 94/8 94/10
94/11 94/16 94/19
95/11 95/14 99/16
102/21
**used [4]** 26/18 26/21
34/5 94/15
**uses [1]** 55/5
**using [5]** 6/21 90/2
97/6 99/13 102/18
**usual [1]** 43/18
**Usually [1]** 41/25

**V**

**vacuum [1]** 52/24
**valid [4]** 90/10 90/18
90/19 91/3
**value [3]** 94/17 95/7
95/8
**van [26]** 6/21 7/1 8/10
14/18 14/18 14/21
14/22 17/12 19/9
20/20 26/17 26/22
27/2 27/5 27/7 27/10
27/11 27/14 27/15
31/6 31/10 31/12 32/5
32/7 32/18 32/20
**verbal [2]** 84/13 84/21
**verbally [1]** 30/20
**verbatim [1]** 60/13
62/22 62/23 63/13
**verbiage [2]** 69/10
70/8
**verdict [36]** 49/5 49/7
54/1 54/9 54/9 54/14
54/23 54/24 55/1 56/9
56/12 56/17 62/10
70/13 75/12 76/13
79/2 85/10 90/14
90/16 92/23 93/1
93/20 93/23 98/4 98/9
98/16 98/17 100/5
101/7 101/10 102/13
103/11 104/10 104/11
104/12
**verdicts [1]** 94/20
**Verdugo [1]** 50/4
**Verdugo-Urquidez [1]**
50/4
**version [1]** 59/7

**via [3]** 98/25 98/25
101/22
**vicariously [2]** 89/5
92/10
**Victor [3]** 9/15 12/3
25/20
**Victor Fuentes [2]**
9/15 25/20
**video [18]** 14/8 15/6
15/14 15/17 16/8
16/19 18/15 18/21
19/21 20/2 23/21
35/17 35/18 39/17
40/16 42/10 43/5 43/9
**videographer [2]** 20/5
20/5
**videos [3]** 9/4 16/24
39/3
**videotaped [1]** 32/8
**videotaping [1]** 32/12
**view [9]** 81/7 81/12
81/21 82/8 92/3 99/15
99/17 102/20 102/22
**viewing [1]** 82/17
**views [1]** 98/8
**violate [1]** 86/22
**violated [1]** 84/5
**violates [3]** 86/24
100/14 103/19
**violations [1]** 95/23
**visit [3]** 41/22 99/15
102/20
**visiting [1]** 21/14
**visual [1]** 87/16
**vote [1]** 101/6

**W**

**W-o-o-d-w-a-r-d [1]**
4/24
**waiting [2]** 78/17
101/3
**walked [2]** 7/17 17/19
**walking [3]** 14/16
19/25 41/25
**wanted [6]** 22/16
28/20 28/23 31/6
31/10 58/15
**wants [1]** 32/25
**waste [1]** 22/24
**watch [2]** 99/10
102/13
**watching [2]** 7/3
23/16
**weakness [1]** 87/2
**Website [10]** 38/12
51/25 52/16 52/24
53/5 53/8 58/12 82/12
97/18 99/1
**weekends [1]** 38/22
**weeks [1]** 21/11
**weight [5]** 77/20
77/22 80/11 80/14
98/15
**went [11]** 17/23 32/18
32/21 32/24 33/1 36/9
39/10 43/11 43/12
43/16 43/18
**WEST [1]** 1/24

**WESTERN [1]** 1/2
**when -- I [1]** 60/18
**whole [7]** 4/18 18/22
20/10 36/24 69/6
88/21 94/15
**why [16]** 12/2 12/3
12/6 23/22 28/10
28/20 29/21 31/3
33/20 35/1 47/16
48/12 53/21 60/24
61/2 73/8
**WIENER [17]** 2/3 2/3
3/6 3/9 8/14 8/14 8/16
15/19 23/11 34/12
50/12 54/12 62/5
68/14 69/6 72/10
105/10
**wife [2]** 23/15 23/16
**wilfully [1]** 96/5
**willful [8]** 55/8 56/22
67/11 85/1 96/4 96/8
96/15 96/22
**willful/ignorance [1]**
55/8
**willfully [1]** 57/3
**willing [2]** 95/9 95/10
**WILSHIRE [1]** 2/8
**wish [3]** 48/8 49/17
68/14
**wishes [1]** 105/6
**without [5]** 51/9 59/19
89/3 90/6 93/25
**witness [23]** 4/8 22/22
34/18 35/2 35/14
35/23 36/12 47/22
48/3 76/6 77/16 77/16
79/5 79/7 79/9 79/21
80/4 80/7 80/7 80/15
80/16 80/21 81/4
**witness's [6]** 79/11
79/12 79/13 79/15
79/17 79/18
**witnesses [12]** 3/4
36/10 48/4 48/9 76/18
79/23 80/12 80/13
99/20 99/25 102/25
103/6
**woman [1]** 17/17
**wonder [1]** 59/3
**wonderful [1]** 53/19
**Woodward [6]** 4/10
4/13 4/23 5/5 23/11
34/3
**word [1]** 51/14
**worded [1]** 57/7
**wording [1]** 55/11
**words [6]** 52/4 65/22
66/12 68/7 97/20
101/8
**work [80]** 5/15 6/16
11/8 12/24 16/9 30/23
38/19 39/2 72/13
87/12 87/13 87/14
87/14 87/14 87/15
87/15 87/15 87/16
87/16 87/17 87/20
87/21 87/24 87/24
88/2 88/6 88/13 88/16

**W**

**work... [52]** 88/18
88/19 88/21 88/22
88/23 88/25 88/25
89/3 89/18 89/19
89/20 89/22 89/23
89/24 90/3 90/6 90/12
90/21 90/22 91/5 91/5
91/7 91/8 91/12 91/13
91/18 91/19 91/20
91/22 91/23 92/1 92/2
92/3 92/4 92/5 92/5
93/24 94/4 94/6 94/8
94/13 94/15 94/17
94/20 95/7 95/9 95/12
95/15 95/20 95/25
96/2 96/4
**workable [1]** 65/7
**workday [2]** 43/13
43/18
**worked [5]** 5/11 6/5
6/14 37/22 38/10
**working [7]** 10/2 10/3
17/7 30/16 49/7 74/8
78/17
**works [7]** 9/16 87/12
87/21 87/22 89/2
89/17 89/18
**works' [1]** 92/7
**worried [1]** 67/3
**worth [1]** 39/18
**wrap [3]** 27/12 28/3
28/9
**wraps [1]** 27/12
**write [4]** 28/12 29/12
29/13 52/4
**writing [6]** 53/5 80/25
98/25 100/23 100/24
101/21
**written [5]** 14/21
30/20 80/24 84/13
84/21
**wrong [2]** 12/22 105/8

**Y**

**year [1]** 27/3
**years [7]** 6/8 6/15
37/23 38/3 38/17 97/8
97/10
**yell [1]** 42/23
**yelled [1]** 19/24
**Yep [1]** 41/9
**your Honor [43]** 13/5
13/8 15/8 22/4 23/6
23/8 24/8 30/8 30/12
34/10 34/16 34/19
34/23 40/19 44/10
45/4 47/7 47/18 47/21
47/25 48/10 51/1
51/18 52/25 53/2 53/9
53/12 54/13 54/17
56/18 61/15 62/7 62/9
64/24 68/20 69/5
70/12 71/16 72/11
72/22 73/11 73/13
73/22
**YouTube [2]** 99/3
101/24