1              UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE ANDRÉ BIROTTE JR., U.S. DISTRICT JUDGE

4

5  THUNDER STUDIOS, INC.; RODRIC   )
    DAVID,                     )

6                           )
              PLAINTIFFS,    )

7                           )
          vs.            ) No. CV 17-0871-AB

8                           )
    CHARIF KAZAL; TONY KAZAL;    )

9    ADAM KAZAL; AND DOES 1 TO 100, )
    INCLUSIVE,              )

10                         )
             DEFENDANTS.    )

11  _____)

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15          TUESDAY, DECEMBER 11, 2018

16              9:25 A.M.

17          LOS ANGELES, CALIFORNIA

18       Day 4 of Jury Trial, A.M. Session

19

20

21

22  _____

23        **CHIA MEI JUI, CSR 3287, CCRR, FCRR**
          FEDERAL OFFICIAL COURT REPORTER

24       350 WEST FIRST STREET, ROOM 4311
        LOS ANGELES, CALIFORNIA 90012

25           cmjui.csr@gmail.com

```
1    APPEARANCES OF COUNSEL:

2    FOR THE PLAINTIFFS:

3              LAW OFFICES OF SETH W. WIENER
               BY:  SETH W. WIENER, ATTORNEY AT LAW
4              609 KARINA COURT
               SAN RAMON, CALIFORNIA 94582
5              (925) 487-5607

6                   -and-

7              SYVERSON, LESOWITZ & GEBELIN
               BY:  STEVEN GEBELIN, ATTORNEY AT LAW
8              8383 WILSHIRE BOULEVARD, SUITE 520
               BEVERLY HILLS, CALIFORNIA 90211
9              (310) 341-3072

10
     FOR THE DEFENDANTS:
11
               THE TAYLOR LAW FIRM
12             BY:  BENJAMIN TAYLOR, ATTORNEY AT LAW
               AND DIANE BANI-ESRAILI, ATTORNEY AT LAW
13             1880 CENTURY PARK EAST, SUITE 714
               LOS ANGELES, CALIFORNIA 90067
14             (310) 201-7600

15

16

17

18

19

20

21

22

23

24

25
```

<u>I N D E X</u>

<u>DECEMBER 11, 2018</u>

PLAINTIFFS'
WITNESSES                                                          PAGE

RODRIC DAVID (THE PLAINTIFF)
    DIRECT EXAMINATION BY MR. WIENER                                74
    CROSS-EXAMINATION BY MR. TAYLOR                                 89

<u>EXHIBITS</u>

| TRIAL EXHIBITS | MARKED | ADMITTED | NOT ADMIT |
|---|---|---|---|
| 49 | 79 | 95 | |
| 50 | 81 | 95 | |
| 51 | | 95 | |
| 52 | | 95 | |
| 53 | | 95 | |
| 54 | | 95 | |

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, DECEMBER 11, 2018

 2                              9:25 A.M.

 3                               - - -

 4        (The following was heard in open court in the presence

 5         of the jury:)

 6              THE CLERK:  Calling CV 17-0871-AB, Thunder

 7    Studios, Inc., versus Charif Kazal, et al.

 8              Counsel, please step forward and state your

 9    appearances.

10              MR. WIENER:  Seth Wiener for plaintiffs

11    Thunder Studios, Inc. and Rodric David.

12              MR. GEBELIN:  Steven Gebelin, also for plaintiffs.

13              MR. TAYLOR:  Good morning, Your Honor.

14    Benjamin Taylor on behalf of defendants Charif Kazal,

15    Adam Kazal and Tony Kazal.

16              MS. BANI-ESRAILI:  Good morning, Your Honor.

17    Diane Bani-Esraili for the defense.

18              THE COURT:  All right.  Good morning to you all

19    and good morning to you, ladies and gentlemen.

20              The moment you all have been waiting for --

21    closing arguments.  I will say nothing more other than,

22    Counsel, you may proceed.

23              MR. WIENER:  Thank you, Your Honor.

24              I'd like to thank both the Court and the jury for

25    their time, for braving the rain last week, and carefully
```

1  considering the testimony and evidence that's been presented

2  to you.

3          We are here today and for the past week because of

4  the stalking campaign that was conducted by the Kazal

5  brothers against Rodric David and his family and their

6  infringement of Thunder Studios copyrights in connection

7  with carrying out their stalking.

8          This is a case where the Kazals resorted to what

9  the Court referred to as street justice, taking the law into

10  their own hands rather than going through proper legal

11  channels.

12          The Kazals attempt to justify their wrongful

13  conduct by claiming that it was to protect their family

14  honor and because of business dealings they had with

15  Mr. David about ten years ago.  Those business dealings

16  aren't directly relevant.  I'll just briefly summarize them

17  for the jury.

18          The Kazals didn't honor their financial commitment

19  to the parties' joint venture business, Emergent Capital.

20  They then attempted to wrongfully acquire what they were not

21  entitled to by filing criminal complaints against Mr. David

22  in the United Arab Emirates, immigration complaint, and

23  lawsuits in the Cayman Islands.  None of these were

24  successful.

25          The Kazals also blame Mr. David for an Independent

1    Commission Against Corruption Investigation, other wrongful

2    conduct that took place in Australia.  As suggested by the

3    name, Independent Commission Against Corruption, it is an

4    independent commission.  Mr. David has no control over the

5    ICAC and didn't initiate the proceeding.  His only role was

6    to testify in the subpoena truthfully pursuant to a

7    subpoena.

8          The ICAC made findings that Charif Kazal had

9    engaged in corrupt conduct and given false or misleading

10   evidence.  The latter offense, having given false and

11   misleading evidence, was referred for criminal prosecution.

12   Contrary to Charif's statements, he was never exonerated

13   from these findings.

14         Now, the Kazals also blame Mr. David for a series

15   of articles that appeared in the *Sydney Morning Herald* and

16   which were republished online by someone other than

17   Mr. David.

18         And as you heard from several witnesses, the

19   *Sydney Morning Herald* is a respected newspaper, and it's

20   published by Fairfax Media, which is a large media

21   conglomerate that Mr. David has no control or ability to

22   influence what they publish.  Notably and, again, contrary

23   to Charif Kazal's testimony, none of the articles were ever

24   retracted.

25         The articles, which the jury does have with them,

1    discuss the Kazals' money laundering; links to Muammar

2    Gaddafi; links to Hezbollah, a terrorist organization;

3    corrupt property deals; and intimidation tactics.  It's

4    those intimidation tactics that are the reason for this

5    lawsuit.

6          The Kazals had stalked Mr. David and his family

7    members both online and offline.  The stalking began soon

8    after their business ventures and have continued through

9    2017.

10          Beginning in about April 2016 and even after the

11   filing of this lawsuit, Charif and Tony Kazal sent almost

12   daily e-mails to Rodric David and other employees of

13   Thunder Studios.  We have provided you just with a small

14   snippet of those e-mails as they number in the hundreds and

15   are repetitious.

16          The e-mails, as you have seen, accuse Mr. David

17   and his employees of having committed despicable crimes,

18   having made desperate lies and malicious threats.

19          These e-mails were simultaneously published by the

20   Kazals on their kazalfamilystory.com Website and also copied

21   onto their Twitter accounts and other social media accounts.

22          Beginning in October 2016, the defendants

23   escalated their stalking campaign.  In Australia, the Kazals

24   placed 15,000 posters on the streets of Sydney and in the

25   neighborhood where Mr. David's family members resided,

1   depositing 30,000 flyers in mailboxes in the same

2   neighborhood and drove vans throughout the neighborhood with

3   signs proclaiming that Rodric David and his former business

4   partner were criminals.

5            Mr. David obtained a restraining order from the

6   federal court of Australia prohibiting these activities in

7   Australia.  It's undisputed that Charif Kazal violated this

8   order, was found in civil contempt of Court.  That wasn't a

9   mere technical violation.  The Court made a finding that he

10  was in contempt, that he was in blatant disregard of the

11  Court's order to remove the signage.

12           Adam Kazal also violated the restraining order,

13  and the federal court of Australia found beyond a reasonable

14  doubt that he was in criminal contempt of the Court,

15  sentenced him to 33 months in prison.

16           In its order, the federal court of Australia also

17  noted that there was no justification for Adam Kazal's

18  actions and that he had willfully disobeyed the Court's

19  order.

20           Notably, Adam Kazal has not even appeared here at

21  trial to attempt to defend his actions nor could he do so.

22  Likewise, Tony Kazal has not appeared before you to explain

23  his actions.  Their absence to me suggests that they are

24  continuing contempt for the Court's legal processes.

25           The Kazals also stalked Mr. David in California.

1    Adam Kazal and Tony Kazal both hired private investigators

2    to follow Mr. David and his wife.  You heard testimony from

3    the private investigator who is unable to provide any

4    explanation what legitimate purpose there was for the

5    investigation.  It was designed to harass Mr. David.

6         Also, you will see that Charif had tried

7    blaming -- claiming that he had no knowledge of this

8    campaign and that it was solely the work of his brother,

9    Adam.  That's contradicted by the fact that Tony Kazal --

10   name appears on the contracts, and the private investigator

11   was being told to relay information to Tony.

12        It also bears note that the person who is

13   organizing the campaign here on the ground in California for

14   the Kazals was an individual named Jamie Brown, a former

15   police officer, who had known the Kazal family, including,

16   in particular, Charif, for approximately 15 years, according

17   to the ICAC report.

18        Given that the brothers clearly worked in close

19   conjunction, the jury would have to suspend belief to

20   believe than Charif wasn't involved in the harassment

21   campaign that took place here in California.

22        The Kazals also hired a large team of thugs to

23   harass Mr. David and his family, both at the David's family

24   home and at Thunder Studios.  These protests also occurred

25   close to Thunder -- the elementary school that was attended

1  by Mr. David's child.  This was particularly distressing for

2  a parent and understandably so.

3         These California protest activities took place in

4  October and in November of 2016, even after the Australia

5  Court had issued a restraining order.

6         You saw there were clumsy attempts by the Kazals

7  to avoid liability by instructing the protestors to change

8  the signs from being "Care of Adam Kazal" to "Care of

9  Tony Kazal."  They don't deny that they are the ones who

10  carried out this campaign.

11         This also wasn't conduct that was protected by the

12  First Amendment.  The defendants, as foreign citizens, don't

13  have any First Amendment rights.  Even if they did, though,

14  the First Amendment doesn't protect against threats, and

15  this was a case about threats.  I'll go further into those

16  threats but first just want to remind the jury what the

17  defendants carried out here.

18         They drove a van, again, through Mr. David's

19  neighborhood and his children's elementary school, decorated

20  with copyrighted photographs of Mr. David with Mr. David's

21  name printed in large letters underneath with large writings

22  proclaiming that he was exposed as a corporate thief, that

23  he had stolen $180 million, calling him a fraudster and

24  telling his viewers not to be his next victim.

25         I would ask that the jury consider what the impact

1    would be on their family members if they were similarly

2    subjected to such a harassment campaign.

3           The David family attempted to stop these

4    activities.  They summoned the Los Angeles

5    Police Department, made a request to the Kazals' attorneys

6    for the conduct to stop.  It didn't.  The defendants refused

7    to stop and continued to take the law into their own hands.

8           On October 28th of 2016, Adam Kazal made a post on

9    Twitter stating, "Hey, Rodric David, my team in L.A. are

10   going to expose you wherever you go."  The reference to a

11   team in L.A. was meant to let Mr. David know that they knew

12   where he was located and would take whatever actions were

13   necessary to make him fearful here in California.

14          On October 30th, 2016, Adam Kazal told David that

15   he reserved the right to not only continue using the van but

16   to increase the size of his fleet unless his extortionate

17   demands were paid -- were met, including a demand that he be

18   paid -- $666,666.66.  These -- the number of sixes was

19   sinister and, again, meant to place Mr. David in fear.

20          Again, this wasn't a campaign that was solely

21   conducted by Adam Kazal.  Charif and Tony were part and

22   parcel of this campaign leading up to the -- what the

23   defendants referred to as protest activities, and even

24   afterwards they sent daily e-mails threatening Mr. David.

25          There's also no evidence of how this campaign was

1   financed.  Mark Woodward, the private investigator you heard

2   from yesterday claimed he was paid by Jamie Brown.  In turn,

3   Jamie Brown has not testified who paid him.  And what we do

4   have is testimony from Adam Kazal that was read into the

5   record where he said he paid for it from winnings from a

6   horse race.

7            Notably, when I asked Mr. Kazal more details about

8   this horse race, he was unable to provide any.  It was

9   simply a bold faced lie that he funded it with money from a

10  horse race.  It's clear that he received the funding from

11  Tony and Charif Kazal.  He's lying just to try -- protecting

12  them from liability for his wrongful activities and for

13  their harassment campaign.

14           There is also no reasonable dispute that the

15  defendants' stalking conduct caused Mr. David to reasonably

16  fear for his safety and the safety of his family members.

17  You heard from both Mr. David, his wife, Elizabeth, that it

18  is particularly distressing to him that the conduct occurred

19  near their child's elementary school.

20           After it occurred it -- immediately afterwards,

21  the Davids changed the locks to their home, purchased

22  security cameras, and also contracted for armed security.

23           Again, if the defendants were solely waging a war

24  of words, there wouldn't be the need for those actions.

25  Instead, the defendants made it clear that they are prepared

1    to commit violence against the Davids here in California and

2    that they were establishing a physical presence here.

3           As I am sure the jury observed both during

4    Mr. and Mrs. David's testimony, they suffered understandable

5    emotional distresses as a result of what took place.  So

6    would any reasonable person.

7           The defendant's conduct also served to establish a

8    credible threat to the safety of Mr. David and his family.

9    It bears note that -- Mr. David's testimony that Adam Kazal

10   had previously assaulted his father, John David.  And while

11   conducting the harassment and -- in October 2016, Adam Kazal

12   told Mr. David that he was, quote, "Different to the rest of

13   the family" and that he would, "See you around, Grub."

14          The reference to being different than his family

15   was meant to imply that he was the one who would carry out

16   violence.  The reference to "See you around, Grub," was

17   meant to imply to Mr. David -- and it was understood -- that

18   Adam Kazal would personally come to California to inflict

19   violence upon him.

20          Again, defendants have never ceased their

21   harassing conduct, have offered no apology to Mr. David and

22   his family.  They've also attempted to diminish their

23   violation of restraining orders from the federal court of

24   Australia by claiming they are technical violations and they

25   consented to them.  There is no evidence that these were

 1   technical violations, nor does such a thing even exist in
 2   the context of a contempt order, nor did the defendants
 3   consent to them.
 4          The Court sentenced Adam Kazal to 33 months in
 5   prison because it thought he was belligerent and
 6   unrepentant, and that seems to be the defendants' attitude
 7   even today.
 8          With regard to copyright infringement, the
 9   copyright infringement asserted by Thunder Studios has two
10   basic elements.  The first element is ownership of the valid
11   copyright, and the second element is copying of constituent
12   elements of the work that are original.
13          Here, there is no dispute that Thunder Studios is
14   the owner of the images set forth in the two copyright
15   registrations that are Exhibits 23 and 24.  These consist of
16   photographs that were published in 2015 and 2016.
17          Now, the photographs, according to the copyright
18   certificates, were taken by Anthony Parlato.  You heard from
19   Mr. Parlato yesterday, and he testified that he was employed
20   at Thunder Studios beginning in the 2015.
21          Accordingly, there is no statute of limitations
22   defense based on the -- when the photographs were first
23   published as the photographs were taken only in 2015 and
24   previous statute of limitations defense would require the
25   defendants to show that they had copied them in

1    February 2014 or earlier.  The photographs simply didn't

2    exist in February 2014; therefore, the defendants' statute

3    of limitation defense has no merit whatsoever.

4           Likewise, the defendants have also asserted what's

5    called a fair use defense to the copyrights.  Their

6    assertion of this defense admits that they actually did

7    publish the photographs, and what they're asserting is that

8    it was a fair use.

9           They have offered no evidence how it constitutes a

10   fair use to copy the photographs entirely, place a

11   derogatory statement on them, and then use them in

12   furtherance of a harassment campaign.  I can assure the jury

13   there's no case law that finds that that would constitute a

14   fair use.  The jury should reject that defense out of hand.

15          Now, the Kazals intentionally copied

16   Thunder Studios copyrighted photographs on their Website,

17   kazalfamilystory.com.  Thunder Studios pursued the

18   appropriate legal processes by sending what's called a

19   Digital Millennium Copyright Act notice to GoDaddy, which

20   was hosting the Website.  GoDaddy took down the Website in

21   the response to the notice.

22          The Kazals received notice of the takedown and the

23   infringement from their attorney.  Rather than take steps to

24   ensure that they didn't use copyrighted photos going

25   forward, they didn't do that.  Instead, they transferred the

1    Website -- hosting the Website to a company in Iceland

2    called Orange Website that doesn't comply with U.S.

3    copyright laws.  This evidence is a clear intent to

4    circumvent the law, not comply with the law, to commit

5    what's called street justice.

6            After transferring the hosting of the Website,

7    in 2017, the Kazals continued to publish Thunder Studios's

8    photographs on the Website.

9            We presented evidence of the infringed

10   photographs.  That's Exhibit 31 and 32 in the binder.

11   Obviously, Thunder Studios never authorized or consented to

12   the use of its photographs by the defendants.

13           Charif Kazal has stated that he takes full

14   responsibility for everything on the Website.  That was his

15   deposition testimony.  And he specifically used the word

16   "everything."  Realizing afterwards that that would make him

17   liable for copyright infringement, he now claims that he was

18   only responsible for the words on the Website and not the

19   photographs and attempts to blame the photographs on an

20   individual named Joe Dabab.  Notably, Mr. Dabab is not here

21   nor does he exist.

22           We provided you with Website information that was

23   provided by GoDaddy that shows that the Website was

24   registered to and administered by an individual named Jean

25   Ghalo, who is in Lebanon.  Mr. Kazal testified that he

1    didn't know who Jean Ghalo was.  We submit to the jury that

2    Jean Ghalo was likely an alias for Tony Kazal.  Tony Kazal

3    is also situated in the Middle East.

4         Regardless of whether the jury finds that it was

5    actually Tony Kazal's Website or Charif Kazal's Website or

6    Adam Kazal's Website, there is no dispute that each of the

7    defendants is also secondarily liable for the copy

8    infringement.

9         Each of them was aware of the Website and its use

10   of the copyrighted photographs.  They also received notice

11   that the photographs were copyrighted and continued to

12   infringe them after receiving the notice.

13        They also contributed to the Website both by

14   promoting it on their signs, posters, street vans, and by

15   writing the content that was on the Website.  All this was a

16   carefully coordinated plan, and all the defendants are

17   liable for copyright infringement.

18        The Copyright Act provides that Thunder Studios is

19   entitled to damages for each infringement of its copyrighted

20   images.  In cases such as this one where the copyright owner

21   proves that the infringement was conducted willfully, the

22   jury can increase the award to statutory damages to a sum up

23   to $150,000.

24        Willfulness occurs where an infringer acts with

25   knowledge that the infringer's conduct constitutes copyright

 1   infringement.  Here, any doubt that the Kazals had that

 2   their conduct constituted copyright infringement would have

 3   been erased when they received a notice in October 2016 from

 4   GoDaddy of the complaint made by Thunder Studios concerning

 5   the violation of its copyrights.

 6          Again, they didn't comply with the takedown notice

 7   and continued to recently publish the photographs in

 8   defiance of the law.

 9          We ask that the jury find that each of the three

10   defendants is liable for infringement of each of the

11   photographs listed in the verdict form provided to the jury.

12          In conclusion and reserving a few minutes for

13   rebuttal, Mr. David has been continuously stalked and

14   harassed by the Kazals for over a decade.  He tried moving

15   to California just to flee this harassment, and he thought

16   for some time that he had obtained peace.  He didn't.  In

17   October 2016 the defendants shattered that by bringing the

18   fight to Mr. David here in California.

19          Again, the Kazals attacks have caused great

20   emotional distress to Mr. David.  It's caused him to fear

21   both for his own safety and more importantly to him the

22   safety of his wife and children.

23          Again, the defendants' conduct is not protected by

24   the First Amendment right of free speech.  The First

25   Amendment rights doesn't apply to foreign citizens such as

1    the defendants.  It also doesn't protect threats, and this

2    was a threat.  It was terrorism committed against a U.S.

3    citizen.

4              The jury can take direction from the federal court

5    of Australia which already found that almost identical

6    stalking conduct in Australia was in contempt of restraining

7    orders of the federal court of Australia.

8              In particular, the federal court of Australia

9    found that Adam Kazal, quote, "Had no lawful justification

10   or excuse for his conduct."  It also found that Adam flouted

11   its orders and had engaged in a serious contempt of a

12   criminal nature.

13             Again, a criminal nature means that the federal

14   court had to find beyond a shadow of a reasonable doubt that

15   Adam Kazal was in criminal contempt.  Here, the jury only

16   needs to find it more likely than not that the Kazals did

17   what they have admitted doing -- conducting harassment of

18   Mr. David and his family.

19             The federal court of Australia also found that

20   Adam Kazal defied its orders in as public a way as he could.

21             Finally, it also found that Adam Kazal's sense of

22   grievance with Mr. David didn't justify his conduct;

23   therefore, even though the defendants will try claiming that

24   Mr. David is a bad guy, I don't think he is.  I think he is

25   a good man and treats people respectfully and honestly.  But

 1    even if the jury finds he's a bad guy, that doesn't warrant

 2    what they did.

 3          Criminal conduct, stalking somebody, is never

 4    warranted.  The jury should not condone what the Kazals did

 5    here.  It needs to send them a severe message that threats

 6    have no place in a civilized society.

 7          We ask that the jury deliberate and make an

 8    appropriate award of monetary damages for the harassment

 9    campaign and they'd also award the full amount of statutory

10    damages based on the defendants' intentional and malicious

11    infringement of the copyrights.  Thank you.

12          THE COURT:  All right.  Thank you, Counsel.

13          Mr. Taylor.

14          MR. TAYLOR:  Yes.  Thank you, Your Honor.

15          Good morning, ladies and gentlemen.  Thank you for

16    your time and your attention these few days.

17          Thank you to the Court for overseeing this trial,

18    and at this point I want to explain to you why we believe

19    that, after hearing all the evidence, after considering

20    witness testimony and looking at the documents, the videos,

21    and the other evidence that's been presented during this

22    trial, we believe that you should find in favor of the

23    defendants on both claims for relief that plaintiffs have

24    filed in this case.

25          First of all, as counsel touched on, it's

1    important to bear in mind the burden of proof that applies

2    to the claims at issue here.  The burden of proof, as you

3    heard, is what's called a preponderance of the evidence.

4    While that's not as high, of course, as the beyond a

5    reasonable doubt standard that we're familiar with in

6    criminal cases, it does still require the plaintiffs to

7    prove its claims as being more likely than not.

8              That means that, if you think that the evidence is

9    exactly evenly balanced or if it tilts in favor of the

10   defendants, then you have to enter a verdict in favor of the

11   defendants on the claim.

12             Now, counsel's closing argument included a lot of

13   speculation, a lot of guesswork.  He wants you to make

14   certain leaps that I don't think you can make.

15             I think we need to bear in mind the burden of

16   proof and take a look at the evidence that was actually

17   presented and the reasonable inferences that you can draw

18   from that evidence.  Let's apply the facts to the law; and I

19   think, once we do that, you'll will see that the verdict on

20   both claims should be in favor of the defendants here.

21             Now, as we have discussed, there are two separate

22   claims by the two separate plaintiffs in this case.  One by

23   Thunder Studios for copyright infringement and one by

24   Mr. David individually for stalking.

25             Now, the first claim, as you know, for copyright

1    infringement is based upon, as we've heard, the alleged

2    infringement of Thunder Studios copyrighted photographs on

3    the kazalfamilystory.com Website.

4           Now, as you heard during testimony and as you

5    heard quite a bit during closing argument by plaintiffs'

6    counsel, the plaintiffs are very eager to group all of the

7    defendants together as if they acted as a single monolith

8    with three heads, but they are three separate individuals.

9    And I think the evidence was pretty clear that each of the

10   three of them did different things here in this case.

11          The evidence shows that each of them took

12   different steps and not every act committed by any

13   individual of the three can be attributed to all three.

14          Let's break down the two claims and consider each

15   one separately with respect to each of the three defendants.

16          Now, as Mr. Kazal readily acknowledges, he was

17   behind the creation of the kazalfamilystory.com Website

18   in 2013.  He's not a technical person.  Beyond operating his

19   cell phone, he doesn't really have any technical skills

20   whatsoever.  He wouldn't know how to create a Website if you

21   paid him to do it.

22          Now, in conversation with a friend of his named

23   Joe -- who the plaintiffs would very much like you to

24   believe does not exist -- in conversation with a friend his

25   named Joe Dabab in 2013, it was agreed that Mr. Dabab would

1    create the actual Website giving Mr. Kazal a platform to

2    clear his name, to get his side of the story out there in

3    the public so that at least he would feel he had an

4    opportunity to set the record straight.

5           Now, as he testified, what was important to

6    Mr. Kazal was the words on the page, getting his story out

7    there.  He had no input in, nor he did care for, the

8    technical aspects of the site, the esthetics of the site.

9           The content was what was his focus -- the layout,

10   the pictures, the tabs, the meta-data, whatever -- the

11   meta-tags Mr. Kolesa testified to -- none of that mattered

12   to him at all.  What was important was that someone could go

13   to the Website and see the words on the page, and that's

14   what Mr. Dabab did for him.

15          Now, Mr. Kazal wanted to do so to get his words

16   out there, to get his side of the story in the public domain

17   because of the series of malicious and untrue articles that

18   appeared about him in the *Sydney Morning Herald* and in the

19   *Sydney Morning Herald* only, written by a journalist, who

20   Mr. David acknowledges he was in direct contact with, text

21   messaging and e-mailing with him well into 2013 and, of

22   course, after the findings of the ICAC inquiry, which

23   Mr. Kazal only learned about from Mr. David's lawyer nearly

24   a full year before it became public and, of course,

25   Mr. David was a star witness.

1          Mr. Kazal was never criminally charged because
2    there was no evidence to support a prosecution.  And so with
3    the public report out there and all these news articles on
4    the Web, he had no way to clear his name other than to
5    create a Website where he could put his side of the story
6    out there for the public.

7          So, again, to be clear, Mr. Dabab created the
8    site, registered it, renewed the domain, designed the
9    Website.  We saw the registration information from the Web
10   hosting company which listed Jean Ghalo.  We don't know who
11   that is.  Could be an assistant of Mr. Dabab.

12         As Mr. Kolesa testified, he helped Mr. Price with
13   all of his Websites.  It's very common that the person who
14   registers a Website may list other individuals as a
15   technical contact or as a point of contact on the actual
16   registration.

17         But, again, the key point is that Mr. Dabab was
18   the one who created the site, and he made all the decisions
19   about how it would look and what photographs would appear on
20   it.

21         Now, Mr. Kazal acknowledges that he did send links
22   to photos that he found on his Google search, photos of
23   Mr. David back in 2013 when the Website was created.

24         It's been five years now.  So you can't say with
25   any certainty what Website he found them on.  But one thing

1   he does know -- he never posted them on the Website nor did

2   the photographs that he found bear any indication that they

3   were copyrighted whatsoever.

4        They were not watermarks.  They did not bear a C

5   symbol, the copyright symbol that many of us are familiar

6   with, and being a foreign citizen, he was certainly not at

7   all familiar with American copyright law.

8        I think it's fair to say most Americans aren't

9   familiar with American copyright law.  He legitimately

10  assumed, as many reasonable people do, that photographs that

11  you find in a Google search online in the public domain are

12  available for use in the public domain.

13       But, again, all he did was send a few links to

14  Mr. Dabab back in 2013.  Mr. Kazal never deliberately copied

15  any photos or put them on the Website himself -- never, nor

16  did he direct Mr. Dabab to do so.  Whatever he did with the

17  Website, Mr. Dabab, in terms of the photographs and the look

18  of the site, he did on his own.

19       And, indeed, when he received the DMCA takedown

20  notice forwarded to him from Mr. Dabab, Mr. Kazal

21  immediately, immediately, forwarded it to his attorney; and

22  when his attorney advised him that Thunder Studios had

23  registered the copyright, he directed Mr. Dabab to take down

24  the photos.  And that was done in 2017.  And indeed by June

25  of 2017, as you heard from Mr. Kazal, he disabled the entire

1    Website altogether.

2            Now, even if there were any evidence of direct

3    infringement here, we believe the claim for copyright

4    infringement is time barred and should be precluded by the

5    statute of limitations.  And you have an instruction,

6    Instruction Number 36 in your packet, on the statute of

7    limitations.  And I will ask you to read that closely when

8    the time comes.

9            But for now let me point out that, as Mr. David

10   acknowledged under oath, he alleges in his Amended

11   Complaint, Second Amended Complaint, in this lawsuit that

12   the infringing activity -- alleged infringing activity on

13   the part of the defendants in this case began when the

14   Website was created in 2013.

15           He testified on this stand under oath that that's

16   a true allegation, that he went to the Website himself

17   in 2013 and saw Thunder Studios copyrighted photographs on

18   that Website and yet didn't file this lawsuit until February

19   of 2017, four years later.

20           Now, being generous, based on his own testimony,

21   this lawsuit had to have been filed by December of 2016, at

22   the very latest.  The lawsuit was not filed, again, until

23   February of 2017.

24           So you must find -- we believe you must find for

25   the defendants for that reason alone.  The statute of

1     limitations bars the copyright infringement claim.  You

2     can't be aware of a wrong done to you.  You can't perceive

3     that you've been aggrieved or harmed and then sit on your

4     rights for years and file a lawsuit after the statute of

5     limitations expires.

6              Now, remember, even if the claim were not time

7     barred, which we believe it is, the verdict should be in

8     favor of the defendants for other reasons too.

9              The claim for copyright infringement was asserted,

10    as both claims in this case are, against all three

11    defendants in this case, not only against Charif, but

12    against Tony and Adam Kazal as well.

13             But during the three days of testimony in this

14    case, there was no evidence presented whatsoever that could

15    possibly support any claim for copyright infringement

16    against either Tony or Adam.

17             The plaintiffs very eagerly want to blame Tony and

18    Adam for whatever was on the Website, but they had nothing

19    to do with the Website whatsoever.  They had nothing to do

20    with its creation, nothing to do with its development,

21    nothing to do with the selection of photos on there.  There

22    was no evidence that they were in direct contact with

23    Mr. Dabab.

24             The testimony from all three defendants that you

25    heard from Mr. Kazal and the two deposition transcripts that

1    were read into the record is that Charif was the only one

2    involved in the Website.  Adam and Tony had no involvement,

3    no control.  There was no evidence presented at all to

4    suggest that Tony or Adam knew anything about any copyright

5    infringement activity or that they even knew about the

6    photographs at all.

7         Now, it's true that Adam referenced the

8    kazalfamilystory.com Website on the banners that he created

9    on the wraps that appeared on the van on the flyers that he

10   had circulated.

11        That doesn't mean, though, that he had anything to

12   do with the creation of that Website.  That doesn't mean

13   that he takes full responsibility for everything that anyone

14   does with respect to any content on the site.

15        It means that he knows about the site, and he

16   wants people to go take a look at it.  That doesn't make him

17   liable as either a direct infringer or secondary infringer

18   or contributory infringer.  He's not liable for any alleged

19   copyright infringement in any way, shape, or form.

20        Tony even less so.  He had nothing to do with the

21   Website.  Now, Tony's e-mails do appear -- some of his

22   e-mails anyway -- on the Website, and you've seen some of

23   those, you have some of those in the exhibits that we'll

24   take a look at, but that's because Mr. Kazal copied his

25   brother Charif on those e-mails.  Charif was the one who

1   forwarded them to Mr. Dabab, and Mr. Dabab went ahead and

2   posted them on the Website.

3           Again, that doesn't mean that Tony had anything to

4   do with the photographs or with the other aspects of the

5   site.  Charif was the one directing all of the content.

6           Let's take a look for a quick moment, if you

7   would, in the jury instructions that you have in front of

8   you at Instruction Number 28.  That should be at page 35 of

9   the packet, and that's the instruction on what's called

10  vicarious infringement where someone has not directly

11  infringed the copyright but could be liable for infringement

12  in a secondary way.

13          If there is infringement, the instruction says,

14  then you have to determine whether the other defendants

15  vicariously infringed the copyright.  So the plaintiff has

16  the burden of proving each of the following elements -- I'm

17  on line six now -- by a preponderance of the evidence:

18          1.  That the other defendants directly benefited

19  financially from the infringing activity.

20          Again, no evidence presented whatsoever of any

21  financial benefit to anyone in connection with the Website.

22          2.  The other defendants had the right and ability

23  to supervise or control the infringing activity.

24          Again, zero evidence presented on that element

25  whatsoever, and the third element is irrelevant because the

1  second element does not apply here.

2          So no liability to Tony and Adam with respect to

3  vicarious infringement.

4          Now, let's turn to page 36, the next page, for

5  Instruction Number 29, contributory infringement.

6          Reading on line 4, the instruction says --

7              (Reading:)  A defendant may be

8              liable for copyright infringement engaged in

9              by another if he knew, or had reasons to know,

10             of the infringing activity and intentionally

11             induced or materially contributed to that

12             infringing activity.

13                 If you find that any of the

14             defendants infringed the plaintiffs'

15             copyrighted photographs, you must determine

16             whether the other defendants contributorily

17             infringed that copyright.  The plaintiff has

18             the burden of proving each of the following

19             elements by a preponderance of the evidence:

20                 1.  The defendant knew or had reason

21             to know of the infringing activity.

22         No evidence presented during this trial whatsoever

23  that either Tony or Adam Kazal had any knowledge of any

24  infringing activity.

25                 (Reading:)  2.  Defendant

1              intentionally induced or materially

2              contributed to direct infringer's infringing

3              activity.

4         Again, no evidence on that element either.

5         So it's pretty clear to us that -- we believe,

6    ladies and gentlemen, that under either -- under any theory

7    for copyright infringement -- direct, vicarious, or

8    contributory -- there can be no liability at all to -- on

9    the part of Adam and Tony.

10         With respect to the element of damages, again, we

11   believe the verdict should be entirely in favor of the

12   defendants for the reasons I've said.  But even if you find

13   that there was any infringement here at all, it's pretty

14   clear that it was not willful, it was innocent, for the

15   following reasons:  First of all, as I said, Mr. Kazal is

16   not a technical person.  He is not tech savvy.  He doesn't

17   know anything about copyrights.  He's is not an American

18   citizen.

19         And as he testified, he assumed that images you

20   find online are available for use.  He didn't actually use

21   them.  He forwarded them to Mr. Dabab.  And when he got the

22   DMCA takedown notice in late 2016, he immediately forwarded

23   it to his lawyer for handling, and, when he found out that

24   there could be a potential problem, at least, after the

25   registration of the copyrights, he ordered Joe to take down

1   the photos.

2          So for that reason, at most, there should be a

3   minor award of damages here under the statutory framework,

4   and it could be as little, as you see in the instruction

5   before you, as $200.

6          But, again, I believe you don't need to even get

7   there because I think the claim for copyright infringement

8   should be in favor of the defendants because of the statute

9   of limitations and the other reasons I've already explained.

10          Now, separate and apart from the copyright

11   infringement claim, there is a claim by Mr. David only for

12   stalking, and we've heard a lot about that during closing

13   and during the testimony in this case.

14          Now, the word "stalking" is a scary word.  It's

15   very serious, but it's important that we not be moved by the

16   term "stalking."  It's important that we take a look at the

17   law and consider the facts that we saw during this trial and

18   then figure out whether plaintiffs have met their burden by

19   a preponderance of the evidence of proving stalking --

20   actionable unlawful stalking, under the statute against all

21   three of the defendants in this case.

22          We've seen that the stalking claim asserted by

23   plaintiff, Mr. David, is basically based on the following

24   conduct -- tweets and e-mails by defendant Adam Kazal, a

25   series of e-mails over the course of a year or so by

1    defendants Charif Kazal and Tony Kazal, and, of course, the

2    appearance of the protestors in the neighborhood of

3    Mr. David's home and outside Thunder Studios.

4           Now, let's breakdown the stalking claim and

5    consider it against each of the defendants.

6           The evidence was that in late October 2016, we

7    have the appearance of some protestors in the neighborhood

8    of Mr. David's home in Los Angeles as well as outside the

9    gates of Thunder Studios in Long Beach.

10          Now, plaintiffs have attempted to suggest that we

11   are blaming Adam for what happened, but Adam takes full

12   responsibility for the appearance of those protestors.

13          There was no evidence presented to the contrary

14   that anyone other than Adam Kazal arranged for the

15   protestors through a company called Crowds on Demand.

16          Separately, Mr. Kazal arranged for the van with

17   the video camera, as you heard from Mr. Woodward, through

18   Mr. Woodward's company, ICS.

19          Again, the plaintiffs want to blame all of the

20   defendants for that, but there was no evidence to suggest

21   that anyone other than Adam Kazal was responsible.

22          Now, there is that e-mail that says, "Point of

23   contact, Jamie and Tony Kazal."  But as Mr. Woodward

24   explained, that was a mistake.  The agreement between ICS

25   and Mr. Kazal was with Jamie and Adam Kazal.

1          Adam Kazal was the one who was billed, Adam Kazal

2    was the one who we saw paid the invoice, and Adam Kazal was

3    the point of contact through Jamie.

4          Now, as you heard from plaintiffs' counsel,

5    Mr. Brown knows the Kazal family.  He knows Charif, he knows

6    Tony, he knows Adam.  That doesn't mean that everything he

7    does is on behalf of all of them.  He was acting on behalf

8    of Adam Kazal, and I think that's pretty clear.

9          As we also heard from the plaintiff himself and

10    from his wife the protestors who appeared in their

11    neighborhood were peaceful protestors.  They made no

12    threats.  They didn't attack anyone.  They didn't try to

13    come near their house.  They certainly didn't try to break

14    into their house, and we saw the video.

15          They stood in the street marching, holding signs

16    and chanting.  You see the interactions with passersby.  As

17    Mr. Woodward testified -- affable, calm, pleasant

18    interactions.

19          And as you heard from Mr. David, his wife summoned

20    the police more than once, and the police told them the same

21    thing each time.  The police told them that the protests

22    were lawful, there's a right to peaceful protest.  And,

23    indeed, the police made no arrests, they didn't disperse the

24    protestors, they didn't confiscate their signs or banners.

25          In short, the police allowed the protest to

```
 1    continue.  As Mrs. David testified herself, the police

 2    weren't going to do much.  And, importantly, both of the

 3    Davids acknowledged that they had no fear for their safety

 4    from those protestors -- neither from the Hispanic laborers,

 5    who appeared on the first day, who Mr. David said didn't

 6    even appear to speak English or know what they were doing,

 7    nor from the more thuggish protesters, to use Mr. David's

 8    term and counsel's term, who we saw in the video who

 9    appeared in the second day.

10           They just paced back and forth in the street

11    holding their signs, chanting and holding their signs, and

12    that's it.  We saw the video, and we heard the testimony.

13           And you have seen Mr. David's reaction.  Near the

14    house he approached the protestors, and he spoke with them.

15    He filmed them from a very close distance.  He stood right

16    among them.

17           Same thing at the studio.  He got out of the car,

18    he approached the protestors, arms in the air, thumbs up,

19    applauding.

20           He wants you to believe that that was a gesture to

21    his security guard, James, but, frankly, I don't think

22    that's very credible.  He sent his employee out,

23    Mr. Parlato, who we heard from who we saw in the video to

24    take pictures, to take video right among the protestors,

25    standing inches from them with no fear for his safety,
```

1    certainly with no fear for his employees' safety.

2         And, indeed, Mr. Parlato was in the street, I

3    think he said, for 15 or 20 minutes standing right among the

4    protestors who barely said a word to him.  They just came

5    right up, and he took his pictures as we saw in the video,

6    as we heard in his testimony.

7         Now, Adam arranged for these protests after

8    Websites appeared in early 2016, mid-2016 called, among

9    other things, kazalfamilytruth.com and adamkazal.com, which

10   the Kazals later learned that year were created by Thunder

11   Studios employees, including CTO Matthew Price, assisted by

12   Mr. Kolesa, as you heard from Mr. Kolesa when he was on the

13   stand under oath.

14        Adam's kids are asking him in Australia, "Dad, why

15   are there Websites about you?  Why are the kids saying

16   you're a terrorist?"  They're are hearing about it in

17   school.  Adam just wanted those Websites to come down.

18        Adam found himself brought into this dispute by

19   those Websites.  Imagine a Thunder Studios employee creates

20   Websites in the name of four of the eight Kazal brothers --

21   three of whom just happen to be brothers with whom Mr. David

22   has had business disputes in the past and ongoing --

23   Websites without their permission, without their knowledge,

24   in their names -- adamkazal.com -- Mr. Price creates a

25   Website, and on that Website he associates Mr. Kazal -- we

1   have the screenshots -- with terrorism, with crime, with

2   perjury, with bribery -- terrible things on the Website.

3           As we heard from Mr. Kolesa -- who was responsible

4   for security and maintenance he said that on every single

5   Website that Mr. Price was working on during that time

6   frame -- many, many Websites -- those were the only ones

7   that he created in the name of an individual or a family --

8   the only ones.

9           Everyone else, he says, was in the name of a

10  company, a business.  Of all the human beings on planet

11  earth only the Kazals.  Now, Mr. David claims, "I didn't

12  know anything about it.  I didn't direct it."  I guess it's

13  just a coincidence, ladies and gentlemen.

14          I find that, frankly, totally unbelievable.

15  Thunder Studios employees are creating these Websites, and

16  Mr. Kazal says, "I need to do something about it.  I'm

17  linked to terrorism globally for anyone to see on the

18  Internet.  What am I supposed to do?"  And he arranges a

19  protest.

20          Mr. David asks rhetorically on the witness stand

21  about the protest.  "Who does that"?  "Who does that?" he

22  says.  Well, ask you, ladies and gentlemen, about these

23  Websites.  Who does that?  Who creates a Website in someone

24  else's name without their consent and without their

25  knowledge and calls them a terrorist supporter on that

1    Website?  Calls them a criminal, a perjurer, a briber.  Who

2    does that?  It was only Adam who arranged for those

3    protests.  There is no evidence presented to the contrary.

4            Now, separate and apart from the protests, we

5    heard from Mr. David that he received Twitter notifications

6    about tweets by Adam Kazal.  He could have blocked those

7    tweets, those notifications, but he chose not to.

8            He didn't have to read the tweets, and he

9    testified that he didn't always do so.  Same thing with the

10   e-mails from Charif and Tony.  We saw some of those e-mails.

11   You are going to have those e-mails in the exhibit binder.

12           And the e-mails repeat a common theme -- Mr. David

13   did us wrong, and we need him to right that wrong.

14           In response to those e-mails, Mr. David never

15   sends a reply saying stop it, never sends a cease and desist

16   letter.  We didn't see it in evidence because it doesn't

17   exist.  Never sent a demand that the e-mails stop.

18           He just went about his business.  He wasn't in

19   fear for his safety.  He testified he didn't even read most

20   of the e-mails.

21           In fact, the e-mails which were cc'd to

22   Thunder Studios employees, he had his IT department block

23   those e-mails from his employees while allowing himself to

24   continue receiving them.  But, again, he acknowledged he

25   didn't even read most of them in any case.

```
 1              We heard from him that, until the protestors
 2    appeared, he never asserted any claim or complaint for
 3    stalking based on those e-mails.  And that's because he
 4    wasn't concerned about his safety from the e-mails at all.
 5    He made a report to the FBI, he testified, which apparently
 6    took no action whatsoever.
 7              Now, as we've heard, the Kazal brothers were born
 8    in the Middle East and came to Australia at a young age.
 9    They've been fully integrated into society for decades now.
10              Charif Kazal, who has been here from Australia in
11    court with us for this entire trial has worked hard and made
12    something of himself in business.
13              And you heard from Mr. David on the witness stand
14    that he considered Charif and Tony sending these e-mails,
15    Adam's tweets, and the protests that we saw on the videos to
16    be terrorist tactics, terrorist tactics, ladies and
17    gentlemen.
18              I think it's really remarkable that he used that
19    term.  And his counsel echoed the same term -- "terrorism."
20    I think we all know, ladies and gentlemen, what terrorism
21    is, and that's not terrorism.
22              He didn't like it, to be sure, but it's not
23    terrorism.  And, frankly, ladies and gentlemen, it's not
24    stalking.  It's not unlawful at all.
25              We heard from Mr. David that you can't take the
```

1    law into your own hands.  And that's true.  You can't.  But,

2    ladies and gentlemen, that's not what happened here.

3            Taking the law into your own hands is where

4    someone loans someone else a thousand dollars, for example,

5    and, when the guy doesn't repay the loan, the lender goes

6    into the guy's house, breaks in, steals some cash and

7    jewelry.  That's taking the law into your own hands.

8            If someone kills someone else and the family of

9    the victim hunts down the killer and beats them to death,

10   that's taking law into your own hands.  Peaceful protest is

11   not taking the law into your own hands.  There is a right to

12   peaceful protest.

13           They want to say that it doesn't apply to the

14   defendants in this case, but the activity itself, the

15   protesting in the street, that's protected First Amendment

16   activity.

17           Now, I want to direct your attention very briefly

18   to Instruction Number 14, which is on page 17 of your

19   packet.  I'm going to highlight a couple areas very quickly

20   where I believe plaintiffs haven't met their burden.

21           They have to prove with respect to each of the

22   three defendants separately that the defendant engaged in a

23   pattern of conduct, the intent of which was to follow,

24   alarm, place under surveillance, or harass the plaintiff.

25   They haven't done so.

1          And if you look at the next page, the definition

2     of harass includes various conduct which serves no

3     legitimate purpose.  There was abundant evidence of the

4     legitimate purpose of the alleged activity undertaken by the

5     defendants here.

6          So because it was for a legitimate purpose,

7     namely, to get Mr. David to acknowledge his wrongdoing, to

8     make it right financially and to then later to take down the

9     kazalfamilytruth-related Websites, there's a legitimate

10    purpose, and there's no pattern.

11         Number 2, either (A) or (B).  Fear for safety, I

12    think we saw very clearly that the Davids had no fear for

13    their safety.

14         Plaintiff suffered substantial emotional distress.

15    Yes, we heard about the effect of the protests and the

16    e-mails on the David family.  Was it substantial emotional

17    distress?  I don't think so.

18         And Number 3, one of the following:  Credible

19    threat -- I am just skipping ahead now because we're short

20    on time -- credible threat with intent to place plaintiff in

21    fear of safety, I don't see any credible threat or threat to

22    safety in any of the communications, certainly not in the

23    protests that we've seen in this case or reckless disregard

24    for safety -- same thing.

25         And Number 2, in addition, the plaintiff must have

1    clearly and definitively demanded the defendant cease and

2    abate his pattern of conduct.  Again, no clear demands that

3    any defendant stop any of the conduct that's alleged here.

4              Or (B), the defendant violated restraining order.

5    The restraining order as to Charif was not about

6    Rodric David.  There was no restraining order related to

7    Tony.  And as for Adam, it was a consent order -- you'll see

8    it yourself -- and it's not the type of restraining order

9    that's referenced here by the statute.

10             Ladies and gentlemen, the Kazals have been the

11   victims here and have been since day one.  They've been

12   trying to clear their names since 2010.

13             They've had no hesitation about pursuing their

14   rights in the courts, but they also pursued the right to

15   protest, the right to speak and the right to set the record

16   straight, to the voice their grievances; and that's exactly

17   what they've done.

18             This lawsuit is Mr. David's effort to punish the

19   Kazals for pushing back against the harm that he's caused

20   them.  He didn't like the e-mails, he didn't like the

21   Website, he didn't like the tweets, and he definitely didn't

22   like the protestors, but that does not give him a legal

23   claim.

24             He has to prove the elements of the claims, ladies

25   and gentlemen, and I believe, if you take a look at the

1    facts and you take a look at the law, you will agree with me

2    that the plaintiffs here have not done so.

3          That's why we're going to ask you to do the right

4    thing, ladies and gentlemen, and return a verdict in favor

5    of the defendants on both claims.

6          Thank you, ladies and gentlemen, for your time.

7    Thank you for your attention.

8          THE COURT:  All right.  Thank you, Mr. Taylor.

9          Mr. Wiener.

10         MR. WIENER:  Yes.

11         Here is a very telling admission in Mr. Taylor's

12   closing argument.  Perhaps it was accidental, but he

13   admitted that, quote, Charif was responsible for all content

14   on that Website.

15         That includes the photographs.  The attempts to

16   claim that Joe Dabab -- someone named Joe Dabab created the

17   Website, was responsible for the photo selection, there's

18   absolutely no evidence of it.  Mr. Dabad's not here.

19         The GoDaddy records, which are reliable, unlike

20   the defendants, establish that there is a person named

21   Jean Ghalo who's listed as the registrar.  That person's not

22   here either.

23         What is clear is this was a Website that all the

24   brothers were using to promote their interest.  Charif

25   claims that he was responsible for the selection of photos

1   that were uploaded to the site in 2013, 2014.

2            So he clearly had knowledge of how to upload

3   photographs.  Those aren't the photos that are at issue

4   here.  The photos that are at issue here were taken by

5   Anthony Parlato who was only employed by Thunder Studios

6   in 2015.

7            The photos couldn't have been taken earlier than

8   that, and it's those photos there, the ones that were

9   infringed.  It also wasn't innocent infringement.

10            The defendants' counsel, the counsel for all three

11   of the defendants, received a notice to take down the

12   infringed photos.

13            Again, they didn't.  They transferred the Website

14   to Iceland to avoid complying with the law.  There's

15   intentional infringement of copyrighted photographs here,

16   and the jury should find so accordingly.

17            With regard to the stalking campaign, the Kazals

18   admit that they could have pursued legal means to try

19   clearing their supposed good names.

20            They may have done that though they certainly have

21   had no success in clearing their good names.  The ICAC has

22   at all times maintained its findings that Charif Kazal is

23   corrupt.

24            What they did instead was to pursue a harassment

25   campaign against Mr. David.  Mr. David is not even the

1   person who is responsible for the Kazal Family Truth

2   Website.  Moreover, the articles on Kazal Family Truth

3   Website are republished from the *Sydney Morning Herald*.

4   There is nothing illegal about republishing articles.

5           Notably, the defendants haven't put in any

6   evidence -- or -- that any of the articles were, in fact,

7   false.  When shown one of the articles about Tony Kazal's

8   links to Hezbollah, Charif was unable to explain what about

9   the article he believed was false.

10          Defendants would also have you isolate their

11  conduct and try and minimize it by saying, well, I did this

12  and Tony did that and Adam did that.

13          That's not what the juries here do.  The jury has

14  to consider their entire pattern of conduct and the entire

15  campaign, which was clearly coordinated between the

16  brothers.

17          Adam Kazal was bankrupt when this was occurring,

18  couldn't provide any testimony at his deposition about how

19  he financed it.

20          The financing came from somewhere.  We know the

21  bills were paid by Jamie Brown and that he was a close

22  friend of Charif and Tony.  The jury can certainly make a

23  logical inference that somebody paid for it, and it was

24  Charif and Tony who did so.

25          It also wasn't protected for speech.  The

1    First Amendment doesn't protect extortionate demands for

2    $666,666.66 to make the harassment stop.  That's not

3    protected speech.

4         I wouldn't want to live in a society that

5    tolerates extortionate threats under -- as free speech.

6    It's simply not free speech.  It's criminal, and it's

7    already being found criminal by the federal court of

8    Australia.

9         The federal court of Australia also found that

10   Adam did have control over the Website and was in contempt

11   by continuing to make defamatory statements about Mr. David

12   being a criminal.

13        Again, the jury can follow the federal court of

14   Australia's lead on that issue and should find that the

15   defendants have infringed copyrights and conducted a

16   malicious and oppressive stalking campaign against Mr. David

17   and his family.  Thank you.

18        THE COURT:  All right.  Thank you, Counsel.

19        Ladies and gentlemen of the jury, we have a

20   bailiff here that is going to be sworn in, and he will

21   preside over you all during your deliberations.

22        So will you please step forward please, sir.

23        THE CLERK:  Please state your name for the record.

24        THE BAILIFF:  David Williams.

25        THE CLERK:  Do you solemnly swear to keep this

1    jury together in some private and convenient place, that you

2    will not permit anyone to communicate with them nor do so

3    yourself unless by order of the Court or to ask them whether

4    they have agreed upon a verdict and return them to court

5    when they have so agreed and ordered by the Court so hope

6    you God?

7              THE BAILIFF:  I do.

8              THE CLERK:  All rise for the jury.

9         (The following was heard in open court outside the

10         presence of the jury:)

11        (Jury out at 10:27 AM)

12             THE CLERK:  Please be seated.

13             THE COURT:  All right.  A couple housekeeping

14   matters with respect to the jury's deliberation.

15             I expect the parties to be within a five-minute

16   return from a phone call.  So unless your offices are

17   downtown, I am expecting you all to remain in the building.

18   Make sure my courtroom deputy has the telephone number,

19   contact information, for you all.

20             Secondly, yesterday as we were going through the

21   jury instructions, I noticed some typos that I have

22   corrected in the jury instructions.  If you have a copy of

23   the jury instructions, I want to go over them with you.

24             My intention is to print out one final copy that

25   cleans up the typos because I cleaned them up as I was

1    reading them, but I will go over them with you to make sure

2    there is no confusion.

3              If you look starting -- I'm just going to go page

4    numbers instead of instruction number.  Starting on page 11,

5    line 16, it says "Sometimes a witness may have said."  The

6    original version said, "Sometimes a witness may say

7    something," in the present as opposed to the past tense.

8              Next page is 15 --

9              MR. TAYLOR:  Your Honor?

10             THE COURT:  Yes.

11             MR. TAYLOR:  Mine actually says "May say

12   something."  So I'm worried I'm looking at the wrong thing

13   now.

14             THE COURT:  No, no.  I said, "May have said."  I

15   said it in the past tense.  What my proposal is what I

16   actually said to the jury because, when I was reading this

17   yesterday, I realized it's not "may say" because that

18   suggests a witness is going to testify in the future.

19             MR. TAYLOR:  Okay.  So it should be "May have

20   said."

21             THE COURT:  Correct.

22             MR. TAYLOR:  Thank you.

23             THE COURT:  Page 15 is the next page that I

24   noticed there was something that I changed during

25   the -- that I believe I changed, line 17, "A Court

 1  technician may enter the jury room with the bailiff."  I am

 2  just deleting "the clerk" because I didn't say "the clerk."

 3          Page 21, line 5, it says, "The purposes of

 4  punitive damage," and it should be, "The purpose of punitive

 5  damage is" -- "The purpose of punitive damage is to punish a

 6  defendant."

 7          So there's the change there.

 8          Page 22, line 6, again, in the version that was

 9  submitted to the jurors, "that you will hear," it should

10  have been, "you heard during the trial."

11          Page 23, line 3, "infringed the plaintiffs'."  It

12  should be "'s" as opposed to "s'" because there's only one

13  plaintiff as it relates to the copyright claim and reading

14  along, "the plaintiff has the burden," as opposed to "have

15  the burden."

16          Then we jump to page 36.

17          MR. WIENER:  I'm --

18          THE COURT:  I'm sorry.

19          MR. WIENER:  -- sorry, Your Honor.  Line 4, it

20  should be "plaintiff is the owner" as well, just to get the

21  grammar.

22          THE COURT:  You are correct.

23          MR. WIENER:  That's my error originally.  I

24  apologize.

25          THE COURT:  All right.  Then we jump to page 36 on

1    line 16, "that the plaintiff has," there is a misspelling

2    there.

3          Then 43, line 3, "Defendants assert as a defense

4    that the statute of limitations prohibits" as opposed to

5    statutes" -- in the plural -- "prohibit."

6          And then "Thunder Studios'," it should be "s'" as

7    opposed to "'s."

8          And, similarly, on line 10, "the applicable

9    statute" -- singular -- "of limitations," as opposed to

10   plural, as what was typed in the instructions.

11         And then, lastly, page 44, line 15, "Do not be

12   unwilling to change your opinion if the evidence persuades

13   you."  It's a decision.

14         So those are my proposed ones.  I just want to go

15   over -- Mr. Wiener, direct me back to the page -- if you can

16   recall -- where we missed -- where there was a typo that you

17   picked up.  I think it was on page 36.

18         MR. WIENER:  Was page 23, Your Honor, line 4.

19         THE COURT:  Page 23.  All right.

20         Okay.  Great.  All right.  So I want to make --

21   well, I have made those changes with the exception of

22   page 23, line 4, which I am doing -- we're having done right

23   now.  I am going to have just one copy submitted back to the

24   jury which says "Closing Jury Instructions," the cover page,

25   and it will say "Final" so that we know that that's the

```
 1    final version that was submitted.  That was my intention.
 2              Any objection on behalf of the plaintiff,
 3    Mr. Wiener?
 4              MR. WIENER:  No, Your Honor.
 5              THE COURT:  Mr. Taylor?
 6              MR. TAYLOR:  No objection.
 7              THE COURT:  All right.  So, then, I will do that.
 8    Once it's done, I will give it to my courtroom deputy, and
 9    then she will bring it back to the jury.
10              So at this point, we'll just wait -- right.  So
11    we'll just wait until we hear anything from the jurors, and
12    we'll proceed from there.  All right.
13              Any other issues that either side wishes to raise
14    at this time?
15              Mr. Wiener?
16              MR. WIENER:  No, Your Honor.
17              THE COURT:  Mr. Taylor?
18              MR. TAYLOR:  No, Your Honor.
19              THE COURT:  Thank you.
20              THE CLERK:  All rise.  This Court is in recess.
21         (Recess taken 10:36 AM to 11:40 AM)
22              THE COURT:  All right.  We have received a note
23    from the jurors at 11:30 which reads as follows:  "What is
24    the min/max for damages in regards to the tort of stalking?"
25              That is the question.  It seems to me that that
```

```
 1   is a -- that's really a determination that the jurors make.

 2   There is no maximum or minimum, but I throw this out to both

 3   sides to see if they have a proposal as to how to respond to

 4   this question.

 5          Mr. Wiener?

 6          MR. WIENER:  Your Honor, I believe we would just

 7   refer them back to the jury instruction regarding proof of

 8   damages.

 9          THE COURT:  What number is that or what page?

10          MR. WIENER:  I apologize.  I'm just trying to find

11   it in the updated instructions.  It was 24.  It may have

12   become 25.

13          THE COURT:  I don't think -- the instruction

14   shouldn't change.

15          MR. WIENER:  Mr. Taylor, do you have that?

16          MR. TAYLOR:  Is that 15?

17          THE COURT:  Are you talking about

18   Instruction Number 15 or page 15?

19          MR. TAYLOR:  I think counsel is talking about the

20   Instruction 15.

21          MR. WIENER:  And that's damages proof --

22          MR. TAYLOR:  I think so.

23          Is that what you mean?

24          MR. WIENER:  Yeah, it begins, "It's the duty of

25   the Court to instruct you about the measure of damages"?
```

```
 1              MR. TAYLOR:  Right.

 2         I have a thought, Your Honor.

 3              THE COURT:  All right, Mr. Taylor.

 4              MR. TAYLOR:  Well, since the stalking claim is not

 5    asserted in isolation but we've, obviously, talked about

 6    copyright, I'm thinking that maybe there's a little

 7    confusion because the statutory framework regarding

 8    copyright provides for statutory damages, which we talked

 9    about, and this question may be coming from a place of,

10    well, is there a similar --

11              THE COURT:  Right.

12              MR. TAYLOR:  -- framework, and I would say to

13    alleviate that confusion, maybe we can explain that the

14    minimum is technically zero.  They don't have to award any

15    damages, but there's no maximum either.

16              THE COURT:  Right, but -- okay.  How is that

17    different than that's a question that they have to decide or

18    referring them back to the instruction?

19              MR. TAYLOR:  Because -- well, it's a little bit

20    different simply because the question implies that they

21    think that -- it may imply that the jury thinks that they

22    have to award some measure of damages, and that's not true.

23    They have to assess if there's damages to be awarded, and

24    they determine that amount is, if any.

25              THE COURT:  Okay.  I guess I'm trying to
```

 1   understand.  So what would you -- how would you respond to

 2   this note, then?

 3            MR. TAYLOR:  I mean, I would respond, "The minimum

 4   is zero; the maximum is not set by law."

 5            THE COURT:  "The minimum is zero."  Okay.

 6            MR. TAYLOR:  That's a true statement, I think,

 7   Your Honor.

 8            THE COURT:  All right.

 9            Mr. Wiener, what are your thoughts with respect to

10   that?

11            MR. WIENER:  Your Honor, I agree that there is no

12   maximum.  I'm not sure if the minimum is zero or $1 and --

13            THE COURT:  Well, no -- I mean, factually, the

14   answer is they can award nothing or -- that's why it's

15   really up to them.  I mean, I do take to heart what

16   Mr. Taylor has said that -- I'm sure they have read the

17   copyright instructions where they suggest what the -- a

18   minimum is, and they're thinking is there a parallel for

19   stalking.  The answer is no, but we have to answer what

20   their question is.

21            MR. WIENER:  Yeah.  And my inclination would be

22   refer them back to Joint Proposed Instruction Number 24,

23   just the -- sorry -- Instruction Number 15, that there is no

24   minimum or maximum and the factors they can consider in

25   determining an award of damages.

1    THE COURT:  Well, it is interesting -- I mean, if

2    you look at Number 15 -- I'm sorry -- Closing Jury

3    Instruction Number 15, it does state at line 16 "It is for

4    you to determine what damages, if any, have been proved.

5    Your award must be based upon evidence and not speculation,

6    guesswork, or conjecture."

7    One might argue that that answers the question

8    because it says, "what damages, if any, have been proved"

9    and leave it at that.

10   So maybe the best response is to please refer back

11   to jury instruction -- Closing Jury Instruction Number 15

12   and leave it at that without providing any additional

13   information that we right now are somewhat speculating as to

14   what the question -- what's behind the question.

15   I think we all -- I think we're in agreement that

16   we think it stems from the copyright instruction, but I

17   think the cleanest answer would be to say, "Please refer to

18   Closing Jury Instruction Number 15."

19   MR. WIENER:  I'd like to also -- just so the jury

20   doesn't feel that we're ducking their question -- just tell

21   them there is no minimum or maximum amount of damages, which

22   I believe is correct.

23   MR. TAYLOR:  I think that's true, Your Honor.  I

24   think the reason I think it's not fully adequate to just

25   simply refer them back to the instruction is because all

```
 1   eight of them have seen the instruction and have heard the
 2   instruction presumably and, obviously, it's still not clear.
 3   So we could do that, but I would agree with counsel that
 4   maybe we add that single caveat if we could.
 5            THE COURT:  So the proposal would be, then, to say
 6   there "Please see Jury Instruction Number 15.  There is
 7   no" -- and put in the same phraseology, verbiage, if you
 8   will, that they did -- "min/max for damages in regards to
 9   the tort of stalking."
10            But I worry that -- when you say there is no
11   min/max, that suggests -- could one interpret or
12   misinterpret that to suggest to mean they should not award
13   damages?  I don't think so, but I'm just throwing it out
14   there.
15            I'm very hesitant to answer beyond -- you know,
16   this is what the Ninth Circuit looks at.  You know, what are
17   you telling the jurors?  Here are the instructions.  The
18   instruction says, "It is for you to determine what damages,
19   if any."  That suggests to me that's the answer.
20            You know, they can determine zero or whatever they
21   determine.  When we start saying there is no minimum or
22   maximum for damages, it makes me a little concerned, but I
23   am open to be convinced otherwise.
24            MR. WIENER:  Could we add the word "amount" after
25   "min/max"?
```

 1          THE COURT:  "There is no min/max amount for

 2   damages in regard to the tort of stalking"?

 3          Mr. Taylor?

 4          MR. TAYLOR:  Proposal is to add the word "amount"?

 5          THE COURT:  Right.  So it would read as follows:

 6   "Please see Jury Instruction Number 15.  There is no min/max

 7   amount for damages in regard to the tort of stalking."

 8          MR. TAYLOR:  I mean, I think that's right.  I

 9   think it answers the question.  The instruction does say,

10   "if any."

11          THE COURT:  Mr. Wiener, do you have any objection

12   to that proposed response as phrased?

13          MR. WIENER:  No, Your Honor.

14          THE COURT:  All right.  So I will prepare the

15   response.  I will have you both take a look at it.  If there

16   is no disagreement, my courtroom deputy will bring the note

17   back to the jurors.  So we'll be in recess while we get that

18   response ready.  All right.  Thank you.

19          THE CLERK:  All rise.  This Court is recess.

20      (Recess taken 11:51 AM to 12:04 PM)

21          THE COURT:  All right.  I understand we have an

22   issue, Mr. Taylor.

23          MR. TAYLOR:  Your Honor, the Court will recall

24   when the trial was initially set to go to Tuesday through

25   Thursday or Friday morning of last week, Mr. Kazal had made

```
 1    plans to return on Saturday morning.  Then when the national
 2    holiday came up, he changed his flight.  He changed his
 3    flight again because we went into this morning, and he's got
 4    personal and business commitments, and he's got to catch a
 5    flight this afternoon.  And, frankly, technically, Your
 6    Honor, he didn't have to be here for this trial at all and
 7    now to have to change his flight again and reschedule all
 8    his commitments, I don't think --
 9              THE COURT:  Do you want to tell the jury for the
10    punitive damages phrase that they need to come back at a
11    time when Mr. Kazal can be here?
12              MR. TAYLOR:  I don't know that he needs to be
13    here, if we even get to that point.
14              THE COURT:  Have you subpoenaed him?  Why do you
15    need him here as a witness?
16              MR. WIENER:  Your Honor, we'd like to present
17    evidence of his net worth, which is -- if he --
18              THE COURT:  Do you have your own evidence of net
19    worth or -- what do you need him for to establish net worth?
20              MR. WIENER:  To testify about the assets that he
21    holds personally, his income --
22              THE COURT:  You don't have any independent
23    evidence of that?
24              MR. WIENER:  Very little.  We have statements by
25    the federal court of Australia that Mr. Kazal appears to be
```

1    a man of means and -- but his testimony is largely being

2    that his holdings are through a family trust, and he's not

3    divulged what his specific interest is in those trusts, what

4    specific properties are held in those trusts, and we have

5    not obtained any discovery about it.

6            As the evidence is -- as the assets are largely in

7    Australia or in the Middle East, there is no practical means

8    of --

9            THE COURT:  Well, look.  It's your decision.  If

10   you want to go, you should go.  The jury will draw whatever

11   inference -- if we even get to that phase.  You don't have

12   him under subpoena, he didn't have to be here for the trial,

13   so he can leave.

14           But you run the risk.  I mean, as long as both

15   sides, sort of, know the risk of what will happen if he's

16   not here if there is that phase.  But for your -- for his

17   sake, you know, I am sure he wishes that that doesn't

18   happen.  So --

19           MR. TAYLOR:  Of course, Your Honor, and that's

20   right.  There is no subpoena, and he's already been here

21   three, four days longer than he intended.

22           THE COURT:  All right.

23           MR. TAYLOR:  So it's been difficult, and he really

24   needs to get going.

25           THE COURT:  All right.  So that will be --

```
 1              Safe travels to you, sir.

 2              I have an appointment that I need to get to; so I

 3     need to leave.

 4              MR. TAYLOR:  Thank you, Your Honor.  Thank you

 5     very much.

 6              DEFENDANT CHARIF KAZAL:  Thank you, Your Honor,

 7     for your time.

 8              THE CLERK:  All rise.  This Court is in recess.

 9        (Recess taken 12:08 PM to 3:48 PM)

10              THE COURT:  All right.  We've received a note.

11     The jury has reached a unanimous verdict.  So why don't we

12     bring in the jury.

13         (The following was heard in open court in the presence

14          of the jury:)

15              THE COURT:  Good afternoon.  Thank you for your

16     patience.  I understand you have reached a unanimous

17     verdict.

18              Miss Kaddo?

19              JUROR:  Yes.

20              THE COURT:  Why don't you hand the verdict form to

21     our courtroom clerk.

22              THE CLERK:  United States District Court,

23     Central District of California.  Thunder Studios, Inc.;

24     Rodric David, plaintiffs, versus Charif Kazal; Tony Kazal;

25     Adam Kazal; and Does 1 to 100, inclusive, defendants; Case
```

1    No. CV 17-871-AB, Special Verdict Form.

2            We, the jury, in the above-entitled action

3    unanimously find as follows on the questions submitted to

4    us:

5            Thunder Studios, Inc.'s claim for copyright

6    infringement.

7            Question 1:  Has Thunder Studios, Inc., proven

8    that it owns copyrights in the following photographs:

9            Name of photograph.

10           Audi-r8-dec-13, yes;

11           Rodric-david-orange-mclaren, yes;

12           Rodric-david-thunder-studios-office, yes;

13           Rodric-david-la-clippers-lexus, yes;

14           Rodric-david-yellow-mclaren, yes;

15           Rodric-david-Tesla-p90d, yes;

16           Rodric-david-channel-west-coast, yes;

17           Rodric-david-Meeting-Distribution-101-RD_Featured_

18   Image-4-18-2016, yes;

19           Image_2584, yes;

20           Rodric-david-Official-Portrait-Headshot-Thunder-

21           Studios-CEO, yes;

22           Tyga-and-Rodric-David-at-Thunder-Studios-Web, yes;

23           Thunder-digital-media-rodric-david-carey-martell,

24           yes;

25           Rodric-david-toyota-hydro-car, yes.

Question 2:   Below is a chart that identifies each allegedly infringed photograph.   Identify:

1.   Whether Charif Kazal is liable for that photograph's infringement;

2.   Whether Charif Kazal committed copyright infringement willfully or out of ignorance or by accident;

3.   The amount of damages, if any, owed by Charif Kazal to Thunder Studios, Inc., for that photograph's infringement;

4.   Whether Tony Kazal is liable for that photographs's infringement;

5.   Whether Tony Kazal committed copyright infringement willfully or out of ignorance/by accident;

6.   The amount of damages, if any, owed by Tony Kazal to Thunder Studios, Inc., for the photograph's infringement;

7.   Whether Adam Kazal is liable for that photographs's infringement;

8.   Whether Adam Kazal committed copyright infringement willfully or out of ignorance/by accident;

9.   The amount of damages, if any, owed by Adam Kazal to Thunder Studios, Inc., for that photograph's infringement;

10.   The total amount of damages, if any, owed to Thunder Studios, Inc., for that photograph's infringement.

```
 1              Name of photographs.

 2              Audi-r8-dec-13-15: Charif Liable?  Yes.

 3              Charif Willful/Ignorant?  Ignorant.

 4              Charif Damages?  $200.

 5              Tony Liable?  No.

 6              Tony Willful/Ignorant?  Not Applicable.

 7              Tony Damages?  Zero.

 8              Adam Liable?  No.

 9              Adam Willful/Ignorant?  Not Applicable.

10              Adam Damages?  Zero.

11              Total Damages?  $200.

12              Rodric-david-orange-mclaren:  Charif Liable?  Yes.

13              Charif Willful/Ignorant?  Ignorant.

14              Charif Damages?  $200.

15              Tony Liable?  No.

16              Tony Willful/Ignorant?  Not Applicable.

17              Tony Damages?  Zero.

18              Adam Liable?  No.

19              Adam Willful/Ignorant?  Not Applicable.

20              Adam Damages?  Zero.

21              Total Damages?  $200.

22              Rodric-david-thunder-studios-office:  Charif

23      Liable?  Yes.

24              Charif Willful/Ignorant?  Ignorant.

25              Charif Damages?  $200.
```

```
 1              Tony Liable?  No.

 2              Tony Willful/Ignorant?  Not Applicable.

 3              Tony Damages?  Zero.

 4              Adam Liable?  No.

 5              Adam Willful/Ignorant?  Not Applicable.

 6              Adam Damages?  Zero.

 7              Total Damages?  $200.

 8              Rodric-david-la-clippers-lexus:  Charif Liable?

 9  Yes.

10              Charif Willful/Ignorant?  Ignorant.

11              Charif Damages?  $200.

12              Tony Liable?  No.

13              Tony Willful/Ignorant?  Not Applicable.

14              Tony Damages?  Zero.

15              Adam Liable?  No.

16              Adam Willful/Ignorant?  Not Applicable.

17              Adam Damages?  Zero.

18              Total Damages?  $200.

19              Rodric-david-yellow-mclaren:  Charif Liable?  Yes.

20              Charif Willful/Ignorant?  Ignorant.

21              Charif Damages?  $200.

22              Tony Liable?  No.

23              Tony Willful/Ignorant?  Not Applicable.

24              Tony Damages?  Zero.

25              Adam Liable?  No.
```

```
 1            Adam Willful/Ignorant?  Not Applicable.

 2            Adam Damages?  Zero.

 3            Total Damages?  $200.

 4            Rodric-david-Tesla-p90d:  Charif Liable?  Yes.

 5            Charif Willful/Ignorant?  Ignorant.

 6            Charif Damages?  $200.

 7            Tony Liable?  No.

 8            Tony Willful/Ignorant?  Not Applicable.

 9            Tony Damages?  Zero.

10            Adam Liable?  No.

11            Adam Willful/Ignorant?  Not Applicable.

12            Adam Damages?  Zero.

13            Total Damages?  $200.

14            Rodric-david-channel-west-coast:  Charif Liable?

15   Yes.

16            Charif Willful/Ignorant?  Ignorant.

17            Charif Damages?  $200.

18            Tony Liable?  No.

19            Tony Willful/Ignorant?  Not Applicable.

20            Tony Damages?  Zero.

21            Adam Liable?  No.

22            Adam Willful/Ignorant?  Not Applicable.

23            Adam Damages?  Zero.

24            Total Damages?  $200.

25            Rodric-David-Meeting-Distribution-101-RD_Featured_
```

```
1    Image-4-18-2016:  Charif Liable?  Yes.

2            Charif Willful/Ignorant?  Ignorant.

3            Charif Damages?  $200.

4            Tony Liable?  No.

5            Tony Willful/Ignorant?  Not Applicable.

6            Tony Damages?  Zero.

7            Adam Liable?  No.

8            Adam Willful/Ignorant?  Not Applicable.

9            Adam Damages?  Zero.

10           Total Damages?  $200.

11           Image_2584:  Charif Liable?  Yes.

12           Charif Willful/Ignorant?  Ignorant.

13           Charif Damages?  $200.

14           Tony Liable?  No.

15           Tony Willful/Ignorant?  Not Applicable.

16           Tony Damages?  Zero.

17           Adam Liable?  No.

18           Adam Willful/Ignorant?  Not Applicable.

19           Adam Damages?  Zero.

20           Total Damages?  $200.

21           Rodric-David-Official-Portrait-Headshot-Thunder-

22   Studios-CEO:  Charif Liable?  Yes.

23           Charif Willful/Ignorant?  Ignorant.

24           Charif Damages?  $200.

25           Tony Liable?  No.
```

1         Tony Willful/Ignorant?  Not applicable.

2         Tony Damages?  Zero.

3         Adam Liable?  No.

4         Adam Willful/Ignorant?  Not Applicable.

5         Adam Damages?  Zero.

6         Total Damages?  $200.

7         Tyga-and-Rodric-David-at-Thunder-Studios-Web:

8    Charif Liable?  Yes.

9         Charif Willful/Ignorant?  Ignorant.

10        Charif Damages?  $200;

11        Tony Liable?  No.

12        Tony Willful/Ignorant?  Not Applicable.

13        Tony Damages?  Zero.

14        Adam Liable?  No.

15        Adam Willful/Ignorant?  Not Applicable.

16        Adam Damages?  Zero.

17        Total Damages?  $200.

18        Thunder-digital-media-rodric-david-carey-martel:

19   Charif Liable?  Yes.

20        Charif Willful/Ignorant?  Ignorant.

21        Charif Damages?  $200.

22        Tony Liable?  No.

23        Tony Willful/Ignorant?  Not Applicable.

24        Tony Damages?  Zero.

25        Adam Liable?  No.

```
 1              Adam Willful/Ignorant?  Not Applicable.

 2              Adam Damages?  Zero.

 3              Total Damages?  $200.

 4              Rodric-david-toyota-hydro-car:  Charif Liable?

 5   Yes.

 6              Charif Willful/Ignorant?  Ignorant.

 7              Charif Damages?  $200.

 8              Tony Liable?  No.

 9              Tony Willful/Ignorant?  Not Applicable.

10              Tony Damages?  Zero.

11              Adam Liable?  No.

12              Adam Willful/Ignorant?  Not Applicable.

13              Adam Damages?  Zero.

14              Total Damages?  $200.

15              Question 3:  Has Rodric David proven his claim of

16   stalking against Charif Kazal?

17              No.

18              Question 4:  Has Rodric David proven his claim of

19   stalking against Tony Kazal?

20              Yes.

21              Question 5:  Has Rodric David proven his claim of

22   stalking against Adam Kazal?

23              Yes.

24              Question 6:  What amount of compensatory damages,

25   if any, do you award to Rodric David and against
```

1    Charif Kazal for stalking?

2            Zero.

3            Question 7:  What amount of compensatory damages,

4    if any, do you award to Rodric David and against Tony Kazal

5    for stalking?

6            $100,000.

7            Question 8:  What amount of compensatory damages,

8    if any, do you award to Rodric David and against Adam Kazal

9    for stalking?

10           Amount:  $100,000.

11           Question 9:  Did Charif Kazal engage in the

12   conduct with malice, oppression, or fraud?

13           No.

14           Question 10:  Did Tony Kazal engage in the conduct

15   with malice, oppression, or fraud?

16           Yes.

17           Question 11:  Did Adam Kazal engage in the conduct

18   with malice, oppression, or fraud?

19           Yes.

20           Dated December 11th, 2018, signed by the jury

21   foreperson.

22           Ladies and gentlemen of the jury, is this verdict

23   as presented and read the verdict of each of you, so say you

24   all?

25           THE JURORS:  Yes.

```
 1              THE COURT:  Does either side wish the jury polled?
 2              MR. WIENER:  No, Your Honor.
 3              THE COURT:  Mr. Taylor?
 4              MR. TAYLOR:  Yes, Your Honor.
 5              THE COURT:  All right.  Let's poll the jury.
 6              THE CLERK:  Ladies and gentlemen of the jury, as I
 7    call your number, if this is your verdict as presented and
 8    read, please answer yes.  If this is not your verdict,
 9    please answer no.
10              Juror Number 1?
11              JUROR:  Yes.
12              THE CLERK:  Juror Number 2?
13              JUROR:  Yes.
14              THE COURT:  I'm sorry.  The answer to the question
15    is whether this is your verdict, yes or no.  So let's start
16    again with Juror Number 1, please.
17              THE CLERK:  Juror Number 1?
18              JUROR:  Yes.
19              THE CLERK:  Juror Number 2?
20              JUROR:  Yes.
21              THE CLERK:  Juror Number 3?
22              JUROR:  Yes.
23              THE CLERK:  Juror Number 4?
24              JUROR:  Yes.
25              THE CLERK:  Juror Number 5?
```

```
 1              JUROR:  Yes.

 2              THE CLERK:  Juror Number 6?

 3              JUROR:  Yes.

 4              THE CLERK:  Juror Number 7?

 5              JUROR:  Yes.

 6              THE CLERK:  Juror Number 8?

 7              JUROR:  Yes.

 8              THE COURT:  Can I have the attorneys at sidebar,

 9    please.

10         (The following proceedings were held at sidebar.)

11              THE COURT:  Okay, Counsel.  Just deciding the next

12    steps.  I intend to inform the jury now and give them an

13    instruction that, now that they've reached a verdict, we go

14    into the punitive damages phase.

15              Who are you going to call, if anyone, for your

16    witnesses?

17              MR. WIENER:  I will call Rodric David.

18              THE COURT:  Okay.  And then you're going to

19    argue -- are you going to call any witnesses on punitive

20    damages?

21              MR. TAYLOR:  No.

22              THE COURT:  And you're prepared to argue this

23    afternoon, then?  Because my intention is to try to get this

24    to them before we leave today.

25              MR. WIENER:  Yes, Your Honor.
```

```
 1              THE COURT:  Anything either side wishes to --
 2              MR. TAYLOR:  Does Your Honor mean argue about
 3    punitive damages to the jury?
 4              THE COURT:  Yes.
 5              MR. TAYLOR:  All right.
 6              THE COURT:  All right.  Thank you.
 7         (The following was heard in open court in the presence
 8          of the jury:)
 9              THE COURT:  All right, ladies and gentlemen.
10    Based on your answers to the verdict form, you must now
11    decide the amount, if any, that should be awarded in
12    punitive damages as it relates to the two defendants where
13    you answered yes.
14              Just so you understand -- and you'll get a copy of
15    these instructions at the end -- the purpose of the punitive
16    damages are to punish a wrongdoer for the conduct that
17    harmed the plaintiff and to discourage similar conduct in
18    the future.
19              There is no fixed standard for determining the
20    amount of punitive damages, and you are not required to
21    award any punitive damages.
22              If you decide to award punitive damages, you
23    should consider all of the following separately for each
24    defendant in determining the amount:  How reprehensible was
25    that defendant's conduct?  In deciding how reprehensible a
```

1    defendant's conduct was, you may consider, among other

2    factors, whether the conduct caused physical harm; whether

3    the defendant disregarded the health or safety of others;

4    whether the plaintiff was financially weak or vulnerable and

5    the defendant knew the plaintiff was financially weak or

6    vulnerable and took advantage of him; whether the

7    defendants' conduct involved a pattern or practice; and

8    whether the defendant acted with trickery or deceit.

9            Other things that you may consider is whether or

10   not there is a reasonable relationship between the amount of

11   punitive damages and the plaintiffs' harm, and, in view of

12   the defendants' financial condition, what amount is

13   necessary to punish and discourage future wrongful conduct.

14           You may not increase the punitive award above an

15   amount that is otherwise appropriate merely because a

16   defendant has substantial financial resources.  Any award

17   you impose may not exceed that defendant's ability to pay.

18   You are going to get a copy of this in the jury room, but at

19   this time, I am going to allow the plaintiff to present any

20   evidence as it relates to punitive damages.

21           Mr. Wiener.

22           MR. WIENER:  Yes, Your Honor, and we'll call

23   Rodric David as our first witness.

24           THE COURT:  Mr. David, you may step forward.

25   ///

```
 1                        RODRIC DAVID,

 2            having been previously duly sworn,

 3                 testified further as follows:

 4            THE COURT:  I remind you you are under oath.  So

 5    you can resume the witness stand.

 6            Go ahead.  You may proceed.

 7                     DIRECT EXAMINATION

 8    BY MR. WIENER:

 9    Q    Mr. David, have you and your family suffered at the

10    hands of the Kazal brothers over the past ten years?

11    A    Yes.

12    Q    Can you briefly recap for the jury what you have gone

13    through.

14    A    I prefer not to.  This has been a long process.

15    They've heard it all.  I don't want to waste their time or

16    yours or anyone else's.

17    Q    You understand that the -- Tony Kazal and Adam Kazal

18    have the financial resources to pay a substantial judgment

19    in this action?

20    A    Yes.

21    Q    Do you believe that a substantial judgment will serve

22    to punish them?

23    A    Yes.

24    Q    Do you also believe that a substantial punitive damages

25    award will serve to deter them from further harassment of
```

1  you and your family?

2  A    Yes.

3  Q    What do you know about the financial condition of Adam

4  Kazal?

5  A    He's a member of the family.  They are all supported by

6  a family trust.  He spent six years, I believe, as an

7  undischarged bankrupt.

8          During the contempt of Court case in Australia, he

9  had to deal with his undischarged bankrupt nature.  That

10 case I was awarded in excess of half a million dollars in

11 costs against him; and one of his brothers put up about a

12 hundred thousand dollars to pay part of that fee, and I know

13 his brothers paid for his legal defense.

14 Q    And I'd like you to turn to Exhibit 30 in the binder.

15 A    I don't have a binder.

16          MR. WIENER:  May I approach.

17          THE COURT:  If you have a binder, yes.  Because

18 the binders are in the jury room.

19 BY MR. WIENER:

20 Q    I'd like you to turn to Exhibit 30, please, Mr. David.

21 A    Yes.

22 Q    And turn to the document Bates stamped

23 plaintiffs' 1742.

24 A    Yes.

25 Q    Can you read the sentence that begins, "You have a

1    brother."

2    A    What paragraph, please?

3            Am I on the right exhibit?  Exhibit 30-001742?

4    Q    You are, and I am trying to find the paragraph number

5    for you.

6    A    They are noted on the side of this page as I am looking

7    at.

8    Q    I can't find the paragraphs.  I will look for it.

9    Instead I would like for you to turn to 1734, paragraph 24.

10           Can you read the entirety paragraph 24 to the

11   jury.

12   A    (Reading:)

13                    Moreover, you have put no evidence

14              before me about how you can live in your home,

15              have four children go to private school, and

16              be able to organize and fund the considerable

17              and costly teams of people in Los Angeles and

18              Sydney that featured in the evidence.  I note

19              that there were nine or ten persons visible --

20              I think it's a reference to Sydney -- who held

21              signs in a screenshot of the video taken by

22              Miss Sambrook that was reproduced in her

23              evidence.  Moreover, there are four vans on 22

24              November 2016 in the Central Business District

25              of Sydney that I infer had to be driven by at

```
 1                    least three other drivers.  However, the
 2                    source of the resources necessary to finance
 3                    your lifestyle and your contemptuous conduct
 4                    is not in evidence.
 5    Q    I would like for you to turn to page 1742,
 6    paragraph 17.
 7    A    Yes.
 8    Q    And I'd like you to read from the third line of
 9    paragraph 17.
10              THE COURT:  Why don't you have him read the second
11    sentence, start at the second sentence.
12              THE WITNESS:  The one that says, "However, your
13    wife"?
14              THE COURT:  Right.
15              THE WITNESS:  (Reading:)
16                    However, your wife has three sisters
17                    who also live in Sydney, and you have a
18                    brother, Oscar, who is prepared to assist you
19                    in paying a fine were I to impose such a
20                    sentence.
21    BY MR. WIENER:
22    Q    It's correct that your understanding is that Adam
23    Kazal's brother did assist him in paying the fine?
24    A    To put into trust.  In that case it's been put into
25    trust.  It hasn't been disbursed yet.
```

```
 1   Q     All right.  But money has been deposited --

 2   A     Yes.

 3   Q     -- in trust to pay the fine against Adam Kazal?

 4   A     Yes.

 5   Q     Does that suggest to you that Adam Kazal does have

 6   resources available to him to satisfy a punitive damage

 7   award?

 8   A     Yes.

 9   Q     Do you understand if Adam Kazal is a beneficiary of a

10   family trust?

11   A     Yes, I think it's called the Kazal Family Trust.  I

12   understand they have a number of them.

13   Q     All right.  And do you understand what assets are part

14   of that trust?

15   A     I know of some assets that are part of the trust.

16   Q     Could you tell the jury what those assets are.

17   A     The ones that I know about are around business assets

18   in Sydney, which include restaurants, cafes, and property

19   assets in the Rocks District of Sydney, which is the tourist

20   area of Sydney, plus various property developments they've

21   developed.

22   Q     Do you know what specific businesses are part of the

23   trust?

24   A     Off the top of my head, there's Eastbank Restaurant;

25   there's a number of Guylian Chocolate Cafes; there was a bar
```

```
 1   called Barkley's or Bunkley's Bar or Bentley's Bar or

 2   something like that.  Plus their AWT head office in Maquarie

 3   Place.

 4   Q    Okay.  And are you aware of any documentation that

 5   establishes what businesses are part of the trust?

 6   A    Some.

 7   Q    Does this document -- have you seen this document

 8   before?

 9   A    Yes.

10        THE COURT:  What exhibit is this?

11        MR. WIENER:  It wasn't marked as an exhibit.

12        THE COURT:  Do we want to mark it so the record

13   reflects that you have just presented him with an exhibit?

14        MR. WIENER:  Sure.  I'll mark this as Exhibit 49,

15   Your Honor.

16        THE COURT:  All right.

17      (Trial Exhibit 49 was marked for identification.)

18        THE COURT:  What is it?

19        MR. WIENER:  It's the current details for

20   ABN 77 920 338 673.

21   Q    Can you explain what the ABN number is, Mr. David.

22   A    It's an acronym for Australian Business Number.  It's

23   similar in the United States to the Employment

24   Identification Number.  It's a unique number assigned to any

25   corporate entity for taxation purposes in Australia.
```

```
 1   Q    All right.  What business does it -- underneath that
 2   does it list the entity name as the trustee for the Kazal
 3   Family Trust?
 4   A    Yes, it does.
 5   Q    Are you aware whether Adam Kazal is a beneficiary of
 6   the Kazal Family Trust?
 7   A    Certainly is what was stated in his evidence in the
 8   hearing in Australia.
 9   Q    Do you know if Tony Kazal is a beneficiary of the Kazal
10   Family Trust?
11   A    Yes, he is.
12   Q    According to this what businesses are comprised in the
13   Kazal Family Trust?
14             MR. TAYLOR:  Lacks foundation, Your Honor.
15             THE COURT:  Well, the document is in front of him;
16   so the objection is overruled.
17             THE WITNESS:  The Guylian Cafe in the Darling
18   Quarter, the one in the Rocks, the one on George Street.
19   There is another one in the Rocks and another one in
20   Circular Quay, and then there is another one called The
21   Rocks Cafe.
22   BY MR. WIENER:
23   Q    Could you briefly describe for the jury what your
24   understanding is of those businesses.
25   A    The Kazals own the rights to, I think, a Belgian
```

```
 1   franchise, Guylian Chocolates, a Belgian company.  So they
 2   own the Australian rights to that name, and so they have
 3   opened up a series of corporate and franchise cafes in
 4   Australia and elsewhere, to my understanding.
 5   Q    Do you have an understanding of what the gross revenue
 6   is at the chocolate cafe?
 7   A    From what was reported in one of these business forums,
 8   it exceeds $6 million.
 9   Q    All right.  And I am going to show you a document just
10   to verify if it's the business form that you are referring
11   to.
12           THE COURT:  Is this another exhibit that you
13   intend to introduce into evidence?
14           MR. WIENER:  Yes.  It's a printout from Zoom Info
15   for Guylian Belgian Chocolate Cafe, and it provides a
16   company profile, and we'll mark it as Exhibit 50,
17   Your Honor.
18           THE COURT:  All right.
19       (Trial Exhibit 50 was marked for identification.)
20   BY MR. WIENER:
21   Q    Mr. David, you've seen this document previously?
22   A    Yes, I have.
23   Q    And does it list the Guylian Belgian Chocolate Cafe as
24   having revenues of 6.4 million?
25   A    Yes, it does.
```

1    Q     All right.  Do you have any estimate what the value of

2    the other businesses that are part of the Kazal Family Trust

3    is collectively?

4    A     Their long-standing, high-profile restaurants that have

5    a nightclub called Bar 100, Eastbank Restaurants, those

6    Guylian Chocolate Cafes.  As a going concern, the business

7    would exceed $20 million in value as a business I would

8    assume.

9    Q     Are you familiar with a company called KTC?

10   A     Yes.

11   Q     Is Tony one of the owners of that company?

12   A     Yes.

13   Q     Do you know if there was testimony offered by

14   Charif Kazal that KTC received a distribution from the

15   liquidation of Emergent Capital?

16   A     Yes.

17   Q     How much was that distribution?

18   A     It exceeded 1.09 million U.S. dollars.

19   Q     All right.  And that was money received by KTC?

20   A     Yes.

21   Q     Are you aware of any sales by the Kazal family of real

22   property in Australia within the past 18 months?

23   A     Yes.

24   Q     Could you explain to the jury what property sales you

25   are aware of.

1  A     They had a property in East Circular Quay, which is

2  right on the Harbor Foreshore, that they had a tenant in --

3  I mentioned before -- Bentley's Bar or Barkley's Bar or

4  something like that.  They sold it for 21.5 million in

5  late 2017.

6  Q     And I am just going to show you an article that was

7  published online and just want you to verify if it's

8  consistent with your understanding.

9        It's an August 22, 2017, article entitled,

10 "Sydney's Kazal family sell Circular Quay retail space."

11       And I'll mark this as Exhibit 51, Your Honor.

12 A     Can you turn it over, please.

13 Q     That would be of assistance.

14 A     Yes.  That's the Buckley's Bar that I was referring to.

15 That's where -- they are the landlord.

16 Q     All right.  And it's correct the article reflects that

17 it was sold for 21.5 million?

18 A     Yes.

19       THE COURT:  Is that U.S. dollars?

20       THE WITNESS:  No.  This is Australian dollars.

21       THE COURT:  Thank you.

22 BY MR. WIENER:

23 Q     Are you familiar with what the exchange rate is between

24 Australian dollars and U.S. dollars?

25 A     Not currently.  It's fluctuated quite a bit over the

```
 1   course of the last year.  It's maybe about on average
 2   80 percent.
 3   Q    All right.  Do you have an estimate what the exchange
 4   rate was in August 2000 --
 5   A    I have no idea.  It would be a guess.  It would be
 6   something circa 80 percent of the value of the U.S. dollar.
 7   Q    All right.
 8   A    But any currency exchange Website can show you that.
 9   Q    All right.  Would you say it was plus or minus
10   ten percent approximately?
11   A    Yeah, it's circa 80 percent.  It fluctuates anywhere
12   between -- and 70 percent -- 70 cents.
13   Q    All right.  So at a minimum, the property was sold for
14   at least $15 million U.S.?
15   A    Well, that would be underballing it, but, yes.
16   Q    All right.  Or possibly up to 21 million U.S. --
17   A    Depending on the exchange rate, yes.
18   Q    All right.  Did you hear testimony by Charif Kazal that
19   KTC made a $30 million offer to buy Emergent Capital's stake
20   in Global Renewables?
21   A    That was in evidence, yes.
22   Q    All right.  Does that suggest to you that Charif and
23   Tony Kazal had at least 20 to $30 million in assets
24   available to them?
25   A    Yes.
```

```
 1   Q    It's correct that Tony Kazal's involved with AWT?

 2   A    Yes.

 3   Q    What is AWT?

 4   A    It's an acronym for Australia World Trading.  It's a

 5   company that Karl, Charif, and Tony had been operating since

 6   at least 2000.

 7   Q    I am going to show you a document that's a printout

 8   from a Website called kazalicacacnsw.com, and it states on

 9   it, "Tony Kazal represents Australian World Trading on the

10   consulting end," and I will mark this as the next exhibit.

11        Does this document, as far as you are aware,

12   accurately represent Tony Kazal's involvement with AWT?

13   A    Yes.

14   Q    Does it state that he is responsible for the

15   significant amount of economic development?

16   A    That's what it states, yes.

17   Q    Are you aware whether Tony Kazal is the owner of a

18   property company named Top Racing Property, LLC?

19   A    Yes.

20   Q    Are you aware if he is the owner of a company named

21   Troy Stable, LLC?

22   A    Yes.

23   Q    All right.  Did Tony Kazal testify to his ownership of

24   Top Racing Property, LLC in a New Jersey lawsuit?

25   A    Yes.
```

```
 1            MR. WIENER:  Your Honor, the next exhibit that
 2   plaintiffs will move into evidence is a certification of
 3   Tarek Kazal, aka Tony Kazal, in the case Sven Temming,
 4   plaintiff, versus Top Racing Property, LLC, Superior Court
 5   of New Jersey Law Division, Burlington County, Docket
 6   No. BUR-L-2787-08.
 7   Q    Mr. David, have you seen this certification previously?
 8   A    Yes.
 9   Q    Do you believe it's a true and correct copy of a
10   certification signed by Tony Kazal?
11   A    Yes, it is.
12   Q    All right.  I'd like you to read the entirety of
13   paragraph 4.
14   A    (Reading:)
15                    For information purposes, while my
16            legal name is Tarek Kazal, I have also been
17            known as Tony Kazal.  The plaintiff also
18            referred to me as Troy.  I also referred to
19            the plaintiff as Bondy.  I am the sole owner
20            of Top Racing Property, LLC, and Troy Stable,
21            LLC.
22   Q    Next I'd like you to read paragraph 6.
23   A    (Reading:)
24                    On May 4th, 2005, Top Racing
25            Property, LLC, acquired land at 28235 Gaunts
```

 1                    Bridge Road, Columbus, New Jersey.  See deed

 2                    attached hereto, Exhibit E.

 3    Q    And do you recognize this signature in the lower

 4    right-hand corner of this document?

 5    A    Yes.  It's Tony Kazal.

 6    Q    Are you familiar with the property at 28235 Gaunts

 7    Bridge Road in Columbus, New Jersey?

 8    A    I have never been there.

 9    Q    Have you seen any valuations of the property?

10    A    Yes, I have.

11    Q    What was the most resent valuation you saw?

12    A    The one I saw was the same time as this lawsuit, around

13    2010.

14    Q    What was the valuation of the property at that time?

15    A    2.5 million.

16    Q    Could you briefly describe the property for the jury.

17    A    I understand it's a ranch for training racing horses.

18    Q    All right.  To the best of your knowledge, is the

19    property still owned by Top Racing Property, LLC?

20    A    To the best of my knowledge.

21    Q    I'd like you to turn to Exhibit 39 in your binder.

22    A    Yes.

23    Q    Could you explain for the jury what Exhibit 39 is.

24    A    It's an excerpt of a newspaper article from the *Sydney*

25    *Morning Herald*, I think, dated 2013.

```
1    Q    All right.  And could you explain to the jury what the
2    article discusses.
3    A    It discusses Tony Kazal's run-in with someone who tried
4    to defraud him as he was trying to facilitate a money
5    laundering exchange with Hezbollah.
6    Q    All right.  And does it mention Tony Kazal having a
7    cash transaction?
8    A    Yes, of about $1.2 million.
9    Q    And that was a cash transaction?
10   A    Yes.
11   Q    Finally, have you ever seen any bank account statements
12   for Tony Kazal?
13   A    I have.
14   Q    All right.  Have you seen a statement from the Dubai
15   Islamic Bank on November 26th, 2011?
16   A    Yes, I have.
17   Q    All right.
18        I will mark that as plaintiffs' last and final
19   exhibit, Your Honor.  It's a statement of account.
20        Could you briefly walk the jury through this
21   document.
22        THE COURT:  Counsel, unless he's got magnifying
23   glasses, you have to zoom this in.
24        MR. WIENER:  All right.
25   Q    Does this document show an opening balance of 2.5 --
```

1    $2,552,847.02?

2    A    Yes.

3    Q    Does it also show incoming payments from the Kazal

4    brothers?

5    A    Yes, it does.

6    Q    Did you do a tabulation of what the total approximate

7    amount of the incoming transfers from the Kazal brothers

8    was?

9    A    About a million.

10   Q    And that's over what period?

11   A    The statement looks like it's a period of one calendar

12   year.

13   Q    Thank you.

14          I have nothing further.

15          THE COURT:   Cross-examination.

16                       CROSS-EXAMINATION

17   BY MR. TAYLOR:

18   Q    Mr. David, the exhibit we were just looking at, the

19   statement of account --

20   A    Yes.

21   Q    -- what's the date that you see there?

22   A    I see a range of dates.   The first one is January 2010.

23   Q    So that was about almost nine years ago?

24   A    Approximately.

25   Q    Okay.  And at the top of the page, it says, "Currency

```
 1   AED."

 2            Do you see that?

 3   A    Yes, I do.

 4   Q    What's AED?

 5   A    I don't know what the acronym -- but it's Malaysia --

 6   but it's UAE currency.

 7   Q    It's the currency in the Emirates; right?

 8   A    Correct.

 9   Q    Not American dollars?

10   A    No.

11   Q    So these amounts at right are not -- these are dirhams,

12   not American dollars; right?

13   A    They're UAE currency; yes.

14   Q    Did you have an understanding what the exchange rate

15   was of the dirham to the dollar back in 2010?

16   A    No, I don't.  Possibly three, but I am not specifically

17   sure.

18   Q    Three to one dollar?

19   A    Yes.

20   Q    You mentioned a Kazal Family Trust a few minutes ago.

21   A    Yes, the Kazal Family Trust.

22   Q    Right.  Do you know who the trustees of the trust are?

23   A    No, I don't.

24   Q    And do you know whether Adam is a beneficiary or a

25   trustee of that trust?
```

```
1    A    He is a beneficiary.

2    Q    So is it your understanding that that means that he

3    owns the trust assets?

4    A    I believe the trust assets are collectively owned by

5    the family.

6    Q    And the family includes many, many people; doesn't it?

7    A    I don't believe so.  I think it's Kazal brothers.

8    Q    Well, that's eight people right there.

9    A    Well, I meant the business brothers, but I am not the

10   administrator of the company.

11   Q    You have testified that you understood Adam to be an

12   undischarged bankrupt for some period of time?

13   A    Yes, he was.

14   Q    What period of time?

15   A    Circa 2010 through to 2000 -- well, until the case of

16   late 2016, early '17.

17   Q    Early 2017, you said?

18   A    Yes.

19   Q    What does that term mean in your understanding?

20   A    It means that he entered bankruptcy protection.

21   Australian law requires you to file a statement of affairs

22   within six weeks of seeking protection from your creditors.

23         For some reason that I don't know, he was able to

24   not submit his statement of financial for a period of six

25   years.
```

```
 1   Q    Well, did the status of being an undischarged bankrupt

 2   suggest to you that Adam Kazal had significant income?

 3   A    No, that's not what bankruptcy does.

 4        Through his bankruptcy trustee, he declared no

 5   income, and then the judge -- the paragraph I read before --

 6   challenges Mr. Kazal as to how he can have such a lavish

 7   lifestyle when he doesn't have any declared income or assets

 8   with the Australian tax office.

 9   Q    Does the status of being an undischarged bankrupt

10   suggest to you that the debtor has significant assets?

11   A    No, by definition it does not.

12   Q    Now, you mentioned also the $30 million offer that we

13   heard about during testimony in the case by -- I believe it

14   was by KTC to purchase Global Renewables --

15   A    Yes.

16   Q    And that was back in 2011?

17   A    Yes.

18   Q    You testified, in part, that that offer was

19   unacceptable because, in part, it was tied to the LIA, the

20   Libyan Investment Authority?

21   A    Yes.

22   Q    So it didn't suggest to you, did it, that it was

23   actually based on $30 million in actual assets owned by KTC

24   at the time?

25   A    The decision that I made at the time, I couldn't be
```

1    comfortable that their offer was supported by any financial

2    wherewithal in which to conclude the transaction.  Whereas

3    the private equity firm, Iron Bridge Capital, being an

4    Australian private equity firm, I was pretty comfortable did

5    have the capacity in which to close.

6    Q    I understand that.

7         Was it your understanding that the financing for

8    the Kazals or the KTC offer would be provided by the LIA?

9    A    Wasn't my understanding at all.  That's one of the

10   sources that they proffered.

11   Q    Sources for the financing?

12   A    Correct.

13   Q    It didn't suggest to you that -- they never told you

14   they had $30 million in cash prepared to make an offer, did

15   they?

16   A    Well, if you recall my earlier testimony, they've

17   always said that they were a powerful, well-to-do, wealthy

18   family, and this dispute all started because of their

19   failure to invest in the company that we agreed to do.

20   Q    Now, I thought you testified earlier that you thought

21   at least one or more of the Kazal brothers at the time

22   were -- I think you used the term "impecunious"?

23   A    Yes.

24   Q    What does that mean?

25   A    "Impecunious" means of questionable financial strength.

1    Q    Meaning weak financial strength?

2    A    Yes, that was to Charif Kazal.

3              MR. TAYLOR:  May I just take a moment, Your Honor,

4    to look at the exhibits.

5              THE COURT:  Yes.

6              MR. TAYLOR:  Thank you.

7              No further questions now, Your Honor.

8              THE COURT:  Redirect.

9              MR. WIENER:  No redirect.  I just want to make

10   sure that the exhibits we have introduced are properly moved

11   into evidence.

12             THE COURT:  Okay.  What exhibits are you seeking

13   to introduce into evidence?

14             In the interest of time, why not give you a hand.

15   Are you talking about Exhibits 49, 50, 51, 52, 53, and 54?

16             MR. WIENER:  That's correct, Your Honor.

17             THE COURT:  Any objection to those exhibits?

18             MR. TAYLOR:  I would object to the extent that the

19   witness didn't have personal knowledge or that no foundation

20   was laid for the authenticity of any of those documents, and

21   I didn't get them in advance.  So I don't have -- I haven't

22   had time to study to them, Your Honor.  I would object to

23   that extent, though.

24             THE COURT:  The objection is noted but overruled.

25   The documents will be admitted into evidence.

```
 1            (Trial Exhibits 49, 50, 51, 52, 53, 54 were admitted

 2             into evidence.)

 3                 THE COURT:  All right.  Sir, you may step down.

 4                 THE WITNESS:  Thank you.

 5                 THE COURT:  You may call your next witness.

 6                 MR. WIENER:  Your Honor, no further witnesses.

 7                 THE COURT:  Mr. Taylor, do you wish to present any

 8      evidence at this time?

 9                 MR. TAYLOR:  No, Your Honor.

10                 THE COURT:  Can I have counsel approach at

11      sidebar.

12            (The following proceedings were held at sidebar.)

13                 THE COURT:  The only instruction I intend to give

14      is the instruction that I read earlier.  Take a moment to

15      look at it.  It's one page.  It fills in the blanks as it

16      relates to names of plaintiff and defendants.  I don't

17      believe there are any other instructions that are applicable

18      in this case.

19                 So my intention is to read this instruction, have

20      you both provide closing arguments.  I will give you -- I

21      don't think that you need, quite frankly, based on the 15

22      minutes of testimony, if you need any more than ten minutes

23      to argue, and that's being gracious.  So ten minutes each

24      side, and then I will give you three minutes to rebut

25      afterwards.
```

```
 1              Any objections to the proposal that I -- to the
 2   instructions first and the proposed plan of action going
 3   forward?
 4              Take a minute to look at the instructions.
 5              And I'm going to show you a copy of the verdict
 6   form which asks two questions.
 7              So are you objecting to the instruction?
 8   Mr. Taylor?
 9              MR. TAYLOR:  Not to the instruction, not to the
10   plan that Your Honor --
11              THE COURT:  Okay.  Any objection to the
12   instruction or the proposed plan of action?
13              MR. WIENER:  No, Your Honor.
14              THE COURT:  All right.  I will have you take a
15   look at the punitive damages form.  You can look at both
16   pages but -- and it's specific to Tony Kazal and Adam Kazal.
17              MR. TAYLOR:  It's fine with us, Your Honor.
18              MR. WIENER:  Agreed.
19              THE COURT:  Did you have anything else you want to
20   state on the record?  Oh, you look like you had something to
21   say.
22              MR. TAYLOR:  Oh, no, no.
23              THE COURT:  Okay.  So then I will read this
24   instruction, and we'll go forward with the arguments.  All
25   right?
```

 1          MR. WIENER:  Thank you, Your Honor.

 2      (The following was heard in open court in the presence

 3       of the jury:)

 4          THE COURT:  Ladies and gentlemen, you have now

 5  heard the evidence as it relates to the second phase of this

 6  trial.  I am going to read to you one instruction, which I

 7  read to you 20 minutes ago but a more complete version of

 8  that instruction which will guide your consideration of the

 9  evidence in this case.  I will make sure you have a copy of

10  that instruction available for you in the jury deliberation

11  room.

12          You must now decide the amount, if any, that you

13  should award Rodric David in punitive damages.  The purposes

14  of punitive damages are to punish a wrongdoer for the

15  conduct that harmed the plaintiff and to discourage similar

16  conduct in the future.  There is no fixed standard for

17  determining the amount of punitive damages, and you are not

18  required to award any punitive damages.  If you decide to

19  award punitive damages, you should consider all of the

20  following separately for each defendant in determining the

21  amount:

22          (A)  How reprehensible was that defendant's

23  conduct?  In deciding how reprehensible a defendant's

24  conduct was, you may consider among, other factors:

25          1.  Whether the conduct caused physical harm;

1          2.    Whether the defendant disregarded the health

2    or safety of others;

3          3.    Whether Rodric David was financially weak or

4    vulnerable and the defendant knew Rodric David was

5    financially weak or vulnerable and took advantage of him;

6          4.    Whether defendant's conduct involved a

7    pattern or practice; and

8          5.    Whether the defendant acted with trickery or

9    deceit.

10          (B)   Is there a reasonable relationship between

11    the amount of punitive damages and Rodric David's harm;

12          (C)   In view of defendant's financial condition,

13    what amount is necessary to punish it and discourage future

14    wrongful conduct?

15          You may not increase the punitive damage award

16    above an amount that is otherwise appropriate merely because

17    a defendant has substantial financial resources.  Any award

18    you may impose -- I'm sorry -- any award you impose may not

19    exceed that defendant's ability to pay.

20          With that, Mr. Wiener, you may proceed.

21          MR. WIENER:  I'd like to thank the jury for making

22    the correct finding that Adam and Tony Kazal engaged in a

23    pattern of malicious and oppressive conduct, not just

24    towards just Mr. David but his family.

25          It bears substantial note that this was a campaign

1    that was designed to hurt the Davids.  When it began, it

2    caused them to flee their country.  They pursued it even

3    here in California at great expense to them.

4           You have heard the numerous lawsuits they brought.

5    You've heard the evidence of their substantial property and

6    business holdings.

7           Within the past 18 months, they've liquidated

8    businesses worth at least $15,000,000 U.S. and more likely

9    closer to $20 million U.S.

10          These are well-funded defendants, and it's

11   important that the jury send them a message that this

12   conduct won't be tolerated.  You know, if they just get a

13   slap on the wrist, it's very likely that this conduct could

14   resume, and that's what this lawsuit is designed to prevent.

15          There is a manifest disregard for the safety and

16   well-being of the David family.  The protests were conducted

17   near his children's elementary school.

18          That wasn't a coincidence, and it wasn't something

19   that the defendants abated.  Instead, they engaged in

20   trickery by attempting to first have the message be

21   delivered "Care of Adam Kazal," and then, when the federal

22   court of Australia restrained Adam Kazal, they then planned

23   to change the signs to be "Care of Tony Kazal" in order to

24   flout the Court orders.

25          These defendants don't have any respect for the

1   law.  They do have respect for money and financial damages,

2   and that's what needs to be issued against them, is a severe

3   financial award.

4          Notably, they haven't even seen fit to defend

5   their conduct before the jury, and I think the jury can

6   easily infer that they're in contempt of our legal

7   processes.

8          The only way you can tell them that the rule of

9   law means something is to hit them with a severe financial

10  punitive damage award.

11         Thank you.

12         THE COURT:  Mr. Taylor.

13         MR. TAYLOR:  Ladies and gentlemen, I also thank

14  you for your time and for your effort in deliberating and

15  reaching a verdict here.  I would point out a few things

16  with respect to the punitive damages claim in this case.

17         First of all, the jury reached a verdict of

18  liability on stalking as to Tony Kazal and Adam Kazal, and,

19  as I heard it, assessed damages in the sum of $100,000

20  against each of them.

21         I would hardly call that a slap on the wrist.

22  That's a significant damages award.  And given that there's

23  been no evidence that any of the alleged stalking activity

24  has taken place in the last, roughly, two years now, there's

25  no indication that it's about to begin again.

1        There was no evidence presented that the

2   defendants intend to arrange a similar protest to the one

3   that took place two years ago.  The e-mails have stopped.

4   The Website is down.  The tweets aren't happening any more.

5   So for that reason, I don't think the deterrent factor is

6   really an issue here at all.

7        Now, with respect to the factors that are

8   outlined -- the other factors outlined in the jury

9   instruction that the Court just read, whether the conduct at

10  issue caused physical harm, there was evidence of the effect

11  on the David family, but there was no evidence of actual

12  physical harm.

13       Counsel has mentioned that the protests were in

14  the area of the David family children's school, but the

15  school is about 300 meters from their home.  So if you're in

16  the area of their home, you're also necessarily right near

17  the school whether you know it or not.

18       With respect to the health and safety of others,

19  again, I don't believe there was any evidence presented on

20  that point either.

21       Whether Mr. David was financially weak or

22  vulnerable, that doesn't seem to be applicable here as the

23  CEO of a significant motion picture and television facility

24  in the Los Angeles area.

25       Whether the defendants' conduct involved a pattern

```
 1    or practice, I believe that was addressed previously.  But
 2    whether the defendant acted with trickery or deceit, as to
 3    defendant Tony Kazal, I don't see any evidence of that at
 4    all.
 5            With respect to defendant Adam Kazal, there was
 6    evidence that he attempted to remove his name from the
 7    placards, but I believe that was about the extent of it.
 8            So, again, for those reasons, ladies and
 9    gentlemen, I would submit to you that an award of punitive
10    damages here is probably unnecessary.
11            Adam Kazal has gone from being an undischarged
12    bankrupt with no assets to the scion of a very wealthy
13    family in the course of this case in the last few days.  So
14    I think the jury has to figure out which one that is.
15            The evidence of Mr. Tony Kazal's financial
16    condition is pretty outdated for the most part and based on
17    a lot of speculation and guesswork, and so I think, under
18    the circumstances, we would submit that no punitive damages
19    or a very small punitive damages award would be appropriate.
20            Thank you very much.
21            THE COURT:  All right.  Thank you, Counsel.
22            All right.  Ladies and gentlemen, we're going to
23    have -- oh, I'm sorry.  You have a few minutes for rebuttal.
24            MR. WIENER:  I apologize.
25            THE COURT:  My apologies.  That's my mistake.
```

 1   Sorry.  It's late.  Sorry.

 2              MR. WIENER:  I will be very quick, Your Honor.

 3              Deterrence is an issue here.  The conduct at

 4   issue, the stalking by Adam Kazal, stopped after he was

 5   imprisoned.  He is out of prison now, and he does pose a

 6   significant threat to the Davids.  And unless there's

 7   financial consequences, they are legitimately concerned that

 8   the conduct will resume;

 9              And given that Adam Kazal is overseas and

10   obviously has no intent of ever coming to California or

11   abiding by any judicial processes here, nor does Tony Kazal,

12   the only message that can be sent is financial damages.

13              Fear is also -- by the fact that neither Kazals

14   have ever apologized to the Davids for their misconduct.

15   They're belligerent and dangerous people, and there is no

16   remorse on their part.  They're fanatical and will do

17   whatever it takes to hurt the David family.

18              Adam Kazal has been found to be in contempt of

19   Court as a criminal contempt finding, much higher standard

20   of proof than what the jury found here today, and he is not

21   unable to pay a judgment.  He is the beneficiary of a

22   family trust that has realized multi-million dollars from

23   the sale of a property, and that's money that the federal

24   court of Australia has found will be made available to him

25   to satisfy the judgment.

1          Notably, none of the Kazals have presented any

2     evidence disputing that they're beneficiaries of a trust.

3     It was set up to avoid liability, and it is available to

4     satisfy the judgment here, and the jury properly considers

5     those proceeds as well as the obvious financial resources

6     available to the Kazals in rendering its punitive damages

7     verdict.

8          Thank you.

9          THE COURT:  All right.  Thank you, Counsel.

10         All right.  Ladies and gentlemen, the bailiff is

11    here to escort you back to the jury room to begin your

12    deliberations.  You will have the exhibits and the verdict

13    form with you momentarily.  And just for the -- let me just

14    double-check.

15         He'll escort you back to the jury deliberation

16    room.

17         THE CLERK:  All rise for the jury.

18      (Jury out at 4:56 PM)

19      (The following was heard in open court outside the

20       presence of the jury:)

21         THE CLERK:  Please be seated.

22         THE COURT:  All right.  I don't know how long

23    or -- how long they will need, but I intend to let them

24    deliberate until at least 6:30 or so.  And if they can't

25    come up with a decision by then, I will probably bring you

```
 1    back in and have them come back tomorrow morning.

 2              So in the interest of the hour, I would suggest

 3    that you remain relatively close by.

 4              Mr. Taylor, you were moving.  I thought you were

 5    going to get up.

 6              MR. TAYLOR:  No.

 7              THE COURT:  If there is nothing further, we are in

 8    recess.  Thank you.

 9              MR. WIENER:  Your Honor --

10              THE COURT:  Yes.

11              MR. WIENER:  -- I just need to probably coordinate

12    with Carla about the exhibits.

13              THE COURT:  You mean Ms. Badirian?

14              MR. WIENER:  I apologize.

15              THE COURT:  You should probably do that sooner

16    rather than later.  She's been kind enough to get the

17    exhibit tags ready for you so that we can get the exhibits

18    to the jury so they can look them over.

19              MR. WIENER:  Thank you.

20              And no disrespect.

21              THE COURT:  I know.  Just remember we are in the

22    federal court house.

23              MR. WIENER:  I understand.

24              THE CLERK:  All rise.  This Court is in recess.

25         (Recess taken 4:57 to 6:02 PM)
```

```
 1          (The following was heard in open court in the presence
 2      of the jury:)
 3          THE COURT:  All right.  I guess for the first
 4   time, I think, in this trial I could say "good evening."
 5          So I understand the jury has reached a unanimous
 6   verdict.
 7          Miss Kaddo, would you mind presenting the verdict
 8   to our courtroom clerk again.
 9          THE CLERK:  United States District Court,
10   Central District of California.  Thunder Studios, Inc.,
11   Rodric David, plaintiff, versus Charif Kazal, Tony Kazal,
12   Adam Kazal, and Does 1 through 100, Inclusive, defendants,
13   Case Number CV 17-817.
14          Verdict Form, Punitive Damages.
15          Question 1:  What amount of punitive damages, if
16   any, do you award Rodric David and against Tony Kazal?
17          Amount:  $1 million.
18          Question 2:  What amount of punitive damages, if
19   any, do you award to Rodric David and against Adam Kazal?
20          Amount:  $1 million.
21          Dated December 11, 2018, signed by the jury
22   foreperson.
23          Ladies and gentlemen of the jury, is this verdict
24   as presented and read the verdict of each of you, so say you
25   all?
```

```
 1              THE JURORS:  Yes.

 2              THE COURT:  Does either side wish the jury to be

 3  polled?  Mr. Wiener?

 4              MR. WIENER:  No, Your Honor.

 5              THE COURT:  Mr. Taylor?

 6              MR. TAYLOR:  Yes, Your Honor.

 7              THE COURT:  All right.  Poll the jury, please.

 8              THE CLERK:  Ladies and gentlemen of the jury, as I

 9  call your number, if this is your verdict as presented and

10  read, please answer yes.  If it is not your verdict, please

11  answer no.

12              Juror Number 1?

13              JUROR:  Yes.

14              THE CLERK:  Juror Number 2?

15              JUROR:  Yes.

16              THE CLERK:  Juror Number 3?

17              JUROR:  Yes.

18              THE CLERK:  Juror Number 4?

19              JUROR:  Yes.

20              THE CLERK:  Juror Number 5?

21              JUROR:  Yes.

22              THE CLERK:  Juror Number 6?

23              JUROR:  Yes.

24              THE CLERK:  Juror Number 7?

25              JUROR:  Yes.
```

```
 1              THE CLERK:  Juror Number 8?

 2              JUROR:  Yes.

 3              THE COURT:  All right.  Ladies and gentlemen,

    thank you.  There is now one final phase -- I'm kidding, I'm

 5    kidding, I'm kidding.

 6              You have now completed your service as jurors on

 7    this case.  I want to thank you, again, for the time and

 8    effort you took throughout this trial over the last several

 9    weeks.

10              As I mentioned during the initial voir dire

11    process, what I think makes our justice system the best in

12    the world is having good people like you taking the time to

13    listen and deliberate and resolve disputes just like this.

14    So we all certainly appreciate it.

15              You are now no longer under any orders about this

16    case.  You have the absolute right to discuss the case or

17    not.  It's entirely up to you.  If you do decide to discuss

18    the case, I would simply submit to you that you abide by a

19    rule that I was taught when I was a young prosecutor known

20    as the L.A. Times rule.  Just whatever you say, you should

21    feel comfortable with that being on the cover of the

22    L.A. Times.  And if you're not, then it's probably not worth

23    saying out of respect for your other members of the jury.

24              Lawyers often appreciate any comments that you

25    might have to assist them in the future.  Again, that's
```

1   entirely up to you.  Sometimes the lawyers are waiting in

2   the hallway; sometimes they're not.  It's entirely up to you

3   whether you want to talk to them at all.

4           Again, I want to thank you for your service.  You

5   are now excused.  I'm going to come back into the jury room

6   just to say thank you personally again.

7           Happy holidays to each and every one of you and

8   thank you.

9           THE CLERK:  All rise for the jury.

10      (The following was heard in open court outside the

11       presence of the jury:)

12          THE CLERK:  Please be seated.

13          THE COURT:  All right.  I am just going to go

14  thank the jurors in a moment.

15          I assume, based on the litigious nature of -- the

16  litigious history, I should say, of the case, there will

17  probably be post-trial motions at some point.  But unless

18  there's anything further that we need to discuss, we can

19  recess for the evening.

20          Is there anything you wish to say at this time,

21  Mr. Wiener?

22          MR. WIENER:  No, Your Honor.

23          THE COURT:  All right.  Mr. Taylor?

24          MR. TAYLOR:  No, Your Honor.

25          THE COURT:  All right.  Thank you all.  Good luck.

1        It's unfortunate that you had to go through this,

2   Mr. David, but I hope this gives you some closure having

3   your day in court.

4        The only thing I would respectfully -- or add to

5   this is that there has been some mention during the course

6   of the trial about some other Websites that are out there.

7        I would trust that, given your business acumen and

8   your intellect, that you would refrain from -- what's the

9   right word? -- stooping low to engage in activity that would

10  cause more drama.  But I wish you and your family the best.

11       Well done on both sides, the lawyers.  So good

12  luck to you all and happy holidays.

13       MR. WIENER:  Thank you, Your Honor.

14       MR. TAYLOR:  Thank you, Your Honor.

15     (Proceedings concluded at 6:09 P.M.)

16                    --oOo--

17

18

19

20

21

22

23

24

25

CERTIFICATE


     I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  May 5, 2019.




                         ___/S/ CHIA MEI JUI _____

                         Chia Mei Jui, CSR No. 3287

**DEFENDANT**
**CHARIF KAZAL: [1]**
60/5
**JUROR: [19]** 60/18
70/10 70/12 70/17
70/19 70/21 70/23
70/25 71/2 71/4 71/6
107/12 107/14 107/16
107/18 107/20 107/22
107/24 108/1
**MR. GEBELIN: [1]**
4/11
**MR. TAYLOR: [42]**
4/12 20/13 48/8 48/10
48/18 48/21 51/5
51/17 52/15 52/18
52/21 52/25 53/3
53/11 53/18 54/2 54/5
55/22 57/3 57/7 57/22
58/11 59/18 59/22
60/3 70/3 71/20 72/1
72/4 80/13 94/2 94/5
94/17 95/8 96/8 96/16
96/21 100/12 105/5
107/5 109/23 110/13
**MR. WIENER: [50]**
4/9 4/22 43/9 49/16
49/18 49/22 50/17
51/3 51/15 52/5 52/9
52/14 52/20 52/23
54/10 54/20 55/18
56/23 57/12 58/15
58/19 58/23 70/1
71/16 71/24 73/21
75/15 79/10 79/13
79/18 81/13 85/25
88/23 94/8 94/15 95/5
96/12 96/17 96/25
98/20 102/23 103/1
105/8 105/10 105/13
105/18 105/22 107/3
109/21 110/12
**MS. BANI-ESRAILI:**
**[1]** 4/15
**THE BAILIFF: [2]**
46/23 47/6
**THE CLERK: [33]** 4/5
46/22 46/24 47/7
47/11 51/19 57/18
60/7 60/21 70/5 70/11
70/16 70/18 70/20
70/22 70/24 71/1 71/3
71/5 104/16 104/20
105/23 106/8 107/7
107/13 107/15 107/17
107/19 107/21 107/23
107/25 109/8 109/11
**THE COURT: [106]**
4/17 20/11 43/7 46/17
47/12 48/9 48/13
48/20 48/22 49/17
49/21 49/24 50/18
51/4 51/6 51/16 51/18
51/21 52/8 52/12
52/16 53/2 53/10
53/15 53/24 54/4 54/7
54/12 54/25 56/4

56/25 57/4 57/10
57/13 57/20 58/8
58/13 58/17 58/21
59/8 59/21 59/24 60/9
60/14 60/19 69/25
70/2 70/4 70/13 71/7
71/10 71/17 71/21
71/25 72/3 72/5 72/8
73/23 74/3 75/16 77/9
77/13 79/9 79/11
79/15 79/17 80/14
81/11 81/17 83/18
83/20 88/21 89/14
94/4 94/7 94/11 94/16
94/23 95/2 95/4 95/6
95/9 95/12 96/10
96/13 96/18 96/22
97/3 100/11 102/20
102/24 104/8 104/21
105/6 105/9 105/12
105/14 105/20 106/2
107/1 107/4 107/6
108/2 109/12 109/22
109/24
**THE JURORS: [2]**
69/24 106/25
**THE JURORS: [5]**
77/11 77/14 80/16
83/19 95/3

**$**
**$1 [3]** 54/12 106/17
106/20
**$1 million [2]** 106/17
106/20
**$1.2 [1]** 88/8
**$1.2 million [1]** 88/8
**$100,000 [3]** 69/6
69/10 100/19
**$15 [1]** 84/14
**$15 million [1]** 84/14
**$15,000,000 [1]** 99/8
**$150,000 [1]** 17/23
**$180 [1]** 10/23
**$180 million [1]** 10/23
**$2,552,847.02 [1]** 89/1
**$20 [2]** 82/7 99/9
**$20 million [2]** 82/7
99/9
**$200 [27]** 32/6 63/4
63/11 63/14 63/21
63/25 64/7 64/11
64/18 64/21 65/3 65/6
65/13 65/17 65/24
66/3 66/10 66/13
66/20 66/24 67/6
67/10 67/17 67/21
68/3 68/7 68/14
**$30 [5]** 84/19 84/23
92/12 92/23 93/14
**$30 million [4]** 84/19
84/23 92/23 93/14
**$6 [1]** 81/8
**$6 million [1]** 81/8
**$666,666.66 [2]** 11/18
46/2

**'**
**'17 [1]** 91/16

**'s [2]** 13/6 50/7

**-**
**--oOo [1]** 110/16
**-and [1]** 2/6

**0**
**001742 [1]** 76/3
**08 [1]** 86/6

**1**
**1.09 [1]** 82/18
**10 [3]** 50/8 62/24
69/14
**100 [4]** 1/9 60/25 82/5
106/12
**10:27 [1]** 47/11
**10:36 [1]** 51/21
**11 [6]** 1/15 3/2 4/1
48/4 69/17 106/21
**11:30 which [1]** 51/23
**11:40 [1]** 51/21
**11:51 [1]** 57/20
**11th [1]** 69/20
**12:04 [1]** 57/20
**12:08 [1]** 60/9
**13 [1]** 61/10
**14 [1]** 40/18
**15 [18]** 9/16 36/3 48/8
48/23 51/12 52/16
52/18 52/18 52/20
54/23 55/2 55/3 55/11
55/18 56/6 57/6 63/2
95/21
**15,000 [1]** 7/24
**16 [3]** 48/5 50/1 55/3
**17 [4]** 40/18 48/25
77/6 77/9
**17-0871-AB [2]** 1/7
4/6
**17-817 [1]** 106/13
**17-871-AB [1]** 61/1
**1734 [1]** 76/9
**1742 [2]** 75/23 77/5
**18 [2]** 82/22 99/7
**1880 [1]** 2/13

**2**
**2.5 [1]** 88/25
**2.5 million [1]** 87/15
**20 [3]** 36/3 84/23 97/7
**2000 [3]** 84/4 85/6
91/15
**2005 [1]** 86/24
**201-7600 [1]** 2/14
**2010 [5]** 42/12 87/13
89/22 90/15 91/15
**2011 [2]** 88/15 92/16
**2013 [9]** 22/18 22/25
23/21 24/23 25/14
26/14 26/17 44/1
87/25
**2014 [3]** 15/1 15/2
44/1
**2015 [4]** 14/16 14/20
14/23 44/6
**2016 [18]** 7/10 7/22
10/4 11/8 11/14 13/11
14/16 18/3 18/17

26/21 31/22 33/6 36/8
36/8 61/18 66/1 76/24
91/16
**2017 [9]** 7/9 16/7
25/24 25/25 26/19
26/23 83/5 83/9 91/17
**2018 [5]** 1/15 3/2 4/1
69/20 106/21
**2019 [1]** 111/10
**21 [1]** 49/3
**21 million [1]** 84/16
**21.5 million [2]** 83/4
83/17
**22 [3]** 49/8 76/23 83/9
**23 [5]** 14/15 49/11
50/18 50/19 50/22
**24 [5]** 14/15 52/11
54/22 76/9 76/10
**25 [1]** 52/12
**2584 [2]** 61/19 66/11
**26th [1]** 88/15
**28 [2]** 29/8 111/4
**28235 [2]** 86/25 87/6
**29 [1]** 30/5

**3**
**30 [2]** 75/14 75/20
**30,000 [1]** 8/1
**300 [1]** 101/15
**3072 [1]** 2/9
**30th [1]** 11/14
**31 [1]** 16/10
**310 [2]** 2/9 2/14
**32 [1]** 16/10
**3287 [2]** 1/23 111/15
**33 [2]** 8/15 14/4
**341-3072 [1]** 2/9
**35 [1]** 29/8
**350 [1]** 1/24
**36 [5]** 26/6 30/4 49/16
49/25 50/17
**39 [2]** 87/21 87/23
**3:48 [1]** 60/9

**4**
**43 [1]** 50/3
**4311 [1]** 1/24
**44 [1]** 50/11
**487-5607 [1]** 2/5
**49 [4]** 79/14 79/17
94/15 95/1
**4:56 [1]** 104/18
**4:57 [1]** 105/25
**4th [1]** 86/24

**5**
**50 [4]** 81/16 81/19
94/15 95/1
**51 [3]** 83/11 94/15
95/1
**52 [2]** 94/15 95/1
**520 [1]** 2/8
**53 [2]** 94/15 95/1
**54 [2]** 94/15 95/1
**5607 [1]** 2/5

**6**
**6.4 million [1]** 81/24
**609 [1]** 2/4

**673 [1]** 79/20
**6:02 [1]** 105/25
**6:09 [1]** 110/15
**6:30 or [1]** 104/24

**7**
**70 [2]** 84/12 84/12
**714 [1]** 2/13
**753 [1]** 111/3
**7600 [1]** 2/14

**8**
**80 percent [3]** 84/2
84/6 84/11
**817 [1]** 106/13
**8383 [1]** 2/8

**9**
**90012 [1]** 1/24
**90067 [1]** 2/13
**90211 [1]** 2/8
**925 [1]** 2/5
**94582 [1]** 2/4
**9:25 [2]** 1/16 4/2

**A**
**AB [3]** 1/7 4/6 61/1
**abate [1]** 42/2
**abated [1]** 99/19
**abide [1]** 108/18
**abiding [1]** 103/11
**ability [4]** 6/21 29/22
73/17 98/19
**able [2]** 76/16 91/23
**ABN [1]** 79/20 79/21
**ABN 77 920 338 673**
**[1]** 79/20
**absence [1]** 8/23
**absolute [1]** 108/16
**absolutely [1]** 43/18
**abundant [1]** 41/3
**accident [3]** 62/6
62/13 62/20
**accidental [1]** 43/12
**according [3]** 9/16
14/17 80/12
**account [3]** 88/11
88/19 89/19
**accounts [2]** 7/21
7/21
**accurately [1]** 85/12
**accuse [1]** 7/16
**acknowledge [1]** 41/7
**acknowledged [3]**
26/10 35/3 38/24
**acknowledges [3]**
22/16 23/20 24/21
**acquire [1]** 5/20
**acquired [1]** 86/25
**acronym [1]** 79/22
85/4 90/5
**act [3]** 15/19 17/18
22/12
**acted [4]** 22/7 73/8
98/8 102/2
**acting [1]** 34/7
**action [5]** 39/6 61/2
74/19 96/2 96/12
**actionable [1]** 32/20

**A**

**actions [5]** 8/18 8/21 8/23 11/12 12/24
**activities [5]** 8/6 10/3 11/4 11/23 12/12
**activity [15]** 26/12 26/12 28/5 29/19 29/23 30/10 30/12 30/21 30/24 31/3 40/14 40/16 41/4 100/23 110/9
**acts [1]** 17/24
**actual [4]** 23/1 24/15 92/23 101/11
**acumen [1]** 110/7
**ADAM [119]**
**Adam Kazal [2]** 4/15 106/12
**Adam Kazal's [1]** 17/6
**Adam's [2]** 36/14 39/15
**adamkazal.com [2]** 36/9 36/24
**add [4]** 56/4 56/24 57/4 110/4
**addition [1]** 41/25
**additional [1]** 55/12
**addressed [1]** 102/1
**adequate [1]** 55/24
**administered [1]** 16/24
**administrator [1]** 91/10
**admission [1]** 43/11
**admit [2]** 3/11 44/18
**admits [1]** 15/6
**admitted [5]** 3/11 19/17 43/13 94/25 95/1
**advance [1]** 94/21
**advantage [2]** 73/6 98/5
**advised [1]** 25/22
**AED [2]** 90/1 90/4
**affable [1]** 34/17
**affairs [1]** 91/21
**after [14]** 7/8 7/10 10/4 12/20 16/6 17/12 20/19 20/19 23/22 27/4 31/24 36/7 56/24 103/4
**afternoon [3]** 58/5 60/15 71/23
**afterwards [4]** 11/24 12/20 16/16 95/25
**again [37]** 6/22 10/18 11/19 11/20 12/23 13/20 18/6 18/19 18/23 19/13 24/7 24/17 25/13 26/22 29/3 29/20 29/24 31/4 31/10 32/6 33/19 38/24 42/2 44/13 46/13 49/8 58/3 58/7 70/16 100/25 101/19 102/8 106/8 108/7 108/25 109/4 109/6
**again and [1]** 58/7

**against [28]** 5/5 5/21 6/1 6/3 10/14 13/1 19/2 27/10 27/11 27/12 27/16 32/20 33/5 42/19 44/25 46/16 68/16 68/19 68/22 68/25 69/4 69/8 75/11 78/3 100/2 100/20 106/16 106/19
**age [1]** 39/8
**aged [1]** 40/22
**aggrieved [1]** 27/3
**ago [5]** 5/15 89/23 90/20 97/7 101/3
**agree [3]** 43/1 54/11 56/3
**agreed [5]** 22/25 47/4 47/5 93/19 96/18
**agreement [2]** 33/24 55/15
**ahead [3]** 29/1 41/19 74/6
**air [1]** 35/18
**aka [1]** 86/3
**al [1]** 4/7
**alarm [1]** 40/24
**alias [1]** 17/2
**allegation [1]** 26/16
**alleged [6]** 22/1 26/12 28/18 41/4 42/3 100/23
**allegedly [1]** 62/2
**alleges [1]** 26/10
**alleviate [1]** 53/13
**allow [1]** 73/19
**allowed [1]** 34/25
**allowing [1]** 38/23
**almost [3]** 7/11 19/5 89/23
**alone [1]** 26/25
**along [1]** 49/14
**already [4]** 19/5 32/9 46/7 59/20
**altogether [1]** 26/1
**always [3]** 38/9 93/17
**Amended [2]** 26/10 26/11
**Amendment [7]** 10/12 10/13 10/14 18/24 18/25 40/15 46/1
**American [5]** 25/7 25/9 31/17 90/9 90/12
**Americans [1]** 25/8
**among [6]** 35/16 35/24 36/3 36/8 73/1 97/24
**amount [33]** 20/9 53/24 55/21 56/24 57/1 57/4 57/7 62/7 62/14 62/21 62/24 68/24 69/3 69/7 69/10 72/11 72/20 72/24 73/10 73/12 73/15 85/15 89/7 97/12 97/17 97/21 98/11 98/13 98/16 106/15 106/17 106/18 106/20
**amounts [1]** 90/11

**ANDREA [1]** 1/3
**ANGELES [8]** 1/17 1/24 2/13 4/1 11/4 33/8 76/17 101/24
**another [5]** 30/9 80/19 80/19 80/20 81/12
**answer [11]** 54/14 54/19 54/19 55/17 56/15 56/19 70/8 70/9 70/14 107/10 107/11
**answered [1]** 72/13
**answers [3]** 55/7 57/9 72/10
**Anthony [2]** 14/18 44/5
**anyway [1]** 28/22
**apart [2]** 32/10 38/4
**apologies [1]** 102/25
**apologize [4]** 49/24 52/10 102/24 105/14
**apologized [1]** 103/14
**apology [1]** 13/21
**apparently [1]** 39/5
**appear [3]** 24/19 28/21 35/6
**appearance [3]** 33/2 33/7 33/12
**appearances [2]** 2/1 4/9
**appeared [10]** 6/15 8/20 8/22 23/18 28/9 34/10 35/5 35/9 36/8 39/2
**appears [2]** 9/10 58/25
**applauding [1]** 35/19
**applicable [29]** 50/8 63/6 63/9 63/16 63/19 64/2 64/5 64/13 64/16 64/23 65/1 65/8 65/11 65/19 65/22 66/5 66/8 66/16 66/18 67/1 67/4 67/12 67/15 67/23 68/1 68/9 68/12 95/17 101/22
**applies [1]** 21/1
**apply [4]** 18/25 21/18 30/1 40/13
**appointment [1]** 60/2
**appreciate [2]** 108/14 108/24
**approach [2]** 75/16 95/10
**approached [2]** 35/14 35/18
**appropriate [5]** 15/18 20/8 73/15 98/16 102/19
**approximate [1]** 89/6
**approximately [3]** 9/16 84/10 89/24
**April [1]** 7/10
**April 2016 [1]** 7/10
**Arab [1]** 5/22
**area [2]** 78/20 101/14 101/16 101/24
**areas [1]** 40/19
**aren't [4]** 5/16 25/8

44/3 101/4
**argue [5]** 55/7 71/19 71/22 72/2 95/23
**argument [3]** 21/12 22/5 43/12
**arguments [3]** 4/21 95/20 96/24
**armed [1]** 12/22
**arms [1]** 35/18
**around [4]** 13/13 13/16 78/17 87/12
**arranged [4]** 33/14 33/16 36/7 38/2
**arranges [1]** 37/18
**arrests [1]** 34/23
**article [6]** 45/9 83/6 83/9 83/16 87/24 88/2
**articles [7]** 6/15 6/23 6/25 23/17 24/3 45/2 45/4 45/6 45/7
**asked [1]** 12/7
**asking [1]** 36/14
**asks [2]** 37/20 96/6
**aspects [2]** 23/8 29/4
**assaulted [1]** 13/10
**assert [1]** 50/4
**asserted [6]** 14/9 15/4 27/9 32/22 39/2 53/5
**asserting [1]** 15/6
**assertion [1]** 15/6
**assess [1]** 53/23
**assessed [1]** 100/19
**assets [14]** 58/20 59/6 78/13 78/15 78/16 78/17 78/19 84/23 91/3 91/4 92/7 92/10 92/23 102/12
**assigned [1]** 79/24
**assist [3]** 77/18 77/23 108/25
**assistance [1]** 83/13
**assistant [1]** 24/11
**assisted [1]** 36/11
**associates [1]** 36/25
**assume [2]** 82/8 109/15
**assumed [2]** 25/10 31/19
**assure [1]** 15/12
**attached [1]** 87/2
**attack [1]** 34/12
**attacks [1]** 18/19
**attempt [2]** 5/12 8/21
**attempted [5]** 5/20 11/3 13/22 33/10 102/6
**attempting [1]** 99/20
**attempts [3]** 10/6 16/19 43/15
**attended [1]** 9/25
**attention [3]** 20/16 40/17 43/7
**attitude [1]** 14/6
**attributed [1]** 22/13
**Audi [2]** 61/10 63/2
**Audi-r8-dec-13 [1]** 61/10

**Audi-r8-dec-13-15 [1]** 63/2
**August [2]** 83/9 84/4
**August 22 [1]** 83/9
**Australia [28]** 6/2 7/23 8/6 8/7 8/13 8/16 10/4 13/24 19/5 19/6 19/7 19/8 19/19 36/14 39/8 39/10 46/8 46/9 58/25 59/7 75/8 79/25 80/8 81/4 82/22 85/4 99/22 103/24
**Australia's [1]** 46/14
**Australian [8]** 79/22 81/2 83/20 83/24 85/9 91/21 92/8 93/4
**authenticity [1]** 94/20
**Authority [1]** 92/20
**authorized [1]** 16/11
**available [8]** 25/12 31/20 78/6 84/24 97/10 103/24 104/3 104/6
**average [1]** 84/1
**avoid [3]** 10/7 44/14 104/3
**award [32]** 17/22 20/8 20/9 32/3 53/14 53/22 54/14 54/25 55/5 56/12 68/25 69/4 69/8 72/21 72/22 73/14 73/16 74/25 78/7 97/13 97/18 97/19 98/15 98/17 98/18 100/3 100/10 100/22 102/9 102/12 106/16 106/19
**awarded [3]** 53/23 72/11 75/10
**aware [9]** 17/9 27/2 79/4 80/5 82/21 82/25 85/11 85/17 85/20
**AWT [4]** 79/2 85/1 85/3 85/12

**B**

**back [21]** 24/23 25/14 35/10 42/19 50/15 50/23 51/9 52/7 53/18 54/22 55/10 55/25 57/17 58/10 90/15 92/16 104/11 104/15 105/1 105/1 109/5
**bad [2]** 19/24 20/1
**Badirian [1]** 105/13
**bailiff [3]** 46/20 49/1 104/10
**balance [1]** 88/25
**balanced [1]** 21/9
**BANI [2]** 2/12 4/17
**BANI-ESRAILI [2]** 2/12 4/17
**bank [2]** 88/11 88/15
**bankrupt [7]** 45/17 75/7 75/9 91/12 92/1 92/9 102/12
**bankruptcy [3]** 91/20 92/3 92/4

**B**

banners [2] 28/8
34/24
bar [7] 78/25 79/1
79/1 82/5 83/3 83/3
83/14
barely [1] 36/4
Barkley's [2] 79/1
83/3
barred [2] 26/4 27/7
bars [1] 27/1
based [12] 14/22
20/10 22/1 26/20
32/23 39/3 55/5 72/10
92/23 95/21 102/16
109/15
basic [1] 14/10
basically [1] 32/23
Bates [1] 75/22
Bates stamped [1]
75/22
Beach [1] 33/9
bear [4] 21/1 21/15
25/2 25/4
bears [3] 9/12 13/9
98/25
beats [1] 40/9
became [1] 23/24
become [1] 52/12
before [9] 8/22 23/24
32/5 71/24 76/14 79/8
83/3 92/5 100/5
began [3] 7/7 26/13
99/1
begin [2] 100/25
104/11
beginning [3] 7/10
7/22 14/20
begins [2] 52/24
75/25
behalf [4] 4/14 34/7
34/7 51/2
behind [2] 22/17
55/14
beings [1] 37/10
Belgian [4] 80/25 81/1
81/15 81/23
belief [1] 9/19
believe [27] 9/20
20/18 20/22 22/24
26/3 26/24 27/7 31/5
31/11 32/6 35/20
40/20 42/25 48/25
52/6 55/22 74/21
74/24 75/6 86/9 91/4
91/7 92/13 95/17
101/19 102/1 102/7
believed [1] 45/9
belligerent [2] 14/5
103/15
Below [1] 62/1
beneficiaries [1]
104/2
beneficiary [6] 78/9
80/5 80/9 90/24 91/1
103/21
benefit [1] 29/21
benefited [1] 29/18

**BENJAMIN [2]** 2/12
4/14
Benjamin Taylor [1]
4/14
Bentley's [2] 79/1
83/3
best [5] 55/10 87/18
87/20 108/11 110/10
between [6] 33/24
45/15 73/10 83/23
84/12 98/10
BEVERLY [1] 2/8
beyond [5] 8/13 19/14
21/4 22/18 56/15
billed [1] 34/1
bills [1] 45/21
binder [6] 16/10 38/11
75/14 75/15 75/17
87/21
binders [1] 75/18
BIROTTE [1] 1/3
bit [3] 22/5 53/19
83/25
blame [5] 5/25 6/14
16/19 27/17 33/19
blaming [1] 9/7 33/11
blanks [1] 95/15
blatant [1] 8/10
block [1] 38/22
blocked [1] 38/6
bold [1] 12/9
Bondy [1] 86/19
born [1] 39/7
both [19] 4/24 7/7 9/1
9/23 12/17 13/3 17/13
18/21 20/23 21/20
27/10 35/2 43/5 52/2
57/15 59/14 95/20
96/15 110/11
BOULEVARD [1] 2/8
braving [1] 4/25
break [2] 22/14 34/13
breakdown [1] 33/4
breaks [1] 40/6
briber [1] 38/1
bribery [1] 37/2
Bridge [3] 87/1 87/7
93/3
briefly [6] 5/16 40/17
74/12 80/23 87/16
88/20
bring [4] 51/9 57/16
60/12 104/25
bringing [1] 18/17
brother [5] 9/8 28/25
76/1 77/18 77/23
brothers [15] 5/5 9/18
36/20 36/21 39/7
43/24 45/16 74/10
75/11 75/13 89/4 89/7
91/7 91/9 93/21
brought [2] 36/18
99/4
Brown [5] 9/14 12/2
12/3 34/5 45/21
Buckley's [1] 83/14
building [1] 47/17
Bunkley's [1] 79/1

BUR: [3] 86/6
burden [9] 21/1 21/2
21/15 29/16 30/18
32/18 40/20 49/14
49/15
Burlington [1] 86/5
business [21] 5/14
5/15 5/19 7/8 8/3
36/22 37/10 38/18
39/12 58/4 76/24
78/17 79/22 80/1 81/7
81/10 82/6 82/7 91/9
99/6 110/7
businesses [6] 78/22
79/5 80/12 80/24 82/2
99/8
buy [1] 84/19

**C**

cafe [5] 80/17 80/21
81/6 81/15 81/23
cafes [4] 78/18 78/25
81/3 82/6
calendar [1] 89/11
CALIFORNIA [20] 1/2
1/17 1/24 2/4 2/8 2/13
4/1 8/25 9/13 9/21
10/3 11/13 13/1 13/18
18/15 18/18 60/23
99/3 103/10 106/10
call [9] 47/16 70/7
71/15 71/17 71/19
73/22 95/5 100/21
107/9
called [14] 15/5 15/18
16/2 16/5 21/3 29/9
33/15 36/8 78/11 79/1
80/20 82/5 82/9 85/8
calling [2] 4/10 55/20
calls [2] 37/25 38/1
calm [1] 34/17
came [4] 36/4 39/8
45/20 58/2
camera [1] 33/17
cameras [1] 12/22
campaign [18] 5/4
7/23 9/8 9/13 9/21
10/10 11/2 11/20
11/22 11/25 12/13
15/12 20/9 44/17
44/25 45/15 46/16
98/25
capacity [1] 93/5
Capital [3] 5/19 82/15
93/3
Capital's [1] 84/19
car [3] 35/17 61/25
68/4
care [5] 10/8 10/8
23/7 99/21 99/23
carefully [2] 4/25
17/16
carey [2] 61/23 67/18
Carla [1] 105/12
carried [2] 10/10
10/17
carry [1] 13/15
carrying [1] 5/7

Case Number CV [1]
106/13
cases [2] 17/20 21/6
cash [4] 40/6 88/7
88/9 93/14
catch [1] 58/4
cause [1] 110/10
caused [8] 12/15
18/19 18/20 42/19
73/2 97/25 99/2
101/10
caveat [1] 56/4
Cayman [1] 5/23
Cayman Islands [1]
5/23
cc'd [1] 38/21
CCRR [1] 1/23
cease [2] 38/15 42/1
ceased [1] 13/20
cell [1] 22/19
CENTRAL [4] 1/2
60/23 76/24 106/10
Central Business [1]
76/24
Central District [2]
60/23 106/10
cents [1] 84/12
CENTURY [1] 2/13
CEO [3] 61/21 66/22
101/23
certain [1] 21/14
certainly [8] 25/6
34/13 36/1 41/22
44/20 45/22 80/7
108/14
certainty [1] 24/25
CERTIFICATE [1]
111/1
certificates [1] 14/18
certification [3] 86/2
86/7 86/10
certify [1] 111/3
challenges [1] 92/6
change [5] 10/7 49/7
50/12 52/14 58/7
99/23
changed [5] 12/21
48/24 48/25 58/2 58/2
changes [1] 50/21
channel [2] 61/16
65/14
channels [1] 5/11
chanting [2] 34/16
35/11
charged [1] 24/1
CHARIF [83] 1/8 4/7
4/14 6/8 6/23 7/11 8/7
9/6 9/16 9/20 11/21
12/11 16/13 17/5
27/11 28/1 28/25
28/25 29/5 33/1 34/5
38/10 39/10 39/14
42/5 43/13 43/24
44/22 45/8 45/22
45/24 60/24 62/3 62/5
62/8 63/2 63/3 63/4
63/12 63/13 63/14
63/22 63/24 63/25

64/8 64/10 64/11
64/19 64/20 64/21
65/4 65/5 65/6 65/14
65/16 65/17 66/1 66/2
66/3 66/11 66/12
66/13 66/22 66/23
66/24 67/8 67/9 67/10
67/19 67/20 67/21
68/4 68/6 68/7 68/16
69/1 69/11 82/14
84/18 84/22 85/5 94/2
106/11
Charif Kazal [14] 4/14
6/8 8/7 16/13 33/1
39/10 62/3 62/5 62/8
69/1 69/11 82/14 94/2
106/11
Charif Kazal's [2]
6/23 17/5
Charif's [1] 6/12
chart [1] 62/1
check [1] 104/14
CHIA [3] 1/23 111/14
111/15
child [1] 10/1
child's [1] 12/19
children [2] 18/22
76/15
children's [3] 10/19
99/17 101/14
chocolate [5] 78/25
81/6 81/15 81/23 82/6
Chocolates [1] 81/1
chose [1] 38/7
circa [3] 84/6 84/11
91/15
Circuit [1] 56/16
Circular [3] 80/20
83/1 83/10
circulated [1] 28/10
circumstances [1]
102/18
circumvent [1] 16/4
citizen [2] 19/3 25/6
31/18
citizens [2] 10/12
18/25
civil [1] 8/8
civilized [1] 20/6
claim [22] 21/11 21/25
26/3 27/1 27/6 27/9
27/15 32/7 32/11
32/11 32/22 33/4 39/2
42/23 43/16 44/13
53/4 61/5 68/15 68/18
68/21 100/16
claimed [1] 12/2
claiming [4] 5/13 9/7
13/24 19/23
claims [12] 16/17
20/23 21/2 21/7 21/20
21/22 22/14 27/10
37/11 42/24 43/5
43/25
cleaned [1] 47/15
cleanest [1] 55/17
cleans [1] 47/25
clear [14] 12/10 12/25

**C**

**clear... [12]** 16/3 22/9 23/2 24/4 24/7 31/5 31/14 34/8 42/2 42/12 43/23 56/2
**clearing [2]** 44/19 44/21
**clearly [5]** 9/18 41/12 42/1 44/2 45/15
**clerk [4]** 49/2 49/2 60/21 106/8
**clippers [2]** 61/13 64/8
**close [6]** 9/18 9/25 35/15 45/21 93/5 105/3
**closely [1]** 26/7
**closer [1]** 99/9
**closing [10]** 4/21 21/12 22/5 32/12 43/12 50/24 55/2 55/11 55/18 95/20
**closure [1]** 110/2
**clumsy [1]** 10/6
**cmjui.csr [1]** 1/25
**coast [2]** 61/16 65/14
**Code [1]** 111/4
**coincidence [2]** 37/13 99/18
**collectively [2]** 82/3 91/4
**Columbus [2]** 87/1 87/7
**comes [1]** 26/8
**comfortable [2]** 93/1 93/4 108/21
**coming [2]** 53/9 103/10
**comments [1]** 108/24
**commission [3]** 6/1 6/3 6/4
**commit [2]** 13/1 16/4
**commitment [1]** 5/18
**commitments [2]** 58/4 58/8
**committed [6]** 7/17 19/2 22/12 62/5 62/12 62/19
**common [2]** 24/13 38/12
**communicate [1]** 47/2
**communications [1]** 41/22
**company [14]** 16/1 24/10 33/15 33/18 37/10 81/1 81/16 82/9 82/11 85/5 85/18 85/20 91/10 93/19
**compensatory [3]** 68/24 69/3 69/7
**complaint [5]** 5/22 18/4 26/11 26/11 39/17
**complaints [1]** 5/21
**complete [1]** 97/7
**completed [1]** 108/6
**comply [3]** 16/2 16/4 18/6
**complying [1]** 44/14

**comprised [1]** 80/12
**concern [1]** 82/6
**concerned [1]** 39/4 56/22 103/7
**concerning [1]** 18/4
**conclude [1]** 93/2
**concluded [1]** 110/15
**conclusion [1]** 18/12
**condition [4]** 73/12 75/3 98/12 102/16
**condone [1]** 20/4
**conduct [49]** 5/13 6/2 6/9 10/11 11/6 12/15 12/18 13/7 13/21 17/25 18/2 18/23 19/6 19/10 19/22 20/3 32/24 40/23 41/2 42/2 42/3 45/11 45/14 69/12 69/14 69/17 72/16 72/17 72/25 73/1 73/2 73/7 73/13 77/3 97/15 97/16 97/23 97/24 97/25 98/6 98/14 98/23 98/12 99/13 100/5 101/9 101/25 103/3 103/8
**conducted [5]** 5/4 11/21 17/21 46/15 99/16
**conducting [2]** 13/11 19/17
**Conference [1]** 111/8
**confiscate [1]** 34/24
**conformance [1]** 111/7
**confusion [3]** 48/2 53/7 53/13
**conglomerate [1]** 6/21
**conjecture [1]** 55/6
**conjunction [1]** 9/19
**connection [2]** 5/6 29/21
**consent [3]** 14/3 37/24 42/7
**consented [2]** 13/25 16/11
**consequences [1]** 103/7
**consider [11]** 10/25 22/14 32/17 33/5 45/14 54/24 72/23 73/1 73/9 97/19 97/24
**considerable [1]** 76/16
**consideration [1]** 97/8
**considered [1]** 39/14
**considering [2]** 5/1 20/19
**considers [1]** 104/4
**consist [1]** 14/15
**consistent [1]** 83/8
**constituent [1]** 14/11
**constitute [1]** 15/13
**constituted [1]** 18/2
**constitutes [2]** 15/9

17/25
**consulting [1]** 85/10
**contact [7]** 23/20 24/15 24/15 27/22 33/23 34/3 47/19
**contempt [1]** 8/8 8/10 8/14 8/24 14/2 19/6 19/11 19/15 46/10 75/8 100/6 103/18 103/19
**contemptuous [1]** 77/3
**content [5]** 17/15 23/9 28/14 29/5 43/13
**context [1]** 14/2
**continue [3]** 11/15 35/1 38/24
**continued [5]** 7/8 11/7 16/7 17/11 18/7
**continuing [2]** 8/24 46/11
**continuously [1]** 18/13
**contracted [1]** 12/22
**contracts [1]** 9/10
**contradicted [1]** 9/9
**contrary [4]** 6/12 6/22 33/13 38/3
**contributed [3]** 17/13 30/11 31/2
**contributorily [1]** 30/16
**contributory [3]** 28/18 30/5 31/8
**control [5]** 6/4 6/21 28/3 29/23 46/10
**convenient [1]** 47/1
**conversation [2]** 22/22 22/24
**convinced [1]** 56/23
**coordinate [1]** 105/11
**coordinated [2]** 17/16 45/15
**copied [5]** 7/20 14/25 15/15 25/14 28/24
**copy [10]** 15/10 17/7 47/22 47/24 50/23 72/14 73/18 86/9 96/5 97/9
**copying [1]** 14/11
**copyright [41]** 14/8 14/9 14/11 14/14 14/17 15/19 16/3 16/17 17/17 17/18 17/20 17/25 18/2 21/23 21/25 25/5 25/7 25/9 25/23 26/3 27/1 27/9 27/15 28/4 28/19 29/11 29/15 30/8 30/17 31/7 32/7 32/10 49/13 53/6 53/8 54/17 55/16 61/5 62/5 62/12 62/19
**copyrighted [11]** 10/20 15/16 15/24 17/10 17/11 17/19 22/2 25/3 26/17 30/15 44/15

**copyrights [8]** 5/6 15/5 18/5 20/11 31/17 31/25 46/15 61/8
**corner [1]** 87/4
**corporate [3]** 10/22 79/25 81/3
**corrected [1]** 47/22
**corrupt [6]** 6/9 7/3 44/23
**Corruption [2]** 6/1 6/3
**costly [2]** 76/17
**costs [1]** 75/11
**counsel [19]** 2/1 4/8 4/22 20/12 20/25 22/6 34/4 39/19 44/10 44/10 46/18 52/19 56/3 71/11 88/22 95/10 101/13 102/21 104/9
**counsel's [2]** 21/12 35/8
**country [1]** 99/2
**County [1]** 86/5
**couple [2]** 40/19 47/13
**course [9]** 21/4 23/22 23/24 32/25 33/1 59/19 84/1 102/13 110/5
**Court's [3]** 8/11 8/18 8/24
**courts [1]** 42/14
**cover [5]** 50/24 108/21
**create [3]** 22/20 23/1 24/5
**created [8]** 24/7 24/18 24/23 26/14 28/8 36/10 37/7 43/16
**creates [1]** 36/19 36/24 37/23
**creating [1]** 37/15
**creation [3]** 22/17 27/20 28/12
**credible [5]** 13/8 35/22 41/18 41/20 42/1
**creditors [1]** 91/22
**crime [1]** 37/1
**crimes [1]** 7/17
**criminal [13]** 5/21 6/11 8/14 19/12 19/13 19/15 20/3 21/6 38/1 46/6 46/7 46/12 103/19
**criminally [1]** 24/1
**criminals [1]** 8/4
**CROSS [3]** 3/7 89/15 89/16
**CROSS-EXAMINATION [3]** 3/7 89/15 89/16
**Crowds [1]** 33/2
**CSR [2]** 1/23 111/15
**CTO [1]** 36/11
**currency [1]** 84/8 89/25 90/6 90/7 90/13
**current [1]** 79/19
**currently [1]** 83/25

**CV [4]** 1/7 4/6 61/1 106/13

**D**

**Dabab [19]** 16/20 16/20 22/25 22/25 23/14 24/7 24/11 24/17 25/14 25/16 25/17 25/20 25/23 27/23 29/1 29/1 31/21 43/16 43/16
**Dabad's [1]** 43/18
**Dad [1]** 36/14
**daily [2]** 7/12 11/24
**damage [6]** 49/4 49/5 49/5 78/6 98/15 100/10
**damages [114]**
**dangerous [1]** 103/15
**Darling [1]** 80/17
**data [1]** 23/10
**date [2]** 89/21 111/10
**dated [3]** 69/20 87/25 106/21
**dated 2013 [1]** 87/25
**dates [1]** 89/22
**david [117]**
**David's [14]** 7/25 9/23 10/1 10/18 10/20 13/4 13/9 23/23 33/3 33/8 35/7 35/13 42/18 98/11
**Davids [7]** 12/21 13/1 35/3 41/12 99/1 103/6 103/14
**day [5]** 1/18 35/5 35/9 42/11 110/3
**days [4]** 20/16 27/13 59/21 102/13
**deal [1]** 75/9
**dealings [2]** 5/14 5/15
**deals [1]** 7/3
**death [1]** 40/9
**debtor [1]** 92/10
**dec [2]** 61/10 63/2
**decade [1]** 18/14
**decades [1]** 33/9
**deceit [3]** 73/8 98/9 102/2
**DECEMBER [6]** 1/15 3/2 4/1 26/21 69/20 106/21
**December 11 [1]** 106/21
**December 11th [1]** 69/20
**decide [6]** 53/17 72/11 72/22 97/12 97/18 108/17
**deciding [3]** 71/11 72/25 97/23
**decision [4]** 50/13 59/9 92/25 104/25
**decisions [1]** 24/18
**declared [2]** 92/4 92/7
**decorated [1]** 10/19
**deed [1]** 87/1
**defamatory [1]** 46/11

**D**

**defend** [2] 8/21 100/4
**defendant** [22] 30/7 30/20 30/25 32/24 40/22 42/1 42/3 42/4 49/6 72/24 73/3 73/5 73/8 73/16 97/20 98/1 98/4 98/8 98/17 102/2 102/3 102/5
**defendant's** [9] 13/7 72/25 73/1 73/17 97/22 97/23 98/6 98/12 98/19
**defendants** [61] 1/10 2/10 4/14 7/22 10/12 10/17 11/6 11/23 12/23 12/25 13/20 14/2 14/25 15/4 16/12 17/7 17/16 18/10 18/17 19/11 19/23 20/23 21/10 21/11 21/20 22/7 22/15 26/13 26/25 27/8 27/11 27/24 29/14 29/18 29/22 30/14 30/16 31/12 32/8 32/21 33/1 33/5 33/20 40/14 40/22 41/5 43/5 43/20 44/11 45/5 45/10 46/15 50/3 60/25 72/12 95/16 99/10 99/19 99/25 101/2 106/12
**defendants'** [9] 12/15 14/6 15/2 18/23 20/10 44/10 73/7 73/12 101/25
**defense** [9] 4/17 14/22 14/24 15/3 15/5 15/6 15/14 50/3 75/13
**defiance** [1] 18/8
**defied** [1] 19/20
**definitely** [1] 42/21
**definition** [2] 41/1 92/11
**definitively** [1] 42/1
**defraud** [1] 88/4
**deleting** [1] 49/2
**deliberate** [3] 20/7 104/24 108/13
**deliberately** [1] 25/14
**deliberating** [1] 100/14
**deliberation** [3] 47/14 97/10 104/15
**deliberations** [2] 46/21 104/12
**delivered** [1] 99/21
**demand** [3] 11/17 33/15 38/17
**demanded** [1] 42/1
**demands** [3] 11/17 42/2 46/1
**deny** [1] 10/9
**department** [2] 11/5 38/22
**Depending** [1] 84/17
**deposited** [1] 78/1

**depositing** [1] 8/1
**deposition** [3] 16/15 27/25 45/18
**deputy** [3] 47/18 51/8 57/16
**derogatory** [1] 15/11
**describe** [2] 80/23 87/16
**designed** [4] 9/5 24/8 99/1 99/14
**desist** [1] 38/15
**desperate** [1] 7/18
**despicable** [1] 7/17
**details** [2] 12/7 79/19
**deter** [1] 74/25
**determination** [1] 52/1
**determine** [7] 29/14 30/15 53/24 55/4 56/18 56/20 56/21
**determining** [5] 54/25 72/19 72/24 97/17 97/20
**Deterrence** [1] 103/3
**deterrent** [1] 101/5
**developed** [1] 78/21
**development** [2] 27/20 85/15
**developments** [1] 78/20
**DIANE** [2] 2/12 4/17
**different** [6] 13/12 13/14 22/10 22/12 53/17 53/20
**difficult** [1] 59/23
**digital** [3] 15/19 61/23 67/18
**diminish** [1] 13/22
**dire** [1] 108/10
**direct** [12] 3/6 23/20 25/16 26/2 27/22 28/17 31/2 31/7 37/12 40/17 50/15 74/7
**directed** [1] 25/23
**directing** [1] 29/5
**direction** [1] 19/4
**directly** [3] 5/16 29/10 29/18
**dirham** [1] 90/15
**dirhams** [1] 90/11
**disabled** [1] 25/25
**disagreement** [1] 57/16
**disbursed** [1] 77/25
**discourage** [4] 72/17 73/13 97/15 98/13
**discovery** [1] 55/20
**discuss** [4] 7/1 108/16 108/17 109/18
**discussed** [1] 21/21
**discusses** [2] 88/2 88/3
**disobeyed** [1] 8/18
**disperse** [1] 34/23
**dispute** [5] 12/14 14/13 17/6 36/18 93/18
**disputes** [2] 36/22

108/13
**disputing** [1] 104/2
**disregard** [3] 8/10 41/23 99/15
**disregarded** [2] 73/3 98/1
**disrespect** [1] 105/20
**distance** [1] 35/15
**distress** [3] 18/20 41/14 41/17
**distresses** [1] 13/5
**distributing** [2] 10/1 12/18
**distribution** [4] 61/17 65/25 82/14 82/17
**DISTRICT** [9] 1/1 1/2 1/3 60/22 60/23 76/24 78/19 106/9 106/10
**District of** [1] 78/19
**DIVISION** [2] 1/2 86/5
**divulged** [1] 59/3
**DMCA** [2] 25/19 31/22
**Docket** [1] 86/5
**document** [11] 75/22 79/7 79/7 80/15 81/9 81/21 85/7 85/11 87/4 88/21 88/25
**documentation** [1] 79/4
**documents** [3] 20/20 94/20 94/25
**dollar** [3] 84/6 90/15 90/18
**dollars** [11] 40/4 75/10 75/12 82/18 83/19 83/20 83/24 83/24 90/9 90/12 103/22
**domain** [4] 23/16 24/8 25/11 25/12
**double** [1] 104/14
**double-check** [1] 104/14
**doubt** [4] 8/14 18/1 19/14 21/5
**down** [10] 15/20 22/14 25/23 31/25 36/17 40/9 41/8 44/11 95/3 101/4
**downtown** [1] 47/17
**drama** [1] 110/10
**draw** [2] 21/17 59/10
**driven** [1] 76/25
**drivers** [1] 77/1
**drove** [2] 8/2 10/18
**Dubai** [1] 88/14
**ducking** [1] 55/20
**duly** [1] 74/2
**during** [17] 13/3 20/21 22/4 22/5 27/13 30/22 32/12 32/13 32/17 37/5 46/21 48/24 49/10 75/8 92/13 108/10 110/5
**duty** [1] 52/24

**E**

**e-mail** [1] 33/22

**e-mailing** [1] 23/21
**e-mails** [25] 7/12 7/14 7/16 7/19 11/24 28/21 28/22 28/25 32/24 32/25 38/10 38/10 38/11 38/12 38/14 38/17 38/20 38/21 38/23 39/3 39/4 39/14 41/16 42/20 101/3
**each** [22] 17/6 17/9 17/19 18/9 18/10 22/9 22/11 22/14 22/15 29/16 30/18 33/5 34/21 40/21 62/1 69/23 72/23 95/23 97/20 100/20 106/24 109/7
**eager** [1] 22/6
**eagerly** [1] 27/17
**earlier** [5] 15/1 44/7 93/16 93/20 95/14
**early** [3] 36/8 91/16 91/17
**Early 2017** [1] 91/17
**earth** [1] 37/11
**easily** [1] 100/6
**EAST** [5] 2/13 17/3 39/8 59/7 83/1
**Eastbank** [2] 78/24 82/5
**echoed** [1] 39/19
**economic** [1] 85/15
**effect** [2] 41/15 101/10
**effort** [3] 42/18 100/14 108/8
**eight** [3] 36/20 56/1 91/8
**either** [13] 27/16 28/17 30/23 31/4 31/6 41/11 43/22 51/13 53/15 70/1 72/1 101/20 107/2
**element** [7] 14/10 14/11 29/24 29/25 30/1 31/4 31/10
**elementary** [4] 9/25 10/19 12/19 99/17
**elements** [5] 14/10 14/12 29/16 30/19 42/24
**Elizabeth** [1] 12/17
**else's** [2] 37/24 74/16
**elsewhere** [1] 81/4
**Emergent** [3] 5/19 82/15 84/19
**Emirates** [2] 5/22 90/7
**emotional** [4] 13/5 18/20 41/14 41/16
**employed** [2] 14/19 44/5
**employee** [2] 35/22 36/19
**employees** [6] 7/12 7/17 36/11 37/15 38/22 38/23
**employees'** [1] 36/1
**Employment** [1]

79/23
**end** [2] 72/15 85/10
**eng** [1] 40/22
**engage** [4] 69/11 69/14 69/17 110/9
**engaged** [5] 6/9 19/11 30/8 98/22 99/19
**English** [1] 35/6
**enough** [1] 105/16
**ensure** [1] 15/24
**enter** [2] 21/10 49/1
**entered** [1] 91/20
**entire** [4] 25/25 39/11 45/14 45/14
**entirely** [5] 15/10 31/11 108/17 109/1 109/2
**entirety** [2] 76/10 86/12
**entitled** [5] 5/21 17/19 61/2 83/9 111/6
**entity** [2] 79/25 80/2
**equity** [2] 93/3 93/4
**erased** [1] 18/3
**error** [1] 49/23
**escalated** [1] 7/23
**escort** [2] 104/11 104/15
**ESRAILI** [2] 2/12 4/17
**establish** [3] 13/7 43/20 58/19
**establishes** [1] 79/5
**establishing** [1] 13/2
**esthetics** [1] 23/8
**estimate** [2] 82/1 84/3
**even** [23] 7/10 8/20 10/4 10/13 11/23 14/1 14/7 19/23 20/1 26/2 27/6 28/25 28/20 31/12 32/6 35/6 38/19 38/25 44/25 58/13 59/11 99/2 100/4
**evening** [2] 106/4 109/19
**evenly** [1] 21/9
**evidence** [68] 5/1 6/10 6/11 11/25 13/25 15/9 16/3 16/9 20/19 20/21 21/3 21/8 21/16 21/18 22/9 22/11 24/2 26/2 29/17 29/20 29/24 30/19 30/22 31/4 32/19 33/6 33/13 33/20 38/3 38/16 41/3 43/18 45/6 50/12 55/5 58/17 58/18 58/23 59/6 73/20 76/13 76/18 76/23 77/4 80/7 81/13 84/21 86/2 94/11 94/13 94/25 95/2 95/8 97/5 97/9 99/5 100/23 101/1 101/10 101/11 101/19 102/3 102/6 102/15 104/2
**exactly** [2] 21/9 42/16
**examination** [5] 3/6

**E**

examination... **[4]** 3/7
74/7 89/15 89/16
example **[1]** 40/4
exceed **[3]** 73/17 82/7
98/19
exceeded **[1]** 82/18
exceeds **[1]** 81/8
exception **[1]** 50/21
excerpt **[1]** 87/24
excess **[1]** 75/10
exchange **[6]** 83/23
84/3 84/8 84/17 88/5
90/14
excuse **[1]** 19/10
excused **[1]** 109/5
Exhibit 30 **[2]** 75/14
75/20
Exhibit 30-001742 **[1]**
76/3
Exhibit 39 **[2]** 87/21
87/23
Exhibit 49 **[1]** 79/14
Exhibit 50 **[1]** 81/16
Exhibit 51 **[1]** 83/11
exhibits **[13]** 3/10
3/11 14/15 28/23 94/4
94/10 94/12 94/15
94/17 95/1 104/12
105/12 105/17
Exhibits 23 **[1]** 14/15
Exhibits 49 **[1]** 94/15
exist **[5]** 14/1 15/2
16/21 22/24 38/17
exonerated **[1]** 6/12
expect **[1]** 47/15
expecting **[1]** 47/17
expense **[1]** 99/3
expires **[1]** 27/5
explain **[8]** 8/22 20/18
45/8 53/13 79/21
82/24 87/23 88/1
explained **[2]** 32/9
33/24
explanation **[1]** 9/4
expose **[1]** 11/10
exposed **[1]** 10/22
extent **[3]** 94/18 94/23
102/7
extortionate **[3]** 11/16
46/1 46/5

**F**

faced **[1]** 12/9
facilitate **[1]** 88/4
facility **[1]** 101/23
fact **[4]** 9/9 38/21 45/6
103/13
factor **[1]** 101/5
factors **[5]** 54/24 73/2
97/24 101/7 101/8
facts **[5]** 21/18 32/17
43/1
factually **[1]** 54/13
failure **[1]** 93/18
fair **[5]** 15/5 15/8
15/10 15/14 25/8
Fairfax **[1]** 6/20

false **[4]** 6/9 6/10 45/7
45/9
familiar **[7]** 21/5 25/5
25/7 25/9 82/9 83/23
87/6
family **[49]** 5/5 5/13
7/6 7/25 9/15 9/23
9/23 11/1 11/3 12/16
13/8 13/13 13/14
13/22 19/18 34/5 37/7
40/8 41/16 45/1 45/2
46/17 59/2 74/9 75/1
75/5 75/6 78/10 78/11
80/3 80/6 80/10 80/13
82/2 82/21 83/10
90/20 90/21 91/5 91/6
93/18 98/24 99/16
101/11 101/14 102/13
103/17 103/22 110/10
family trust **[12]** 59/2
75/6 78/10 78/11 80/3
80/6 80/10 80/13 82/2
90/20 90/21 103/22
fanatical **[1]** 103/16
far **[1]** 85/11
father **[1]** 13/10
favor **[8]** 20/22 21/9
21/10 21/20 27/8
31/11 32/8 43/4
FBI **[1]** 39/5
FCRR **[1]** 1/23
fear **[11]** 11/19 12/16
18/20 35/3 35/25 36/1
38/19 41/11 41/12
41/21 103/13
fearful **[1]** 11/13
featured **[1]** 61/17
65/25 76/18
February **[4]** 15/1 15/2
26/18 26/23
February 2014 **[2]**
15/1 15/2
federal **[17]** 1/23 8/6
8/13 8/16 13/23 19/4
19/7 19/8 19/13 19/19
46/7 46/9 46/13 58/25
99/21 103/23 105/22
fee **[1]** 75/12
feel **[3]** 23/3 55/20
108/21
few **[7]** 18/12 20/16
25/13 90/20 100/15
102/13 102/23
fight **[1]** 18/18
figure **[2]** 32/18
102/14
filed **[3]** 20/24 26/21
26/22
filing **[2]** 5/21 7/11
fills **[1]** 95/15
filmed **[1]** 35/15
final **[5]** 47/24 50/25
51/1 88/18 108/4
Finally **[2]** 19/21 88/11
finance **[1]** 77/2
financed **[2]** 12/1
45/19
financial **[19]** 5/18

29/2 33/12 73/16
74/18 75/3 91/24 93/1
93/25 94/1 98/12
98/17 100/1 100/3
100/9 102/15 103/7
103/12 104/5
financially **[7]** 29/19
41/8 73/4 73/5 98/3
98/5 101/21
financing **[3]** 45/20
93/7 93/11
find **[17]** 18/9 19/14
19/16 20/22 25/11
26/24 26/24 30/13
31/12 31/20 37/14
44/16 46/14 52/10
61/3 76/4 76/8
finding **[3]** 8/9 98/22
103/19
findings **[4]** 6/8 6/13
23/22 44/22
finds **[5]** 15/13 17/4
20/1
fine **[4]** 77/19 77/23
78/3 96/17
firm **[3]** 2/11 93/3 93/4
first **[21]** 1/24 10/12
10/13 10/14 10/16
14/10 14/22 18/24
18/24 20/25 21/25
31/15 35/5 40/15 46/1
73/23 89/22 96/2
99/20 100/17 106/3
First Amendment **[6]**
10/12 10/13 10/14
18/24 40/15 46/1
fit **[1]** 100/4
five **[2]** 24/24 47/15
five-minute **[1]** 47/15
fixed **[2]** 72/19 97/16
flee **[2]** 18/15 99/2
fleet **[1]** 11/16
flight **[4]** 58/2 58/3
58/5 58/7
flout **[1]** 99/24
flouted **[1]** 19/10
fluctuated **[1]** 83/25
fluctuates **[1]** 84/11
flyers **[2]** 8/1 28/9
focus **[1]** 23/9
follow **[3]** 9/2 40/23
46/13
following **[18]** 4/4
29/16 30/18 31/15
32/23 41/18 47/9
60/13 61/8 71/10 72/7
72/23 95/12 97/2
97/20 104/19 106/1
109/10
follows **[4]** 51/23 57/5
61/3 74/3
foregoing **[1]** 111/4
foreign **[3]** 10/12
18/25 25/6
foreperson **[2]** 69/21
106/22
Foreshore **[1]** 83/2
form **[10]** 18/11 28/19

60/20 61/1 72/10
81/10 96/6 96/15
104/13 106/14
format **[1]** 111/7
former **[2]** 8/3 9/14
forth **[2]** 14/14 35/10
forums **[1]** 81/7
forward **[4]** 4/8 15/25
46/22 73/24 96/3
96/24
forwarded **[5]** 25/20
25/21 29/1 31/21
31/22
found **[17]** 8/8 8/13
19/5 19/9 19/10 19/19
19/21 24/22 24/25
25/2 31/23 36/18 46/7
46/9 103/18 103/20
103/24
foundation **[2]** 80/14
94/19
four **[5]** 26/19 36/20
59/21 76/15 76/23
frame **[1]** 37/6
framework **[3]** 32/3
53/7 53/12
franchise **[2]** 81/1
81/3
frankly **[5]** 35/21
37/14 39/23 58/5
95/21
fraud **[3]** 69/12 69/15
69/18
fraudster **[1]** 10/23
free **[3]** 18/24 46/5
46/6
Friday **[1]** 57/25
friend **[3]** 22/22 22/24
45/22
front **[2]** 29/7 80/15
full **[5]** 16/13 20/9
23/24 28/13 33/11
fully **[2]** 39/9 55/24
fund **[1]** 76/16
funded **[2]** 12/9 99/10
funding **[1]** 12/10
further **[8]** 10/15 74/3
74/25 89/14 94/7 95/6
105/7 109/18
furtherance **[1]** 15/12
future **[6]** 48/18 72/18
73/13 97/16 98/13
108/25

**G**

Gaddafi **[1]** 7/2
gates **[1]** 33/9
Gaunts **[2]** 86/25 87/6
GEBELIN **[3]** 2/7 2/7
4/12
generous **[1]** 26/20
gentlemen **[25]** 4/19
20/15 31/6 37/13
37/22 39/17 39/20
39/23 40/2 42/10
42/25 43/4 43/6 49/19
69/22 70/6 72/9 97/4
100/13 102/9 102/22

104/10 106/23 107/8
108/3
George **[1]** 80/18
gesture **[1]** 35/20
getting **[1]** 23/6
Ghalo **[5]** 16/25 17/1
17/2 24/10 43/21
give **[5]** 42/22 51/8
71/12 94/14 95/13
95/20 95/24
given **[6]** 6/9 6/10 9/18
100/22 103/9 110/7
gives **[1]** 110/2
giving **[1]** 23/1
glasses **[1]** 88/23
Global **[2]** 84/20 92/14
globally **[1]** 37/17
gmail.com **[1]** 1/25
God **[1]** 47/6
GoDaddy **[5]** 15/19
15/20 16/23 18/4
43/19
goes **[1]** 40/5
gone **[2]** 74/12 102/11
good **[13]** 4/13 4/16
4/18 4/19 19/25 20/15
44/19 44/21 60/15
106/4 108/12 109/25
110/11
Google **[2]** 24/22
25/11
gracious **[1]** 95/23
grammar **[1]** 49/21
great **[3]** 18/19 50/20
99/3
grievance **[1]** 19/22
grievances **[1]** 42/16
gross **[1]** 81/5
ground **[1]** 9/13
group **[1]** 22/6
Grub **[2]** 13/13 13/16
guard **[1]** 35/21
guess **[4]** 37/12 53/25
84/5 106/3
guesswork **[3]** 21/13
55/6 102/17
guide **[1]** 97/8
guy **[3]** 19/24 20/1
40/5
guy's **[1]** 40/6
Guylian **[6]** 78/25
80/17 81/1 81/15
81/23 82/6

**H**

half **[1]** 75/10
hallway **[1]** 109/2
hand **[4]** 15/14 60/20
87/4 94/14
handling **[1]** 31/23
hands **[8]** 5/10 11/7
40/1 40/3 40/7 40/10
40/11 74/10
happen **[3]** 36/21
59/15 59/18
happened **[2]** 33/11
40/2
happening **[1]** 101/4

**H**

**happy [2]** 109/7 110/12
**harass [4]** 9/5 9/23 40/24 41/2
**harassed [1]** 18/14
**harassing [1]** 13/21
**harassment [11]** 9/20 11/2 12/13 13/11 15/12 18/15 19/17 20/8 44/24 46/2 74/25
**Harbor [1]** 39/11
**hard [1]** 39/11
**hardly [1]** 100/21
**harm [3]** 42/19 73/2 73/11 97/25 98/11 101/10 101/12
**harmed [3]** 27/3 72/17 97/15
**having [9]** 6/10 7/17 7/18 50/22 74/2 81/24 88/6 108/12 110/2
**He'll [1]** 104/15
**he's [13]** 12/11 20/1 22/18 28/18 31/17 42/19 58/3 58/4 59/2 59/15 59/20 75/5 88/22
**head [2]** 78/24 79/2
**heads [1]** 22/8
**Headshot [2]** 61/20 66/21
**health [3]** 73/3 98/1 101/18
**hear [3]** 49/9 51/11 84/18
**heard [43]** 4/4 6/18 9/2 12/1 12/17 14/18 21/3 22/1 22/4 22/5 25/25 27/25 32/12 33/17 34/4 34/9 34/19 35/12 35/23 36/6 36/12 37/3 38/5 39/1 39/7 39/13 39/25 41/15 47/9 49/10 56/1 60/13 72/7 74/15 92/13 97/2 97/5 99/4 99/5 100/19 104/19 106/1 109/10
**hearing [3]** 20/19 36/16 80/8
**heart [1]** 54/15
**held [5]** 59/4 71/10 76/20 95/12 111/6
**helped [1]** 24/12
**Herald [6]** 6/15 6/19 23/18 23/19 45/3 87/25
**hereby [1]** 111/3
**hereto [1]** 87/2
**herself [1]** 35/1
**hesitant [1]** 56/15
**hesitation [1]** 42/13
**Hey [1]** 11/9
**Hezbollah [3]** 7/2 45/8 88/5
**high [2]** 21/4 82/4
**high-profile [1]** 82/4

**higher [1]** 103/19
**highlight [1]** 40/19
**HILLS [1]** 2/8
**himself [6]** 25/15 26/16 34/9 36/18 38/23 39/12
**hired [2]** 9/1 9/22
**Hispanic [1]** 35/4
**history [1]** 109/16
**hit [1]** 100/9
**holding [3]** 34/15 35/11 35/11
**holdings [2]** 59/2 99/6
**holds [1]** 58/21
**holiday [1]** 58/2
**holidays [2]** 109/7 110/12
**home [7]** 9/24 12/21 33/3 33/8 76/14 101/15 101/16
**honestly [1]** 19/25
**HONORABLE [1]** 1/3
**hope [2]** 47/5 110/2
**horse [3]** 12/6 12/8 12/10
**horses [1]** 87/17
**hosting [4]** 15/20 16/1 16/6 24/10
**hour [1]** 105/2
**house [5]** 34/13 34/14 35/14 40/6 105/22
**housekeeping [1]** 47/13
**However [3]** 77/1 77/12 77/16
**human [1]** 37/10
**hundred [1]** 75/12
**hundreds [1]** 7/14
**hunts [1]** 40/9
**hurt [1]** 99/1 103/17
**hydro [2]** 61/25 68/4

**I**

**I'd [9]** 4/24 55/19 75/14 75/20 77/8 86/12 86/22 87/21 98/21
**ICAC [5]** 6/5 6/8 9/17 23/22 44/21
**Iceland [2]** 16/1 44/14
**ICS [2]** 33/18 33/24
**idea [1]** 84/5
**identical [1]** 19/5
**identification [3]** 79/17 79/24 81/19
**identifies [1]** 62/1
**identify [1]** 62/2
**ignorance [3]** 62/6 62/13 62/20
**ignorance/by [2]** 62/13 62/20
**Ignorant [52]** 63/3 63/3 63/6 63/9 63/13 63/13 63/16 63/19 63/24 64/2 64/4 64/5 64/10 64/10 64/13 64/16 64/20 64/20 64/23 65/1 65/2 65/5

**65/6 65/15** 65/16 65/16 65/19 65/22 66/2 66/2 66/5 66/8 66/12 66/12 66/15 66/18 66/23 66/23 67/1 67/4 67/9 67/9 67/12 67/15 67/20 67/20 67/23 68/1 68/6 68/6 68/9 68/12
**illegal [1]** 66/11
**Image [4]** 61/18 61/19 66/1 66/11
**Image-4-18-2016 [2]** 61/18 66/1
**images [3]** 14/14 17/20 31/19
**Imagine [1]** 36/19
**immediately [4]** 12/20 25/21 25/21 31/22
**immigration [1]** 5/22
**impact [1]** 10/25
**impecunious [2]** 93/22 93/25
**implies [1]** 53/20
**imply [2]** 13/15 13/17 53/21
**important [6]** 21/1 23/5 23/12 32/15 32/16 99/11
**importantly [2]** 18/21 35/2
**impose [4]** 73/17 77/19 98/18 98/18
**imprisoned [1]** 103/5
**in 2013 [7]** 22/18 22/25 24/23 25/14 26/14 26/17 44/1
**in 2015 [3]** 14/16 14/23 44/6
**in 2017 [2]** 16/7 25/24
**in August [1]** 84/4
**INC [10]** 1/5 4/7 4/11 60/23 61/7 62/8 62/15 62/22 62/25 106/10
**Inc.'s [1]** 61/5
**inches [1]** 35/25
**inclination [1]** 54/21
**include [1]** 78/18
**included [1]** 21/12
**includes [3]** 41/2 43/15 91/6
**including [3]** 9/15 11/17 36/11
**inclusive [1]** 1/9 60/25 106/12
**income [4]** 58/21 92/2 92/5 92/7
**incoming [1]** 89/3 89/7
**increase [4]** 11/16 17/22 73/14 98/15
**indeed [4]** 25/19 25/24 34/23 36/2
**independent [4]** 5/25 6/3 6/4 58/22
**indication [2]** 25/2 100/25
**individual [5]** 9/14

16/20 16/24 22/13 37/7
**individually [1]** 21/24
**individuals [2]** 22/8 24/14
**induced [2]** 30/11 31/1
**infer [2]** 76/25 100/6
**inference [2]** 45/23 59/11
**inferences [1]** 21/17
**inflict [1]** 13/18
**influence [1]** 6/22
**Info [1]** 81/14
**inform [1]** 71/12
**information [6]** 9/11 16/22 24/9 47/19 55/13 86/15
**infringe [1]** 17/12
**infringed [10]** 16/9 29/11 29/15 30/14 30/17 44/9 44/12 46/15 49/11 62/2
**infringement [46]** 5/6 14/8 14/9 15/23 16/17 17/8 17/17 17/19 17/21 18/1 18/2 18/10 20/11 21/23 22/1 22/2 26/3 26/4 27/1 27/9 27/15 28/5 28/19 29/10 29/11 29/13 30/3 30/5 30/8 31/7 31/13 32/7 32/11 44/9 44/15 61/6 62/4 62/6 62/9 62/11 62/13 62/16 62/18 62/20 62/23 62/25
**infringer [4]** 17/24 28/17 28/17 28/18
**infringer's [2]** 17/25 31/2
**infringing [9]** 26/12 26/12 29/19 29/23 30/10 30/12 30/21 30/24 31/2
**initial [1]** 108/10
**initially [1]** 57/24
**initiate [1]** 6/5
**innocent [2]** 31/14 44/9
**input [1]** 23/7
**inquiry [1]** 23/22
**instead [6]** 12/25 15/25 44/24 48/4 76/9 99/19
**instruct [1]** 52/25
**instructing [1]** 10/7
**instruction [41]** 26/5 26/6 29/8 29/9 29/13 30/5 30/6 32/4 40/18 48/4 52/7 52/13 52/18 52/20 53/18 54/22 54/23 55/3 55/11 55/11 55/16 55/18 55/25 56/1 56/2 56/6 56/18 57/6 57/9 71/13 95/13 95/14 95/19 96/7 96/9 96/12 96/24

**Instruction 15 [1]** 52/20
**Instruction Number [1]** 52/18
**Instruction Number 14 [1]** 40/18
**Instruction Number 15 [1]** 54/23
**Instruction Number 28 [1]** 29/8
**Instruction Number 29 [1]** 30/5
**Instruction Number 36 [1]** 26/6
**instruction that [1]** 95/14
**instructions [13]** 29/7 47/21 47/22 47/23 50/10 50/24 52/11 54/17 56/17 72/15 95/17 96/2 96/4
**integrated [1]** 39/9
**intellect [1]** 110/8
**intellect [13]** 71/12 81/13 95/13 101/2 104/23
**intended [1]** 59/21
**intent [4]** 16/3 40/23 41/20 103/10
**intention [4]** 47/24 51/1 71/23 95/19
**intentional [2]** 20/10 44/15
**intentionally [3]** 15/15 30/10 31/1
**interactions [2]** 34/16 34/18
**interest [4]** 43/24 59/3 94/14 105/2
**interesting [1]** 55/1
**Internet [1]** 37/18
**interpret [1]** 56/11
**intimidation [2]** 7/3 7/4
**into 2013 [1]** 23/21
**introduce [2]** 81/13 94/13
**introduced [1]** 94/10
**invest [1]** 93/19
**investigation [2]** 6/1 9/5
**investigator [3]** 9/3 9/10 12/1
**investigators [1]** 9/1
**Investment [1]** 92/20
**invoice [1]** 34/2
**involved [6]** 9/20 28/2 73/7 85/1 98/6 101/25
**involvement [2]** 28/2 85/12
**Iron [1]** 93/3
**irrelevant [1]** 29/25
**is a [1]** 52/1
**Islamic [1]** 88/15
**Islands [1]** 5/23
**isolate [1]** 45/10
**isolation [1]** 53/5
**issue [9]** 21/2 44/3

**I**

issue... [7]  44/4 46/14
57/22 101/6 101/10
103/3 103/4
issued [2]  10/5 100/2
issues [1]  51/13
itself [1]  40/14

**J**

James [1]  35/21
Jamie [7]  9/14 12/2
12/3 33/23 33/25 34/3
45/21
Jamie Brown [2]  9/14
45/21
January [1]  89/22
January 2010 [1]
89/22
Jean [5]  16/24 17/1
17/2 24/10 43/21
Jean Ghalo [4]  17/1
17/2 24/10 43/21
Jersey [4]  85/24 86/5
87/1 87/7
jewelry [1]  40/7
Joe [6]  16/20 22/23
22/25 31/25 43/16
43/16
Joe Dabab [2]  43/16
43/16
John [1]  13/10
joint [2]  5/19 54/22
Joint Proposed [1]
54/22
journalist [1]  23/19
JR [1]  1/3
judge [2]  1/3 92/5
judgment [5]  74/18
74/21 103/21 103/25
104/4
judicial [2]  103/11
111/8
JUI [3]  1/23 111/14
111/15
jump [2]  49/16 49/25
June [1]  25/24
juries [1]  45/13
Juror [19]  70/10 70/12
70/16 70/17 70/19
70/21 70/23 70/25
71/2 71/4 71/6 107/12
107/14 107/16 107/18
107/20 107/22 107/24
108/1
Juror Number 1 [4]
70/10 70/16 70/17
107/12
Juror Number 2 [3]
70/12 70/19 107/14
Juror Number 3 [2]
70/21 107/16
Juror Number 4 [2]
70/23 107/18
Juror Number 5 [2]
70/25 107/20
Juror Number 6 [2]
71/2 107/22
Juror Number 7 [1]

71/4 107/24
Juror Number 8 [2]
71/6 108/1
jurors [8]  49/9 51/11
51/23 52/1 56/17
57/17 108/6 109/14
Jury Instruction
Number [2]  56/6 57/6
jury's [1]  47/14
justice [3]  5/9 16/5
108/11
justification [2]  8/17
19/9
justify [2]  5/12 19/22

**K**

Kaddo [2]  60/18 106/7
KARINA [1]  2/4
Karl [1]  85/5
KAZAL [160]
Kazal's [12]  6/23 8/17
17/5 17/5 17/6 19/21
45/7 77/23 85/1 85/12
88/3 102/15
kazalfamilystory.com
[5]  7/20 15/17 22/3
22/17 28/8
kazalfamilytruth [1]
41/9
kazalfamilytruth-relat
ed [1]  41/9
kazalfamilytruth.com
[1]  36/9
kazalicacacnsw.com
[1]  85/8
Kazals [30]  5/8 5/12
5/18 5/25 6/14 7/6
7/20 7/23 8/25 9/14
9/22 10/6 15/15 15/22
16/7 18/1 18/14 18/19
19/16 20/4 36/10
37/11 42/10 42/19
44/17 80/25 93/8
103/13 104/1 104/6
Kazals' [2]  7/1 11/5
keep [1]  46/25
key [1]  24/17
kidding [3]  108/4
108/5 108/5
kids [2]  36/14 36/15
killer [1]  40/9
kills [1]  40/8
kind [1]  105/16
knew [7]  11/11 28/4
28/5 30/9 30/20 73/5
98/4
knowledge [9]  9/7
17/25 30/23 36/23
37/25 44/2 87/18
87/20 94/19
known [3]  9/15 86/17
108/19
knows [5]  28/15 34/5
34/5 34/5 34/6
Kolesa [5]  23/11
24/12 36/12 36/12
37/3
KTC [7]  82/9 82/14

82/14 83/19 92/14
92/23 93/8

**L**

L.A [2]  11/9 11/11
L.A. [2]  108/20 108/22
L.A. Times [2]  108/20
108/22
la [2]  61/13 64/8
laborers [1]  35/4
Lacks [1]  80/14
ladies [25]  4/19 20/15
31/6 37/13 37/22
39/16 39/20 39/23
40/2 42/10 42/24 43/4
43/6 46/19 69/22 70/6
72/9 97/4 100/13
102/8 102/22 104/10
106/23 107/8 108/3
laid [1]  94/20
land [1]  86/25
landlord [1]  83/15
large [4]  6/20 9/22
10/21 10/21
largely [2]  59/1 59/6
last [7]  4/25 57/25
84/1 88/18 100/24
102/13 108/8
lastly [1]  50/11
late [5]  31/22 33/6
83/5 91/16 103/1
late 2017 [1]  83/5
later [4]  26/19 36/10
41/8 105/16
latest [1]  26/22
latter [1]  6/10
laundering [2]  7/1
88/5
lavish [1]  92/6
law [28]  2/3 2/3 2/7
2/11 2/12 2/12 5/9
11/7 15/13 16/4 16/4
18/8 21/18 25/7 25/9
32/17 40/1 40/3 40/7
40/10 40/11 43/1
44/14 54/4 86/5 91/21
100/1 100/9
lawful [2]  19/9 34/22
laws [1]  16/3
lawsuit [11]  7/5 7/11
26/11 26/18 26/21
26/22 27/4 42/18
85/24 87/12 99/14
lawsuits [2]  5/23 99/4
lawyer [2]  23/23 31/23
lawyers [3]  108/24
109/1 110/11
layout [1]  23/9
lead [1]  46/14
leading [1]  11/22
leaps [1]  21/14
learned [2]  23/23
36/10
least [9]  23/3 31/24
77/1 84/14 84/23 85/6
93/21 99/8 104/24
leave [5]  55/9 55/12
59/13 60/3 71/24

Lebanon [1]  16/25
legal [8]  5/10 8/24
15/18 42/22 44/18
75/13 86/16 100/6
legitimate [5]  9/4 41/3
41/4 41/6 41/9
legitimately [2]  25/9
103/7
lender [1]  40/5
LESOWITZ [1]  2/7
less [1]  28/20
let [4]  11/11 26/9
104/13 104/23
letter [1]  38/16
letters [1]  10/21
lexus [2]  61/13 64/8
LIA [2]  92/19 93/8
liability [6]  10/7 12/12
30/2 31/8 100/18
104/3
liable [50]  16/17 17/7
17/17 18/10 28/17
28/18 29/11 30/8 62/3
62/10 62/17 63/2 63/5
63/8 63/12 63/15
63/18 63/23 64/1 64/4
64/8 64/12 64/15
64/19 64/22 64/25
65/4 65/7 65/10 65/14
65/18 65/21 66/1 66/4
66/7 66/11 66/14
66/17 66/22 66/25
67/3 67/8 67/11 67/14
67/19 67/22 67/25
68/4 68/8 68/11
Libyan [1]  92/20
lie [1]  12/9
lies [1]  7/18
lifestyle [2]  77/3 92/7
like [24]  4/24 22/23
39/22 42/20 42/20
42/21 42/22 55/19
58/16 75/14 75/20
76/9 77/5 77/8 79/2
83/4 86/12 86/22
87/21 89/11 96/20
98/21 108/12 108/13
likely [5]  17/2 19/16
21/7 99/8 99/13
Likewise [2]  8/22 15/4
limitation [1]  15/3
limitations [9]  14/21
14/24 26/5 26/7 27/1
27/5 32/9 50/4 50/9
line [16]  29/17 30/6
48/5 48/25 49/3 49/8
49/11 49/19 50/1 50/3
50/8 50/11 50/18
50/22 55/3 77/8
line 10 [1]  50/8
line 15 [1]  50/11
line 16 [3]  48/5 50/1
55/3
line 17 [1]  48/25
line 3 [2]  49/11 50/3
line 4 [2]  30/6 50/22
line 5 [1]  49/3
line 6 [1]  49/8

linked [1]  37/17
links [5]  7/1 7/2 24/21
25/13 45/8
liquidated [1]  99/7
liquidation [2]  82/15
list [3]  24/14 80/2
81/23
listed [3]  18/11 24/10
43/21
listen [1]  108/13
litigious [2]  109/15
109/16
little [5]  32/4 53/6
53/19 56/22 58/24
live [3]  46/4 76/14
77/17
LLC [8]  85/18 85/21
85/24 86/4 86/20
86/21 86/25 87/19
loan [1]  40/5
loans [1]  40/4
located [1]  11/12
locks [1]  12/21
logical [1]  45/23
long [6]  33/9 59/14
74/14 82/4 104/22
104/23
Long Beach [1]  33/9
long-standing [1]
82/4
longer [2]  59/21
108/15
look [22]  21/16 24/19
25/17 28/16 28/24
29/6 32/16 41/1 42/25
43/1 48/3 55/2 57/15
59/9 76/8 94/4 95/15
96/4 96/15 96/15
96/20 105/18
looking [4]  20/20
48/12 76/6 89/18
looks [2]  56/16 89/11
LOS [8]  1/17 1/24 2/13
4/1 11/4 33/8 76/17
101/24
Los Angeles [4]  11/4
33/8 76/17 101/24
lot [4]  21/12 21/13
32/12 102/17
low [1]  110/9
lower [1]  87/3
luck [2]  109/25 110/12
lying [1]  12/11

**M**

made [17]  6/8 7/18 8/9
11/5 11/8 12/25 18/4
24/18 34/11 34/23
39/5 39/11 50/21
57/25 84/19 92/25
103/24
magnifying [1]  88/22
mail [1]  33/22
mailboxes [1]  8/1
mailing [3]  23/21
mails [25]  7/12 7/14
7/16 7/19 11/24 28/21
28/22 28/25 32/24

**M**

**mails... [16]** 32/25 38/10 38/10 38/11 38/12 38/14 38/17 38/20 38/21 38/23 39/3 39/4 39/14 41/16 42/20 101/3
**maintained [1]** 44/22
**maintenance [1]** 37/4
**make [17]** 11/13 16/16 20/7 21/13 21/14 28/16 41/8 45/22 46/2 46/11 47/18 48/1 50/20 52/1 93/14 94/9 97/9
**makes [2]** 56/22 108/11
**making [1]** 98/21
**Malaysia [1]** 90/5
**malice [3]** 69/12 69/15 69/18
**malicious [5]** 7/18 20/10 23/17 46/16 98/23
**man [2]** 19/25 59/1
**manifest [1]** 99/15
**many [6]** 25/5 25/10 37/6 37/6 91/6 91/6
**Maquarie [1]** 79/2
**marching [1]** 34/15
**mark [7]** 12/1 79/12 79/14 81/16 83/11 85/10 88/18
**Mark Woodward [1]** 12/1
**marked [4]** 3/11 79/11 79/17 81/19
**martel [1]** 67/18
**martell [1]** 61/23
**materially [2]** 30/11 31/1
**matter [1]** 111/6
**mattered [1]** 23/11
**matters [1]** 47/14
**Matthew [1]** 36/11
**max [6]** 51/24 56/8 56/11 56/25 57/1 57/6
**maximum [1]** 52/2 53/15 54/4 54/12 54/24 55/21 56/22
**May 4th [1]** 86/24
**maybe [5]** 53/6 53/13 55/10 56/4 84/1
**mclaren [4]** 61/11 61/14 63/12 64/19
**mean [16]** 28/11 28/12 29/3 34/6 52/23 54/3 54/13 54/15 55/1 56/12 57/8 59/14 72/2 91/19 93/24 105/13
**Meaning [1]** 94/1
**means [10]** 19/13 21/8 28/15 44/18 59/1 59/7 91/2 91/20 93/25 100/9
**meant [5]** 11/11 11/19 13/15 13/17 91/9
**measure [2]** 52/25

**media [1]** 6/20 6/20 7/21 61/23 67/18 65/25
**Meeting [2]** 61/17 106/7
**MEI [3]** 1/23 111/14 111/15
**member [1]** 75/5
**members [5]** 7/7 7/25 11/1 12/16 108/23
**mention [2]** 88/6 110/5
**mentioned [5]** 83/3 90/20 92/12 101/13 108/10
**mere [1]** 8/9
**merely [2]** 73/15 98/16
**merit [1]** 15/3
**message [4]** 20/5 99/11 99/20 103/12
**messaging [1]** 23/21
**met [3]** 11/17 32/18 40/20
**meta [2]** 23/10 23/11
**meta-data [1]** 23/10
**meta-tags [1]** 23/11
**meters [1]** 101/15
**mid [1]** 36/8
**mid-2016 [1]** 36/8
**Middle [3]** 17/3 39/8 59/7
**Middle East [3]** 17/3 39/8 59/7
**might [2]** 55/7 108/25
**Millennium [1]** 15/19
**million [22]** 10/23 75/10 81/8 81/24 82/7 82/18 83/4 83/17 84/14 84/16 84/19 84/23 87/15 88/8 89/9 92/12 92/23 93/14 99/9 103/22 106/17 106/20
**min [6]** 51/24 56/8 56/11 56/25 57/1 57/6
**min/max [6]** 51/24 56/8 56/11 56/25 57/1 57/6
**mind [3]** 21/1 21/15 106/7
**Mine [1]** 48/11
**minimize [1]** 45/11
**minimum [10]** 52/2 53/14 54/3 54/5 54/12 54/18 54/24 55/21 56/21 84/13
**minor [1]** 32/3
**minus [1]** 84/9
**minute [2]** 47/15 96/4
**minutes [9]** 18/12 36/3 90/20 95/22 95/22 95/23 95/24 97/7 102/23
**misconduct [1]** 103/14
**misinterpret [1]** 56/12
**misleading [2]** 6/9

6/11

**Miss [3]** 60/18 76/22 106/7
**Miss Kaddo [2]** 60/18 106/7
**Miss Sambrook [1]** 76/22
**missed [1]** 50/16
**misspelling [1]** 50/1
**mistake [2]** 33/24 102/25
**moment [5]** 4/20 29/6 94/3 95/14 109/14
**momentarily [1]** 104/13
**monetary [1]** 20/8
**money [7]** 7/1 12/9 78/1 82/19 88/4 100/1 103/23
**monolith [1]** 22/7
**months [4]** 8/15 14/4 82/22 99/7
**more [13]** 4/21 12/7 18/21 19/16 21/7 34/20 35/7 93/21 95/22 97/7 99/8 101/4 110/10
**Moreover [3]** 45/2 76/13 76/23
**morning [15]** 4/13 4/16 4/18 4/19 6/15 6/19 20/15 23/18 23/19 45/3 57/25 58/1 58/3 87/25 105/1
**most [6]** 25/8 32/2 38/19 38/25 87/11 102/16
**motion [1]** 101/23
**motions [1]** 109/17
**move [1]** 86/2
**moved [2]** 32/15 94/10
**moving [2]** 18/14 105/4
**Mr. and Mrs. David's [1]** 13/4
**Mr. Brown [1]** 34/5
**Mr. Dabab [15]** 16/20 22/25 23/14 24/7 24/11 24/17 25/14 25/16 25/17 25/20 25/23 27/23 29/1 29/1 31/21
**Mr. David [59]** 5/15 5/21 5/25 6/4 6/14 6/17 6/21 7/6 7/16 8/5 8/25 9/2 9/5 9/23 10/20 11/11 11/19 11/24 12/15 12/17 13/8 13/12 13/17 13/21 18/13 18/18 18/20 19/18 19/22 19/24 21/24 23/20 23/25 24/23 26/9 32/11 32/23 34/19 35/5 36/21 37/11 37/20 38/5 38/12 38/14 39/13 39/25

44/25 44/25 46/11 73/24 74/9 75/20 79/21 86/7 89/18 98/24 101/21 110/2
**Mr. David's [10]** 7/25 10/1 10/18 10/20 13/9 23/23 33/3 33/8 35/13 42/18
**Mr. Kazal [23]** 12/7 16/25 22/16 23/1 23/6 23/15 23/23 24/1 24/21 25/14 25/20 25/25 27/25 28/24 31/15 33/16 33/25 36/25 37/16 57/25 58/11 58/25 92/6
**Mr. Kolesa [4]** 23/11 24/12 36/12 37/3
**Mr. Parlato [3]** 14/19 35/23 36/2
**Mr. Price [3]** 24/12 36/24 37/5
**Mr. Taylor [16]** 20/13 43/8 51/5 51/17 52/15 53/3 54/16 57/3 57/22 70/3 95/7 96/8 100/12 105/4 107/5 109/23
**Mr. Taylor's [1]** 43/11
**Mr. Wiener [11]** 43/9 50/15 51/3 51/15 52/5 54/9 57/11 73/21 98/20 107/3 109/21
**Mr. Woodward [3]** 33/17 33/23 34/17
**Mr. Woodward's [1]** 33/18
**Mrs [1]** 35/1
**Mrs. [1]** 13/4
**Ms. Badirian [1]** 105/13
**Muammar [1]** 7/1
**much [6]** 22/23 35/2 60/5 82/17 102/20 103/19
**multi [1]** 103/22
**multi-million [1]** 103/22
**must [7]** 26/24 26/24 30/15 41/25 55/5 72/10 97/12

**N**

**name [16]** 6/3 9/10 10/21 23/2 24/4 36/20 37/7 37/9 37/24 46/23 61/9 63/1 80/2 81/2 86/16 102/6
**named [9]** 9/14 16/20 16/24 22/22 22/25 43/16 43/20 85/18 85/20
**namely [1]** 41/7
**names [5]** 36/24 42/12 44/19 44/21 95/16
**national [1]** 58/1
**nature [4]** 19/12 19/13 75/9 109/15

**near [5]** 12/19 34/13 35/13 99/17 101/16
**nearly [1]** 23/23
**necessarily [1]** 101/16
**necessary [4]** 11/13 73/13 77/2 98/13
**need [15]** 12/24 21/15 32/6 37/16 38/13 58/10 58/15 58/19 60/2 60/3 95/21 95/22 104/23 105/11 109/15
**needs [5]** 19/16 20/5 58/12 59/24 100/2
**neighborhood [7]** 7/25 8/2 8/2 10/19 33/2 33/7 34/11
**neither [2]** 35/4 103/13
**net [3]** 58/17 58/18 58/19
**never [14]** 6/12 13/20 16/11 20/3 24/1 25/1 25/14 25/15 38/14 38/15 38/17 39/2 87/8 93/13
**New [4]** 85/24 86/5 87/1 87/7
**New Jersey [4]** 85/24 86/5 87/1 87/7
**news [1]** 24/3
**newspaper [2]** 6/19 87/24
**next [10]** 10/24 30/4 41/1 48/8 48/23 71/11 85/10 86/1 86/22 95/5
**nightclub [1]** 82/5
**nine [2]** 76/19 89/23
**Ninth [1]** 56/16
**Ninth Circuit [1]** 56/16
**No. [1]** 86/6
**No. BUR-L-2787-08 [1]** 86/6
**none [4]** 5/23 6/23 23/11 104/1
**Notably [6]** 6/22 8/20 12/7 16/20 45/5 100/4 104/1
**note [8]** 9/12 13/9 51/22 54/2 57/16 60/10 76/18 98/25
**noted [3]** 8/17 76/6 94/24
**nothing [10]** 4/21 27/18 27/19 27/20 27/21 28/20 45/4 54/14 89/14 105/7
**notice [10]** 15/19 15/21 15/22 17/10 17/12 18/3 18/6 25/20 31/22 44/11
**noticed [2]** 47/21 48/24
**notifications [2]** 38/5 38/7
**November [3]** 10/4 76/24 88/15

**N**

November 2016 [1] 76/24
November 26th [1] 88/15
number [50] 7/14 11/18 26/6 29/8 30/5 40/18 41/11 41/18 41/25 47/18 48/4 52/9 52/18 54/22 54/23 55/2 55/3 55/11 55/18 56/6 57/6 70/7 70/10 70/12 70/16 70/17 70/19 70/21 70/23 70/25 71/2 71/4 71/6 76/4 78/12 78/25 79/21 79/22 79/24 79/24 106/13 107/9 107/12 107/14 107/16 107/18 107/20 107/22 107/24 108/1
Number 15 [4] 55/2 55/3 55/11 55/18
Number 2 [1] 41/25
Number 24 [1] 54/22
Number 3 [1] 41/18
numbers [1] 48/4
numerous [1] 99/4

**O**

oath [4] 26/10 26/15 36/13 74/4
object [2] 94/18 94/22
objecting [1] 96/7
objection [7] 51/2 51/6 57/11 80/16 94/17 94/24 96/11
objections [1] 96/1
observed [1] 13/3
obtained [3] 8/5 18/16 59/5
obvious [1] 104/5
obviously [4] 16/11 53/5 56/2 103/10
occurred [3] 9/24 12/18 12/20
occurring [1] 45/17
occurs [1] 17/24
October [8] 7/22 10/4 11/8 11/14 13/11 18/3 18/17 33/6
October 2016 [5] 7/22 13/11 18/13 18/17 33/6
October 28th of [1] 11/8
October 30th [1] 11/14
October and [1] 10/4
Off [1] 78/24
offense [1] 6/10
offer [6] 84/19 92/12 92/18 93/1 93/8 93/14
offered [3] 13/21 15/9 82/13
office [4] 61/12 63/22 79/2 92/8
officer [1] 9/15
offices [2] 2/3 47/16

OFFICIAL [3] 1/23 61/20 66/21
offline [1] 7/7
often [1] 108/24
oh [3] 96/20 96/22 102/23
once [3] 21/19 34/20 51/8
one [41] 13/15 17/20 21/22 21/23 22/15 24/18 24/25 28/1 28/25 29/5 34/1 34/2 41/18 42/11 45/7 47/24 49/12 50/23 55/7 56/11 75/11 77/12 80/18 80/18 80/19 80/20 80/19 80/19 80/20 81/7 82/11 87/12 89/11 89/22 90/18 93/9 93/21 95/15 97/6 101/2 102/14 108/4 109/7
ones [6] 10/9 37/6 37/8 44/8 50/14 78/17
ongoing [1] 36/22
online [5] 6/16 7/7 25/11 31/20 83/7
online and [1] 83/7
only [20] 6/5 11/15 14/23 16/18 19/15 23/19 23/23 27/11 28/1 32/11 37/6 37/8 37/11 38/2 44/5 49/12 95/13 100/8 103/12 110/4
oOo [1] 110/16
open [9] 4/4 47/9 56/23 60/13 72/7 97/2 104/19 106/1 109/10
opened [1] 81/3
opening [1] 88/25
operating [2] 22/18 85/5
opinion [1] 50/12
opportunity [1] 23/4
opposed [6] 48/7 49/12 49/14 50/4 50/7 50/9
oppression [3] 69/12 69/15 69/18
oppressive [2] 46/16 98/23
orange [3] 16/2 61/11 63/12
order [15] 8/5 8/8 8/11 8/12 8/16 8/19 10/5 14/2 42/4 42/5 42/6 42/7 42/8 47/3 99/23
ordered [2] 31/25 47/5
orders [6] 13/23 19/7 19/11 19/20 99/24 108/15
organization [1] 7/2
organize [1] 76/16
organizing [1] 9/13
original [2] 14/12 48/6
originally [1] 49/23

Oscar [2] 77/18 others [3] 73/3 98/2 101/18
otherwise [3] 56/23 73/15 98/16
out [28] 5/7 10/10 10/17 13/15 15/14 23/2 23/6 23/16 24/3 24/6 26/9 31/23 32/18 35/17 35/22 47/11 47/24 52/2 56/13 62/6 62/13 62/20 100/15 102/14 103/5 104/18 108/23 110/6
outdated [1] 102/16
outlined [1] 101/8 101/8
outside [5] 33/3 33/8 47/9 104/19 109/10 109/7
over [14] 6/4 18/14 32/25 46/10 46/21 47/23 48/1 50/15 74/10 83/12 83/25 89/10 105/18 108/8
overruled [2] 80/16 94/24
overseas [1] 103/9
overseeing [1] 20/17
owed [4] 62/7 62/14 62/21 62/24
own [13] 5/10 11/7 18/21 25/18 26/20 40/1 40/3 40/7 40/10 40/11 58/18 80/25 81/2
owned [3] 87/19 91/4 92/23
owner [6] 14/14 17/20 49/20 85/17 85/20 86/19
owners [1] 82/11
ownership [2] 14/10 85/23
owns [2] 61/8 91/3

**P**

p90d [2] 61/15 65/4
paced [1] 35/10
packet [3] 26/6 29/9 40/19
page [32] 3/5 23/6 23/13 29/8 30/4 30/4 40/18 41/1 48/3 48/4 48/8 48/23 48/23 49/3 49/8 49/11 49/16 49/25 50/11 50/15 50/17 50/18 50/19 50/22 50/24 52/9 52/18 76/6 77/5 89/25 95/15 111/7
page 11 [1] 48/4
page 15 [2] 48/23 52/18
page 17 [1] 40/18
page 1742 [1] 77/5
Page 21 [1] 49/3
Page 22 [1] 49/8
page 23 [4] 49/11

50/18 50/19 50/22 page 36 [4] 30/4 49/16 49/25 50/17
pages [1] 96/16
paid [10] 11/17 11/18 12/2 12/3 12/5 22/21 34/2 45/21 45/23 75/13
paragraph [9] 76/2 76/4 76/9 76/10 77/6 77/9 86/13 86/22 92/5
paragraph 17 [2] 77/6 77/9
paragraph 24 [2] 76/9 76/10
paragraph 4 [1] 86/13
paragraph 6 [1] 86/22
paragraphs [1] 76/8
parallel [1] 54/18
parcel [1] 11/22
parent [1] 10/2
PARK [1] 2/13
Parlato [5] 14/18 14/19 35/23 36/2 44/5
part [5] 11/21 26/13 31/9 75/12 78/13
parties [1] 47/15
parties' [1] 5/19
partner [1] 8/4
passersby [1] 34/16
past [7] 5/3 36/22 48/7 48/15 74/10 82/22 99/7
patience [1] 60/16
pattern [8] 40/23 41/10 42/2 45/14 73/7 98/7 98/23 101/25
pay [6] 73/17 74/18 75/12 78/3 98/19 103/21
paying [2] 77/19 77/23
payments [1] 89/3
peace [1] 18/16
peaceful [4] 34/11 34/22 40/10 40/12
people [8] 19/25 25/10 28/16 76/17 91/6 91/8 103/15 108/12
perceive [1] 27/2
percent [5] 84/2 84/6 84/10 84/11 84/12
Perhaps [1] 43/12
period [5] 89/10 89/11 91/12 91/14 91/24
perjurer [3] 38/1
perjury [1] 37/2
permission [1] 36/23
permit [1] 47/2
person [7] 9/12 13/6

22/18 24/13 31/16 43/20 45/1
person's [1] 43/21
personal [2] 58/4 94/19
personally [3] 13/18 58/21 109/6
persons [1] 76/19
persuades [1] 50/12
phase [5] 59/11 59/16 71/14 97/5 108/4
phone [2] 22/19 47/16
photo [1] 43/17
photograph [2] 61/9 62/2
photograph's [5] 62/4 62/8 62/15 62/22 62/25
photographs [32] 10/20 14/16 14/17 14/22 14/23 15/1 15/7 15/10 15/16 16/8 16/10 16/12 16/19 16/19 17/10 17/11 18/7 18/11 22/2 24/19 25/2 25/10 25/17 26/17 28/6 29/4 30/15 43/15 44/3 44/15 61/8 63/1
photographs's [2] 62/11 62/18
photos [13] 15/24 24/22 24/22 25/15 25/24 27/21 32/1 43/25 44/3 44/4 44/7 44/8 44/12
phrase [1] 58/10
phrased [1] 57/12
phraseology [1] 56/7
physical [5] 13/2 73/2 97/25 101/10 101/12
picked [1] 50/17
picture [1] 101/23
pictures [3] 23/10 35/24 36/5
placards [1] 102/7
place [14] 6/2 9/21 10/3 11/19 13/5 15/10 20/6 40/24 41/20 47/1 53/9 79/3 100/24 101/3
placed [1] 7/24
plaintiff [23] 29/15 30/17 32/23 34/9 40/24 41/14 41/20 41/25 49/13 49/14 49/20 50/1 51/2 72/17 73/4 73/5 73/19 86/4 86/17 86/19 95/16 97/15 106/11
plaintiffs [17] 1/6 2/12 4/10 4/12 20/23 21/6 21/22 22/6 22/23 27/17 32/18 33/10 33/19 40/20 43/2 60/24 86/2
plaintiffs' [8] 3/4 22/5 30/14 34/4 49/11

**P**

plaintiffs'... [3] 73/11
75/23 88/18
plaintiffs' 1742 [1]
75/23
plan [4] 17/16 96/2
96/10 96/12
planet [1] 37/10
planned [1] 99/22
plans [1] 58/1
platform [1] 23/1
pleasant [1] 34/17
please [21] 4/8 46/22
46/22 46/23 47/12
55/10 55/17 56/6 57/6
70/8 70/9 70/16 71/9
75/20 76/2 83/12
104/21 107/7 107/10
107/10 109/12
plural [2] 50/5 50/10
plus [3] 78/20 79/2
84/9
PM [5] 57/20 60/9
60/9 104/18 105/25
point [11] 20/18 24/15
24/17 26/9 33/22 34/3
51/10 58/13 100/15
101/20 109/17
police [8] 9/15 11/5
34/20 34/20 34/21
34/23 34/25 35/1
Police Department [1]
11/5
poll [2] 70/5 107/7
polled [2] 70/1 107/3
Portrait [2] 61/20
66/21
pose [1] 103/5
possibly [3] 27/15
84/16 90/16
post [2] 11/8 109/17
post-trial [1] 109/17
posted [2] 25/1 29/2
posters [2] 7/24 17/14
potential [1] 31/24
powerful [1] 93/17
practical [1] 59/7
practice [3] 73/7 98/7
102/1
precluded [1] 26/4
prefer [1] 74/14
prepare [1] 57/14
prepared [4] 12/25
71/22 77/18 93/14
preponderance [4]
21/3 29/17 30/19
32/19
presence [9] 4/4 13/2
47/10 60/13 72/7 97/2
104/20 106/1 109/6
present [4] 48/7 58/16
73/19 95/7
presented [19] 5/1
16/9 20/21 21/17
27/14 28/3 29/20
29/24 30/22 33/13
38/3 69/23 70/7 79/13
101/1 101/19 104/1

presenting [1] 106/7
preside [1] 46/21
presumably [1] 56/2
pretty [6] 22/9 31/5
31/13 34/8 93/4
102/16
prevent [1] 99/14
previous [1] 14/24
previously [5] 13/10
74/2 81/21 86/7 102/1
Price [4] 24/12 36/11
36/24 37/5
print [1] 47/24
printed [1] 10/21
printout [2] 81/14
85/7
prison [3] 8/15 14/5
103/5
private [8] 9/1 9/3
9/10 12/1 47/1 76/15
93/3 93/4
probably [6] 102/10
104/25 105/11 105/15
108/22 109/17
problem [1] 31/24
proceed [4] 4/22
51/12 74/6 98/20
proceeding [1] 6/5
proceedings [5] 1/14
71/10 95/12 110/15
111/6
proceeds [1] 104/5
process [2] 74/14
108/11
processes [4] 8/24
15/18 100/7 103/11
proclaiming [2] 8/3
10/22
proffered [1] 93/10
profile [2] 81/16 82/4
prohibit [1] 50/5
prohibiting [1] 8/6
prohibits [1] 50/4
promote [1] 43/24
promoting [1] 17/14
proof [6] 21/1 21/2
21/16 52/7 52/21
103/20
proper [1] 5/10
properly [2] 94/10
104/4
properties [1] 59/4
property [21] 7/3
78/18 78/20 82/22
82/24 83/1 84/13
85/18 85/18 85/24
86/4 86/20 86/25 87/6
87/9 87/14 87/16
87/19 87/19 99/5
103/23
proposal [5] 48/15
52/3 56/5 57/4 96/1
proposed [5] 50/14
54/22 57/12 96/2
96/12
prosecution [2] 6/11
24/2

prosecuti... [1] 108/19
protect [4] 5/13 10/14
19/1 46/1
protected [5] 10/11
18/23 40/15 45/25
46/3
protecting [1] 12/11
protection [2] 91/20
91/22
protest [10] 10/3
11/23 34/22 34/25
37/19 37/21 40/10
40/12 42/15 101/2
protesters [1] 35/7
protesting [1] 40/15
protestors [15] 10/7
32/3 33/7 33/12 33/15
34/10 34/11 34/24
35/4 35/14 35/18
35/24 36/4 39/1 42/22
protests [10] 9/24
34/21 36/7 38/3 38/4
39/15 41/15 41/23
99/16 101/13
prove [3] 21/7 40/21
42/24
proved [2] 55/4 55/8
proven [4] 61/7 68/15
68/18 68/21
proves [1] 17/21
provide [4] 9/3 12/8
45/18 95/20
provided [5] 7/13
16/22 16/23 18/11
93/8
provides [3] 17/18
53/8 81/15
providing [1] 55/12
proving [3] 29/16
30/18 32/19
public [8] 19/20 23/3
23/16 23/24 24/3 24/6
25/11 25/12
publish [4] 6/22 15/7
16/7 18/7
published [5] 6/20
7/19 14/16 14/23 83/7
punish [7] 42/18 49/5
72/16 73/13 74/22
97/14 98/13
punitive [34] 49/4
49/4 49/5 58/10 71/14
71/19 72/3 72/12
72/15 72/20 72/21
72/22 73/11 73/14
73/20 74/24 78/6
96/15 97/13 97/14
97/17 97/18 97/19
98/11 98/15 100/10
100/16 102/9 102/18
102/19 104/6 106/14
106/15 106/18
purchase [1] 92/14
purchased [1] 12/21
purpose [8] 9/4 41/3
41/4 41/6 41/10 49/4
49/5 72/15
purposes [4] 49/3

79/25 86/15 97/13
pursuant [2] 6/6 111/3
pursue [1] 44/24
pursued [4] 15/17
42/14 44/18 99/2
pursuing [1] 42/13
pushing [1] 42/19

**Q**

Quarter [1] 80/18
Quay [3] 80/20 83/1
83/10
question [25] 51/25
52/4 53/9 53/17 53/20
54/20 55/7 55/14
55/14 55/20 57/9 61/7
62/1 68/15 68/18
68/21 68/24 69/3 69/7
69/11 69/14 69/17
70/14 106/15 106/18
Question 1 [2] 61/7
106/15
Question 10 [1] 69/14
Question 11 [1] 69/17
Question 2 [1] 106/18
Question 4 [1] 68/18
Question 5 [1] 68/21
Question 6 [1] 68/24
Question 7 [1] 69/3
Question 8 [1] 69/7
Question 9 [1] 69/11
questionable [1]
93/25
questions [3] 61/3
94/7 96/6
quick [2] 29/6 103/2
quickly [1] 40/19
quite [3] 22/5 83/25
95/21
quote [3] 13/12 19/9
43/13

**R**

r8 [2] 61/10 63/2
race [3] 12/6 12/8
12/10
racing [7] 85/18 85/24
86/4 86/20 86/24
87/17 87/19
rain [1] 4/25
raise [1] 51/13
RAMON [1] 2/4
ranch [1] 87/17
range [1] 89/22
rate [4] 83/23 84/4
84/17 90/14
rather [5] 5/10 15/23
105/16
RD [2] 61/17 65/25
reached [5] 60/11
60/16 71/13 100/17
106/5
reaching [1] 100/15
reaction [1] 35/13
read [25] 12/4 26/7
28/1 38/8 38/19 38/25
54/16 57/5 69/23 70/8
75/25 76/10 77/8

77/10 86/12 86/22
92/5 95/14 95/19
96/23 97/6 97/7 101/9
106/24 107/10
readily [1] 22/16
reading [10] 30/6 30/7
30/25 48/1 48/16
49/13 76/12 77/15
86/14 86/23
reads [1] 51/23
ready [1] 57/18
105/17
real [1] 82/21
realized [2] 48/17
103/22
Realizing [1] 16/16
really [6] 22/19 39/18
52/1 54/15 59/23
101/6
reason [7] 7/4 26/25
30/20 32/2 55/24
91/23 101/5
reasonable [9] 8/13
12/14 13/6 19/14 21/5
21/17 25/10 73/10
98/10
reasonably [1] 12/15
reasons [6] 27/8 30/9
31/12 31/15 32/9
102/8
rebut [1] 95/24
rebuttal [2] 18/13
102/23
recall [3] 50/16 57/23
93/16
recap [1] 74/12
received [11] 12/10
15/22 17/10 18/3
25/19 38/5 44/11
51/22 60/10 82/14
82/19
receiving [2] 17/12
38/24
recently [1] 18/7
recess [11] 51/20
51/21 57/17 57/19
57/20 60/8 60/9 105/8
105/24 105/25 109/19
reckless [1] 41/23
recognize [1] 87/3
record [7] 12/5 23/4
28/1 42/15 46/23
79/12 96/20
records [1] 43/19
redirect [2] 94/8 94/9
refer [5] 52/7 54/22
55/10 55/17 55/25
reference [1] 11/10
13/14 13/16 76/20
referenced [2] 28/7
42/9
referred [5] 5/9 6/11
11/23 86/18 86/18
referring [3] 53/18
81/10 83/14
reflects [2] 79/13
83/16
refrain [1] 110/8

**R**

refused [1] 11/6
regard [4] 14/8 44/17
57/2 57/7
regarding [2] 52/7
53/7
Regardless [1] 17/4
regards [2] 51/24 56/8
registered [3] 16/24
24/8 25/23
registers [1] 24/14
registrar [1] 43/21
registration [3] 24/9
24/16 31/25
registrations [1]
14/15
regulations [1] 111/8
reject [1] 15/14
related [2] 41/9 42/6
relates [3] 49/13
72/12 73/20 95/16
97/5
relationship [2] 73/10
98/10
relatively [1] 105/3
relay [1] 9/11
relevant [1] 5/16
reliable [1] 43/19
relief [1] 20/23
remain [2] 47/17
105/3
remarkable [1] 39/18
remember [2] 27/6
105/21
remind [2] 10/16 74/4
remorse [1] 103/16
remove [2] 8/11 102/6
rendering [1] 104/6
Renewables [2] 84/20
92/14
renewed [1] 24/8
repay [1] 40/5
repeat [1] 38/12
repetitious [1] 7/15
reply [1] 38/15
reported [2] 81/7
111/5
REPORTER [1] 1/23
REPORTER'S [1] 1/14
reprehensible [4]
72/24 72/25 97/22
97/23
represent [1] 85/12
represents [1] 85/9
reproduced [1] 76/22
republished [2] 6/16
45/3
republishing [1] 45/4
request [1] 11/5
require [2] 14/24 21/6
required [2] 72/20
97/18
requires [1] 91/21
reschedule [1] 58/7
resent [1] 87/11
reserved [1] 11/15
reserving [1] 18/12
resided [1] 7/25

resolve [1] 108/13
resorted [1] 5/8
resources [6] 73/16
74/18 77/2 78/6 98/17
104/5
respect [14] 22/15
28/14 30/2 31/10
40/21 47/14 54/9
99/25 100/1 100/16
101/7 101/18 102/5
108/23
respected [1] 6/19
respectfully [1] 19/25
110/4
respond [3] 52/3 54/1
54/3
response [6] 15/21
38/14 55/10 57/12
57/15 57/18
responsibility [3]
16/14 28/13 33/12
responsible [8] 16/18
33/21 37/3 43/13
43/17 43/25 45/1
85/14
rest [1] 13/12
Restaurant [1] 78/24
restaurants [3] 78/18
82/4 82/5
restrained [1] 99/22
restraining [9] 8/5
8/12 10/5 13/23 19/6
42/4 42/5 42/6 42/8
result [1] 13/5
resume [3] 74/5 99/14
103/8
retail [1] 83/10
retracted [1] 6/24
return [4] 43/4 47/4
47/16 58/1
revenue [1] 81/5
revenues [1] 81/24
rhetorically [1] 37/20
right [97] 4/18 11/15
18/24 20/12 29/22
34/22 35/15 35/24
36/3 36/5 38/13 40/11
41/8 42/14 42/15
42/15 43/3 43/8 46/18
47/13 49/25 50/19
50/20 50/22 51/7
51/10 51/12 51/22
53/1 53/3 53/11 53/16
54/8 55/13 57/5 57/8
57/14 57/18 57/21
59/20 59/22 59/25
60/10 70/5 72/5 72/6
72/9 76/3 77/14 78/1
78/13 79/16 80/1 81/9
81/18 82/1 82/19 83/2
83/16 84/3 84/7 84/9
84/13 84/16 84/18
84/22 85/23 86/12
87/4 87/18 88/1 88/6
88/14 88/17 88/24
90/7 90/11 90/12
90/22 91/8 95/3 96/14
96/25 101/16 102/21

102/23 104/9 104/10
104/22 106/3 107/17
108/3 108/16 109/13
109/23 109/25 110/9
right-hand [1] 87/4
rights [6] 10/13 18/25
27/4 42/14 80/25 81/2
rise [7] 47/8 51/20
57/19 60/8 104/17
105/24 109/9
risk [2] 59/14 59/15
Road [2] 87/1 87/7
Rocks [4] 78/19 80/18
80/19 80/21
rodric [46] 1/5 4/11
5/5 7/12 8/3 11/9 42/6
60/24 61/11 61/12
61/13 61/14 61/15
61/16 61/17 61/20
61/22 61/23 61/25
63/12 63/22 64/8
64/19 65/4 65/14
65/25 66/21 67/7
67/18 68/4 68/15
68/18 68/21 68/25
69/4 69/8 71/17 73/23
74/1 97/13 98/3 98/4
98/11 106/11 106/16
106/19
Rodric David [15]
42/6 60/24 68/18
68/21 68/25 69/4 69/8
71/17 73/23 97/13
98/3 98/4 106/11
106/16 106/19
Rodric David's [1]
98/11
Rodric-david-channel
-west-coast [2] 61/16
65/14
Rodric-david-la-clippe
rs-lexus [2] 61/13
64/8
Rodric-david-Meeting
-Distribution-101-RD
 [2] 61/17 65/25
Rodric-david-Official-
Portrait-Headshot-Th
under [2] 61/20 66/21
Rodric-david-orange-
mclaren [2] 61/11
63/12
Rodric-david-Tesla-p9
0d [2] 61/15 65/4
Rodric-david-thunder-
studios-office [2]
61/12 63/22
Rodric-david-toyota-h
ydro-car [2] 61/25
68/4
Rodric-david-yellow-
mclaren [2] 61/14
64/19
role [1] 6/5
room [8] 1/24 49/1
73/18 75/18 97/11
104/11 104/16 109/5
roughly [1] 100/24

rule [3] 100/8 108/19
108/20
run [2] 59/14 88/3
run-in [1] 88/3

**S**

s' [2] 49/12 50/6
Safe [1] 60/1
safety [19] 12/16
12/16 13/8 18/21
18/22 35/3 35/25 36/1
38/19 39/4 41/11
41/13 41/21 41/22
41/24 73/3 98/2 99/15
101/18
sake [1] 59/17
sale [1] 103/23
sales [2] 82/21 82/24
Sambrook [1] 76/22
same [8] 8/1 34/20
35/17 38/9 39/19
41/24 56/7 87/12
SAN [1] 2/4
satisfy [1] 78/6
103/25 104/4
Saturday [1] 58/1
savvy [1] 31/16
saying [5] 36/15 38/15
45/11 56/21 108/23
scary [1] 32/14
school [9] 9/25 10/19
12/19 36/17 76/15
99/17 101/14 101/15
101/17
scion [1] 102/12
screenshot [1] 76/21
screenshots [1] 37/1
search [2] 24/22
25/11
seated [3] 47/12
104/21 109/12
second [7] 14/11
26/11 30/1 35/9 77/10
77/11 97/5
secondarily [1] 17/7
secondary [2] 28/17
29/12
Secondly [1] 47/20
Section [1] 111/3
security [4] 12/22
12/22 35/21 37/4
see [19] 9/6 13/13
13/16 21/19 23/13
32/4 34/16 37/17
38/16 41/21 42/7 52/3
56/6 57/6 87/1 89/21
89/22 90/2 102/3
seeking [2] 91/22
94/12
seem [1] 101/22
seems [2] 14/6 51/25
seen [13] 7/16 28/22
32/22 35/13 41/23
56/1 79/7 81/21 86/7
87/9 88/11 88/14
100/4
selection [3] 27/21
43/17 43/25

sell [1] 83/10
send [4] 20/5 24/21
25/13 99/11
sending [2] 15/18
39/14
sends [2] 38/15 38/15
sends a [1] 38/15
sense [1] 19/21
sent [5] 7/11 11/24
35/22 38/17 103/12
sentence [4] 75/25
77/11 77/11 77/20
sentenced [2] 8/15
14/4
separate [5] 21/21
21/22 22/8 32/10 38/4
separately [5] 22/15
33/16 40/22 72/23
97/20
series [4] 6/14 23/17
32/25 81/3
serious [2] 19/11
32/15
serve [2] 74/21 74/25
served [1] 13/7
serves [1] 41/2
service [2] 108/6
109/4
Session [1] 1/18
set [6] 14/14 23/4
42/15 54/4 57/24
104/3
SETH [3] 2/3 2/3 4/10
Seth Wiener [1] 4/10
several [2] 6/18 108/8
severe [3] 20/5 100/2
100/9
shadow [1] 19/14
shape [1] 28/19
shattered [1] 18/17
short [2] 34/25 41/19
show [8] 14/25 81/9
83/6 84/25 85/7 88/25
89/3 96/5
shown [1] 45/7
shows [2] 16/23 22/11
side [9] 23/2 23/16
24/5 51/13 70/1 72/1
76/6 95/24 107/2
sidebar [4] 71/8 71/10
95/11 95/12
sides [3] 52/3 59/15
110/11
signage [1] 8/11
signature [1] 87/3
signed [3] 69/20
86/10 106/21
significant [6] 85/15
92/2 92/10 100/22
101/23 103/6
signs [5] 8/3 10/8
17/14 34/15 34/24
35/11 35/11 76/21
99/23
similar [5] 53/10
72/17 79/23 97/15
101/2
similarly [1] 11/1 50/8

**S**

**simply [6]** 12/9 15/1
46/6 53/20 55/25
108/18
**simultaneously [1]**
7/19
**since [4]** 42/11 42/12
53/4 85/5
**single [3]** 22/7 37/4
56/4
**singular [1]** 50/9
**sinister [1]** 11/19
**sir [3]** 46/22 60/1 95/3
**sisters [1]** 77/16
**sit [1]** 27/3
**site [9]** 23/8 23/8 24/8
24/18 25/18 28/14
28/15 29/5 44/1
**situated [1]** 17/3
**six [4]** 29/17 75/6
91/22 91/24
**sixes [1]** 11/18
**size [1]** 11/16
**skills [1]** 22/19
**skipping [1]** 41/19
**slap [2]** 99/13 100/21
**small [2]** 7/13 102/19
**snippet [1]** 7/14
**social [1]** 7/21
**society [3]** 20/6 39/9
46/4
**sold [3]** 83/4 83/17
84/13
**sole [1]** 86/19
**solely [1]** 9/8 11/20
12/23
**solemnly [1]** 46/25
**somebody [2]** 20/3
45/23
**someone [10]** 6/16
23/12 29/10 37/23
40/4 40/4 40/8 40/8
43/16 88/3
**something [11]** 37/16
39/12 48/7 48/12
48/24 79/2 83/4 84/6
96/20 99/18 100/9
**sometimes [4]** 48/5
48/6 109/1 109/2
**somewhat [1]** 55/13
**somewhere [1]** 45/20
**soon [1]** 7/7
**sooner [1]** 105/15
**sorry [9]** 49/18 49/19
54/23 55/2 70/14
98/18 102/23 103/1
103/1
**sort [1]** 59/15
**source [1]** 77/2
**sources [2]** 93/10
93/11
**space [1]** 83/10
**speak [2]** 35/6 42/15
**Special [1]** 61/1
**specific [4]** 59/3 59/4
78/22 96/16
**specifically [2]** 16/15
90/16

**speculating [1]** 55/13
**speculation [3]** 21/13
55/5 102/17
**speech [5]** 18/24
45/25 46/3 46/5 46/6
**spent [1]** 75/6
**spoke [1]** 35/14
**Stable [2]** 85/21 86/20
**stake [1]** 84/19
**stalked [1]** 7/6 8/25
18/13
**stalking [34]** 5/4 5/7
7/7 7/23 12/15 19/6
20/3 21/24 32/12
32/14 32/16 32/19
32/20 32/22 33/4 39/3
39/24 44/17 46/16
51/24 53/4 54/19 56/9
57/2 57/7 68/16 68/19
68/22 69/1 69/5 69/9
100/18 100/23 103/4
**stamped [1]** 75/22
**stand [5]** 26/15 36/13
37/20 39/13 74/5
**standard [4]** 21/5
72/19 97/16 103/19
**standing [3]** 35/25
36/3 82/4
**star [1]** 23/25
**start [3]** 56/21 70/15
77/11
**started [1]** 93/18
**starting [2]** 48/3 48/4
**state [5]** 4/8 46/23
55/3 85/14 96/20
**stated [2]** 16/13 80/7
**statement [8]** 15/11
54/6 88/14 88/19
89/11 89/19 91/21
91/24
**statements [4]** 6/12
46/11 58/24 88/11
**states [8]** 1/1 60/22
79/23 85/8 85/16
106/9 111/4 111/8
**stating [1]** 11/9
**status [2]** 92/1 92/9
**statute [12]** 14/21
14/24 15/2 26/5 26/6
26/25 27/4 32/8 32/20
42/9 50/4 50/9
**statutes [1]** 50/5
**statutory [5]** 17/22
20/9 32/3 53/7 53/8
**steals [1]** 40/6
**stems [1]** 55/16
**stenographically [1]**
111/5
**step [4]** 4/8 46/22
73/24 95/3
**steps [3]** 15/23 22/12
71/12
**STEVEN [2]** 2/7 4/12
**Steven Gebelein [1]**
4/12
**stolen [1]** 10/23
**stood [2]** 34/15 35/15
**stooping [1]** 110/9

**stop [3]** 35/3 11/6
11/7 38/15 38/17 42/3
46/2
**stopped [2]** 101/3
103/4
**story [4]** 23/2 23/6
23/16 24/5
**straight [2]** 23/4 42/16
**street [9]** 1/24 5/9
16/5 17/14 34/15
35/10 36/2 40/15
80/18
**streets [1]** 7/24
**strength [2]** 93/25
94/1
**studio [1]** 35/17
**studios [31]** 1/5 4/7
5/6 7/13 9/24 14/9
14/13 14/20 15/16
15/17 16/11 17/18
18/4 21/23 22/2 25/22
26/17 33/3 33/9 36/11
36/19 37/15 38/22
44/5 61/12 61/21
61/22 62/25 63/22
66/22 67/7
**Studios' [1]** 50/6
**Studios's [1]** 16/7
**Studios, [8]** 4/11
60/23 61/5 61/7 62/8
62/15 62/22 106/10
**Studios-CEO [2]**
61/21 66/22
**study [1]** 94/22
**subjected [1]** 11/2
**submit [5]** 17/1 91/24
102/9 102/18 108/18
**submitted [4]** 49/9
50/23 51/1 61/3
**subpoena [2]** 6/6 6/7
59/12 59/20
**subpoenaed [1]** 58/14
**substantial [9]** 41/14
41/16 73/16 74/18
74/21 74/24 98/17
98/25 99/5
**success [1]** 44/21
**successful [1]** 5/24
**such [6]** 11/2 14/1
17/20 18/25 77/19
92/6
**suffered [3]** 13/4
41/14 74/9
**suggest [12]** 28/4
33/10 33/20 54/17
56/12 78/5 84/22 92/2
92/10 92/22 93/13
105/2
**suggested [1]** 6/2
**suggests [4]** 8/23
48/18 56/11 56/19
**SUITE [2]** 2/8 2/13
**sum [2]** 17/22 100/19
**summarize [1]** 5/16
**summoned [1]** 11/4
34/19
**Superior [1]** 86/4
**supervise [1]** 29/23

**support [2]** 24/2 27/15
**supported [2]** 75/5
93/1
**supporter [1]** 37/25
**supposed [2]** 37/18
44/19
**sure [11]** 13/3 39/22
47/18 48/1 54/12
54/16 59/17 79/14
90/17 94/10 97/9
**surveillance [1]** 40/24
**suspend [1]** 9/19
**Sven [1]** 86/3
**swear [1]** 46/25
**sworn [2]** 46/20 74/2
**Sydney [14]** 6/15 6/19
7/24 23/18 23/19 45/3
76/18 76/20 76/25
77/17 78/18 78/19
78/20 87/24
**Sydney's [1]** 83/10
**symbol [2]** 25/5 25/5
**system [1]** 108/11
**SYVERSON [1]** 2/7

**T**

**tabs [1]** 23/10
**tabulation [1]** 89/6
**tactics [4]** 7/3 7/4
39/16 39/16
**tags [2]** 23/11 105/17
**take [24]** 11/7 11/12
15/23 19/4 21/16
25/23 28/16 28/24
29/6 31/25 32/16
35/24 35/24 39/25
41/8 42/25 43/1 44/11
54/15 57/15 94/3
95/14 96/4 96/14
**takedown [4]** 15/22
18/6 25/19 31/22
**taken [10]** 14/18
14/23 44/4 44/7 51/21
57/20 60/9 76/21
100/24 105/25
**takes [4]** 16/13 28/13
33/11 103/17
**taking [6]** 5/9 40/3
40/7 40/10 40/11
108/12
**talk [1]** 109/3
**talked [2]** 53/5 53/8
**talking [3]** 52/17
52/19 94/15
**Tarek [2]** 86/3 86/16
**taught [1]** 108/19
**tax [1]** 92/8
**taxation [1]** 79/25
**TAYLOR [20]** 2/11
2/12 3/7 4/14 20/13
43/8 51/5 51/17 52/15
53/3 54/16 57/3 57/22
70/3 95/7 96/8 100/12
105/4 107/5 109/23
**Taylor's [1]** 43/11
**team [3]** 9/22 11/9
11/11
**teams [1]** 76/17

**tech [1]** 31/16
**technical [8]** 8/9
13/24 14/1 22/18
22/19 23/8 24/15
31/16
**technically [2]** 53/14
58/5
**technician [1]** 49/1
**telephone [1]** 47/18
**television [1]** 101/23
**telling [3]** 10/24 43/11
56/17
**Temming [1]** 86/3
**ten [6]** 5/15 74/10
76/19 84/10 95/22
95/23
**ten percent [1]** 84/10
**tenant [1]** 83/2
**tense [2]** 48/7 48/15
**term [7]** 32/16 35/8
35/8 39/19 39/19
91/19 93/22
**terms [1]** 25/17
**terrible [1]** 37/2
**terrorism [7]** 19/2
37/1 37/17 39/19
39/20 39/21 39/23
**terrorist [5]** 7/2 36/16
37/25 39/16 39/16
**Tesla [2]** 61/15 65/4
**testified [17]** 12/3
14/19 16/25 23/5
23/11 24/12 26/15
31/19 34/17 35/1 38/9
38/19 39/5 74/3 91/11
92/18 93/20
**testify [4]** 6/6 48/18
58/20 85/23
**testimony [22]** 5/1
6/23 9/2 12/4 13/4
13/9 16/15 20/20 22/4
26/20 27/13 27/24
32/13 35/12 36/6
45/18 59/1 82/13
84/18 92/13 93/16
95/22
**text [1]** 23/20
**than he [1]** 59/21
**thank [43]** 4/23 4/24
20/11 20/12 20/14
20/15 20/17 43/6 43/7
43/8 46/17 46/18
48/22 51/19 57/18
60/4 60/4 60/6 60/15
72/6 83/21 89/13 94/6
95/4 97/1 98/21
100/11 100/13 102/20
102/21 104/8 104/9
105/8 105/19 108/4
108/7 109/4 109/6
109/8 109/14 109/25
110/13 110/14
**the -- that [1]** 48/25
**the 2015 [1]** 14/20
**them [67]** 5/16 6/25
12/12 13/25 14/3
14/25 15/11 15/11
17/9 17/12 20/5 22/10

**T**

**them... [55]** 22/11
24/25 25/1 25/15 29/1
29/2 31/21 31/21 34/7
34/20 34/21 35/14
35/15 35/16 35/25
37/25 38/1 38/24
38/25 40/9 42/20 47/2
47/3 47/4 47/23 47/25
48/1 48/1 52/7 53/18
54/15 54/22 55/21
55/25 56/1 71/12
71/24 74/22 74/25
78/12 84/24 94/21
94/22 99/2 99/3 99/11
100/2 100/8 100/9
100/20 104/23 105/1
105/18 108/25 109/3
**theme [1]** 38/12
**theory [1]** 31/6
**there's [18]** 11/25
15/13 34/22 41/9
41/10 43/17 44/14
49/7 49/12 53/6 53/15
53/23 78/24 78/25
100/22 100/24 103/6
109/18
**therefore [2]** 15/2
19/23
**thief [1]** 10/22
**thing [9]** 14/1 24/25
34/21 35/17 38/9
41/24 43/4 48/12
110/4
**things [5]** 22/10 36/9
37/2 73/9 100/15
**think [46]** 19/24 19/24
21/8 21/14 21/15
21/19 22/9 25/8 32/7
34/8 35/21 36/3 39/18
39/20 41/12 41/17
50/17 52/13 52/19
52/22 53/21 54/6
55/15 55/15 55/16
55/17 55/23 55/24
55/24 56/13 57/8 57/9
58/8 76/20 78/11
80/25 87/25 91/7
93/22 95/21 100/5
101/5 102/14 102/17
106/4 108/11
**thinking [2]** 53/6
54/18
**thinks [1]** 53/21
**third [2]** 29/25 77/8
**though [5]** 10/13
19/23 28/11 44/20
94/23
**thought [6]** 14/5 18/15
53/2 93/20 93/20
105/4
**thoughts [1]** 54/9
**thousand [2]** 40/4
75/12
**threat [7]** 13/8 19/2
41/19 41/20 41/21
41/21 103/6
**threatening [1]** 11/24

**threats [8]** 7/18 10/14
10/15 10/16 19/1 20/5
34/12 46/5
**three [20]** 18/9 22/8
22/8 22/10 22/13
22/13 22/15 27/10
27/13 27/24 32/21
36/21 40/22 44/10
59/21 77/1 77/16
90/16 90/18 95/24
**throughout [2]** 8/2
108/8
**throw [1]** 52/2
**throwing [1]** 56/13
**thuggish [1]** 35/7
**thugs [1]** 9/22
**thumbs [1]** 35/18
**thunder [44]** 1/5 4/6
4/11 5/6 7/13 9/24
9/25 14/9 14/13 14/20
15/16 15/17 16/7
16/11 17/18 18/4
21/23 22/2 25/22
26/17 33/3 33/9 36/10
36/19 37/15 38/22
44/5 50/6 60/23 61/5
61/7 61/12 61/20
61/22 61/23 62/8
62/15 62/22 62/25
63/22 66/21 67/7
67/18 106/10
**Thunder Studios [21]**
5/6 7/13 9/24 14/9
14/13 14/20 15/16
15/17 16/11 17/18
18/4 21/23 22/2 25/22
26/17 33/3 33/9 36/19
37/15 38/22 44/5
**Thunder Studios' [1]**
50/6
**Thunder Studios's [1]**
16/7
**Thunder Studios, Inc
[7]** 4/11 60/23 61/7
62/8 62/15 62/22
106/10
**Thunder Studios,
Inc.'s [1]** 61/5
**Thunder-digital-media
-rodric-david-carey-m
artel [1]** 67/18
**Thunder-digital-media
-rodric-david-carey-m
artell [1]** 61/23
**Thursday [1]** 57/25
**tied [1]** 92/19
**tilts [1]** 21/9
**Title [1]** 111/4
**to 2000 [1]** 91/15
**today [4]** 5/3 14/7
71/24 103/20
**together [2]** 22/7 47/1
**told [6]** 9/11 11/14
13/12 34/20 34/21
93/13
**tolerated [1]** 99/12
**tolerates [1]** 46/5
**tomorrow [1]** 105/1

**TONY [105]** 1/4 4/15
7/11 8/22 9/1 9/9 9/11
10/9 11/21 12/11 17/2
17/2 17/5 27/12 27/16
27/17 28/2 28/4 28/20
29/3 30/2 30/23 31/9
33/1 33/23 34/6 38/10
39/14 42/7 45/7 45/12
45/22 45/24 60/24
62/10 62/12 62/15
63/5 63/6 63/7 63/15
63/16 63/17 64/1 64/2
64/3 64/12 64/13
64/14 64/22 64/23
64/24 65/7 65/8 65/9
65/18 65/19 65/20
66/4 66/5 66/6 66/14
66/15 66/16 66/25
67/1 67/2 67/11 67/12
67/24 68/8 68/9 68/10
68/19 69/4 69/14
74/17 80/9 82/11
84/23 85/1 85/5 85/9
85/12 85/17 85/23
86/3 86/10 86/17 87/5
88/3 88/6 88/12 96/16
98/22 99/23 100/18
102/3 102/15 103/11
106/11 106/16
**Tony Kazal [31]** 4/15
7/11 8/22 9/1 9/9 10/9
17/2 33/1 60/24 62/10
62/12 62/15 68/19
69/4 69/14 74/17 80/9
84/23 85/17 85/23
86/17 87/5 88/6 88/12
96/16 98/22 100/18
102/3 103/11 106/11
106/16
**Tony Kazal's [1]** 17/5
85/1 85/12 88/3
102/15
**Tony's [1]** 28/21
**too [1]** 27/8
**took [12]** 6/2 9/21
10/3 13/5 15/20 22/11
36/5 39/6 73/6 98/5
101/3 108/8
**top [8]** 78/24 85/18
85/24 86/4 86/20
86/24 87/19 89/25
**tort [4]** 51/24 56/9
57/2 57/7
**total [15]** 62/24 63/11
63/21 64/7 64/18 65/3
65/13 65/24 66/10
66/20 67/6 67/17 68/3
68/14 89/6
**totally [1]** 37/14
**touched [1]** 20/25
**tourist [1]** 78/19
**towards [1]** 98/24
**toyota [2]** 61/25 68/4
**Trading [2]** 85/4 85/9
**training [1]** 87/17
**transaction [3]** 88/7
88/9 93/2

**transcript [3]** 1/14
111/5 111/7
**transcripts [1]** 27/25
**transferred [2]** 15/25
44/13
**transferring [1]** 16/6
**transfers [1]** 89/7
**travels [1]** 60/1
**treats [1]** 19/25
**trial [20]** 1/18 3/11
8/21 20/17 20/22
30/22 32/17 39/11
49/10 57/24 58/6
59/12 79/17 81/19
95/1 97/6 106/4 108/8
109/17 110/6
**trickery [4]** 73/8 98/8
99/20 102/2
**tried [3]** 9/6 18/14
88/3
**Troy [3]** 85/21 86/18
86/20
**true [8]** 26/16 28/7
40/1 53/22 54/6 55/23
86/9 111/4
**trust [25]** 59/2 75/6
77/24 77/25 78/3
78/10 78/11 78/14
78/15 78/23 79/5 80/3
80/6 80/10 80/13 82/2
90/20 90/21 90/22
90/25 91/3 91/4
103/22 104/2 110/7
**trustee [3]** 80/2 90/25
92/4
**trustees [1]** 90/22
**trusts [2]** 59/3 59/4
**Truth [2]** 45/1 45/2
**truthfully [1]** 6/6
**try [7]** 12/11 19/23
34/12 34/13 44/18
45/11 71/23
**trying [5]** 42/12 52/10
53/25 76/4 88/4
**TUESDAY [3]** 1/15 4/1
57/24
**turn [9]** 12/2 30/4
75/14 75/20 75/22
76/9 77/5 83/12 87/21
**tweets [7]** 32/24 38/6
38/7 38/8 39/15 42/21
101/4
**Twitter [3]** 7/21 11/9
38/5
**two [10]** 14/9 14/14
21/21 21/22 22/14
27/25 72/12 96/6
100/24 101/3
**Tyga [2]** 61/22 67/7
**Tyga-and-Rodric-Davi
d-at-Thunder-Studios-
Web [2]** 61/22 67/7
**type [2]** 42/8
**typed [1]** 50/10
**typo [1]** 50/16
**typos [2]** 47/21 47/25

**U**

**UAE [2]** 90/6 90/13
**unable [4]** 9/3 12/8
45/8 103/21
**unacceptable [1]**
92/19
**unanimous [3]** 60/11
60/16 106/5
**unanimously [1]** 61/3
**unbelievable [1]**
37/14
**under [13]** 26/10
26/15 31/6 31/6 32/3
32/20 36/13 40/24
46/5 59/12 74/4
102/17 108/15
**underballing [1]**
84/15
**underneath [1]** 10/21
80/1
**understand [12]** 54/1
57/21 60/16 72/14
74/17 78/9 78/12
78/13 87/17 93/6
105/23 106/5
**understandable [1]**
13/4
**understandably [1]**
10/2
**understanding [10]**
77/22 80/24 81/4 81/5
83/8 90/14 91/2 91/19
93/7 93/9
**understood [2]** 13/17
91/11
**undertaken [1]** 41/4
**undischarged [6]**
75/7 75/9 91/12 92/1
92/9 102/11
**undisputed [1]** 8/7
**unfortunate [1]** 110/1
**unique [1]** 79/24
**UNITED [7]** 1/1 5/22
60/22 79/23 106/9
111/4 111/8
**unlawful [2]** 32/20
39/24
**unless [6]** 11/16 47/3
47/16 88/22 103/6
109/17
**unlike [1]** 43/19
**unnecessary [1]**
102/10
**unrepentant [1]** 14/6
**until [6]** 26/18 26/22
39/1 51/11 91/15
104/24
**untrue [1]** 23/17
**unwilling [1]** 50/12
**up [18]** 11/22 17/22
35/18 36/5 47/25
47/25 50/17 54/15
58/2 75/11 81/3 84/16
104/3 104/25 105/5
108/17 109/1 109/2
**updated [1]** 52/11
**upload [1]** 44/2
**uploaded [1]** 44/1

**U**

**upon [4]** 13/19 22/1 47/4 55/5
**us [6]** 25/5 31/5 38/13 39/11 61/4 96/17
**use [12]** 15/5 15/8 15/10 15/11 15/14 15/24 16/12 17/9 25/12 31/20 31/20 35/7
**used [3]** 16/15 39/18 93/22
**using [2]** 11/15 43/24

**V**

**valid [1]** 14/10
**valuation [2]** 87/11 87/14
**valuations [1]** 87/9
**value [3]** 82/1 82/7 84/6
**van [4]** 10/18 11/15 28/9 33/16
**vans [3]** 8/2 17/14 76/23
**various [2]** 41/2 78/20
**venture [1]** 5/19
**ventures [1]** 7/8
**verbiage [1]** 56/7
**verdict [30]** 18/11 21/10 21/19 27/7 31/11 43/4 47/4 60/11 60/17 60/20 61/1 69/22 69/23 70/7 70/8 70/15 71/13 72/10 96/5 100/15 100/17 104/7 104/12 106/6 106/7 106/14 106/23 106/24 107/9 107/10
**verify [2]** 81/10 83/7
**version [4]** 48/6 49/8 51/1 97/7
**versus [4]** 4/7 60/24 86/4 106/11
**vicarious [3]** 29/10 30/3 31/7
**vicariously [1]** 29/15
**victim [2]** 10/24 40/9
**victims [1]** 42/11
**video [8]** 33/17 34/14 35/8 35/12 35/23 35/24 36/5 76/21
**videos [2]** 20/20 39/15
**view [2]** 73/11 98/12
**viewers [1]** 10/24
**violated [3]** 8/7 8/12 42/4
**violation [3]** 8/9 13/23 18/5
**violations [2]** 13/24 14/1
**violence [3]** 13/1 13/16 13/19
**visible [1]** 76/19
**voice [1]** 42/16
**voir [1]** 108/10
**voir dire [1]** 108/10
**vulnerable [5]** 73/4

73/6 98/4 98/5 101/22

**W**

**waging [1]** 12/23
**wait [2]** 51/10 51/11
**waiting [2]** 4/20 109/1
**walk [1]** 88/20
**wanted [2]** 23/15 36/17
**wants [3]** 21/13 28/16 35/20
**war [1]** 12/23
**warrant [1]** 20/1
**warranted [1]** 20/4
**waste [1]** 74/15
**watermarks [1]** 25/4
**weak [6]** 73/4 73/5 94/1 98/3 98/5 101/21
**wealthy [2]** 93/17 102/12
**Web [4]** 24/4 24/9 61/22 67/7
**Website [62]** 7/20 15/16 15/20 15/20 16/1 16/1 16/2 16/6 16/8 16/14 16/18 16/22 16/23 17/5 17/5 17/6 17/9 17/13 17/15 22/3 22/17 22/20 23/1 23/13 24/5 24/9 24/14 24/23 24/25 25/1 25/15 25/17 26/1 26/14 26/16 26/18 27/18 27/19 28/22 28/8 28/12 28/21 28/22 29/2 29/21 36/25 36/25 37/2 37/5 37/23 38/1 42/21 43/14 43/17 43/23 44/13 45/2 45/3 46/10 84/8 85/8 101/4
**Websites [12]** 24/13 36/8 36/15 36/17 36/19 36/20 36/23 37/6 37/15 37/23 41/9 110/6
**week [3]** 4/25 5/3 57/25
**weeks [2]** 91/22 108/9
**well-being [1]** 99/16
**well-funded [1]** 99/10
**well-to-do [1]** 93/17
**went [4]** 26/16 29/1 38/18 58/3
**west [3]** 1/24 61/16 65/14
**WESTERN [1]** 1/2
**wherever [1]** 11/10
**wherewithal [1]** 93/2
**why [10]** 20/18 36/14 36/15 43/3 54/14 58/14 60/11 60/20 77/10 94/14
**WIENER [15]** 2/3 2/3 3/6 4/10 43/9 50/15 51/3 51/15 52/5 54/9 57/11 73/21 98/20 107/3 109/21

**wife [3]** 12/17 18/22 34/10 34/19 77/13 77/16
**willful [40]** 31/14 63/3 63/6 63/9 63/13 63/16 63/19 63/24 64/2 64/5 64/10 64/13 64/16 64/20 64/23 65/1 65/5 65/8 65/11 65/16 65/19 65/22 66/2 66/5 66/8 66/12 66/15 66/18 66/23 67/1 67/4 67/9 67/12 67/15 67/20 67/23 68/1 68/6 68/9 68/12
**Willful/Ignorant [39]** 63/3 63/6 63/9 63/13 63/16 63/19 63/24 64/2 64/5 64/10 64/13 64/16 64/20 64/23 65/1 65/5 65/8 65/11 65/16 65/19 65/22 66/2 66/5 66/8 66/12 66/15 66/18 66/23 67/1 67/4 67/9 67/12 67/15 67/20 67/23 68/1 68/6 68/9 68/12
**willfully [5]** 8/18 17/21 62/6 62/13 62/20
**Willfulness [1]** 17/24
**Williams [1]** 46/24
**WILSHIRE [1]** 2/8
**winnings [1]** 12/5
**wish [5]** 70/1 95/7 107/2 109/20 110/10
**wishes [3]** 51/13 59/17 72/1
**without [5]** 36/23 36/23 37/24 37/24 55/12
**witness [12]** 20/20 23/25 37/20 39/13 48/5 48/6 48/18 58/15 73/23 74/5 94/19 95/5
**witnesses [5]** 3/5 6/18 71/16 71/19 95/6
**Woodward [4]** 12/1 33/17 33/23 34/17
**Woodward's [1]** 33/18
**word [7]** 16/15 32/14 32/14 36/4 56/24 57/4 110/9
**words [5]** 12/24 16/18 23/6 23/13 23/15
**work [2]** 9/8 14/12
**worked [2]** 9/18 39/11
**working [1]** 37/5
**world [3]** 85/4 85/9 108/12
**worried [1]** 48/12
**worry [1]** 56/10
**worry that [1]** 56/10
**worth [5]** 58/17 58/19 58/19 99/8 108/22
**wraps [1]** 28/9
**wrist [2]** 99/13 100/21
**writing [1]** 17/15
**writings [1]** 10/21

**written [1]** 23/19
**wrong [4]** 27/2 38/13 38/13 48/12
**wrongdoer [2]** 72/16 97/14
**wrongdoing [1]** 41/7
**wrongful [5]** 5/12 6/1 12/12 73/13 98/14
**wrongfully [1]** 5/20

**Y**

**year [5]** 23/24 32/25 36/10 84/1 89/12
**years [11]** 5/15 9/16 24/24 26/19 27/4 74/10 75/6 89/23 91/25 100/24 101/3
**yellow [2]** 61/14 64/19
**yesterday [4]** 12/2 14/19 47/20 48/17
**young [2]** 39/8 108/19
**Your Honor [35]** 48/9 49/19 50/18 51/4 51/16 51/18 52/6 53/2 54/11 55/23 57/13 57/23 58/16 59/19 60/6 70/2 70/4 71/25 73/22 79/15 80/14 81/17 83/11 86/1 88/19 94/3 94/7 95/6 95/9 96/13 103/2 107/4 107/6 109/22 109/24

**Z**

**zero [33]** 29/24 53/14 54/4 54/5 54/12 56/20 63/7 63/10 63/17 63/20 64/3 64/6 64/14 64/17 64/24 65/2 65/9 65/12 65/20 65/23 66/6 66/9 66/16 66/19 67/2 67/5 67/13 67/16 67/24 68/2 68/10 68/13 69/2
**zoom [2]** 81/14 88/23